1  William M. Audet (Cal. State Bar No. 117456)
   ALEXANDER, HAWES & AUDET, LLP
2  221 Main Street, Suite 1460
   San Francisco, California 94105
3  Tel: 415.982.1776
   Fax: 415.576.1776
4  Email: waudet@alexanderlaw.com

5  Jason Baker (Cal. State Bar No. 212380)
   ALEXANDER, HAWES & AUDET, LLP
6  152 North Third Street, Suite 600
   San Jose, California 95112
7  Tel: 415.289.1776
   Fax: 415.287.1776
8  Email: jbaker@alexanderlaw.com

9
   *Counsel for Plaintiff and the Proposed Class*
10
   [Additional counsel for Plaintiff listed on signature page]
11

12                   **UNITED STATES DISTRICT COURT**

13                  **NORTHERN DISTRICT OF CALIFORNIA**

14                          **San Jose Division**

15

16  ROBERT L. GARBER, on behalf of himself       No. C-06-4327 MJJ
    and all others similarly situated,
17                                                **CLASS ACTION**
                    Plaintiff,
18                                                **[CORRECTED] COMPLAINT**
             v.
19                                                **JURY TRIAL DEMANDED**
    JUNIPER NETWORKS, INC., MARCEL
20  GANI, WILLIAM R. HEARST III, SCOTT
    KRIENS, STRATTON SCLAVOS,
21  PRADEEP SINDHU and WILLIAM R.
    STENSRUD,
22
23                  Defendants.

24

25      Robert L. Garber ("Plaintiff"), individually and on behalf of all other persons and entities

26  who purchased or otherwise acquired securities issued by Juniper Networks. Inc. ("Juniper" or

27  the "Company") between September 1, 2003 and May 22, 2006, by his undersigned attorneys,

28

_____

                    [CORRECTED] CLASS ACTION COMPLAINT

for his Class Action Complaint ("Complaint"), alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on his investigation (made by and through his attorneys), which investigation included, among other things, a review and analysis of: (i) public documents pertaining to the defendants; (ii) Juniper's filings with the Securities and Exchange Commission ("SEC"); (iii) press releases published by Juniper; (iv) analyst reports concerning the Company; and (v) newspaper and magazine articles (and other media coverage) regarding Juniper and its business. Many of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their custody and/or control. Plaintiff believes that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

1.     This is securities class action brought on behalf of all purchasers of Juniper's publicly traded securities between September 1, 2003 and May 22, 2006, inclusive (the "Class Period"), which securities were artificially inflated as a result of violations of the federal securities laws arising out of defendants' (i) dissemination of false and misleading statements concerning the Company's financial results; and (ii) intentional and/or reckless disregard of basic accounting principles.

2.     On May 22, 2006, Juniper announced that it had received a request for information from the U.S. Attorney for the Eastern District of New York related to its stock option grant practices. At that time, Juniper stated that it was working actively to respond to the request, and further noted that its own Audit Committee was reviewing the Company's option grants, assisted by independent counsel and advisers. This announcement came on the heels of numerous press reports that had been published since March 2006 to the effect that management

at many companies likely had "backdated" the grant date of stock options to senior management personnel in order to increase the potential value of those options to the recipients (backdating refers to the practice by which firms choose an option grant date in the past with a lower stock price). Indeed, two separate reports released in May 2006 identified Juniper as one company whose pattern of stock option grants to senior executives was suspicious.

3.     On the revelations of May 2006 regarding the Company's stock option grant practices, the price of Juniper stock plummeted -- from $18.45 per share at the close of trading on April 28, 2006 to $14.62 per share during the morning hours of May 22, 2006. This represented a loss in market capitalization of over $2.16 billion.

4.     Backdating stock options, in effect, provides extra compensation to the grant recipients while concealing the transfer of wealth from the shareholders. Arthur Levitt, former Chairman of the SEC, recently described backdating in the most blunt terms: "Backdating 'represents the ultimate in greed,' . . . 'It is stealing, in effect. It is ripping off shareholders in an unconscionable way.'" Charles Forelle and James Bandler, *Five More Companies Show Questionable Options Pattern*, THE WALL STREET JOURNAL, May 22, 2006, at A1.

5.     The practice of option backdating also has important accounting ramifications. Under accounting rules in effect through December 31, 2005 (APB No. 25, "Accounting for Stock Issued to Employees" ("APB No. 25")), companies were allowed to expense options according to the intrinsic value method, whereby the expense equaled the difference between the fair value of the underlying stock and the exercise price of the option. This expense is obviously zero for option grants where the exercise price equals the prevailing market price.

6.     Such is not the case when an option grant is "in the money" (priced below a stock's fair market value at the time of the award). Options priced at below a stock's fair market value when they are awarded results in an executive receiving an instant paper gain. Under APB

3

[CORRECTED] CLASS ACTION COMPLAINT

No. 25, that "paper gain" is the equivalent of additional compensation to the executive that must be treated as a cost to the corporation.  Since it appears that Juniper did not treat as an expense the amount by which the market price of the Company's stock on the actual date the options were issued exceeded the exercise price of the options, the Company overstated its reported profits.

7.     Apart from the foregoing, it is readily apparent that the defendants deliberately concealed from the investing public that the Company had manipulated stock option grant dates. While the defendants maintained publicly that stock options to Juniper employees always were issued at the fair market value of the Company's stock on the date of the grant, in practice, the defendants repeatedly manipulated option grant dates to coincide with particularly low share prices (so as to benefit option recipients).

8.     Plaintiff has brought this class action on behalf of similarly situated Juniper shareholders to seek redress for the damages caused by the defendants' unscrupulous and manipulative conduct.

## II.     JURISDICTION AND VENUE

9.     This action arises under Sections 10(b), and 20(a) of the Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated there under, 17 C.F.R. §240.10b-5.

10.     This Court has subject-matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391.  Many of the acts and practices complained of herein occurred in substantial part in this District. Juniper maintains its headquarters in this District at 1194 North Matilda Avenue, Sunnyvale, California 94089.

[CORRECTED] CLASS ACTION COMPLAINT

1    12.    In connection with the acts, transactions and conduct alleged herein, defendants,

2    directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

3    not limited to, the United States mails, interstate telephone communications and the facilities of a

4    national securities exchange and market.

5

6    **III.    THE PARTIES**

7    13.    Plaintiff Robert L. Garber purchased the publicly traded securities of Juniper at

8    artificially inflated prices during the Class Period as set forth in the accompanying certification

9    (incorporated by reference herein).

10    14.    Defendant Juniper is a Delaware corporation with its principal executive offices

11    located at 1194 North Matilda Avenue, Sunnyvale, California 94089.  According to its public

12    filings, Juniper is a leading provider of purpose-built Internet infrastructure solutions that meet

13    the scalability, performance, density and compatibility requirements of rapidly evolving,

14    optically-enabled Internet Protocol (IP) networks.  Juniper's common stock trades on NASDAQ

15

16    under the ticker symbol "JNPR."

17    15.    Defendant Scott Kriens ("Kriens") has served as Chief Executive Officer and

18    Chairman of the Board of Directors of Juniper since October 1996.  Defendant Kriens

19    participated in the issuance of, signed, and/or certified as accurate, the Company's false and

20    misleading SEC filings during the Class Period.  Because of Defendant Kriens' position, he

21    knew the adverse non-public information about the business of Juniper as well as its finances and

22    present and future business prospects, via access to internal corporate documents, conversations

23    and connections with other corporate officers and employees, attendance at management (and/or

24    Board of Directors') meetings and via reports and other information provided to him in

25

26    connection therewith.

27

28

[CORRECTED] CLASS ACTION COMPLAINT

16.     Defendant Pradeep Sindhu ("Sindhu") co-founded Juniper in February 1996 and served as Chief Executive Officer and Chairman of the Board of Directors until September 1996. Since that time, Dr. Sindhu has served as the Vice Chairman of the Board of Directors and Juniper's Chief Technical Officer.  Defendant Sindhu participated in the issuance of and/or signed the Company's false and misleading SEC filings during the Class Period.  Because of Defendant Sindhu's position, he knew the adverse non-public information about the business of Juniper as well as its finances and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management (and/or Board of Directors') meetings and via reports and other information provided to him in connection therewith.

17.     Defendant Marcel Gani ("Gani") joined Juniper as Chief Financial Officer in February 1997 and became Executive Vice President and Chief Financial Officer of the Company in July 2002.  In late 2004, the Company announced that Mr. Gani would assume the position of Chief of Staff.  Defendant Gani still holds that position at the present time. Defendant Gani participated in the issuance of, signed, and/or certified as accurate, certain of the Company's false and misleading SEC filings during the Class Period.  Because of Defendant Gani's position, he knew the adverse non-public information about the business of Juniper as well as its finances and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.

18.     By certifying (where required by the Sarbanes-Oxley Act of 2002) various of the Company's SEC filings, Defendants Kriens, and Gani, represented that (i) those filings

1  accurately portrayed the Company's financial condition; and (ii) each had inspected the

2  Company's disclosure and internal financial reporting controls and found them to be effective.

3        19.    Defendant William R. Hearst III ("Hearst") has served as a director of Juniper

4  since 1996 and was a member of Juniper's Audit Committee (the "Audit Committee") at all

5  times during the Class Period. Defendant Hearst signed certain of the Company's false and

6

7  misleading SEC filings identified in this Complaint.

8        20.    Defendant Stratton Sclavos ("Sclavos") has served as a director of Juniper since

9  2000. He served as a member of the Company's Audit Committee during at least a portion of

10  2003. Defendant Sclavos signed certain of the Company's false and misleading SEC filings

11  identified in this Complaint.

12        21.    As noted above, certain of the above-referenced defendants served as members of

13

14  the Audit Committee of the Juniper Board between 2003 and 2006. The Company's Audit

15  Committee assists the Board in fulfilling its responsibilities for general oversight of the integrity

16  of Juniper's financial statements; the Company's compliance with legal and regulatory

17  requirements; the qualifications and independence of the independent auditors retained by the

18  Company; the performance of Juniper's internal audit function and independent auditors; and

19

20  risk assessment and risk management. More specifically, the Audit Committee's charter states

21  that the responsibilities of the Audit Committee "shall include," *inter alia*:

22              a.    Overseeing the internal audit function and reviewing, on a continuing

23  basis, the adequacy of the Company's system of internal controls, including meeting periodically

24  with the Company's management and the independent auditors to review the adequacy of such

25  controls and to review before release the disclosure regarding such system of internal controls

26  required under SEC rules to be contained in the Company's periodic filings and the attestations

27  or reports by the independent auditors relating to such disclosure;

28

[CORRECTED] CLASS ACTION COMPLAINT

1                  b.        Reviewing and discussing with management and the Company's

2      independent auditors the annual audited financial statements and quarterly unaudited financial

3      statements, including the Company's disclosures under "Management's Discussion and Analysis

4      of Financial Condition and Results of Operations," prior to filing the Company's Annual Report

5      on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

6

7                  c.        Conducting a post-audit review of the financial statements and audit

8      findings, including any significant suggestions for improvements provided to management by the

9      independent auditors; and

10                 d.        Reviewing, approving and monitoring the Company's Worldwide Code of

11     Business Conduct and Ethics.

12         22.       Accordingly, as members of the Audit Committee during all (or a portion) of the

13     period between 2003 to 2006, Defendant Hearst and Defendant Sclavos both had the

14     responsibility to, among other things, monitor the Company's financial reporting processes and

15     internal control systems and review the Company's financial statements prior to their public

16     dissemination.  Defendant Hearst and Defendant Sclavos knew that Juniper's financial

17     statements would be subsequently referred to and incorporated within the Company's public

18     filings.  Consequently, these individuals had an obligation to ensure that those financial

19     statements were not false and misleading.  Nevertheless, as detailed herein, as a result of

20     Defendants Hearst and Sclavos' intentional or reckless disregard of their duties, Juniper

21     published financial statements that were materially false and misleading.

22

23         23.       Defendant William R. Stensrud has served as a director of Juniper since 1996.  He

24     served on the Board's Compensation Committee throughout the Class Period.  Defendant

25     Stensrud signed certain of the Company's false and misleading SEC filings identified in this

26     Complaint.

27

28

[CORRECTED] CLASS ACTION COMPLAINT

24.    Collectively, defendants Kriens, Sindhu, Gani, Hearst, Sclavos and Stensrud are referred to herein as the "Individual Defendants." The Individual Defendants and Juniper are collectively referred to herein as the "Defendants."

## IV.    CONTROL PERSON ALLEGATIONS/GROUP PLEADING

25.    By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about its business, operations, operational trends, finances, and present and future business prospects. The Individual Defendants would ascertain such information through Juniper's internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, conversations and connections with vendors and customers, attendance at sales, management, and Board of Directors' meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as Juniper officers and directors.

26.    It is appropriate to treat the Individual Defendants collectively as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings and press releases as alleged herein was the result of the collective actions of the Individual Defendants identified above. The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

27.    The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information

1   alleged herein, were aware of or recklessly disregarded the fact that materially false and

2   misleading statements were being issued regarding the Company, and approved or ratified these

3   statements, in violation of the federal securities laws.

4          28.     As officers and controlling persons of a publicly-held company whose common

5   stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on

6

7   NASDAQ, and governed by the provisions of the federal securities laws, the Individual

8   Defendants each had a duty to promptly disseminate accurate and truthful information with

9   respect to the Company's financial condition and performance, growth, operations, financial

10  statements, business, markets, management, earnings and present and future business prospects,

11  and to correct any previously issued statements that had become materially misleading or untrue,

12  so that the market price of the Company's publicly traded securities would be based upon

13

14  truthful and accurate information.  The Individual Defendants' material misrepresentations and

15  omissions during the Class Period violated these specific requirements and obligations.

16         29.     The Individual Defendants, by virtue of their positions of control and authority as

17  officers and/or directors of the Company, were able to and did control the content of the various

18  SEC filings, press releases and other public statements pertaining to the Company during the

19  Class Period.  The Individual Defendants were provided with copies of the documents alleged

20

21  herein to be misleading prior to or shortly after their issuance and/or had the ability and/or

22  opportunity to prevent their issuance or cause them to be corrected.  Accordingly, they are

23  responsible for the accuracy of the public reports and releases detailed herein.

24  **V.     CLASS ACTION ALLEGATIONS**

25         30.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil

26  Procedure 23(a) and 23(b)(3) on behalf of a class (the "Class") of all persons who purchased or

27

28

[CORRECTED] CLASS ACTION COMPLAINT

otherwise acquired Juniper securities during the Class Period, and who were damaged thereby. The Class Period is from September 1, 2003 through May 22, 2006.

31.     Excluded from the Class are the Defendants herein, members of the immediate families of the Individual Defendants, any parent, subsidiary, affiliate, officer, or director of Defendant Juniper, any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

32.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of members of the Class is unknown to Plaintiff at the present time and can only be ascertained from books and records maintained by Juniper and/or its agent(s), Plaintiff believes that there are tens of thousands of members of the Class located throughout the United States.  As of May 22, 2006, Juniper had issued and outstanding over 565.75 million shares of common stock.  Throughout the Class Period, Juniper common stock was actively traded on NASDAQ, with more than 6.56 billion shares traded during the Class Period.

33.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained extremely competent counsel experienced in class and securities litigation and intends to prosecute this action vigorously.  Plaintiff is a member of the Class and does not have interests antagonistic to, or in conflict with, the other members of the Class.

34.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class purchased Juniper securities at artificially inflated prices and have sustained damages arising out of the same wrongful course of conduct.

[CORRECTED] CLASS ACTION COMPLAINT

35.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members.  Among the questions of law and fact common to the Class are:

a.      Whether the federal securities laws were violated by the Defendants' acts and omissions as alleged herein;

b.      Whether the Defendants participated in and pursued the common course of conduct and fraudulent scheme complained of herein;

c.      Whether the Defendants had knowledge of (or were reckless with respect to) the improper activities described herein;

d.      Whether the statements disseminated to the investing public, including investors in Juniper, during the Class Period omitted and/or misrepresented material facts about Juniper's true financial condition, business operations and future business prospects;

e.      Whether Defendants acted knowingly or recklessly in omitting to state and/or misrepresenting material facts;

f.      Whether the market price of Juniper's securities during the Class Period was artificially inflated due to the non-disclosures and/or misrepresentations complained of herein; and

g.      Whether Plaintiff and the other members of the Class have sustained damages and, if so, the appropriate measure thereof.

36.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since, among other things, joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by many individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members individually to seek redress for the wrongful conduct alleged.  Plaintiff does not

1  foresee any difficulty in the management of this litigation that would preclude its maintenance as

2  a class action.

3       37.     The names and addresses of the record owners of the shares of Juniper common

4

5  stock and other securities purchased during the Class Period are available from Juniper and/or its

6  transfer agent(s).  Notice can be provided to persons who purchased or otherwise acquired

7  Juniper common stock by a combination of published notice and first class mail, using

8  techniques and forms of notice similar to those customarily used in other class actions arising

9  under the federal securities laws.

10 **VI.    OVERVIEW OF JUNIPER'S FRAUDULENT SCHEME**

11      38.     Each of the Defendants is liable as a participant in a scheme, plan and course of

12 conduct that operated as a fraud and deceit on Class Period purchasers of the Company's

13 securities.  Throughout the Class Period, Defendants disseminated materially false and

14 misleading statements and concealed material adverse facts about Juniper's operations and

15 financial condition.  Among other fraudulent conduct, the Defendants reported inflated revenue

16 figures for Juniper by failing to account properly for stock options made to Juniper employees

17

18 (including senior management personnel).

19      39.     The Company has publicly boasted of its adoption of (and adherence to) a strict

20 ethical code.  Indeed, in its Form 10-K dated March 7, 2006, Juniper noted that it had "adopted a

21 Worldwide Code of Business Conduct and Ethics that applies to our principal executive officer

22 and all other employees."  That code apparently was designed to deter wrongdoing and to

23

24 promote: (i) honest and ethical conduct; (ii) full, fair, accurate, timely and understandable

25 disclosure in reports and documents that the Company files with or submits to the SEC and in

26 other public communications made by the Company; and (iii) compliance with applicable

27 governmental laws, rules and regulations.  The code specifically provides that:

28

[CORRECTED] CLASS ACTION COMPLAINT

As a public company, the Company, through its employees, directors, contractors and agents of Company entities worldwide, has a responsibility to provide full, fair, accurate, timely and understandable disclosure of its business and financial condition in the periodic reports we are required to file with the United States Securities and Exchange Commission. As a result, the integrity of our financial information is paramount. The Company's financial information guides the decisions of our Board of Directors and is relied upon by our stockholders and the financial markets.

However, notwithstanding its alleged adherence to strict ethical standards, throughout the Class Period, the Defendants deceived the investing public by, among other things, issuing false and misleading statements regarding the Company's stock option programs and through the intentional and/or reckless disregard of accounting principles applicable to stock option grants made to employees.

40.     By way of background, for at least the past decade, stock options, which allow option holders to acquire shares of a company's stock on a future date at a price determined by the plan terms (the "exercise price") -- most commonly the closing price for the stock on the day of or the day before the grant – have been a popular form of executive compensation, supposedly because they help align executive interests with those of the shareholders. As *The Wall Street Journal* recently explained:

Stock options give recipients a right to buy company stock at a set price, called the exercise price or strike price. The right usually doesn't vest for a year or more, but then it continues for several years. The exercise price is usually the stock's 4 p.m. price the day before . . .

                              *   *   *

A key purpose of stock options is to give recipients an incentive to improve their employer's performance, including its stock price. No stock gain, no profit on the options.

Charles Forelle and James Bandler, *The Perfect Payday – Some CEOs Reap Millions By Landing Stock Options When They Are Most Valuable; Luck – Or Something Else?*, THE WALL STREET JOURNAL, March 18, 2006 at A1.

41.     Unfortunately, in practice, the granting of stock options to senior management frequently did not have the desired effect.  For example, options sometimes caused managers to look for ways to drive up stock prices in the short term through acquisitions, asset sales, or even fraud, rather than by effectively managing existing businesses for long term success, as many shareholders would prefer.  Although compensation experts continue to debate whether or not these risks outweigh the incentives stock options are intended to provide, a second, potentially larger, problem is beginning to surface: stock option plans are becoming just another place to hide lavish and unprecedented executive compensation.

42.     More specifically, a series of recent reports in *The Wall Street Journal* (and in other publications) concluded that among several firms, a pattern of sharp stock appreciation after grant dates was indicative of backdating.  In the past several months, dozens of companies have been questioned by federal investigators (including the SEC and the U.S. Attorneys' Offices for the Southern and Eastern Districts of New York) about whether backdated option awards have (i) provided undisclosed benefits to senior executives and (ii) resulted in the filing of false financial statements.

43.     As noted above, backdating refers to the practice by which firms choose an option grant date in the past with a lower stock price.  The lower a stock option exercise price is, the more money the recipient can potentially make in the future by exercising the options.  Thus, which day's price the options carry can make a big difference.  By way of example, consider an executive who receives 100,000 options on a day when a company's stock is at $30 per share.  Exercising them after the stock has reached $50 per share would bring a profit of $20 times 100,000, or $2 million.  However, if the grant date was a month earlier and the stock then was at $20 per share, the options would bring in an extra $1 million.

[CORRECTED] CLASS ACTION COMPLAINT

44.     As set forth above, a key purpose of stock options is to give recipients an incentive to improve their employer's performance, including its stock price. Backdating the option grants so that they carry a lower price would run counter to this goal, by giving the recipient a paper gain right from the start. Moreover, that instant paper gain is the equivalent of extra pay and, under Generally Accepted Accounting Principles ("GAAP") in effect until December 31, 2005 (APB No. 25), constitutes a cost to the company. As such, a firm that failed to include such a cost in its books will have overstated its profits, and might need to restate past financial results.

45.     The SEC requires that publicly traded companies present their financial statements in accordance with GAAP. *See* 17 C.F.R. §210.4-01(a)(1). GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R §210.4-01(a)(1), provides that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

46.     The SEC has adopted the view that backdating violates securities laws and constitutes financial fraud when firms fail to record as compensation expense the amount by which the option grants were actually "in the money" at the time that the grant decision was made. For instance, in a complaint filed by the SEC against Peregrine Systems, Inc. in June of 2003, the SEC alleged that Peregrine's option plan administrator used a "look back" process between quarterly Board meetings to identify the day with the lowest stock price over the interval and then declared this date to be the grant date. The SEC views this as a form of financial fraud because it resulted in the understatement of compensation expenses. Specifically, quoting from the SEC complaint: "[u]nder the applicable accounting rules, any positive

[CORRECTED] CLASS ACTION COMPLAINT

difference in the stock price between the exercise price and that on the measurement date . . . had to be accounted for as compensation expense. By failing to record the compensation expense, Peregrine understated its expenses by approximately $90 million."

47.    In addition, backdating stock option grant dates also has significant federal income tax implications. By way of background, favorable tax treatment was one reason that options gained popularity in the 1990s as a way to compensate employees, particularly executives. 28 U.S.C. §162(m), Section 162(m) of the Internal Revenue Code ("Section 162(m)"), provides that compensation in excess of $1 million per year (including gains on stock options) paid to a corporation's five most highly-compensated officers is tax deductible only if certain conditions are met. One of those conditions is that the compensation must be payable solely on account of the attainment of one or more performance goals. Tax experts have opined that options backdated to a day with a lower market price do not qualify for a Section 162(m) deduction (since such grants are not deemed performance-based compensation). As such, companies with backdated options now face the prospect of paying out significant sums to revise prior years' tax returns.

48.    A May 2006 study of 100 companies by the Rockville, Maryland-based Center for Financial Research and Analysis ("CFRA") said that Juniper was among 17 companies in that group which showed a "high-risk profile" for possible back-dating of options. Marc Siegel, director of research at CFRA, said the firm's clients, which include investment managers, have been seeking to identify companies with risky options patterns. CFRA looked at 100 companies that issued a high proportion of options relative to their total executive compensation. It then identified those that, on three or more occasions, granted options at exercise prices that matched, or were close to, lows of the company stock price between 1997 and 2002, followed by a bounce of at least 10% in share price.

49.    At or about that same time, J.P. Morgan analyst, Ehud Gelblum, issued a report reviewing option grants to executives at seventeen companies (including Juniper) dating back to 1998.  With respect to Juniper, Mr. Gelblum concluded that there existed a suspicious pattern of grants at the stock's low price for a given month.

50.    On the heels of the CFRA report and the J.P. Morgan analysis, the Company announced on May 22, 2006 that it had received a request for information from the U.S. Attorney for the Eastern District of New York relating to its granting of stock options.  At that same time, the Company also indicated that its Audit Committee was reviewing practices in the area.  Federal investigators likely are focusing on the stock option grants identified below which, when considered as a whole, reveal a pattern consistent with backdating.

51.    The Company's definitive proxy statement dated April 13, 2000 indicated that the following stock options had been made to named executives during Juniper's fiscal year ended December 31, 1999:

a.    Defendant Kriens received 900,000 options at an exercise price of $60.71 on October 4, 1999;

b.    Defendant Sindhu received 540,000 options at an exercise price of $60.71 on October 4, 1999;

c.    Defendant Gani received 240,000 options at an exercise price of $60.71 on October 4, 1999;

d.    Steven Haley received 315,000 options at an exercise price of $60.71 on October 4, 1999; and

e.    Peter Wexler received 240,000 options at an exercise price of $60.71 on October 4, 1999.

[CORRECTED] CLASS ACTION COMPLAINT

52.     Remarkably, the lowest closing price of the Company's stock during the calendar month of October 1999 occurred on October 4, 1999 (the day of the grant in question). Even more remarkably, the value of the Company's stock jumped considerably during the days following the stock option grant of October 4, 1999. By the close of trading on October 25, 1999 (three weeks after the option grant in question), Juniper's stock stood at $81.33 (adjusted for a subsequent split), a 33.96% jump in one week. By the close of trading on October 25, 1999, Juniper's stock stood at $85.75 (adjusted for a subsequent split), a 41.24% increase over its October 4, 1999 close. The Company's stock ended trading in October 1999 at $91.88 (again adjusted for a subsequent split).

53.     A similar pattern is seen with respect to options granted to senior management personnel in late 2000, and again in early July 2002. According to the Company's definitive proxy statement dated March 28, 2001, the Company granted stock options to named executives as follows:

        a.      Defendant Kriens received 400,000 options at an exercise price of $93.9375 on December 21, 2000;

        b.      Defendant Sindhu received 540,000 options at an exercise price of $93.9375 on December 21, 2000;

        c.      Defendant Gani received 100,000 options at an exercise price of 93.0375 on December 21, 2000;

        d.      Steven Haley received 100,000 options at an exercise price of $93.9375 on October 4, 1999; and

        e.      Peter Wexler received 100,000 options at an exercise price of $93.9375 on October 4, 1999;

[CORRECTED] CLASS ACTION COMPLAINT

54.     The lowest closing price of the Company's stock during the calendar month of December 2000 occurred on December 21, 2000 (the day of the grant in question).  Indeed, on December 1, 2000, the Company's shares stood at $131.88.  By the close of trading on December 28, 2000 (one week after the option grant in question), Juniper stock stood at $138.63, an increase of 40.39%).

55.     According to the Company's definitive proxy statement dated March 28, 2003:

a.      Defendant Kriens received 550,000 options at an exercise price of $5.69 on July 1, 2002;

b.      Defendant Sindhu received 300,000 options at an exercise price of $5.69 on July 1, 2002;

c.      Defendant Gani received 500,000 options at an exercise price of $5.69 on July 1, 2002; and

d.      Lloyd Carney received 500,000 options at an exercise price of $5.69 on July 1, 2002.

56.     The lowest closing price of the Company's stock during the calendar month of July 2002 occurred on July 1, 2002 (the day of the grant in question).  By the close of trading on July 8, 2002 (one week after the option grant in question), Juniper stock stood at $7.25, an increase of 27.4%.  Within two weeks of the date of the grant, the Company's shares stood at $8.05 per share.  Indeed, by the close of trading on July 31, 2002, Juniper's shares were trading at $8.00 per share, an increase of 40.59% over where they stood at the beginning of that calendar month.

57.     The reason for the foregoing pattern is clear -- the Defendants engaged in the practice of backdating options (they chose an option grant date in the past with a lower stock price in order inflate substantially the value of those options in the hands of the recipients).  The

1  Defendants' fraudulent conduct in this regard already has subjected Juniper to significant

2  expense; and potentially will subject the Company to substantial regulatory fines, penalties and

3  other damages and costs, in that, among other things:

4          a.      Options priced at below a stock's fair market value when they are awarded

5  resulted in Juniper's executives receiving an instant paper gain.  Under then applicable

6  accounting rules, that "paper gain" was the equivalent of additional compensation to the

7  executive that had to be treated as a cost to the Company.  Since it appears that Juniper did not

8  treat as an expense the amount by which the market price of the Company's stock on the actual

9  date the options were issued exceeded the exercise price of the options, the Company overstated

10  its reported profits, and, as such, *might need to restate past financial results.*  Indeed, the U.S.

11  Attorney's Office for the Eastern District of New York already is investigating the Company's

12  stock option grant practices and no fewer than three (3) derivative complaints are pending

13  against the Company's senior management team pertaining to this issue.  Moreover, at present,

14  the Company's Audit Committee also is investigating Juniper's historical stock option grants;

15          b.      Section 162(m) provides that compensation in excess of $1 million per

16  year (including gains on stock options) paid to a corporation's five most highly-compensated

17  officers is tax deductible *only* if certain conditions are met.  One of those conditions is that the

18  compensation must be payable solely on account of the attainment of one or more performance

19  goals.  Options backdated to a day with a lower market price do not qualify for a Section 162(m)

20  deduction (since such grants are not deemed performance-based compensation).  As such,

21  companies like Juniper with backdated options now face the prospect of paying out significant

22  sums to revise prior years' tax returns; and

23          c.      The backdating of stock options may negatively affect Juniper's credit

24  rating on a going-forward basis.  A recent report issued by Moody's Investor Services

("Moody's") sets forth several credit risks associated with backdating, including financial and reputation risk. According to Jeffrey Benner, a Moody's analyst and one of the report's authors, backdating inquires could raise ratings questions about a company's leadership, reputation, governance practices, and financial performance. For instance, the report points out those investigations into backdating already have led to leadership shakeups, as senior managers at several companies under investigation departed abruptly. In addition, the report explains that any wrongdoing the investigations uncover could soil a company's reputation enough to affect a company's standing with customers, employees, and investors. Indeed, on May 22, 2006, Standard & Poor's Rating Services placed its ratings on Juniper on CreditWatch with negative implications, citing the probe related to the Company's stock option grants.

## VII.   FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

58.     As detailed herein, during the Class Period, Defendants issued or caused to be issued materially false and misleading statements that deceived the investing public as to the Company's financial performance and condition.

59.     Many of the Company's false and misleading statements during the Class Period below were made in Form 10-K's and Form 10-Q's that were certified by Defendant Kriens and Defendant Gani in accordance with the Sarbanes-Oxley Act of 2002. By certifying those public filings, Defendants Kriens and Gani represented, *inter alia,* that the quality and accuracy of the information contained therein concerning the Company's financial performance and condition was safeguarded by internal financial controls in place at the Company, which were designed to foster the development of reliable financial statements.

### A.   Form 10-Q for the Quarterly Period Ending September 30, 2003

60.     On or about November 14, 2003, Juniper filed with the SEC a Form 10-Q for the quarterly period ending September 30, 2003. Defendant Gani signed this Form 10-Q. Pursuant to the Sarbanes-Oxley Act of 2002, this Form 10-Q also included certifications signed by

22

1   Defendants Kriens and Gani. In that public filing, the Company reported net income of $7.205

2   million for the three month period ending September 30, 2003 (as compared to a net loss of

3   $88.33 million for the three months ending September 30, 2002). The Company further reported

4   net income of $24.466 million for the nine month period ending September 30, 2003 (as

5   compared to a net loss of $128.102 million for the nine month period ending September 30,

6   2002). Juniper further stated that it had recorded tax provisions of $7.7 million and

7   $14.3 million for the three and nine months ended September 30, 2003, or effective tax rates of

8   52% and 37%, respectively.

9   

10      61.     In addition, Juniper noted that its stock option plans were accounted for under the

11  intrinsic value recognition and measurement principles of APB No. 25 (and related

12  interpretations). The Company indicated that since the exercise price of all options granted

13  under these plans was equal to the market price of the underlying common stock on the grant

14  date, no stock-based employee compensation cost, other than acquisition-related compensation,

15  was recognized in net income.

16  

17      62.     With respect to the issue of internal controls, the Company indicated that it had

18  "carried out an evaluation, under the supervision and with the participation of our management,

19  including the Chief Executive Officer and Chief Financial Officer, of the effectiveness of the

20  design and operation of our disclosure controls and procedures as of the end of the period

21  covered by this report." Juniper added that "[b]ased upon that evaluation, the Chief Executive

22  Officer and Chief Financial Officer concluded that our disclosure controls and procedures are

23  effective in timely alerting them to material information relating to the Company (including its

24  consolidated subsidiaries) required to be included in our Exchange Act filings."

25  

26  

27  

28  

[CORRECTED] CLASS ACTION COMPLAINT

1

**B.**      **Form 10-K for Fiscal Year 2003**

2

63.      On or about February 20, 2004, Juniper filed with the SEC a Form 10-K for Fiscal

3

Year 2003 (ending December 31, 2003).  Defendants Kriens, Gani, Sindhu, Hearst, Sclavos, and

4

Stensrud signed Juniper's Form 10-K for Fiscal Year 2003.   Pursuant to the Sarbanes-Oxley Act

5

of 2002, this Form 10-K also included certifications signed by Defendants Kriens and Gani.  In

6

that public filing, Juniper stated that its net income for 2003 was $39.199 million, compared to a

7

net loss in 2002 of $119.56 million (the Company added that it had a net loss of $13.41 million

8

in 2001; net income of $147.91 million in 2000; and a net loss of $9.034 million in 1999).  The

9

Company further indicated that provision for income taxes increased to $19.8 million in 2003

10

from $4.5 million in 2002.  According to the Company, the 2003 effective rate was 33.6%.  The

11

Company added that provision for income taxes had decreased to $4.5 million in 2002 from

12

$30.0 million in 2001, and that the effective tax rates for 2002 and 2001 were -3.9% and 181%,

13

14

respectively.

15

16

64.      The Company again noted that its stock option plans were accounted for under the

17

intrinsic value recognition and measurement principles of APB No. 25 and related

18

interpretations.  According to the Company, since the exercise price of all options granted under

19

these plans was equal to the market price of the underlying common stock on the grant date, no

20

stock-based employee compensation cost, other than acquisition-related compensation cost, was

21

22

recognized in net income.

23

65.      Juniper also added that under the Company's Amended and Restated 1996 Stock

24

Option Plan (the "1996 Plan"), incentive stock options were granted at an exercise price of not

25

less than the fair value per share of the common stock on the date of grant; and that while

26

nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair

27

28

[CORRECTED] CLASS ACTION COMPLAINT

value per share on the date of grant; no nonstatutory stock options had been granted for less than fair market value on the date of grant.

66.   Juniper further noted that in July 2000, its Board of Directors had adopted the Juniper Networks 2000 Nonstatutory Stock Option Plan (the "2000 Plan"). The Company indicated that the 2000 Plan provided for the granting of nonstatutory stock options to employees, directors and consultants; and that while nonstatutory stock options could be granted at an exercise price of not less than 85% of the fair value per share on the date of grant, no nonstatutory stock options had been granted for less than fair market value on the date of grant.

67.   With respect to the issue of internal controls, Juniper stated that: "[w]e carried out an evaluation, under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered this report.  Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective in timely alerting them to material information relating to the Company (including its consolidated subsidiaries) required to be included in our Exchange Act filings."

**C.   Form 10-K for Fiscal Year 2004**

68.   On or about March 4, 2005, Juniper filed with the SEC a Form 10-K for Fiscal Year 2003 (ending December 31, 2003).  Defendants Kriens, Sindhu, Sclavos, and Stensrud signed Juniper's Form 10-K for Fiscal Year 2004.  Pursuant to the Sarbanes-Oxley Act of 2002, this Form 10-K also included certifications signed by Defendant Kriens.  In that public filing, Juniper reported 2004 net income of $135.746 million; compared to $39.199 million in 2003 (the Company further indicated that it had a net loss in 2002 of $119.65 million; a net loss in 2001 of

$13.41 million; and net income of $147.91 million in 2000).  The Company added that provision for income taxes increased to $83.3 million in 2004 from $19.8 million in 2003.

69.    · The Company again reported that its stock option plans were accounted for under the intrinsic value recognition and measurement principles of APB No. 25 and related interpretations.  In this regard, Juniper indicated that since the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based employee compensation cost, other than acquisition-related compensation cost, was recognized in net income.  With regard to its stock option plans, Juniper again noted that under the 1996 Plan, incentive stock options were granted at an exercise price of not less than the fair value per share of the common stock on the date of grant; and that while nonstatutory stock options could be granted at an exercise price of not less than 85% of the fair value per share on the date of grant, no nonstatutory stock options had been granted for less than fair market value on the date of grant.  With respect to the 1996 Plan, Juniper again stated that while nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant, no nonstatutory stock options had been granted for less than fair market value on the date of grant.

70.    With respect to the issue of internal controls, the Company stated that it had assessed the effectiveness of Juniper's internal control over financial reporting as of December 31, 2004 and that it had concluded that "as of December 31, 2004, Juniper Networks Inc.'s internal control over financial reporting is effective."

**D.    Form 10-K for Fiscal Year 2005**

71.    On or about March 7, 2006, Juniper filed with the SEC a Form 10-K for Fiscal Year 2003 (ending December 31, 2003).  Defendants Kriens, Sindhu, Hearst, Sclavos, and Stensrud signed Juniper's Form 10-K for Fiscal Year 2004.  Pursuant to the Sarbanes-Oxley Act

[CORRECTED] CLASS ACTION COMPLAINT

of 2002, this Form 10-K also included certifications signed by Defendant Kriens.  In that public filing, Juniper stated, among other matters, that its 2005 net income was $354 million; compared to 2004 net income of $135.7 million; and 2003 net income of $39.2 (the Company further indicated that it had a net loss in 2002 of $119.7 million; and a net loss in 2001 of $13.4 million). The Company added that provision for income taxes increased to $83.3 million in 2004 from $19.8 million in 2003.  The Company further noted that provision for income taxes increased to $148.2 million in 2005 from $83.3 million in 2004 (and that provision for income taxes increased to $83.3 million in 2004 from $19.8 million in 2003).

72.    The Company added that the Company's stock option plans were accounted for under the intrinsic value recognition and measurement principles of APB No. 25 and related interpretations.  The Company added that since the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based employee compensation cost, other than acquisition-related compensation cost, was recognized in net income.  In addition, the Company again noted that under the 1996 Plan, incentive stock options were granted at an exercise price of not less than the fair value per share of the common stock on the date of grant; and that while nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant, no nonstatutory stock options had been granted for less than fair market value on the date of grant.  Finally, Juniper stated that under the 2000 Plan, non-statutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; but that no non-statutory stock options had been granted for less than fair market value on the date of grant.

73.    With respect to the issue of internal controls, the Company stated that it had assessed the effectiveness of Juniper's internal control over financial reporting as of December

27

31, 2005 and that it had concluded that "as of December 31, 2005, Juniper Networks Inc.'s internal control over financial reporting is effective."

74.     Defendants' statements concerning Juniper's financial performance and condition as set forth above were each false and misleading when made because they misrepresented or omitted the following material adverse facts that the Defendants knew at the time the statements were made:

a.     That stock options to Juniper employees were not always issued at the fair market value of the Company's stock on the date of the grant since the Defendants repeatedly manipulated option grant dates to coincide with particularly low share prices (so as to benefit option recipients);

b.     That the Company had not consistently followed the dictates in APB No. 25 in that (i) options priced at below a stock's fair market value when they are awarded results in an executive receiving an instant paper gain; and (ii) Juniper did not treat that "paper gain" as a cost to the corporation in its financial statements (thus inflating the Company's net earnings);

c.     That the Company understated its income tax liability since options backdated to a day with a lower market price do not qualify for a Section 162(m) deduction (since such grants are not deemed performance-based compensation);

d.     That Company insiders (including defendants Kriens, Sindhu and Gani) received backdated options and thus took excess and unjustified compensation at the expense of the investing public;

e.     That significant accounting errors existed in the Company's historic financial statements;

f.     That the Company had failing and deficient internal controls and procedures and lacked any meaningful ability to accurately report its financial results; and

[CORRECTED] CLASS ACTION COMPLAINT

g.      That the Company's illicit scheme vis-à-vis backdating stock option grant dates potentially subjected Juniper to substantial regulatory fines, penalties and other legal action, thereby compromising the Company's overall financial condition and prospects.

## VIII.   THE TRUTH IS FINALLY REVEALED

75.      As noted above, a May 2006 study of 100 companies by the CFRA said that Juniper was among 17 companies in that group which showed a "high-risk profile" for possible back-dating of options.  In addition, at or about that same time, a J.P. Morgan analyst who had reviewed option grants to executives at seventeen companies dating back to 1998 concluded, with respect to Juniper, that there existed a suspicious pattern of grants at the stock's low price for a given month.  The announcement of these findings had an immediate impact on the Company's stock price.  Juniper's stock, which had closed the month of April 2006 at $18.48 per share stood at only $16.10 per share by the close of trading on May 18, 2006.

76.      Prior to the opening of trading on May 22, 2006, the Company issued a press release in which it announced that the Company had received a request for information from the office of the United States Attorney for the Eastern District of New York relating to the Company's granting of stock options.  Juniper indicated that (i) it was actively engaged in responding to this request for information; and (ii) its Audit Committee was reviewing the Company's historical stock option granting practices.  On the release of this news, Juniper shares dropped to a 52-week low of $14.62 during morning trading on May 22, 2006.

## IX.   INAPPLICABILITY OF SAFE HARBOR

77.      As alleged herein, the Defendants acted with scienter in that they knew, at the time that they issued them, that the public documents and statements issued or disseminated in the name of Juniper were materially false and misleading or omitted material facts; knew that such statements or documents would be issued or disseminated to the investing public; knew that persons were likely to reasonably rely on those misrepresentations and omissions; and knowingly

29

and substantially participated or were involved in the issuance or dissemination of such statements or documents as primary violations of the federal securities law.  As set forth elsewhere herein, the Defendants, by virtue of their (i) receipt of information reflecting the true facts regarding Juniper, (ii) control over, and/or receipt of Juniper's allegedly materially misleading misstatements, and (iii) access to confidential proprietary information concerning Juniper were informed of, participated in and knew of the fraudulent scheme alleged herein. With respect to non-forward-looking statements and/or omissions, Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.

78.     Defendants' false and misleading statements and omissions do not constitute forward-looking statements protected by any statutory safe harbor.  The statements alleged to be false and misleading herein all relate to facts and conditions existing at the time the statements were made.  No statutory safe harbor applies to any of the Defendants' material false or misleading statements.

79.     Alternatively, to the extent that any statutory safe harbor is intended to apply to any forward-looking statement pled herein, the Defendants are liable for the false forward-looking statement pled because, at the time each forward-looking statement was made, the speaker knew or had actual knowledge that the forward-looking statement was materially false or misleading, and the forward-looking statement was authorized and/or approved by a director and/or executive officer of Juniper who knew that the forward-looking statement was false or misleading.  None of the historic or present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made nor were any of the

1  projections or forecasts made by the Defendants expressly related to or stated to be dependent on

2  those historic or present tense statements when made.

3  X.  **ADDITIONAL SCIENTER ALLEGATIONS**

4      80.  As alleged herein, the Defendants acted with scienter in that, *inter* alia, the

5  Defendants knew or acted with recklessness with respect to the fact that the public documents

6  and statements issued or disseminated in the name of Juniper were materially false and

7  misleading; knew that such statements or documents would be issued or disseminated to the

8  investing public; and knowingly and substantially participated or acquiesced in the issuance or

9

10  dissemination of such statements or documents as primary violations of the federal securities

11  laws.  As set forth elsewhere herein, the Individual Defendants, by virtue of their receipt of

12  information reflecting the true facts regarding Juniper, their control over and/or receipt and/or

13  modification of the allegedly materially misleading misstatements and omissions described

14

15  herein, which made them privy to confidential proprietary information concerning Juniper,

16  directly and substantially participated in the fraudulent scheme alleged herein.

17      81.  Moreover, the ongoing fraudulent scheme described in this Complaint could not

18  have been perpetrated over a substantial period of time, as has occurred, without the knowledge

19  of individuals at the highest levels of the Company, including the Individual Defendants.

20  XI.  **APPLICABILITY OF PRESUMPTION OF RELIANCE: THE FRAUD-ON-THE-**
    **MARKET DOCTRINE**
21

22      82.  The market for Juniper's securities was open, well-developed and efficient at all

23  relevant times for the following reasons (among others):

24          a.  The Company's shares met the requirements for listing, and were listed

25  and actively traded on NASDAQ;

26

27          b.  As a regulated issuer, Juniper filed periodic public reports with the SEC;

28

1    c.  Juniper regularly communicated with public investors via established

2 market communication mechanisms, including through regular disseminations of press releases

3 on the national circuits of major newswire services and through other wide-ranging public

4 disclosures, such as communications with the financial press and other similar reporting services;

5    d.  The market reacted to public information disseminated by Juniper;

6

7    e.  Juniper was followed by numerous material securities analysts employed

8 by major brokerage firms who wrote reports which were distributed to the sales force and certain

9 customers of their respective brokerage firms.  Each of these reports was publicly available and

10 entered the public marketplace;

11    f.  The material misrepresentations and omissions alleged herein would tend

12 to induce a reasonable investor to misjudge the value of Juniper securities; and

13

14    g.  Without knowledge of the misrepresented or omitted material facts,

15 Plaintiff and the other members of the Class purchased or otherwise acquired Juniper securities

16 between the time Defendants made the material misrepresentations and omissions and the time

17 the fraudulent backdating was being disclosed, during which time the price of Juniper securities

18 was inflated by Defendants' misrepresentations and omissions.

19  83.  As a result of the foregoing, the market for Juniper's securities promptly digested

20 current information regarding Juniper from all publicly available sources and reflected such

21 information in Juniper's securities prices.  Under these circumstances, all purchasers and

22 acquirers of Juniper's securities during the Class Period suffered similar injury through their

23 purchase or acquisition of Juniper's securities at artificially inflated prices and a presumption of

24

25 reliance apply.

26 **XII. LOSS CAUSATION**

27

28

[CORRECTED] CLASS ACTION COMPLAINT

84.    Throughout the Class Period, the prices of the Company's securities were artificially inflated as a direct result of Defendants' fraudulent misrepresentations regarding the Company's financial condition and results.

85.    The Company's financial condition and results, including Juniper's fraudulent practices vis-à-vis backdated stock option grants, were material information to Plaintiff and the other members of the Class.  Had the truth been disclosed to the market at or before the end of the Class Period, Plaintiff and the other Class members would not have purchased Juniper stock at all, or would have done so only at substantially lower prices than the artificially inflated prices which they actually paid.

86.    When the truth about the Company was revealed, the inflation that had been caused by Defendants' misrepresentations and omissions was swiftly eliminated from the price of the Company's securities, causing significant losses to Plaintiff and the other Class members. The disclosures of third-party reports into the suspicious stock option grant practices of the Company, as well as the May 22, 2006 disclosure of the U.S. Attorneys' investigation of Juniper's stock option grant process, led to a flurry of trading in which Juniper's stock price plunged from its $18.48 close on April 28, 2006, to an opening price of $14.62 on May 22, 2006 (this represented a loss of market capitalization of over $1.34 billion).

87.    The decline in the Company's securities price following the revelations of the Company's fraudulent practices, and the resulting losses suffered by Plaintiff and the other members of the Class, are directly attributable to the market's reaction to the disclosure of information that had previously been misrepresented or concealed by Defendants, and to the market's adjustment of the Company's securities price to reflect the newly emerging truth about the Company's financial condition.

[CORRECTED] CLASS ACTION COMPLAINT

88.     Defendants' fraudulent conduct, as alleged herein, proximately caused foreseeable losses to Plaintiff and the other members of the Class.

## XIII.   CAUSES OF ACTION

### COUNT I

### Violation of Section 10(b) of The Exchange Act And Rule 10b-5 Promulgated Thereunder

### (Against all Defendants)

89.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

90.     This Count is asserted by Plaintiff on behalf of itself and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

91.     During the Class Period, the Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Juniper's securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Juniper's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Defendants, and each of them, took the actions set forth herein.

92.     The Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading by use of means or instrumentalities of interstate commerce; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers and acquirers of the Company's securities in an effort to maintain artificially

[CORRECTED] CLASS ACTION COMPLAINT

1  high market prices for Juniper's securities in violation of Section 10(b) of the Exchange Act and

2  Rule 10b-5.

3      93.    As a result of their making and/or their substantial participation in the creation of

4  affirmative statements and reports to the investing public, the Defendants had a duty to promptly

5  disseminate truthful information that would be material to investors in compliance with the

6  integrated disclosure provisions of the SEC as embodied in SEC Regulation S-K (17 C.F.R.

7  §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with

8

9  respect to the Company's operations and performance so that the market prices of the

10  Company's publicly traded securities would be based on truthful, complete and accurate

11  information.  The Defendants' material misrepresentations and omissions as set forth herein

12  violated that duty.

13

14      94.    The Defendants engaged in the fraudulent activity described above knowingly and

15  intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff

16  and the Class.  The Defendants knowingly caused their reports and statements to contain

17  misstatements and omissions of material fact as alleged herein.

18      95.    As a result of the Defendants' fraudulent activity, the market price of Juniper was

19  artificially inflated during the Class Period.

20      96.    In ignorance of the true financial condition of Juniper, Plaintiff and other

21  members of the Class, relying on the integrity of the market and/or on the statements and reports

22

23  of Juniper containing the misleading information, purchased or otherwise acquired Juniper

24  securities at artificially inflated prices during the Class Period.

25      97.    The market price of Juniper's securities declined materially upon the public

26  disclosure of the true facts which had been misrepresented or concealed as alleged herein.

27

28

[CORRECTED] CLASS ACTION COMPLAINT

98.     Plaintiff's (and the Class') losses were proximately caused by Defendants' active and primary participation in Juniper's scheme to defraud the investing public by, among other things, falsifying the Company's financial results through the knowing or reckless failure to properly apply GAAP.  Plaintiff (and the members of the Class) purchased Juniper securities in reliance on the integrity of the market price of those securities, and Defendants manipulated the price of Juniper securities through their misconduct as described herein.  Furthermore, Defendants' misconduct proximately caused Plaintiff's (and the Class') losses.  Plaintiff's (and the Class') losses were a direct and foreseeable consequence of Defendants' failure to disclose and their concealment of, *inter alia*, the true state of the business operations and financial condition of Juniper.

99.     Throughout the Class Period, Defendants were aware of material non-public information concerning Juniper's fraudulent conduct (including the false and misleading accounting statements).  Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information regarding Juniper's falsified revenue figures, and Plaintiff's (and the Class') losses were the foreseeable consequence of Defendants' concealment of this information.

100.    As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Juniper securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act

### (Against the Individual Defendants)

101.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

[CORRECTED] CLASS ACTION COMPLAINT

102.   As alleged herein, the Individual Defendants acted as controlling persons of Juniper within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).  By virtue of their executive positions, and/or Board membership, as alleged above, these individuals had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's internal reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

103.   In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

104.   As set forth above, the Individual Defendants and Juniper committed a primary violation of Section 10(b) and Rule 10b-5 of the Exchange Act by the acts and omissions alleged in this Complaint.  By virtue of their positions as controlling persons of Juniper, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Juniper securities during the Class Period.

## XIV.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action;

B.     Awarding compensatory damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

**XV.     JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: July 28, 2006

ALEXANDER, HAWES & AUDET, LLP


By:_____/s/_____
William M. Audet (Cal. State Bar No. 117456)
221 Main Street, Suite 1460
San Francisco, California 94105
Tel: 415.982.1776
Fax: 415.576.1776

Mark C. Gardy
James S. Notis
GARDY & NOTIS, LLP
440 Sylvan Avenue, Suite 110
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377
Fax: 201-567-7337

Alfred G. Yates, Jr.
LAW OFFICES OF ALFRED G. YATES, JR.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, Pennsylvania 15219-1649
Tel: 412-391-5164
Fax: 412-471-1033

Jason Baker (Cal. State Bar No. 212380)
ALEXANDER, HAWES & AUDET, LLP
152 North Third Street, Suite 600
San Jose, California 95112
Tel: 415.289.1776
Fax: 415.287.1776

*Counsel for Plaintiff and the Proposed Class*

38

[CORRECTED] CLASS ACTION COMPLAINT

## CERTIFICATION
## PURSUANT TO FEDERAL SECURITIES LAWS

Robert L. Garber ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the class action complaint and authorizes its filing and is willing to serve as a lead or named plaintiff in the action on the basis of the allegations in that complaint or a substantively similar or related complaint or amended complaint to be filed.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transactions in Juniper Networks (JNPR) that are the subject of this action are as follows:
        **See Attached Schedule**

5.    During the three years prior to the date of this Certification, Plaintiff has sought to serve or served as a representative party for a class in a case under the federal securities laws, as follows; In re Vodafone Group PLC Securities Litigation 02 Civ. 7592 USDC So.Dist. NY; Garber v. Pharmacia Corp USDC NJ 03-CV-1519; In re Federal Home Loan Mortgage Corp. Securities & Derivative Litigation (No. II) 1:04-md-01584-JES USDC So.Dist. NY; In re Fannie Mae Securities Litigation No. 04-01639 USDC Dist. of Columbia; Robert L. Garber v. RenaissanceReHoldings Ltd. No. 05-7232 USDC So. NY; In Re Boston Scientific Corporation Securities Litigation No.05-11934 USDC Dist. of Mass.; Robert L. Garber v. KLA-Tencor Corp

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 27 day of June, 2006.

# ROBERT L. GARBER
## SCHEDULE OF TRANSACTIONS FOR
### JUNIPER NETWORKS, INC. (JNPR)

**Account # 037-20834, ROBERT L. GARBER MPP**

| Date | Transaction Type | Shares | Price |
|------|------------------|--------|-------|
| Feb 20, 2004 | Bought | 30 | $25.50200 |
| Oct 12, 2004 | Bought | 75 | $24.36180 |

**Account # 037-43692, R. GARBER C/F BENJAMIN JAMES GARBER UTMA-PA**

| Date | Transaction Type | Shares | Price |
|------|------------------|--------|-------|
| Feb 20, 2004 | Bought | 15 | $25.50200 |
| Oct 12, 2004 | Bought | 20 | $24.36180 |
| Sep 14, 2005 | Bought | 20 | $23.70420 |
| Jan 03, 2006 | Sold | 55 | $21.03000 |

**Account # 037-32481, ROBERT L. GARBER AND JEANNETTE FISHER-GARBER, JTWROS**

| Date | Transaction Type | Shares | Price |
|------|------------------|--------|-------|
| Feb 20, 2004 | Bought | 100 | $25.50200 |
| Nov 11, 2004 | Bought | 140 | $27.27360 |

1

**PROOF OF SERVICE**

2

**STATE OF CALIFORNIA, COUNTY OF SANTA CLARA**

3

4

    I am employed in the County of Santa Clara, State of California; my business address is 152 North Third Street, Suite 600, San Jose, California 95112; I am over the age of 18 and not a party to the within action.  On this date I served the following document(s):

5

6

**[CORRECTED] CLASS ACTION COMPLAINT**

7

on the parties shown below:

8

Robert L. Green
Green Welly
595 Market Street, Suite 2750
San Francisco, CA 94105

9

10

Juniper Networks, Inc.
1194 North Matilda Avenue
Sunnyvale, California 94089

11

Joni Ostler
Wilson Sonsini Goodrich & Rosati
2795 East Cottonwood Parkway,
Suite 300
Salt Lake City, UT 84121-6928

12

Mark C. Gardy
James S. Notis
GARDY & NOTIS, LLP
440 Sylvan Avenue, Suite 110
Englewood  Cliffs,  New  Jersey
07632

13

14

Alfred G. Yates, Jr.
LAW OFFICES OF ALFRED G.
YATES, JR.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, Pennsylvania 15219-1649

15

16

17

18

19

[ ] (BY FAX) I am readily familiar with the firm's practice of facsimile transmission; on this date the above-referenced documents were transmitted, the transmission was reported as complete and without error and the report was properly issued.

20

21

22

[X] (BY MAIL) I am readily familiar with the firm's practice for the processing of mail; on this date, the above-referenced documents were placed for collection and delivery by the U.S. Postal Service following ordinary business practices.

23

24

[X] (BY ELECTRONIC FILING) On this date I provided the documents(s) listed above electronically through the Court's electronic filing service provider pursuant to the instructions on that website.

25

26

[ ] (BY E-MAIL) On this date, the above-referenced documents were converted to electronic files and e-mailed to the addresses shown.

27

28

[ ] (BY PERSONAL SERVICE) I caused the above documents to be delivered by hand pursuant to CCP § 1011.

39

[CORRECTED] CLASS ACTION COMPLAINT

1       I declare that I am employed in the office of a member of the bar of this court at whose
2  direction the service was made.

3       Executed on this  _28th_  day of  _July_  at San Jose, California.

4

5                                                      Bonnie Hoy

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

40

[CORRECTED] CLASS ACTION COMPLAINT