NEIL L. SELINGER
RICHARD BEMPORAD
DAVID C. HARRISON
STACEY E. BLAUSTEIN
LOWEY DANNENBERG BEMPORAD & SELINGER, P.C.
One North Lexington Avenue
White Plains, New York  10601-1714
Telephone: 914-997-0500

*Lead Counsel for the New York City Pension Funds and the Putative Class*

WILLEM F. JONCKHEER S.B.N. 178748
SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1050
San Francisco, California  94111
Telephone: 415-788-4220

*Local Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE JUNIPER NETWORKS, INC. SECURITIES LITIGATION | **No. C06-04327-JW** <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> **<u>JURY TRIAL DEMANDED</u>** |

Lead Plaintiff, the New York City Pension Funds, as defined herein at ¶ 21, for their Consolidated Class Action Complaint (the "Complaint"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief based upon the investigation made by and through their attorneys as to other matters.  Lead Plaintiff's investigation included, *inter alia*, a review and analysis of: (a) public documents pertaining to Juniper Networks, Inc. ("Juniper" or the "Company") and the other defendants named herein; (b) filings with the Securities and Exchange Commission (the "SEC"); (c) the Company's press releases and public statements; (d) analyst reports concerning the Company; (e) newspaper and magazine articles and other media coverage regarding Juniper and its business; and (f) industry studies concerning abusive

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  practices with respect to the granting of company stock options.  Many of the facts supporting the

2  allegations contained herein are known only to defendants or are exclusively within their custody

3  and/or control.

4                                          **NATURE OF THE ACTION**

5       1.      This is a securities class action on behalf of all persons and entities who purchased or

6  otherwise acquired the publicly traded securities of Juniper securities from April 10, 2003 through

7  and including August 10, 2006 (the "Class Period") and were damaged thereby, including (a) those

8  who received (acquired) Juniper common stock issued pursuant to a registration statement on Form

9  S-4 dated March 10, 2004 used to issue new Juniper shares in the Company's merger with

10  NetScreen Technologies Inc. (the "NetScreen Registration Statement"), and (b) purchasers of Zero

11  Coupon Convertible Senior Notes due June 15, 2008 (the "Notes") issued pursuant to a registration

12  statement on Form S-3 dated November 20, 2003 (the "Notes Registration Statement"), against

13  Juniper, certain of its officers and/or directors, and the Company's auditors, Ernst & Young LLP

14  ("E&Y"), for violations of the federal securities laws.

15       2.      This case concerns, among other things, the manipulation of the Company's stock

16  option grants to enrich Juniper's senior executives in an undisclosed and inherently deceptive

17  manner.  This manipulation caused the Company's financial statements to violate generally accepted

18  accounting principles ("GAAP") by understating compensation expenses and overstating profits,

19  and resulted in Juniper's stock price being artificially inflated throughout the Class Period.

20       3.      A stock option granted to an employee of a corporation allows the employee to

21  purchase a specified number of shares of company stock at a set price – called the exercise price –

22  on a future date, typically at the end of a fixed period called the vesting period.  Prior to and during

23  the Class Period, Juniper's public filings repeatedly stated that all stock options granted under the

24  Company's stock option plans gave the holder the right to buy Juniper stock at the market price on

25  the date the options were granted.  When the exercise price of an option grant is set at the market

26  price on the date of grant, *i.e.*, "at the money," company executives and the shareholders will profit

27  only if the stock price goes up over time.  In this way, the grant of stock options supposedly created

28  incentives for Juniper executives to boost long-term corporate performance and profitability.

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

4.      Prior to 2006, Juniper benefited from accounting rules that gave favorable treatment to companies that issued at-the-money options.  Juniper's financial statements repeatedly represented that because the Company only issued at-the-money options under its stock plans, Juniper was not required under GAAP to record any compensation expense with respect to those option grants.

5.      Through a series of disclosures at or near the end of the Class Period, it is now readily apparent that Chief Executive Officer Scott Kriens ("Kriens"), co-founder and Chief Technical Officer Pradeep Sindhu ("Sindhu") and former Chief Financial Officer Marcel Gani ("Gani") (together, the "Executive Defendants") concealed from the investing public that they had manipulated the Company's stock option grant dates to make it appear that options were granted on days when Juniper's stock price was lower, allowing the holder to benefit risk-free from the stock's rise between the "backdated" dates reported in the Company's public filings and the actual grant dates.

6.      Pursuant to this scheme, from at least June 1999 through 2003, the Executive Defendants and other Juniper officers and/or directors received millions of backdated options grants purportedly issued on unusually favorable dates when the stock price had dipped to its monthly lows, and usually just before a large run-up in the stock price.  However, Juniper has recently admitted that this pattern was neither random nor fortuitous, but rather deliberate: "the grant dates were chosen with the benefit of hindsight as to the price of the Company's stock, so as to give favorable prices."

7.      The Executive Defendants concealed their backdating scheme from investors to hide the fact that they were receiving excessive, windfall compensation.  The Executive Defendants were motivated to conceal the fact that the options were actually "in the money" – *i.e.*, their exercise prices were lower than the stock prices on the actual grant date – because that was contrary to the Company's reported practice under its stock plans, and rendered Juniper ineligible for the favorable accounting and tax treatment accorded at-the-money options, which would have significantly reduced the Company's earnings.

CONSOLIDATED CLASS ACTION COMPLAINT

8.     By backdating the grants to dates when the stock prices were low, the Executive Defendants could report apparently at-the-money grants of options without recording any compensation expense, thereby disguising the fact that the options were in-the-money when granted, and assuring instant and riskless gains to the option recipients.

9.     From the time Juniper went public in June 1999, the Executive Defendants knowingly or recklessly concealed the backdating scheme from public investors, the SEC and the market.  Instead, the Executive Defendants (a) materially misrepresented and concealed the backdated nature of the option grants in numerous public filings such as SEC Forms 10-K and 10-Q, proxy and registration statements, and Form 4s and 5s; (b) improperly accounted for the backdated options under GAAP; (c) concealed and misrepresented the inadequacy of the company's internal controls with respect to Juniper's financial reporting and disclosures; and (d) misrepresented critical facts regarding Juniper's executive compensation arrangements.  As a result, the Company's reported corporate profits were improperly inflated for at least three years.

10.     This action is also brought against certain of the non-management directors (the "Director Defendants," defined herein at ¶ 49) and E&Y with respect to, *inter alia*,  the issuance of the false and misleading NetScreen Registration Statement.  Plaintiff's claims against the Director Defendants and E&Y relating to the NetScreen Registration Statement are based solely on negligence.  Plaintiff expressly disclaims any allegations concerning the participation of E&Y and the Director Defendants in the preparation and issuance of the NetScreen Registration Statement that could be construed as alleging fraud or intentional or reckless misconduct.

11.     In reliance on defendants' false and misleading statements, Lead Plaintiff and the other members of the Class purchased Juniper stock at artificially inflated prices and were damaged after the truth gradually emerged and the value of Juniper's shares declined.

12.     By mid-March 2006, numerous news sources, including *The Wall Street Journal*, had reported on the government's expanding probe of options backdating, which currently encompasses over 160 companies.  In May 2006, both the Center for Financial Research and Analysis ("CFRA") and J. P. Morgan Securities, Inc. ("J. P. Morgan") issued independent studies that concluded, based upon statistical analysis of the option grants, that Juniper was a likely candidate for granting

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

backdated stock options to its senior executives.  These studies indicated – and Juniper has recently admitted – that from 1999 through 2003, the Board of Directors and Compensation Committee granted millions of backdated stock options to the Executive Defendants and other Juniper officers and employees.

13.     On August 10, 2006, Juniper admitted that its financial results from 2003 through March 2006 should no longer be relied upon and would be restated.  These financial statements were false and misleading because the Company failed to expense compensation costs for backdated stock options, which artificially inflated operating margins and earnings.

14.     On December 20, 2006, Juniper further admitted that it was required to take a $900 million charge, an acknowledgment that the option grants were backdated on a very large scale. This charge is the second largest to be taken by more than 160 companies implicated in the ever-widening probe of corporate backdating of executive stock options.

15.     Juniper also acknowledged in the December 20 press release that the wrongdoing was both pervasive – extending at least from June 9, 1999 through December 31, 2003 – and deliberate – the Audit Committee found "numerous instances in which the grant dates were chosen with the benefit of hindsight as to the price of the Company's stock so as to give favorable prices."  The Company further faulted management for failures in the stock option process and acknowledged that its internal controls over accounting and disclosure practices were inadequate during this period.

16.     Juniper also announced that it plans to file by February 12, 2007 its Form 10-Qs for the quarters ended June 30, 2006 and September 30, 2006, which should include restated financial results for at least the prior year's comparable quarters, as well as a summary of the Audit Committee's findings.  The Company also stated that it will file restated financial statements no later than March 31, 2007.  Plaintiff anticipates that these filings will reveal additional material information regarding the wrongful conduct alleged in the Complaint.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

thereunder by the SEC, 17 C.F.R. § 10b-5; and Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77o.

18.    This Court has subject matter jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. §§ 1331 and 1337.

19.    Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Many of the acts and transactions constituting the violations of law alleged herein, including the preparation, issuance, and dissemination of materially false and misleading statements, occurred in this District, where Juniper maintains its headquarters.

20.    In connection with the acts, transactions, and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange and market.

## THE PARTIES

### Lead Plaintiff

21.    Lead Plaintiff the New York City Pension Funds is comprised of the New York City Employees' Retirement System ("NYCERS"), the Teachers' Retirement System of the City of New York ("NYCTRS"), the New York City Fire Department Pension Fund ("FIRE"), the New York City Police Pension Fund ("POLICE"), the New York City Board of Education Retirement System ("BERS"), and five variable supplemental funds: the New York City Police Superior Officers' Variable Supplements Fund ("PSOVSF"), the New York City Police Officers' Variable Supplements Fund ("POVSF"), the New York City Firefighters' Variable Supplements Fund ("FFVSF"), the New York City Fire Officers' Variable Supplements Fund ("FOVSF"), and the New York City Teachers' Retirement System of the City of New York Variable Annuity Program ("NYCTRS Variable A") (collectively, the "NYC Funds," the "Funds," or "Plaintiff").  As of July 31, 2006, the NYC Funds had more than $113 billion in assets, and as of June 30, 2005, had approximately 263,000 retired members and 350,000 active members.  On November 20, 2006, the Hon. James Ware appointed the NYC Funds as Lead Plaintiff for this litigation.

CONSOLIDATED CLASS ACTION COMPLAINT

22.     NYCERS, established under Section 12-102 of the Administrative Code of the City of New York, provides pension benefits to all New York City employees who are not eligible to participate in separate Fire Department, Police Department, Teachers, or Board of Education pension funds.

23.     NYCTRS maintains two separate retirement programs, the Qualified Pension Plan ("QPP") and the Tax-Deferred Annuity Program ("TDA").  The QPP, established pursuant to Section 13-502 of the Administrative Code of the City of New York, provides pension benefits to those with regular appointments to the pedagogical staff of the Board of Education.  The TDA, established pursuant to Internal Revenue Code Section 403(b), provides a means of deferring income tax payments on voluntary tax-deferred contributions.

24.     FIRE, established pursuant to Section 13-301 of the Administrative Code of the City of New York, provides pension benefits for full-time uniformed employees of the New York City Fire Department.

25.     POLICE, created pursuant to New York Local Law 2 of 1940, provides pension benefits for full-time uniformed employees of the New York City Police Department.

26.     BERS provides pension benefits to, among others, non-pedagogical employees of the Board of Education.

27.     PSOVSF, POVSF, FFVSF, FOVSF, and NYCTRS Variable A were established, pursuant to enabling State legislation, to provide certain retirees of the New York City Police Department, the New York City Fire Department, and the New York City Board of Education, with supplemental benefits from variable supplement funds.

28.     Each of the NYC Funds purchased or acquired Juniper common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein. During the Class Period, the NYC Funds purchased a total of approximately 3,600,000 shares of Juniper common stock on the open market and acquired 85,228 Juniper shares pursuant to the NetScreen merger, as set forth in their certifications previously filed in connection with the motion for appointment as the Lead Plaintiff.

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**The Company**

29.     Defendant Juniper is an internet networking equipment company that maintains its principal executive offices located at 1194 North Matilda Avenue, Sunnyvale, California 94089. For the fiscal year ended December 31, 2005, the Company reported approximately $2.0 billion in revenues and $354 million in net income.

30.     Plaintiff asserts claims against Juniper in Counts I and III herein.

**The Executive Defendants**

31.     Defendant Kriens has served since October 1996 as Chief Executive Officer and Chairman of Juniper.  Defendant Kriens participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's annual reports for fiscal years 2003 through 2005 on Forms 10-K, and the registration statements for the NetScreen merger and the offering of the Notes.

32.     From June 1999 through December 31, 2003, Kriens received at least 3,550,000 backdated stock options.  During the Class Period, Kriens sold approximately 4,900,000 shares of Juniper stock, reaping proceeds of approximately $106.4 million, while in the possession of material adverse information about the backdated options scheme.

33.     Because of defendant Kriens' position, his involvement in the day-to-day operations of Juniper, his participation in the employee compensation process, his access to internal corporate documents, conversations, and connections with other corporate officers and employees, his attendance at management and/or Board of Directors meetings, his receipt of reports and other information provided to him in connection therewith, and his obligations to certify the accuracy of the Company's financial statements and the adequacy of its internal controls, Kriens knew or recklessly disregarded that Juniper had issued backdated option grants to him and other executives and directors, and that the Company misrepresented and improperly accounted for this practice in its public filings and financial statements.

34.     Defendant Sindhu co-founded Juniper in February 1996 and served as Chief Executive Officer and Chairman of the Board of Directors until September 1996.  Since that time, Dr. Sindhu has served as Juniper's Chief Technical Officer and as Vice Chairman of the Board of

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

Directors.  Defendant Sindhu participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's annual reports for fiscal years 2003 through 2005 on Forms 10-K, and the registration statements for the NetScreen merger and the Notes offering.

35.     From June 1999 through December 31, 2003, Sindhu received at least 1,780,000 backdated stock options.  During the Class Period, Sindhu sold approximately 2,925,000 shares of Juniper stock, reaping proceeds of $70.5 million, while in the possession of material adverse information about the backdated options scheme.

36.     Because of defendant Sindhu's position, his involvement in the day-to-day operations of Juniper, his participation in the employee compensation process, his access to internal corporate documents, conversations, and connections with other corporate officers and employees, his attendance at management and/or Board of Directors meetings, and his receipt of reports and other information provided to him in connection therewith, Sindhu knew or recklessly disregarded that Juniper has issued backdated option grants to him and other executives and directors, and that the Company misrepresented and improperly accounted for this practice in its public filings and financial statements.

37.     Defendant Gani served as Juniper's Chief Financial Officer from February 1997 and as Executive Vice President and Chief Financial Officer of the Company from July 2002 through December 31, 2004.  Beginning January 1, 2005, Mr. Gani assumed the position of Juniper's Chief of Staff.  Defendant Gani participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's annual report for fiscal year 2003 on Form 10-K, the Company's reports on Forms 10-Q for each quarter of 2003 and 2004, and the registration statements for the NetScreen acquisition and the Notes offering.

38.     From June 1999 through December 31, 2003, Gani received at least 1,580,000 backdated stock options.  During the Class Period, Gani exercised 300,000 backdated options and sold the shares for an approximately $3.9 million profit, and he made an additional $3.4 million profit from the sale of another 250,000 shares, while in the possession of material adverse information about the backdated options scheme.

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

39.     Because of defendant Gani's position, his involvement in the day-to-day operations of Juniper, his participation as CFO in the employee compensation process, his access to internal corporate documents, conversations, and connections with other corporate officers and employees, his attendance at management and/or Board of Directors meetings, his receipt of reports and other information provided to him in connection therewith, and his obligations with respect to certifying the accuracy of the Company's financial statements and the adequacy of its internal controls, Gani knew or recklessly disregarded that Juniper had issued backdated option grants to him and other executives and that the Company misrepresented and improperly accounted for this practice in its public filings and financial statements.

40.     Defendants Kriens, Sindhu and Gani are collectively referred to as the "Executive Defendants."  Plaintiff asserts claims against the Executive Defendants in Counts I through IV herein.

**The Director Defendants**

41.     Defendant Robert M. Calderoni ("Calderoni") has served since October 2003 as a Director of Juniper and a member of the Audit Committee of the Board.  As a member of the Audit Committee, Calderoni oversaw and reviewed the Company's financial reporting and public disclosure activities.  Defendant Calderoni participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's annual reports filed with the SEC for the years 2003 through 2005 on Forms 10-K, and the registration statements for the NetScreen merger and the offering of the Notes.

42.     Defendant Kenneth Goldman ("Goldman") has served since October 2003 as a Director of Juniper and the Chair of the Audit Committee of the Board.  Goldman is identified in Juniper's SEC filings as an "audit committee expert" under SEC rules.  As Chairman of the Audit Committee, Goldman oversaw and reviewed the Company's financial reporting and public disclosure activities.  Defendant Goldman participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's annual reports filed with the SEC for the years 2003 through 2005 on Forms 10-K, and the registration statements for the NetScreen merger and the offering of the Notes.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

43.     Defendant William R. Hearst III ("Hearst") has served since 1996 as a Director of Juniper and has been a member of the Audit Committee since 1999.  As a member of the Audit Committee, Hearst oversaw and reviewed the Company's financial reporting and public disclosure activities.  Defendant Hearst participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's annual reports filed with the SEC for the years 2003 through 2005 on Forms 10-K, and the registration statements for the NetScreen merger and the offering of the Notes.

44.     Defendant Stratton Sclavos ("Sclavos") has served since May 2000 as a Director of Juniper and a member of the Audit Committee of the Board for the years 2000 through 2002.  As a member of the Audit Committee, Sclavos oversaw and reviewed the Company's financial reporting and public disclosure activities.  Sclavos signed the Company's annual reports on Forms 10-K filed with the SEC for the years 2003 through 2005, and the registration statements for the NetScreen merger and the Notes offering.

45.     On May 11, 2000, Sclavos received 40,000 backdated stock options.

46.     Defendant Vinod Khosla ("Khosla") was, from February 1996 through April 15, 2004, a Director of Juniper and a member of the Compensation Committee of the Board.  As a member of the Board and the Compensation Committee, Khosla authorized and approved the option grants which Juniper admits were improperly backdated from at least June 1999 through December 31, 2003.  Defendant Khosla participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's annual report filed with the SEC for 2003 on Form 10-K and the registration statements for the NetScreen merger and the Notes offering, and authorized the inclusion of a false and misleading Compensation Committee Report on Executive Compensation in the Company's proxy statements.

47.     Defendant Kenneth Levy ("Levy") has served since 2003 as a Director of Juniper and a member of the Compensation Committee of the Board.  As a member of the Board of Directors and/or the Compensation Committee, defendant Levy authorized and approved certain option grants that Juniper admits were improperly backdated.  Defendant Levy participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

annual reports filed with the SEC for the years 2003 through 2005 on Forms 10-K and the registration statements for the NetScreen merger and the Notes offering, and authorized the inclusion of a false and misleading Compensation Committee Report on Executive Compensation in the Company's proxy statements.

48.    Defendant William R. Stensrud ("Stensrud") has served since October 1996 as a Director of Juniper, and since 2002 as a member of the Compensation Committee.  As a member of the Board of Directors and/or the Compensation Committee, defendant Stensrud authorized and approved certain option grants which Juniper admits were improperly backdated.  Defendant Stensrud participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's annual reports filed with the SEC for the years 2003 through 2005 on Forms 10-K and the registration statements for the NetScreen merger and the Notes offering, and authorized the inclusion of a false and misleading Compensation Committee Report on Executive Compensation in the Company's proxy statements.

49.    Defendants Calderoni, Goldman, Hearst, Sclavos, Khosla, Levy, and Stensrud are collectively referred to as the "Director Defendants."  Plaintiff asserts claims against the Director Defendants as "controlling persons" of Juniper in Counts II and IV herein, and as directors and signatories to the NetScreen Registration Statement in Count III herein.

50.    The Executive Defendants and the Director Defendants are collectively referred to as the "Individual Defendants."

**Ernst & Young**

51.    Defendant E&Y is headquartered at 5 Times Square, New York, New York, and maintains offices in San Jose, California.  E&Y has served as Juniper's auditor at least since it became a public company in June 1999.  E&Y has regularly performed audit services for Juniper in this District, including the issuance of unqualified opinions on Juniper's financial statements from 1999 through 2005 for inclusion in Juniper's Forms 10-K for 1999 through 2005 and the Company's registrations statements for the NetScreen merger and the Notes offering.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

52.     Plaintiff asserts a claim against E&Y in Count III herein, based solely on negligence. Plaintiff expressly disclaims any allegations regarding E&Y that could be construed as alleging fraud or intentional or reckless misconduct.

**OBLIGATIONS AND DUTIES OF THE INDIVIDUAL DEFENDANTS**

53.     By reason of their positions as directors and/or officers of Juniper, and because of their ability to control the business, corporate and financial affairs of Juniper, each Individual Defendant was obligated to exercise due care and diligence in the management and administration of the affairs of the Company, including in the administration of the Company's stock options and incentive plans and in ensuring that Juniper operated in compliance with all applicable federal and state laws, rules and regulations, including the federal securities laws.

54.     Indeed, the Sarbanes-Oxley Act of 2002 requires an issuer and its chief executive officer and chief financial officer to publicly certify the accuracy of its financial statements and the adequacy of its internal controls.

55.     The Company's Worldwide Code of Business Conduct and Ethics also imposes an obligation of full disclosure upon Company officers and directors:

> As a public company, the Company, through its employees, directors, contractors and agents of Company entities worldwide, has a responsibility to provide full, fair, accurate, timely and understandable disclosure of its business and financial condition in the periodic reports we are required to file with the United States Securities and Exchange Commission.  As a result, the integrity of our financial information is paramount.  The Company's financial information guides the decisions of our Board of Directors and is relied upon by our stockholders and the financial markets.
>
> •       It is the Company's policy to maintain books, records and accounts in reasonable detail to accurately and fairly reflect all of the Company's transactions.  The Company and its subsidiaries maintain a system of internal accounting controls designed to reinforce policy compliance.

56.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial and corporate affairs of Juniper.  By virtue of these duties, Individual Defendants were required, *inter alia*, to

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

a.     Manage, conduct, supervise, and direct the employees, businesses and affairs of Juniper in accordance with laws, rules and regulations, and the charter and by-laws of Juniper;

b.     Manage and supervise the administration of Juniper's various stock option and incentive plans in a manner consistent with the plans' objectives; and

c.     Supervise the preparation, filing, and/or dissemination of any SEC filing, registration statement, press releases, audits, reports, or other information disseminated by Juniper and to examine and evaluate any reports of examinations or investigations concerning the practices, products, or conduct of officers of Juniper.

57.     Moreover, the Director Defendants generally, and members of the Compensation Committee specifically, were responsible for administering the Company's stock option plans. According to the Company's definitive proxy statement on Schedule 14A dated April 12, 2004 (the "2004 Proxy Statement"), the Compensation Committee is responsible for reviewing and approving the Company's compensation, employee benefits and stock-based programs. The Compensation Committee also negotiates and administers the Company's employment arrangements with its Chief Executive Officer and President, supervises incentive and equity-based compensation for the Company's employees and reviews and monitors directors' compensation programs.

58.     The Director Defendants generally, and the members of the Audit Committee specifically, were responsible for maintaining and establishing adequate internal accounting controls for the Company and ensuring that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Director Defendants were required to:

a.     Make and keep books, records, and accounts, which, in reasonable detail, fairly and accurately reflect the transactions and dispositions of assets of the issuer; and

b.     Devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:

i.     Transactions are executed in accordance with management's general or specific authorization; and

CONSOLIDATED CLASS ACTION COMPLAINT

ii.     Transactions are recorded as necessary to permit preparation of financial statements.

59.     Juniper's Audit Committee Charter provides that the Audit Committee shall, among other things:

• Assist the Board of Directors in oversight and monitoring of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; . . . (iv) the Company's internal accounting and financial controls, improvements made or to be made in such controls; and (v) the internal audit function.

\*     \*     \*

• Oversee the internal audit function and review, on a continuing basis, the adequacy of the Company's system of internal controls, including meeting periodically with the Company's management and the independent auditors to review the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure;

\*     \*     \*

• Review before release the unaudited quarterly operating results in the Company's quarterly earnings release.

## CLASS ACTION ALLEGATIONS

60.     Lead Plaintiff the NYC Funds brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class (the "Class") of all persons who purchased or otherwise acquired publicly traded Juniper securities during the period from April 10, 2003 through and including August 10, 2006, and who were damaged thereby, including all persons or entities who (a) received shares of Juniper common stock in the NetScreen merger that were issued pursuant to the NetScreen Registration Statement, and (b) purchased Juniper's Notes issued pursuant to the Notes Registration Statement.

61.     Excluded from the Class are defendants; members of the immediate families of the Individual Defendants; any parent, subsidiary, affiliate, officer, or director of defendant Juniper; any

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

entity in which any excluded person has a controlling interest; and the legal representatives, heirs, successors, and assigns of any excluded person.

62.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of members of the Class is unknown to Plaintiff at present and can only be ascertained from books and records maintained by Juniper and/or its agent(s), Plaintiff believes that there are tens of thousands of members of the Class located throughout the United States.  As of May 15, 2006, Juniper had issued and outstanding over 565 million shares of common stock and approximately $400 million principal amount of Notes.  Throughout the Class Period, Juniper's securities and Notes were actively traded, with more than 9.0 billion shares traded on the NASDAQ National Market System during the Class Period.

63.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class purchased Juniper securities at artificially inflated prices and have sustained damages arising out of the same wrongful course of conduct.

64.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained extremely competent counsel experienced in class and securities litigation and intends to prosecute this action vigorously.  Plaintiff is a member of the Class and does not have interests antagonistic to, or in conflict with, the other members of the Class.

65.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members.  Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

b.     whether defendants participated in and pursued the common course of conduct and fraudulent scheme complained of herein;

c.     whether the registration statements issued by Juniper contained material misstatements or omitted to state material facts;

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

d.      whether the statements disseminated to the investing public, including investors in Juniper, during the Class Period omitted and/or misrepresented material facts about Juniper's financial condition and compensation arrangements;

e.      whether Juniper's financial results during the Class Period were materially misstated;

f.      whether certain of the defendants had knowledge of or were reckless with respect to the improper activities described herein;

g.      whether the market prices of Juniper's securities during the Class Period were artificially inflated due to the material omissions and/or misrepresentations complained of herein; and

h.      whether Plaintiff and the other members of the Class have sustained damages and, if so, the appropriate measure thereof.

66.     A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Moreover, because the damages suffered by many individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members individually to seek redress for the wrongful conduct alleged.  Plaintiff does not foresee any difficulty in the management of this litigation that would preclude its maintenance as a class action.

67.     The names and addresses of the record owners of Juniper common stock and Notes purchased during the Class Period are available from Juniper and/or its transfer agent(s).  Notice can be provided to persons who purchased or otherwise acquired Juniper common stock by a combination of published notice and first-class mail, using techniques and forms of notice similar to those customarily used in other class actions arising under the federal securities laws.

## SUBSTANTIVE ALLEGATIONS

### Juniper's Compensation Philosophy Embraced the Wide Use of Stock Options

68.     The use of stock options surged in the late 1990s, as fledgling firms such as Juniper that had bright prospects but little revenues used them to attract and pay executives.  As dot-com and telecom share prices soared, stock options became a source of vast wealth for company executives.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

69.     From its inception as a public company in June 1999, Juniper adopted a policy of compensating defendants Kriens, Sindhu, Gani, and other employees in large part through stock options.  Moreover, prior to 2003, the Company exclusively used stock options to compensate nonmanagement directors for their services.

70.     Juniper described its compensation philosophy in its definitive proxy statement, filed with the SEC on Schedule 14A dated April 13, 2000 (the "2000 Proxy Statement"), as follows:

> The [Compensation] Committee's approach is predicated upon the philosophy that a substantial portion of aggregate annual compensation for executive officers should be contingent upon the Company's performance and an individual's contribution to the Company's success in meeting certain critical objectives.  <u>In addition, the Committee strives to align the interests of the Company's executive officers with the long-term interests of stockholders through stock option grants such that grants of stock options should relate the performance of the executive to the market perception of the performance of the Company.</u>
>
> *     *     *
>
> <u>Stock options are granted at market price on the date of the grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price.</u>

71.     As reflected in Juniper's proxy statements, Kriens' total cash compensation from salary and bonus from 1999 through 2003 ranged from $175,000 to $436,350; Gani's annual cash compensation ranged from $157,425 to $317,345; and Sindhu's cash compensation ranged from $162,500 to $255,554.  However, as shown in the tables below, these compensation figures pale when compared to the tens of millions of dollars the Executive Defendants stood to potentially realize from annual stock option grants, based upon a modest 5% annual price appreciation during the term of the options:

### Kriens' Annual Stock Option Compensation

| Year | No. of Stock Options Granted* | Potential Value (5% Price Appreciation) |
|------|------|------|
| 1999 | 1,800,000 | $ 34,361,211 |
| 2000 | 400,000 | $ 23,630,716 |
| 2001 | N/A | N/A |
| 2002 | 2,750,000 | $ 16,232,714 |
| 2003 | 800,000 | $  7,546,736 |

* Adjusted for stock split.

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

### Gani's Annual Stock Option Compensation

| Year | No. of Stock Options Granted* | Potential Value (5% Price Appreciation) |
|------|-------------------------------|------------------------------------------|
| 1999 | 480,000 | $ 9,162,990 |
| 2000 | 100,000 | $ 5,907,679 |
| 2001 | N/A | N/A |
| 2002 | 1,080,000 | $ 5,549,869 |
| 2003 | 50,000 | $ 4,716,710 |

* Adjusted for stock split.

### Sindhu's Annual Stock Option Compensation

| Year | No. of Stock Options Granted* | Potential Value (5% Price Appreciation) |
|------|-------------------------------|------------------------------------------|
| 1999 | 1,080,000 | $ 20,616,727 |
| 2000 | 100,000 | $ 5,907,679 |
| 2001 | N/A | N/A |
| 2002 | 400,000 | $ 1,721,913 |
| 2003 | 300,000 | $ 1,962,162 |

* Adjusted for stock split.

72.     As described herein, certain stock option grants to the Executive Defendants and other recipients were systematically backdated, and the Company's public filings and financial statements repeatedly misrepresented that the options were at-the-money and that no compensation expenses were required to be recorded.  The Executive Defendants were motivated to engage in this fraudulent scheme because backdating provided them with built-in, instant gains, and to conceal the fact that this compensation did not qualify for favorable accounting and tax treatment.  As a result, Juniper engaged in massive earnings overstatements for at least three years.

**Juniper's Stock Option Plans**

73.     Juniper had two stock option plans outstanding prior to and during the Class Period: the Amended and Restated 1996 Stock Options Plan (the "1996 Plan") and the 2000 Nonstatutory Stock Option Plan (the "2000 Plan") (together, the "Plans").  The 1996 Plan provided for the grant of certain stock options to employees, consultants, and non-management directors, whereas the 2000 Plan was designed for employees and consultants only.  Options granted under both Plans generally vested over a four-year period beginning on the date of grant and had a maximum term of ten years.

CONSOLIDATED CLASS ACTION COMPLAINT

74.     Both Plans provided that the exercise price of a stock option is set by the Board or a committee designated to administer the Plans, which in Juniper's case was the Compensation Committee.  The 1996 Plan provided generally that options should be set at "fair market value" on the date of grant.  "Fair market value" for publicly traded securities like Juniper common stock is the closing market price on the last trading day prior to the grant.

75.     The 1996 Plan at ¶ 8 provides in relevant part: Option Exercise Price and Consideration.

(a)     The per share exercise price for the Shares to be issued upon exercise of an Option shall be such price as is determined by the Administrator, but shall be subject to the following:

(i)  In the case of an Incentive Stock Option

(A)  granted to an Employee who, at the time of grant of such Option, owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary, the per Share exercise price shall be no less than 110% of the Fair Market Value per Share on the date of grant.

(B)  granted to any other Employee, the per Share exercise price shall be no less than 100% of the Fair Market Value per share on the date of grant.

(ii)  In the case of a Nonstatutory Stock Option, the per Share exercise price shall be determined by the Administrator [*i.e.*, the Board or Compensation Committee].  In the case of a Nonstatutory Stock Option intended to qualify as "performance-based compensation" within the meaning of Section 162(m) of the [Internal Revenue] Code, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant.

(Emphasis added.)

76.     While the 2000 Plan provides that "the exercise price for the Shares to be issued upon exercise of an Option shall be such price as is determined by the Administrator," Juniper repeatedly represented in its public filings from 1999 through the end of the Class Period, including the Company's audited financial statements, that "the exercise price of the Company's stock options equals the market price of the underlying stock on the date of grant," and that no stock options "have been granted for less than fair market value on the date of grant."  As demonstrated herein, these

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

representations were false and misleading with respect to numerous stock options granted to the Executive Defendants and other Juniper officers and directors.

**Accounting and Tax Treatment of Stock Options**

77.     Juniper's stated policy of issuing at-the-money stock options under its Plans was designed to enable the Company to receive favorable treatment under then-existing GAAP and IRS rules.

78.     Options are a form of employee compensation.  Prior to January 1, 2006, issuers typically accounted for options-related compensation expenses pursuant to the "intrinsic value" method described in Accounting Principles Board ("APB") Opinion No. 25, "Accounting for Stock Issued to Employees."  Under the intrinsic value method, the compensation expense attributed to a stock option grant is calculated as the difference of: (a) the exercise price and (b) the quoted market price of the underlying stock on the measurement date, defined as the "first date on which are known both (1) the number of shares that an individual employee is entitled to receive and (2) the option or purchase price, if any."  Pursuant to most stock option plans, including Juniper's, the measurement date is the date that the issuer's compensation committee approves the grant to the executive.

79.     Under the intrinsic value method, if the issuer grants an at-the-money option with an exercise price at or above the quoted market price of the stock on the grant date, then the issuer is not required to recognize any compensation-related expense for the option.  In fact, as long as the issuer granted options at the money, it could provide compensation to its executives without incurring any related compensation expense for the life of the option.  This benefit was particularly important to high-tech start-up companies like Juniper, which tended to be cash-poor, and relied heavily on stock options to attract and/or retain employees.

80.     In contrast, an issuer that granted an in-the-money option, *i.e.*, an option with an exercise price below the quoted market price of the stock on grant date, was not eligible for favorable treatment under GAAP.  Under APB No. 25, if the stock's market price on the date of grant exceeds the exercise price of the option, the company must recognize the difference as an expense, which directly reduces net income.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

81.     An arguable weakness of APB Opinion No. 25's intrinsic value method is that it does not take into account the possibility that an option granted with an exercise price at or above the quoted market price would someday increase in value as that market price went up.  Consequently, in October 1995, the Financial Accounting Standards Board ("FASB") offered an alternative method for valuing stock-based awards, FAS Statement 123, "Accounting for Stock-Based Compensation." FAS 123 allowed issuers to either continue valuing options using the intrinsic value method, or use the "fair value" method and employ option pricing models such as the Black-Scholes pricing model. If an issuer continued using the intrinsic value method, it had to disclose in the footnotes to its financial statements a pro forma income calculation of what the compensation expense would have been using the fair value method.

82.     Over the next decade, the vast majority of companies, including Juniper, continued to use APB Opinion No. 25's intrinsic value method, because using the fair value accounting method would have required that some compensation expenses be recorded, as compared to the intrinsic value method, where no compensation expenses were required to be recorded for at-the-money options.

83.     As reflected in Juniper's annual and quarterly financial statements from 2000 through 2005, the differential in reported earnings under the intrinsic value and the fair value accounting methods amounted to hundreds of millions of dollars.  Accordingly, the Executive Defendants were well aware of the importance to Juniper's bottom line of satisfying the requirements of APB No. 25.

84.     Juniper was also entitled to take tax deductions under the Internal Revenue Code ("IRC") for at-the-money options, but was not eligible for this favorable tax treatment if the options were granted in-the-money.  For example, IRC Section 162(m), 28 U.S.C. § 162(m) ("Section 162(m)"), provides that compensation in excess of $1 million per year (including gains on stock options) paid to a corporation's five most highly compensated officers is tax-deductible only if certain conditions are met.  One of those conditions is that the compensation must be payable solely on account of the attainment of one or more performance goals, such as increasing the value of the Company's stock in the future.  Tax experts have opined that in-the-money options do not qualify for a Section 162(m) deduction since such grants are not deemed performance-based compensation.

CONSOLIDATED CLASS ACTION COMPLAINT

As such, companies with backdated options face the prospect of paying out significant sums to revise prior years' tax returns, plus interest and penalties.

85.     In this case, Juniper did not expense stock option compensation to Juniper executives and consultants, even though the backdated stock options at issue were priced below the fair market value of the Company's stock at the date of grant and issuance.  As a result, Juniper's financial statements materially inflated margins and earnings in violation of GAAP, requiring the Company to take a $900 million charge to account for compensation expenses and restate its financial results for at least three years.

**The Backdated Option Grants**

86.     As noted above, the Executive Defendants received stock option grants from Juniper on unusually favorable dates from at least June 1999 through December 31, 2003.  The grants were numerous and consistently made at or near monthly lows and/or were just before a large increase in the stock price.  Analyses by CFRA and J. P. Morgan of the grants suggested, and Juniper has subsequently admitted, that, unbeknownst to public investors, millions of option shares were backdated to permit the Executive Defendants and other Juniper officers, directors, and consultants to reap the largest possible gains.  By disguising their true compensation practices, the Executive Defendants violated the Company's reported practices under its Plans and inflated earnings in the Company's financial statements in violation of GAAP.

87.     The 2000 Proxy Statement indicated that a total of 4,470,000 stock options (adjusted for a subsequent stock split), at an exercise price of $30.36 per share, were purportedly granted to five of the Company's executive officers on October 4, 1999, including Kriens, Sindhu, Gani, Steven Haley, Vice President of Worldwide Sales and Service, and Peter Wexler, Vice President of Engineering.

88.     Remarkably, the lowest closing price of the Company's stock during October 1999 occurred on October 4, 1999, the day of the grant in question.  Even more remarkable, the value of the Company's stock increased considerably during the days following the stock option grant of October 4, 1999.  By the close of trading on October 11, 1999, one week after the option grant, Juniper's stock, adjusted for a subsequent split, stood at $40.67, a 34% increase.  By the close of

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

trading on October 25, 1999, Juniper's stock traded at $42.96, a 41% increase over its October 4, 1999 close.  The Company's closing stock price as of the last trading day of October 1999, adjusted for a subsequent split, was $45.94, an increase of 52%.

89.    A graph illustrating the October 1999 trading in relation to the Company's stock option grants is set forth below.



90.    A table showing the reported stock options, and comparing their value on the purported grant date of October 4 with their value on October 25, evidences a $56 million increase in only three weeks.

| Date | Executive | No. of Securities Options Granted | Per Option Gain in Intrinsic Value Between Date of Grant and Oct. 25 | Gain in Intrinsic Value Between Date of Grant and Oct. 25 |
|---|---|---|---|---|
| 10/4/1999 | Kriens | 1,800,000 | $ 12.60 | $ 22,680,000 |
| 10/4/1999 | Sindhu | 1,080,000 | $ 12.60 | $ 13,608,000 |
| 10/4/1999 | Gani | 480,000 | $ 12.60 | $ 6,048,000 |
| 10/4/1999 | Haley | 630,000 | $ 12.60 | $ 7,938,000 |
| 10/4/1999 | Wexler | 480,000 | $ 12.60 | $ 6,048,000 |
| | | 4,470,000 | | $ 56,322,000 |

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

91.     A similar pattern is shown with respect to options granted to senior management in December 2000.  According to the Company's definitive proxy statement dated March 28, 2001 (the "2001 Proxy"), a total of 1,240,000 stock options at an exercise price of $93.9375 were purportedly granted to the same five executives on December 20, 2000.

92.     Once again, the lowest closing price of the Company's stock during the month of December 2000 occurred on December 21, 2000, the date of the grant in question. This marked a sharp decline from $131.88 that Juniper stock stood at on December 1, 2000.  Moreover, the stock price rebounded just one week after the December 21 option grant to close on December 28, 2000 at $138.63, an increase of more than 40%.

93.     A table showing the reported stock options grants and comparing their value on the purported grant date of December 21 with their value on December 28, 2000 evidences a $35 million gain for these executives in one week.

| Date | Executive | No. of Securities Options Granted | Per Option Gain in Intrinsic Value Between Date of Grant and Dec. 28 | Total Grant Value as of Dec. 28 |
|---|---|---|---|---|
| 12/21/2000 | Kriens | 400,000 | $ 44.69 | $ 17,876,000 |
| 12/21/2000 | Sindhu | 100,000 | $ 44.69 | $  4,469,000 |
| 12/21/2000 | Gani | 100,000 | $ 44.69 | $  4,469,000 |
| 12/21/2000 | Haley | 100,000 | $ 44.69 | $  4,469,000 |
| 12/21/2000 | Wexler | 100,000 | $ 44.69 | $  4,469,000 |
| | | 800,000 | | $ 35,752,000 |

94.     The beneficiaries of stock option backdating were not limited to Juniper executives. According to his Form 4, on May 11, 2000, defendant Sclavos received 40,000 stock options at an exercise price of $74.00.

95.     The lowest closing price of the Company's stock during the month of May 2000 occurred on May 11, 2000, the date of the grant to Sclavos.  This marked a sharp decline from $109.47 that Juniper stock stood at on May 1, 2000.  Moreover, the stock price rebounded less than one week after the May 11 option grant to close on May 16, 2000 at $87.53, an increase of more than 18%.  In five days, the options granted to Sclavos increased in value by more than $540,000.

96.     A graph illustrating the Company's May 2000 through December 2000 trading in relation to the Company's stock options grants in 2000 is set forth below:

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220



**Juniper Networks**
**Daily Stock Prices:  May - Dec 2000**

97.     According to the Company's definitive proxy statement dated March 28, 2003 (the "2003 Proxy"), a total of 1,850,000 stock options at an exercise price of $5.69 were purportedly granted on July 1, 2002 to defendants Kriens, Sindhu, Gani, and Lloyd Carney, Executive Vice President Operations.  Carney also was purportedly granted 1,500,000 stock options at an exercise price of $9.32 on February 28, 2002.

98.     As with the prior option grants to Juniper executives, the reported grant to Carney on February 28 occurred on the date when the Juniper stock hit its low for the month of February at $9.32.  The stock price had dramatically declined by 32% from a closing price of $13.75 on February 12, and dropped 38% from a closing price of $14.96 as of February 1.  Incredibly, following the option grant on February 28, Juniper's stock price rebounded just as dramatically as it had dropped.  By March 11, 2002, the stock rose to $14.71, a 58% gain in less than two weeks.

99.     A similar pattern occurred with respect to the option grants on July 1, 2002.  The lowest closing price of the Company's stock during July 2002 occurred on July 1, the day of the grants in question.  However, by July 8, 2002, one week after the option grants, the price of Juniper

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

stock stood at $7.25, an increase of more than 27%.  Less than three weeks after the grant, on July

31, 2002, the Company's shares increased to $9.21 per share, an increase of 62% over the July 1

price.

100.    A graph illustrating the February through July 2002 trading in Juniper stock in

relation to the Company's grants of stock options is set forth below.



Juniper Networks Daily Pricing:  Feb. - July 2002

101.    The table below shows the reported stock option grants and compares their respective

values as of their February 28, 2002 and July 1, 2002 grant dates with their respective values on

March 11 and July 17, 2002, and evidences $14 million in gains reaped by these executives as a

result of the precipitous rises in Juniper's stock price in a very short time frame.

| Date | Executive | No. of Stock Options Granted | Per Option Gain in Intrinsic Value Between Date of Grant and July 17 | Total Grant Value As Of July 17 |
|------|-----------|------------------------------|------------------------------------------------------------------|--------------------------------|
| 7/1/2002 | Kriens | 550,000 | $ 3.52 | $ 1,936,000 |
| 7/1/2002 | Sindhu | 300,000 | $ 3.52 | $ 1,056,000 |
| 7/1/2002 | Gani | 500,000 | $ 3.52 | $ 1,760,000 |
| 7/1/2002 | Carney | 500,000 | $ 3.52 | $ 1,760,000 |
| | | 1,850,000 | $ 3.52 | $ 6,512,000 |

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

| Date | Executive | No. of Stock Options Granted | Per Option Gain in Intrinsic Value Between Date of Grant and March 11 | Total Grant Value As Of March 11 |
|---|---|---|---|---|
| 2/28/2002 | Carney | 1,500,000 | $ 5.39 | $ 8,085,000 |

102.    The 2004 Proxy Statement also indicated that a total of 2,350,000 stock options at an exercise price of $15.00 were purportedly granted on September 26, 2003 to five of the Company's executive officers, including Kriens, Sindhu, Gani, James A. Dolce, Jr., Executive Vice President Field Operations and Ashok Krishnamurthi ("Krishnamurthi"), Vice President Engineering.  An additional 37,500 stock options at an exercise price of $8.16 were purportedly granted to Krishnamurthi on April 1, 2003.

103.    As with the prior options grants described above, the lowest closing price of Juniper's stock during September 2003 occurred on September 26, 2003, the reported date of the option grants in question.  This price represented a drop from $17.11, where the Company's stock stood on September 2, 2003.  Moreover, within 10 trading days following the option grants, Juniper's stock price more than fully recovered from its temporary dip, rising 23% to close at $18.40 on October 9, 2003.

104.    Similarly, the lowest closing price of Juniper's stock during April 2003 occurred on April 1, 2003, the reported date of the stock option grant to Krishnamurthi.  By April 15, Juniper's stock had increased 22% to close at $9.98, and the price continued to rise to a closing price of $10.24 on April 30, 2003, more than 25% higher than its price on the date the option was purportedly granted.

105.    A graph illustrating the trading in Juniper stock in relation to the Company's reported April 2003 and September 2003 grants of stock options is set forth below:

CONSOLIDATED CLASS ACTION COMPLAINT





**Juniper Networks**
**Daily Shares:  Apr. - Oct. 2003**

9/26/03 - $15.00
Options granted to Kriens
(800,000), Sindhu (300,000),
Gani (500,000), Dolce
(500,000), Krishnamurthi
(250,000)

4/1/03 - $8.16
Options granted to
Krishnamurthi
(37,500)

106.    The table below shows the executive option grants on April 1, 2003 and September
26, 2003 and compares their respective values on April 30 and October 9, 2003, and evidences a
total increase in value of almost $8.0 million as a result of the opportune rise in Juniper's stock
price.

| Date | Executive | No. of Stock Options Granted | Per Option Gain in Intrinsic Value Between Date of Grant and Oct. 9 | Total Grant Value As Of Oct. 9 |
|---|---|---|---|---|
| 9/20/2003 | Kriens | 800,000 | $ 3.12 | $ 2,496,000 |
| 9/26/2003 | Sindhu | 300,000 | $ 3.12 | $ 936,000 |
| 9/26/2003 | Gani | 500,000 | $ 3.12 | $ 1,560,000 |
| 9/29/2003 | Dolce | 500,000 | $ 3.12 | $ 1,560,000 |
| 9/29/2003 | Krishnamurthi | 250,000 | $ 3.12 | $ 780,000 |
| | | 2,350,000 | | $ 7,332,000 |

| Date | Executive | No. of Stock Options Granted | Per Option Gain in Intrinsic Value Between Date of Grant and April 30 | Total Grant Value As Of April 30 |
|---|---|---|---|---|
| 4/1/2003 | Krishnamurthi | 37,500 | $ 2.08 | $ 636,480 |

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD**

107.    On December 20, 2006, Juniper admitted that the foregoing pattern is not the result of coincidence.  Rather, on that date, the Company stated that from June 9, 1999 through December 31, 2005, "there were numerous instances in which grant dates were chosen with the benefit of hindsight as to the price of the Company's stock, so as to give favorable prices," thereby substantially increasing the value of those options in the hands of the recipients.  To conceal their backdating scheme, the Executive Defendants made false statements in Juniper's public filings concerning the option grant dates and the Company's compensation practices, and improperly accounted for the option grants in the Company's financial statements, thereby inflating Juniper's reported earnings.

108.    Juniper has admitted that its financial results from fiscal year 2003 through March 31, 2006 were false and misleading and should no longer be relied upon.  These financial statements were false due to the improper accounting for stock options which understated its compensation costs and inflated the Company's operating margins and income.  As a result, the Company is required to record a $900 million charge relating to the grant of these options, and to restate its financial results for at least three years, as they were presented in violation of GAAP and SEC rules.

109.    The Company's false financial results for 2003 through March 31, 2006 were included in reports filed with the SEC including Forms 10-K and 10-Q and registration statements. The inflated results were also included in press releases disseminated to the investing public.  The Executive Defendants also reiterated these false financial results in conference calls and other communications with securities analysts.

110.    Defendants Kriens and Gani certified many of the Company's false and misleading statements during the Class Period in Forms 10-K and 10-Q, in accordance with the Sarbanes-Oxley Act of 2002.  By certifying those public filings, defendants Kriens and Gani falsely represented, *inter alia*, that Juniper's financial statements were accurate and that the Company had adequate internal financial controls to foster the development and preparation of reliable financial statements.

111.    Juniper's compensation practices were also misrepresented in its proxy statements and other SEC filings from 2000 through April 2006.  In these filings, it was repeatedly

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

misrepresented that (a) options under the Company's Plans were granted at fair market value at the date of the grant; (b) the option grants were aligning the interests of investors and shareholders with those of Juniper's executives; and (c) the Board was administering, reviewing and monitoring the grants in accordance with the Company's stock option plans.

**The False Financial Statements**

**A.      Fiscal Year 2003**

112.      On April 10, 2003, Juniper issued a press release announcing its purported financial results for the quarter ended March 31, 2003 (the "1Q 2003 Press Release").  The 1Q 2003 Press Release stated in relevant part:

> GAAP net income for the first quarter was $3.7 million or $0.01 per share, compared with a net loss of $46.0 million or $0.14 per share in the first quarter of 2002.  Non-GAAP net income, which excludes amortization of purchased intangibles and deferred compensation and a gain on the sale of investments, was $6.3 million or $0.02 per share, compared with non-GAAP net income of $0.4 million or $0.00 per share in the first quarter of 2002.

113.      On May 8, 2003, Juniper filed its Report on Form 10-Q with the SEC for the period ended on March 31, 2003 (the "1Q 2003 10-Q").  The 1Q 2003 10-Q reiterated the financial results in the 1Q 2003 Press Release and represented that the financial results and related disclosures were prepared in accordance with GAAP.  The 1Q 2003 10-Q was signed by defendant Gani.

114.      In Note 2 to the 1Q 2003 consolidated financial statements, the Company's accounting treatment of stock-based compensation was described as follows:

> **Stock Based Compensation**
>
> The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees" and related interpretations.  <u>As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based employee compensation cost, other than acquisition-related compensation, is recognized in net income (loss)</u>.

(Emphasis added.)

115.      Pursuant to the Sarbanes-Oxley Act of 2002, the 1Q 2003 10-Q contained certifications by CEO Kriens and CFO Gani which represented (a) that the 1Q 2003 10-Q accurately

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that they had inspected the Company's disclosure and internal financial reporting controls and found them to be effective.

116.    The foregoing statements concerning Juniper's 1Q 2003 financial results and compensation practices were materially false and misleading, for the reasons set forth herein at ¶¶ 9, 108, 111, and 200.

117.    On July 10, 2003, Juniper issued a press release announcing its purported financial results for the quarter ended June 30, 2003 (the "2Q 2003 Press Release").  The 2Q 2003 Press Release stated in relevant part:

> GAAP net income for the second quarter was $13.6 million or $0.03 per share, compared with a GAAP net income of $6.2 million or $0.02 per share in the second quarter of 2002.  Non-GAAP net income, which excludes an adjustment to the purchase price of an acquisition, the amortization of purchased intangibles and deferred compensation, the gain on the sale of investments and the gain on the partial retirement of the convertible subordinated notes was $10.3 million or $0.03 per share, compared with non-GAAP net income of $0.4 million or $0.00 per share in the second quarter of 2002.

118.    On August 7, 2003, Juniper filed its Report on Form 10-Q with the SEC for the second quarter ended on June 30, 2003 (the "2Q 2003 10-Q").  The 2Q 2003 10-Q reiterated the financial results in the 2Q 2003 Press Release and represented that the financial results and related disclosures were prepared in accordance with GAAP.  The 2Q 2003 10-Q was signed by defendant Gani.

119.    In Note 2 to the 2Q 2003 consolidated financial statements, the Company's accounting treatment of stock-based compensation was described as follows:

> Stock Based Compensation

> The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees" and related interpretations.  As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based employee compensation cost, other than acquisition-related compensation, is recognized in net income (loss).

> (Emphasis added.)

CONSOLIDATED CLASS ACTION COMPLAINT

Page 32

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

120.    Pursuant to the Sarbanes-Oxley Act of 2002, the 2Q 2003 10-Q contained certifications by CEO Kriens and CFO Gani which represented (a) that the 2Q 2003 10-Q accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that they had inspected the Company's disclosure and internal financial reporting controls and found them to be effective.

121.    The foregoing statements concerning Juniper's 2Q 2003 financial results and compensation practices were materially false and misleading, for the reasons set forth herein at ¶¶ 9, 108, 111, and 200.

122.    On October 9, 2003, Juniper issued a press release announcing its purported financial results for the quarter ended September 30, 2003 (the "3Q 2003 Press Release").  The 3Q 2003 Press Release stated in relevant part:

> GAAP net income for the third quarter was $7.2 million or $0.02 per share, compared with a GAAP net loss of $88.3 million or $0.24 per share in the third quarter of 2002. Non-GAAP net income, which excludes restructuring expenses, in-process research and development expenses, integration expenses, the amortization of purchased intangibles and deferred compensation, the write-down of investments and the gain on the partial retirement of the 4.75% Convertible Subordinated Notes was $14.7 million or $0.04 per share, compared with non-GAAP net loss of $8.4 million or $0.02 per share in the third quarter of 2002.

123.    On or about November 14, 2003, Juniper filed its Report on Form 10-Q with the SEC for the third quarter ended on September 30, 2003 (the "3Q 2003 10-Q").  The 3Q 2003 10-Q reiterated the financial results in the 3Q 2003 Press Release and represented that the financial results and related disclosures were prepared in accordance with GAAP.  The 3Q 2003 10-Q was signed by defendant Gani.

124.    In Note 2 to the 3Q 2003 consolidated financial statements, the Company's accounting treatment of stock-based compensation was described as follows:

**Stock Based Compensation**

The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees" and related interpretations.  <u>As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based employee compensation cost, other</u>

CONSOLIDATED CLASS ACTION COMPLAINT

than acquisition-related compensation, is recognized in net income (loss).

(Emphasis added.)

125.   Pursuant to the Sarbanes-Oxley Act of 2002, the 3Q 2003 10-Q contained certifications by CEO Kriens and CFO Gani which represented that the 3Q 2003 10-Q accurately portrayed Juniper's financial condition, and was not materially false or misleading.  In addition, they "concluded that [Juniper's] disclosure controls and procedures are effective in timely alerting them to material information relating to the Company (including its consolidated subsidiaries) required to be included in our Exchange Act filings."

126.   The foregoing statements concerning Juniper's 3Q 2003 financial results and compensation practices were materially false and misleading, for the reasons set forth herein at ¶¶ 9, 108, 111, and 200.

127.   On January 15, 2004, Juniper issued a press release announcing its purported financial results for the fourth quarter and year ended December 31, 2003 (the "2003 Press Release").  The 2003 Press Release stated in relevant part:

> GAAP net income for the fourth quarter was $14.7 million or $0.04 per share, compared with a GAAP net income of $8.5 million or $0.02 per share in the fourth quarter of 2002.  Non-GAAP net income, which excludes restructuring expenses, the amortization of purchased intangibles and deferred compensation, and the loss on the partial retirement of the 4.75% Convertible Subordinated Notes was $27.7 million or $0.07 per share, compared with non-GAAP net income of $2.7 million or $0.01 per share in the fourth quarter of 2002.

> *     *     *

> GAAP net income for the year ended December 31, 2003 was $39.2 million or $0.10 per share, compared with a GAAP net loss of $119.7 million or $0.34 per share for the same period last year.  Non-GAAP net income, which excludes restructuring expenses, in-process research and development expenses, integration expenses, the amortization of purchased intangibles and deferred compensation, an adjustment to the purchase price of an acquisition, the gain on the sale of investments, the write-down of investments and the gain (loss) on the partial retirement of the 4.75% Convertible Subordinated Notes was $59.0 million or $0.15 per share, compared with non-GAAP net loss of $4.8 million or $0.01 per share for the same period last year.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

128.     On or about February 20, 2004, Juniper filed with the SEC a Report on Form 10-K for the fiscal year ended December 31, 2003 (the "2003 Form 10-K").  Defendants Kriens, Gani, Sindhu, Calderoni, Goldman, Khosla, Levy, Hearst, Sclavos, and Stensrud signed the 2003 Form 10-K.  In the 2003 Form 10-K, Juniper stated that its net income for 2003 was $39.199 million, compared to a net loss in 2002 of $119.56 million, and earnings per share were $0.10 compared to a loss of $0.34 for 2002.

129.     The 2003 Form 10-K included the Company's audited consolidated balance sheets and statements of operations for each of the three years in the period ended December 31, 2003.  At Note 2 to the 2003 financial statement, the Company's accounting for stock options was described as follows:

> The Company has employee stock benefit plans, which are described more fully in Note 10, "Stockholders' Equity."  The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related Interpretations.  <u>As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based employee compensation cost, other than acquisition-related compensation cost, is recognized in net income</u>.

(Emphasis added.)

130.     In Note 10 to the 2003 financial statements, the Company described its purported practice under both the 1996 Plan and the 2000 Plan of issuing all stock options at their fair-market value on the date of grant.  Note 10 states in relevant part:

> The Company's Amended and Restated 1996 Stock Option Plan (the "1996 Plan") provides for the granting of incentive stock options to employees and nonstatutory stock options to employees, directors and consultants.  <u>Incentive stock options are granted at an exercise price of not less than the fair value per share on the date of grant</u>.  Nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, <u>no nonstatutory stock options have been granted for less than fair market value on the date of grant</u>.

> *     *     *

> In July 2000, the Board of Directors adopted the Juniper Networks 2000 Nonstatutory Stock Option Plan (the "2000 Plan").  The 2000 Plan provides for the granting of nonstatutory stock options to employees, directors and consultants.  Nonstatutory stock options may be granted at an exercise price of not less than 85%

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

of the fair value per share on the date of grant; however, <u>no nonstatutory stock options have been granted for less than fair market value on the date of grant</u>.

(Emphasis added.)

131.    Pursuant to the Sarbanes-Oxley Act of 2002, the 2003 Form 10-K contained certifications by CEO Kriens and CFO Gani which represented that (a) the 2003 Form 10-K accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) they had inspected the Company's disclosure and internal financial reporting controls and found them to be effective.

132.    With respect to the issue of internal controls, Juniper stated that: "We carried out an evaluation, under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report.  Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective in timely alerting them to material information relating to the Company (including its consolidated subsidiaries) required to be included in our Exchange Act filings."

133.    The foregoing statements concerning Juniper's 4Q 2003 and year-end 2003 financial results and compensation practices were materially false and misleading, for the reasons set forth herein at ¶¶ 9, 108, 111, and 200.

**B.    <u>The Notes Offering</u>**

134.    On November 20, 2003, Juniper issued $400 million principal amount of Notes pursuant to the Notes Registration Statement.  The Notes were originally issued in private placements in May and June 2003 which were exempt from registration under SEC Rule 144A.  The private placement notes were subsequently registered pursuant to the Notes Registration Statement, and sold by their holders to the public investors.  The Notes Registration Statement was signed by defendants Kriens, Gani, Sindhu, Hearst, Khosla, Levy, Sclavos, and Stensrud.

135.    The Notes are convertible to shares of Juniper common stock, subject to certain adjustments, at a rate of 49.6512 shares of common stock per $1006 principal amount of notes, the

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  equivalent of a conversion price of approximately $20.14 per share.  Because of the conversion

2  feature, the market price of the Notes is directly related to the price of Juniper common stock.

3          136.    The Notes Registration Statement reported on Juniper's financial condition and stated

4  that the Company's ratio of earnings to fixed charges was 1.99, based on its financial results for the

5  nine months ended September 30, 2003.

6          137.    The Notes Registration Statement also incorporated by reference Juniper's audited

7  consolidated financial statements contained in the annual report on Form 10-K for the year ended

8  December 31, 2002, and the quarterly reports on Form 10-Q for the quarters ended March 31, 2003,

9  June 30, 2003, and September 30, 2003.

10         138.    For the reasons set forth herein at ¶¶ 9, 108, 111, and 200 above, the 2003 interim

11  financial statements which were summarized and incorporated by reference in the Notes

12  Registration Statement, were materially false and misleading in failing to disclose, *inter alia*, the

13  option backdating scheme, and to record compensation expenses for those grants, thereby inflating

14  Juniper's earnings.

15  **C.     The NetScreen Merger**

16         139.    In connection with its merger with NetScreen, Juniper filed with the SEC the

17  NetScreen Registration Statement, which became effective on March 10, 2004.  The NetScreen

18  Registration Statement was signed by defendants Kriens, Gani, Sindhu, Calderoni, Goldman, Hearst,

19  Khosla, Levy, Sclavos, and Stensrud.

20         140.    The NetScreen Registration Statement included a joint proxy statement/prospectus

21  dated March 10, 2004 (the "Proxy Statement/Prospectus").  At separate special meetings of

22  stockholders held on April 16, 2004, Juniper shareholders approved the issuance of Juniper common

23  stock in connection with the merger, and NetScreen shareholders adopted the merger agreement

24  between Juniper and NetScreen, pursuant to which NetScreen became a wholly-owned subsidiary of

25  Juniper.  Upon completion of the merger, NetScreen shareholders received 1.404 shares of Juniper

26  common stock for each share of NetScreen common stock held by them.  According to Juniper's

27  consolidated statements of stockholders' equity, contained in the Company's Annual Report on

28  Form 10-K for the fiscal year ended December 31, 2004 (the "2004 Form 10-K"), approximately

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

1  132,000,000 Juniper shares were issued to NetScreen common stockholders in connection with the

2  NetScreen Merger.

3       141.   The NetScreen Registration Statement and the Proxy Statement/Prospectus contained

4  therein set forth a summary of Juniper's reported financial statements for the years 1999 through

5  2003, and incorporated by reference Juniper's audited consolidated financial statements contained in

6  the 2003 Form 10-K.  The NetScreen Registration Statement stated that the complete financial

7  statements were intended to be read together with the summary financial data in the joint Proxy

8  Statement/Prospectus.

9       142.   For the reasons specified in ¶ 133 above, the audited financial statements for 2003,

10  which were summarized and incorporated by reference in the NetScreen Registration Statement,

11  were materially false and misleading in failing to disclose, *inter alia*, the option backdating scheme,

12  and to record compensation expenses for those grants, thereby inflating Juniper's earnings.

13       143.   Juniper's 2003 financial results were supported by the unqualified opinion of E&Y

14  contained in the 2003 Form 10-K, which was incorporated by reference in the NetScreen

15  Registration Statement.  E&Y's report, entitled "Report of Independent Auditors" dated January 13,

16  2004 (except for Note 18, which was dated as of February 9, 2004), stated:

17       We have audited the accompanying consolidated balance sheets of Juniper Networks,
         Inc. as of December 31, 2003 and 2002, and the related consolidated statements of
18       operations, stockholders' equity and cash flows for each of the three years in the
         period ended December 31, 2003.  Our audits also included the financial statement
19       schedule listed in the Index at Item 15(a).  These financial statements and schedule
         are the responsibility of the Company's management.  Our responsibility is to express
20       an opinion on these financial statements and schedule based on our audits.

21

22       We conducted our audits in accordance with auditing standards generally accepted in
         the United States.  Those standards require that we plan and perform the audit to
23       obtain reasonable assurance about whether the financial statements are free of
         material misstatement.  An audit includes examining, on a test basis, evidence
24       supporting the amounts and disclosures in the financial statements.  An audit also
         includes assessing the accounting principles used and significant estimates made by
25       management, as well as evaluating the overall financial statement presentation.  We
         believe that our audits provide a reasonable basis for our opinion.
26

27       In our opinion, the financial statements referred to above present fairly, in all material
         respects, the consolidated financial position of Juniper Networks, Inc. at December
28       31, 2003 and 2002, and the consolidated results of their operations and their cash

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

flows for each of the three years in the period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States.

144.    E&Y's opinion on the 2003 financial statements contained material misrepresentations because the 2003 financial statements did not conform with GAAP in failing to report compensation expenses for millions of backdated in-the-money stock options as required under APB 25.

145.    The NetScreen Registration Statement highlighted E&Y's expertise in auditing financials, as follows:

**EXPERTS**

The consolidated financial statements and schedule of Juniper Networks, Inc. appearing in Juniper Networks, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2003, have been audited by Ernst & Young LLP, independent auditors, as set forth in their report thereon included therein and incorporated herein by reference.  Such consolidated financial statements and schedule are incorporated herein by reference in reliance upon such report given on the authority of such firm as experts in accounting and auditing.

146.    This representation was materially misleading in failing to disclose the material facts that Juniper's audited 2003 financials overstated earnings, and were not in compliance with GAAP. Juniper has admitted that the 2003 financials are being restated for failing to properly record compensation expenses.

**D.      Fiscal Year 2004**

147.    On April 21, 2004, Juniper issued a press release announcing its purported financial results for the first quarter ended March 31, 2004 (the "1Q 2004 Press Release").  The 1Q 2004 Press Release stated in relevant part:

GAAP net income for the first quarter was $33.5 million or $0.08 per share, compared with a GAAP net income of $3.7 million or $0.01 per share in the first quarter of 2003.  Non-GAAP net income, which excludes the amortization of purchased intangibles and deferred compensation and the gain on the sale of investments, was $36.4 million or $0.09 per share, compared with non-GAAP net income of $6.3 million or $0.02 per share in the first quarter of 2003.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

148.    On May 3, 2004, Juniper filed with the SEC a Report on Form 10-Q for the first quarter ended March 31, 2004 (the "1Q 2004 Form 10Q").  The 1Q 2004 Form 10-Q reiterated the financial results reported in the 1Q 2004 Press Release and represented that the 1Q 2004 financial results had been prepared in accordance with GAAP.  The 1Q 2004 Form 10-Q was signed by defendant Gani.

149.    In Note 2 to the financial statements, Juniper's accounting treatment for stock options was described as follows:

**Stock-Based Compensation**

The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations.  <u>As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date</u>, no stock-based compensation cost, other than acquisition-related compensation, is recognized in net income.

150.    Pursuant to the Sarbanes-Oxley Act of 2002, the Form 10-Q contained signed certifications by defendants Kriens and Gani representing (a) that the 1Q 2004 Form 10-Q accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that they had inspected the Company's disclosure and internal financial reporting controls and found them to be effective.

151.    The foregoing statements concerning Juniper's 1Q 2004 financial results and compensation practices were materially false and misleading, for the reasons set forth herein at ¶¶ 9, 108, 111, and 200.

152.    On July 13, 2004, Juniper issued a press release announcing its purported financial result for the second quarter ended June 30, 2004 (the "2Q 2004 Press Release").  The 2Q 2004 Press Release stated in relevant part:

GAAP net loss for the second quarter was $12.6 million or $0.02 per share, compared with a GAAP net income of $13.6 million or $0.03 per share in the second quarter of 2003.  Non-GAAP net income was $42.7 million or $0.08 per share, compared with non-GAAP net income of $10.3 million or $0.03 per share in the second quarter of 2003.  See the table at the bottom of the Non-GAAP Condensed Consolidated Statements of Operations for a reconciliation of the non-GAAP net income to the GAAP net loss.

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

153.     On August 5, 2004, Juniper filed with the SEC a Report on Form 10-Q for the second quarter ended June 30, 2004 (the "2Q 2004 Form 10-Q").  The 2Q 2004 Form 10-Q reiterated financial results reported in the 2Q 2004 Press Release and represented that the 2Q 2004 financial results had been prepared in accordance with GAAP.  The 2Q 2004 Form 10-Q was signed by defendant Gani.

154.     In Note 2 to the financial statement, Juniper's accounting treatment for stock options was described as follows:

Stock-Based Compensation

The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations.  As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based compensation cost, other than acquisition-related compensation, is recognized in net income.

155.     Pursuant to the Sarbanes-Oxley Act of 2002, the 2Q 2004 Form 10-Q contained signed certifications by defendants Kriens and Gani representing (a) that the 2Q 2004 Form 10-Q accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that they had inspected the Company's disclosure and internal financial reporting controls and found them to be effective.

156.     The foregoing statements concerning Juniper's 2Q 2004 financial results and compensation practices were materially false and misleading, for the reasons set forth herein at ¶¶ 9, 108, 111, and 200.

157.     On October 14, 2004, Juniper issued a press release announcing its purported financial results for the third quarter ended September 30, 2004 (the "3Q 2004 Press Release"). The 3Q 2004 Press Release stated in relevant part:

GAAP net income for the third quarter was $48.8 million or $0.09 per share, compared with a GAAP net income of $7.2 million or $0.02 per share in the third quarter of 2003.  Non-GAAP net income was $73.5 million or $0.13 per share, compared with non-GAAP net income of $14.7 million or $0.04 per share in the third quarter of 2003.  See the table at the bottom of the Non-GAAP Condensed Consolidated Statements of Operations for a reconciliation of the non-GAAP net income to the GAAP net income.

CONSOLIDATED CLASS ACTION COMPLAINT

158.   On November 2, 2004, Juniper filed with the SEC a Report on Form 10-Q for the third quarter ended September 30, 2004 (the "3Q 2004 Form 10-Q").  The 3Q 2004 Form 10-Q reiterated financial results reported in the 3Q 2004 Press Release and represented that the 3Q 2004 financial statements had been prepared in accordance with GAAP.  The 3Q 2004 Form   10-Q was signed by defendant Gani.

159.   In Note 2 to the financial statement, Juniper's accounting treatment for stock options was described as follows:

**Stock-Based Compensation**

The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations.  <u>As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date</u>, no stock-based compensation cost, other than acquisition-related compensation, is recognized in net income.

160.   Pursuant to the Sarbanes-Oxley Act of 2002, the 3Q 2004 Form 10-Q contained signed certifications by defendants Kriens and Gani representing (a) that the 3Q 2004 Form 10-Q accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that they had inspected the Company's disclosure and internal financial reporting controls and found them to be effective.

161.   The foregoing statements concerning Juniper's 3Q 2004 financial results and compensation practices were materially false and misleading, for the reasons set forth herein at ¶¶ 9, 108, 111, and 200.

162.   On January 18, 2005, Juniper issued a press release announcing its purported financial results for the fourth quarter and year ended December 31, 2004 (the "2004 Press Release").  The 2004 Press Release stated in relevant part:

GAAP net income for the fourth quarter was $66.0 million or $0.11 per share, compared to $14.7 million or $0.03 per share in the fourth quarter of 2003.  Non-GAAP net income was $85.9 million or $0.15 per share, compared to $27.7 million or $0.06 per share in the fourth quarter of 2003.  See the table at the bottom of the Non-GAAP Condensed Consolidated Statements of Operations for a reconciliation of the non-GAAP net income to the GAAP net income.

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

*     *     *

GAAP net income for calendar year 2004 was $135.7 million or $0.25 per share, compared to $39.2 million or $0.09 per share during calendar year 2003. Non-GAAP net income for calendar year 2004 was $238.6 million or $0.44 per share, compared to $59.0 million or $0.14 per share during calendar year 2003. See the table at the bottom of the Non-GAAP Condensed Consolidated Statements of Operations for a reconciliation of the non-GAAP net income to the GAAP net income.

163. On or about March 4, 2005, Juniper filed with the SEC a Form 10-K for the fiscal year 2004 ended December 31, 2004 (the "2004 Form 10-K"). Defendants Kriens, Sindhu, Calderoni, Goldman, Hearst, Levy, Sclavos, and Stensrud signed Juniper's 2004 Form 10-K. In the 2004 Form 10-K, Juniper reported 2004 net income of $135.746 million, compared to $39.199 million in 2003, and earnings per share of $0.25, compared to $0.09 in 2003.

164. The 2004 Form 10-K included the Company's audited consolidated balance sheets and statements of operations for each of the three years in the period ended December 31, 2004. At Note 2 to the 2004 financial statement, the Company's accounting for stock options was described as follows:

The Company has employee stock benefit plans, which are described more fully in Note 10, "Stockholders' Equity." The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related Interpretations. As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based employee compensation cost, other than acquisition-related compensation cost, is recognized in net income.

(Emphasis added.)

165. Note 10 to the 2004 financial statements described the Company's purported practice under the 1996 Plan and the 2000 Plan of issuing all stock options at their fair-market value on the date of grant. Note 10 states in relevant part:

The Company's Amended and Restated 1996 Stock Option Plan (the "1996 Plan") provides for the granting of incentive stock options to employees and nonstatutory stock options to employees, directors and consultants. Incentive stock options are granted at an exercise price of not less than the fair value per share on the date of grant. Nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, no nonstatutory stock

CONSOLIDATED CLASS ACTION COMPLAINT

<u>options have been granted for less than fair market value on the date of grant</u>.

*     *     *

In July 2000, the Board of Directors adopted the Juniper Networks 2000 Nonstatutory Stock Option Plan (the "2000 Plan").  The 2000 Plan provides for the granting of nonstatutory stock options to employees, directors and consultants. Nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, <u>no nonstatutory stock options have been granted for less than fair market value on the date of grant</u>.

(Emphasis added.)

166.    Pursuant to the Sarbanes-Oxley Act of 2002, defendant Kriens signed the certification included as an exhibit to the Form 10-K, in which he represented (a) that the 2004 Form 10-K accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that he had inspected the Company's disclosure and internal financial reporting controls and found them to be effective.

167.    With respect to the issue of internal controls, Juniper stated that it had assessed the effectiveness of Juniper's internal control over financial reporting as of December 31, 2004 and that it had concluded that "as of December 31, 2004, Juniper Networks Inc.'s internal control over financial reporting is effective."

168.    The foregoing statements concerning Juniper's 4Q and year-end 2004 financial results and compensation practices were materially false and misleading, for the reasons set forth herein at ¶¶ 9, 108, 111, and 200.

**E.    <u>Fiscal Year 2005</u>**

169.    On April 19, 2005, Juniper issued a press release announcing its purported financial results for the first quarter ended March 31, 2005 (the "1Q 2005 Press Release").  The 1Q 2005 Press Release stated in relevant part:

GAAP net income for the first quarter was $75.4 million or $0.13 per share, compared to a GAAP net income of $33.5 million or $0.08 per share in the first quarter of 2004.  Non-GAAP net income was $91.9 million or $0.16 per share, compared to non-GAAP net income of $36.4 million or $0.08 per share in the first quarter of 2004.  See the table at the bottom of the Non-GAAP Condensed

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

Consolidated Statements of Operations for a reconciliation of the non-GAAP net income to the GAAP net income.

170.     On April 28 and April 29, 2005, respectively, the Company filed with the SEC Reports on Forms 10-Q and 10-Q/A for the first quarter ended March 31, 2005 (together, the "1Q 2005 Form 10-Q").  The 1Q 2005 Form 10-Q reiterated the financial results reported in the 1Q 2005 Press Release and represented that the 1Q 2005 financial results had been prepared in accordance with GAAP.

171.     In Note 2 to the financial statements, Juniper's accounting treatment for stock options was described as follows:

**Stock-Based Compensation**

The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations.  <u>As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based employee compensation cost, other than acquisition-related compensation, is recognized in net income</u>.

(Emphasis added.)

172.     Pursuant to the Sarbanes-Oxley Act of 2002, the 1Q 2005 Form 10-Q contained signed certifications by defendant Kriens representing (a) that the Form 10-Q accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that they had inspected the Company's disclosure and internal financial reporting controls and found them to be effective.

173.     The foregoing statements concerning Juniper's 1Q 2005 financial results and compensation practices were materially false and misleading, for the reasons set forth herein at ¶¶ 9, 108, 111, and 200.

174.     On July 19, 2005, Juniper issued a press release announcing its purported financial results for the second quarter ended June 30, 2005 (the "2Q 2005 Press Release").  The 2Q 2005 Press Release stated in relevant part:

Sᴄʜᴜʙᴇʀᴛ & Rᴇᴇᴅ LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

GAAP net income for the second quarter was $89.0 million or $0.15 per share, compared with a GAAP net loss of $12.6 million or $0.02 per share in the second quarter of 2004.  Non-GAAP net income was $104.3 million or $0.18 per share, compared with non-GAAP net income of $42.7 million or $0.08 per share in the second quarter of 2004.  See the table at the bottom of the Non-GAAP Condensed Consolidated Statements of Operations for a reconciliation of the non-GAAP net income to the GAAP net loss.

175.    On August 2, 2005, the Company filed with the SEC a Report on Form 10-Q for the second quarter ended June 30, 2005  (the "2Q 2005 Form 10-Q").  The 2Q 2005 Form 10-Q reiterated the financial results reported in the 2Q 2005 Press Release and represented that the 2Q 2005 financial statements had been prepared in accordance with GAAP.

176.    In Note 2 to the financial statements, Juniper's accounting treatment for stock options was described as follows:

**Stock-Based Compensation**

The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations.  <u>As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based compensation cost, other than acquisition-related compensation, is recognized in net income</u>.

(Emphasis added.)

177.    Pursuant to the Sarbanes-Oxley Act of 2002, the 2Q 2005 Form 10-Q contained signed certification by defendant Kriens representing (a) that the 2Q 2005 Form 10-Q accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that they had inspected the Company's disclosure and internal financial reporting controls and found them to be effective.

178.    The foregoing statements concerning Juniper's 2Q 2005 financial results and compensation practices were materially false and misleading, for the reasons set forth herein at ¶¶ 9, 108, 111, and 200.

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

179.     On October 19, 2005, Juniper issued a press release announcing its purported financial results for the third quarter ended September 30, 2005 (the "3Q 2005 Press Release").  The 3Q 2005 Press Release stated in relevant part:

> GAAP net income for the third quarter was $84.1 million or $0.14 per share, compared with a GAAP net income of $48.8 million or $0.08 per share in the third quarter of 2004.  Non-GAAP net income was $114.7 million or $0.19 per share, compared with non-GAAP net income of $73.5 million or $0.13 per share in the third quarter of 2004.  See the table at the bottom of the Non-GAAP Condensed Consolidated Statements of Operations for a reconciliation of the non-GAAP net income to the GAAP net income.

180.     On November 3, 2005, Juniper filed with the SEC a Report on Form 10-Q for the third quarter ended September 30, 2005 (the 3Q 2005 Form 10-Q").  The 3Q 2005 Form 10-Q reiterated financial results reported in the 3Q 2005 Press Release and represented that the 3Q 2005 financial statements had been prepared in accordance with GAAP.

181.     In Note 2 to the financial statements, Juniper's accounting treatment for stock options was described as follows:

> **Stock-Based Compensation**
>
> The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations.  <u>As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based compensation cost, other than acquisition-related compensation, is recognized in net income.</u>
>
> (Emphasis added.)

182.     Pursuant to the Sarbanes-Oxley Act of 2002, the 3Q 2005 Form 10-Q contained signed certifications by defendant Kriens representing (a) that the 3Q 2005 Form 10-Q accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that they had inspected the Company's disclosure and internal financial reporting controls and found them to be effective.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

183.    The foregoing statements concerning Juniper's 3Q 2005 financial results and compensation practices were materially false and misleading, for the reasons set forth herein at ¶¶ 9, 108, 111, and 200.

184.    On January 25, 2006, Juniper issued a press release announcing its purported financial results for the fourth quarter and year ended December 31, 2005 (the "2005 Press Release").  The 2005 Press Release stated in relevant part:

> Net income on a generally accepted accounting principles (GAAP) basis for the fourth quarter of 2005 was $105.5 million or $0.17 per share, compared with a GAAP net income of $66.0 million or $0.11 per share for the fourth quarter of 2004. Non-GAAP net income was $119.6 million or $0.20 per share, compared with non-GAAP net income of $85.9 million or $0.15 per share for fourth quarter of 2004.  A reconciliation between non-GAAP and GAAP net income is provided in a table immediately following the Non-GAAP Condensed Consolidated Statements of Operations.
>
> *        *        *
>
> GAAP net income for fiscal 2005 was $354.0 million or $0.59 per share, compared to $135.7 million or $0.25 per share for fiscal 2004.  Non-GAAP net income for fiscal 2005 was $430.6 million or $0.72 per share, compared to $238.6 million or $0.44 per share, for fiscal 2004.  A reconciliation between non-GAAP and GAAP net income is provided in a table immediately following the Non-GAAP Condensed Consolidated Statements of Operations.

185.    On or about March 7, 2006, Juniper filed with the SEC a Form 10-K for the fiscal year ended December 31, 2005 (the "2005 Form 10-K").  Defendants Kriens, Sindhu, Hearst, Calderoni, Goldman, Levy, Sclavos, and Stensrud signed Juniper's 2005 Form 10-K.  In the 2005 Form 10-K, Juniper reported 2005 net income of $354 million as compared to 2004 net income of $135.7 million, and earnings per share on a diluted basis of $0.59 as compared to $0.25 for 2004.

186.    The 2005 Form 10-K included the Company's audited consolidated balance sheets and statements of operations for each of the three years in the period ended December 31, 2005.  At Note 2 to the 2005 financial statements, the Company's accounting for stock options was described as follows:

> The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations.  <u>As the exercise price of all</u>

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based employee compensation cost, other than acquisition-related compensation cost, is recognized in net income.

(Emphasis added.)

187.     Note 10 to the 2005 financial statements described the Company's purported practice under the 1996 Plan and the 2000 Plan of issuing all stock options at their fair-market value on the date of grant.  Note 10 states in relevant part:

> The Company's Amended and Restated 1996 Stock Option Plan (the "1996 Plan") provides for the granting of incentive stock options to employees and nonstatutory stock options to employees, directors and consultants.  Incentive stock options are granted at an exercise price of not less than the fair value per share of the common stock on the date of grant.  Nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, no nonstatutory stock options have been granted for less than fair market value on the date of grant.

*     *     *

> In July 2000, the Board of Directors adopted the Juniper Networks 2000 Non-statutory Stock Option Plan (the "2000 Plan").  The 2000 Plan provides for the granting of non-statutory stock options to employees, directors and consultants.  Non-statutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, no nonstatutory stock options have been granted for less than fair market value on the date of grant.

(Emphasis added.)

188.     Pursuant to the Sarbanes-Oxley Act of 2002, defendant Kriens signed the certifications included as exhibits to the 2005 Form 10-Q, representing (a) that the 2005 Form 10-Q accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that he had inspected the Company's disclosure and internal financial reporting controls and found them to be effective.

189.     With respect to the issue of internal controls, Juniper stated that it had assessed the effectiveness of Juniper's internal control over financial reporting as of December 31, 2005 and that it had concluded that "as of December 31, 2005, Juniper Networks Inc.'s internal control over financial reporting is effective."

CONSOLIDATED CLASS ACTION COMPLAINT

190.     The foregoing statements concerning Juniper's 4Q and year-end 2005 financial results and compensation practices were materially false and misleading, for the reasons set forth herein at ¶¶ 9, 108, 111, and 200.

**F.     <u>First Quarter 2006</u>**

191.     On April 19, 2006, Juniper issued a press release announcing its purported financial results for the first quarter ended March 31, 2006 (the "1Q 2006 Press Release").  The 2006 Press Release explained the change in accounting standards regarding stock option compensation as follows:

> With the adoption of Statement of Financial Accounting Standards No. 123R (FAS 123R) as of January 1, 2006, Juniper is reporting stock-based compensation expense in its generally accepted accounting principles (GAAP) results for the first time.  Net income on a GAAP basis for the first quarter of 2006 was $75.8 million or $0.13 per share, compared with a GAAP net income of $75.4 million or $0.13 per share in the first quarter of 2005.

*      *      *

> For comparative purposes, net income excluding stock-based compensation for the first quarter of 2006 was $91.9 million or $0.15 per share, compared with a net income excluding stock-based compensation of $77.8 million or $0.13 per share for the first quarter of 2005.

192.     On May 8, 2006, Juniper filed with the SEC a Report on Form 10-Q for the first quarter ended March 31, 2006 (the "1Q 2006 Form 10-Q").  The 1Q 2006 Form 10-Q reiterated financial results reported in the 1Q 2006 Press Release and represented that the 1Q 2006 financial statements had been prepared in accordance with GAAP.

193.     In Note 1 to the 1Q 2006 financial statements, Juniper reported that:

> On January 1, 2006, the Company adopted Statement of Financial Accounting Standards No. 123 (revised 2004), *Share-Based Payment* ("SFAS 123R"), which requires the measurement and recognition of compensation expense for all stock-based payment awards made to employees and directors including employee stock options . . . based on estimated fair values.  SFAS 123R supersedes the previous accounting under Accounting Principles Board Opinion No. 25.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

194.    The net effect of the accounting change under SFAS 123R is to require the Company to record millions of dollars of compensation expenses in connection with stock option grants, which reduced the Company's reported earnings under GAAP.  Note 1 described the impact of SFAS 123R as follows:

> Prior to the adoption of SFAS 123R, no stock-based compensation expense had been recognized in the Company's consolidated statement of operations, other than those related to acquisitions.  As a result of adopting SFAS 123R, pre-tax stock-based compensation expense recorded for the three months ended March 31, 2006 of $23.1 million was related to employee stock options, RSUs, and employee stock purchases under the Company's Employee Stock Purchase Plan.  Pre-tax stock-based compensation expense of $3.4 million for the three months ended March 31, 2005, which the Company recorded under APB 25, was related to options assumed from acquisitions.  The pre-tax compensation expense was $18.8 million higher than the expense that would have been recorded had the Company continued to account for stock-based compensation under APB 25.

(Emphasis added.)

195.    As a result of the change in accounting under SFAS 123R, Juniper reported net income of $75.8 million, or $0.13 per share, for 1Q 2006, approximately $16 million, or $0.02 per share, lower than earnings would have been under APB 25's methodology.

196.    Notwithstanding that the 1Q 2006 financial statements included in the 1Q 2006 10-Q and 1Q 2006 Press Release were prepared using SFAS 123R, which required that compensation expenses be recorded for stock options, the financial statements were materially false and misleading in failing to disclose the options backdating scheme.  The stock options were also improperly valued and expensed based on the backdated grant dates rather than the actual grant dates.

197.    Juniper did not restate prior period results in the 1Q 2006 financial statements to account for the change in accounting methodology.  Accordingly, the Company's financial results for periods prior to 2006 in the 1Q 2006 10-Q and the 1Q 2006 Press Release were inflated.

198.    Note 6 to the 1Q 2006 financial statements also reiterated the misrepresentation in Juniper's previous SEC filings that all stock options issued under the 1996 Plan and the 2000 Plan were granted at an exercise price "no less than the fair value on the date of grant."

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

199.    Pursuant to the Sarbanes-Oxley Act of 2002, the 1Q 2006 Form 10-Q contained a signed certification by defendant Kriens representing (a) that the 1Q 2006 Form 10-Q accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that he had inspected the Company's disclosure and internal financial reporting controls and found them to be effective.

200.    The foregoing statements set forth above under the headings "The False Financial Statements" and "The False Proxy Statements" concerning Juniper's financial results and compensation practices were each materially false and misleading when made because they misrepresented or omitted the following material adverse facts:

a.    that, contrary to the affirmative representations in Juniper's public filings, stock options issued to Juniper employees under the Plans were not always issued at the fair market value of the Company's stock on the date of the grant since the Executive Defendants repeatedly manipulated option grant dates at least from June 1999 through December 2003 to coincide with particularly low share prices so as to benefit Company executives and directors;

b.    that the Company had not consistently followed the dictates in APB No. 25 in that (i) options priced below a stock's fair market value when they are awarded results in an executive receiving an instant paper gain; and (ii) Juniper did not treat that gain in value as a cost to the corporation in its financial statements, thus inflating the Company's net earnings;

c.    that Company insiders, including defendants Kriens, Sindhu, and Gani, received backdated in-the-money options and thus took excess and unjustified compensation at the expense of the investing public;

d.    that the Company's financial statements for at least the years 2003-2005 and 1Q 2006 violated GAAP and, as a result, E&Y's unqualified opinions on Juniper's financial results for fiscal years 2003, 2004, and 2005 were materially false and misleading;

e.    that the procedures for making, accounting for, and reporting stock options grants were deficient to prevent manipulation; and

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

f.      that the illicit scheme vis-à-vis backdating stock option grant dates potentially

subjected Juniper to substantial regulatory fines, penalties, and other legal action,

thereby compromising the Company's overall financial condition and prospects.

**The False Proxy Statements**

201.    Juniper's annual proxy statements from 2000 to 2006, which were disseminated to shareholders and filed with the SEC, contained similar material misstatements and omissions falling into four general categories: (a) misstatements that the options granted under the Plans were priced at the fair market value on the date of the grant, when in fact they were surreptitiously backdated; (b) misstatements that stock options would not provide value to executive officers until the price of Juniper's stock increased over the exercise price, when in fact the options were issued in the money; (c) misstatements relating to the compensation received by the Executive Defendants prior to and during the Class Period; and (d) statements failing to disclose that the stated purpose of option grants to Juniper executives – *i.e.*, linking a significant portion of their compensation to the future performance of the Company – was significantly undermined because the option grants described in the proxies were backdated and in the money.

202.    For example, each of the Company's proxy statements for years 2000 through 2006 includes a "Compensation Committee Report on Executive Compensation" which represents as follows:

> **Stock Option Grants**.  Grants of stock options to executive officers are based upon each executive officer's relative position, responsibilities, historical and expected contributions to the Company, and the executive officer's existing stock ownership and previous option grants.  <u>Stock Options are granted at the fair market value on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price</u>.

> (Emphasis added.)

203.    This representation was materially false and misleading in failing to disclose that from June 1999 through December 2003, Juniper issued backdated in-the-money stock options to Company executives who received an immediate gain in value because the exercise price of the options was below the market price on the dates of the grants.

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

204.    Similarly, the 2000 Proxy Statement included a table titled "Option/SAR Grant in Last Fiscal Year" which set forth the details of the stock options granted in 1999 to the named executive officers and the potential realizable value, assuming an annual appreciation of either 5% or 10%.  Footnote (2) to that table states: "Options were granted at an exercise price equal to the fair market value of the Company's common stock, as determined in good faith by the Board of Directors.  As of the effective date of the initial public offering, options are granted at fair market value on the date of the grant."  (Emphasis added.)

205.    Likewise, Note 2 to the table entitled "Option/SAR Grants In Last Fiscal Year," contained in Juniper's 2001 definitive proxy statement filed with the SEC on Schedule 14A on March 31, 2001 (the "2001 Proxy Statement"), represented that "Options are granted at fair market value on the date of grant."

206.    The statements in ¶¶ 204 and 205 were materially false and misleading because many of Juniper's stock options were not "granted at fair market value on the date of grant."

207.    In each of the Company's Proxy Statements for 2000 through 2006, the Compensation Committee Report on Executive Compensation included a substantially similar discussion of the purpose and administration of the stock option plan.  For example, the 2004 Proxy Statement provides as follows:

> The Compensation Committee's approach is predicated upon the philosophy that a substantial portion of aggregate annual compensation for executive officers should be contingent upon the Company's performance and an individual's contribution to the Company's success in meeting certain critical objectives. . . . In this regard, the Compensation Committee's overall philosophy regarding compensation is to encourage creation of long-term value for stockholders, employee retention, and equity ownership through stock option grants.

208.    The foregoing representation was materially misleading in failing to disclose the backdating scheme involving in-the-money options from 1999 through 2003 which undermined the goal of linking a significant portion of the Executive Defendants' compensation to the future performance of the Company.

209.    Finally, the Summary Compensation Table included in the 2000-2006 Proxy Statements materially misstated the compensation of, and failed to disclose, the illicit compensation

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

received from the Company by the Executive Defendants in fiscal years 1999 through 2003 as a result of their receipt of fraudulently backdated stock options at less than fair market value.

210.    Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of [any] bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered." 17 C.F.R. § 229.402(b)(2)(iii)(B).  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further require that the following items be disclosed in the Summary Compensation Table:

    i.     For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

    ii.    Above-market earnings or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period . . .

    iii.    The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

211.    The disclosures of "Annual Compensation" and "Securities Underlying Options" are materially misleading absent the disclosure of the additional compensation received by the Executive Defendants as a result of the backdated options.  Additionally, the Option/SAR Grants In Last Fiscal Year table in the 2000 through 2004 Proxy Statements is materially misleading because it failed to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) since the options granted during this period were backdated.  Finally, the Proxy Statements were misleading in failing to disclose that the options grants were backdated in light of Item 402(c)(3), which required the disclosure of any material term of option grants.

## THE TRUTH IS GRADUALLY REVEALED

212.    On March 18, 2006, *The Wall Street Journal* published an exposé entitled "The Perfect Payday," which implicated the CEOs at several public companies in the potential backdating

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

of stock option grants beginning in the mid-1990s.  The *Wall Street Journal* article described a striking pattern where option grants at those companies were consistently dated just before a rise in the stock price, often at a bottom of a steep drop.  The article concluded that there was effectively a zero probability of the reported grant dates occurring at random.

213.    The article stated that the SEC was currently examining about a dozen companies' option grants, and suggested that the problem could be far more widespread based on *The Wall Street Journal*'s analysis of grant dates and stock movements.

214.    According to *The Wall Street Journal*, the opportunity to backdate options without detection was facilitated by lax reporting requirements under SEC rules.  Until 2002, companies were permitted to report option grants up to 45 days after the company's fiscal year end.  The extended reporting period made it easier to engage in backdating because it provided a fairly long time period within which to identify and disclose (albeit falsely) a purported date with a low stock price as the option grant date.

215.    The SEC reporting requirements were tightened with the passage of the Sarbanes-Oxley Act.  Section 16(a) of the Exchange Act and SEC Rule 16a-3 promulgated thereunder require executives to disclose stock option grants within two business days following the option grant.  The effect of this reporting change is to reduce, but by no means eliminate, the ability to engage in backdating.  Indeed, Juniper has admitted that it backdated option grants through the end of 2003.

216.    *The Wall Street Journal* also reported that companies that issued backdated options may have violated their stock option plans; may be subject to liability under the federal securities laws for misrepresenting compensation arrangements and inflating reported earnings in violation of GAAP; and could also face potential tax liabilities to the IRS.

217.    Following the publication of the *Wall Street Journal* article, financial analysts began investigating and identifying potential candidates for option backdating.  On or about May 16, 2006, the CFRA released a study of the top 100 North American companies ranked by stock-based compensation as a percentage of revenues.  CFRA identified Juniper as one of 17 companies which showed a "high-risk profile" for option-backdating.  CFRA considered a company's option backdating risk to be significant when a company has, on three or more occasions, granted options at

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

exercise prices and dates that matched exactly or were close to a 40-day low in the Company's

stock, and the stock price rebounded at least 10% from the low during this period.

218.   Based on CFRA's analysis of individual option grants during the period 1997-2002,

CFRA identified suspicious grants for Juniper in October 1999, December 2000 and February 2002

(no options were granted to the Executive Defendants in 2001).

219.   On May 18, 2006, J. P. Morgan analyst Ehud A. Gelblum, Ph.D. issued a report that

also identified Juniper as a likely candidate for backdating.   The J. P. Morgan report stated that

based on its review of price and grant data for the named executives (including Kriens, Sindhu, and

Gani) in Juniper's proxy statements from 1999 through 2005, it found that 6 option grants out of 15

were issued on the dates when Juniper's stock price hit monthly lows.   The grant dates identified by

J. P. Morgan were the same ones independently selected by CFRA, plus additional grant dates in

July 2002, April 2003, and September 2003.

220.   Also on May 18, 2006, *The Wall Street Journal* issued an article entitled "Affiliated

Computer Gets Subpoena."   The *Wall Street Journal* article reported that federal prosecutors in New

York were conducting criminal probes of options-granting practices at UnitedHealth Group, Inc. and

Comverse Technology, Inc.   It also reported that following the announcement a few days earlier by

Affiliated Computer Services, Inc. ("ACS") that it would take a $32 million charge relating to

improper accounting for backdated stock options, ACS had subsequently received a grand jury

subpoena issued by the U.S. District Court for the Southern District of New York.

221.   The May 18, 2006 *Wall Street Journal* article further reported that the SEC

investigation had expanded to about 20 companies, and highlighted CFRA's report identifying

Juniper as one of 17 companies having "the highest risk of having backdated options."   The May 18

article stated:

> Wall Street's interest in identifying potential options problems at companies is also
> on the rise.   An accounting-research firm this week identified 17 companies it termed
> as having "the highest risk of having backdated options."   The research firm, the
> Center for Financial Research and Analysis, based its analysis on regulatory records
> and trading patterns.
>
> Marc Siegel, director of research at CFRA, said the firm's clients, which include
> investment managers, have been seeking to identify companies with risky option

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

patterns, CFRA looked at 100 companies that issued a high proportion of options relative to their total executive compensation.  It then identified those that, on three or more occasions, granted options at exercise prices that matched, or were close to, lows of the company stock price between 1997 and 2002, followed by a bounce of at least 10% in share price.

Among the 17 were Juniper Networks Inc., a Sunnyvale, Calif., networking-equipment company; . . . Half of the grants to Juniper were considered at risk by CFRA.

222.    On May 19, 2006, TheStreet.com issued an article which summarized the CFRA and JP Morgan reports concerning the risk of option backdating at Juniper.  The May 19 article states in relevant part:

Concerns over stock-option timing broadened this week to include tech shops Juniper (JNPR:Nasdaq) and F5 Networks (FFIV:Nasdaq).

Analysts sorting through public filings found that option grants at Juniper and F5 were repeatedly priced over seven years at the stocks' monthly lows.  To market watchers, these patterns suggest that the options could have been timed or backdated to maximize their value to company executives.

Wall Street, already jittery over inflation news, has shown little sympathy for companies that have come under scrutiny in a growing options-backdating scandal.

Shares of Juniper fell 4% Thursday and F5 has slid 12% in the past three days on worries that these stock-option grants will invite investigations and costly legal battles.

*       *       *

Juniper and F5 were pulled into the options-timing spotlight this week after analysts flagged patterns of questionable grant dates.  Accounting muckrakers at Center for Financial Research and Analysis identified 17 companies that may have to explain some troublesome option datings.

And JPMorgan analyst Ehud Gelblum released a report Thursday reviewing executive-option grants for 14 companies dating back to 1998.  Three of the companies – Motorola (MOT:NYSE), Juniper and F5 – show a suspicious pattern of grants at their stock's low for a given month.

223.    *The Los Angeles Times*' May 19, 2006 edition also gave wide coverage to the CFRA report.  The article, entitled "Report Suggests Companies Backdated Stock Option Grants," quoted Marc A. Siegel, CFRA research director, as follows:  "We're trying to identifying companies that

CONSOLIDATED CLASS ACTION COMPLAINT

may have a high-risk profile [of backdating] and warrant further attention." Mr. Siegel further explained in the article:

> Until 2002, the Securities and Exchange Commission allowed companies to report option grants several weeks after the date of the actual grant. The loophole tempted companies to select the most beneficial date to maximize the value of the grants . . . So if a company's stock price hit a 40-day low near the time of the public filing, the company could pick that date as the issue date. The low price then became the base price, giving executives even more money than they would otherwise have received when they sold it at a higher price later.

> In the study, the center matched grant dates to within weeks of those periodic lows in the companies' stock prices . . . Those grant dates were deemed "at risk." The 17 high-risk companies [including Juniper] had at least three such grant dates over the five-year period.

224. Following the widespread coverage of the CFRA and J. P. Morgan reports which identified Juniper as a high risk candidate for options backdating, the price of Juniper stock declined 11% from a closing price of $16.87 on May 17, 2006 to close at $15.06 on May 19, 2006.

225. On May 22, 2006, Juniper issued a press release announcing that the Company had received a request for information from the office of the United States Attorney for the Eastern District of New York relating to the Company's granting of stock options. Juniper indicated that it was responding to this request for information, and that its Audit Committee was reviewing the Company's historical stock option granting practices. On the release of this news, Juniper shares dropped to a 52-week low of $14.62 during morning trading on May 22, 2006.

226. Securities analysts covering Juniper also raised concerns over the adverse implications of Juniper's becoming embroiled in the options backdating investigation. On May 22, 2006, Bear Stearns stated that "[n]ew concerns over options backdating may impact the stock further." That same day, Morgan Keegan & Co., Inc. elaborated on its concerns as follows:

### JNPR: Business Sound, Options Concerns Create A Cloud

- Juniper's stock down 7% last week, reflects concerns from options expensing. Juniper was cited in a recent report along with others as companies that may have exploited a past loophole in SEC regulations regarding pricing options prior to Sarbanes-Oxley in 2002.
- The situation presents risks to the stock. The stock could remain under

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

pressure from a witch hunt mentality.  Negative scenarios include potential SEC investigations, restatements, filing delays, and tarnished management credibility.

227.    On July 19, 2006, the Company issued a press release announcing net revenues for the second quarter of 2006 of $567.5 million, compared with $493.0 million for the same quarter of 2005, an increase of 15 percent.  In conjunction with these positive financial results, the Company also made a short, non-committal disclosure about the Audit Committee investigation.  The release stated that the Audit Committee had reached a preliminary conclusion that the actual measurement dates for financial accounting purposes of certain stock option grants issued in the past differed from the recorded grant dates of such awards.  However, the release continued, the Board had not yet determined the scope or amount of any charges it might record, nor had it determined the potential tax and accounting impact, including whether a restatement was required.  Juniper also stated that it would defer filing its quarterly report on Form 10-Q for the quarter ended June 30, 2006 until after completion of the investigation, which it anticipated would occur after the filing deadline under SEC rules.

228.    On August 9, 2006, Juniper's Board of Directors, upon the recommendation of the Audit Committee, concluded that the Company's financial statements and all earnings press releases and similar communications relating to the period beginning January 1, 2003 should no longer be relied upon, including the Company's financial statements for 2003, 2004, and 2005 and the interim periods contained therein, and 1Q 2006.

229.    On August 10, 2006, after the close of the market, the Company issued a press release entitled "Juniper Networks Announces Update Regarding Stock Option Investigation."  The press release in relevant part stated:

> Although the investigation is ongoing, upon the recommendation of management and the Audit Committee, the Juniper Board of Directors has concluded that the Company will need to restate historical financial statements to record additional non-cash charges for stock-based compensation expense related to past option grants. The Company has not determined the amount of such charges, the resulting tax and accounting impact, or which specific periods require restatement.  Accordingly, the Company today filed a Form 8-K with the SEC stating that the financial statements and all earnings press releases and similar communications issued by the Company

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

relating to periods beginning on or after January 1, 2003 should therefore not be relied upon.

(Emphasis added.)

230.     On August 10, 2006, the market price of Juniper stock dropped to $12.90 from a close of $13.41 on August 9, and the price continued to fall to close at $12.20 on August 11, 2006. This $1.21 drop represented a two-day decline of nine percent.

231.     On December 20, 2006, the Company announced that as a result of the Audit Committee's seven-month review, Juniper had determined to record non-cash charges of approximately $900 million resulting from the improper accounting for backdated option granted between June 9, 1999 and December 31, 2003.  The December 20 release broadly outlined the irregularities as follows:

> As previously announced, the Company reached a conclusion that the actual measurement dates for financial accounting purposes of numerous stock option grants issued in the past differ from the recorded grant dates of such awards.  The Audit Committee determined that there were numerous instances in which grant dates were chosen with the benefit of hindsight as to the price of the Company's stock, so as to give favorable prices.  In this regard, the Audit Committee identified serious concerns regarding certain former management.  In addition, formal documentation often lagged the referenced grant date and there was insufficient exercise by management of responsibility for the stock option process.  The Company currently anticipates that it will record additional non-cash charges for stock-based compensation expense of approximately $900 million, 99.9 percent of which relate to options granted between June 9, 1999 and December 31, 2003.

(Emphasis added.)

232.     CEO Kriens also candidly admitted that the Company failed to establish adequate controls over the stock option granting process: "In prior years, we should have had better stock option granting processes, controls and oversight in place, and we did not."  (Emphasis added.)

233.     Finally, Juniper reported that in order to qualify for continued listing of its common stock on the NASDAQ National Market System, the Company had agreed to file on or before February 12, 2007 (a) Forms 10-Q for the quarters ended June 30, 2006, and September 30, 2006, which should contain restated financial restatements for at least the comparable prior year quarters ended June 30, 2005 and September 30, 2005; and (b) a written summary of the Audit Committee's

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

findings.  The Company further stated that it intends to file no later than March 31, 2007 its restated financial statements for at least the fiscal years 2003 through 2005 and the first quarter ended March 31, 2006.

234.    By acknowledging that a restatement of the Company's financial results is required, Juniper and the Individual Defendants have acknowledged that Juniper's historic financial statements were materially false and misleading and violated GAAP.

## ADDITIONAL SCIENTER ALLEGATIONS

235.    Numerous facts raise a strong inference that the Executive Defendants knowingly or recklessly misrepresented and concealed that (a) options grants issued to them and other Juniper officers and directors were backdated and in the money, and (b) the backdated options were improperly accounted for in the Company's financial statements.

236.    First, the Executive Defendants were highly motivated to deceive investors because each of them reaped millions of dollars in instant gains from the backdating of their stock option grants, which was by far the largest component of their compensation.  Based upon the backdating scenarios described above at ¶¶ 87-106, in-the-money option grants could have increased the value of the Executive Defendants' options alone by $98 million (depending on the actual grant date), as summarized in the table below.

**In-the-Money Options**
**Immediate Gain In Intrinsic Value ($)**

| Year | Kriens | Sindhu | Gani |
|------|--------|--------|------|
| 1999 | 22,689,000 | 13,614,400 | 6,050,400 |
| 2000 | 17,877,000 | 24,133,950 | 4,469,250 |
| 2002 | 1,936,000 | 1,056,000 | 1,760,000 |
| 2003 | 2,496,000 | 936,000 | 1,560,000 |
| | 44,998,000 | 39,740,350 | 13,839,650 |

Total Gains = $98,578,000

237.    Moreover, at least one Executive Defendant, then-CFO Gani, profited more than $3,800,000 from the exercise of 300,000 of his backdated stock options and the simultaneous sale of his stock during the Class Period, as follows:

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

**Gani's Profits from Backdated Stock Options**

| Date of Exercise and Stock Sale | Shares | Exercise Price | Stock Sale Price | Profit ($) |
|---|---|---|---|---|
| 7/15/03 | 50,000 | 5.69 | 14.6980 | 450,400.00 |
| 5/24/04 | 50,000 | 5.69 | 20.5123 | 741,115.00 |
| 8/4/04 | 50,000 | 5.69 | 22.2900 | 830,000.00 |
| 10/20/04 | 50,000 | 5.69 | 24.1597 | 923,485.00 |
| 10/21/04 | 50,000 | 5.69 | 24.1730 | 462,075.00 |
| 10/22/04* | 50,000 | 5.69 | 24.1873 | 462,432.50 |
| Total | 300,000 | | | 3,869,507.50 |

\* Options were exercised on 10/22/04 and sold on 10/23/04.

238.    Second, the Executive Defendants were well aware that the immediate, risk-free gains from backdated options was in direct contradiction to the representations in the Company's proxy statements that "stock options are granted at market price on the date of the grant, and will provide value to the executive officers only when the Company's common shares increase over the exercise price."  It was therefore imperative for them to disguise their illicit practices from investors by manipulating the reported grant dates.

239.    Third, the duration, magnitude, and pervasiveness of the scheme support a strong inference of fraudulent conduct on the parts of Juniper and the Executive Defendants.  Juniper admits that the options backdating spanned more than four years, from June 1999 through December 31, 2003.  The Company also admits that Juniper's financial statements from 2003 through March 31, 2006 can no longer be relied upon and will be restated.  Juniper estimates that it will take a massive $900 million charge for compensation expenses associated with backdated stock options issued over a lengthy period which were not properly accounted for in more than three years of financial results.

240.    The backdating scheme was so pervasive that the Executive Defendants were able to continue it even after the "technological bubble" burst and their options were repriced.  In 2001, the market prices of Juniper stock and those of other high-tech companies plummeted to prices well below the exercise prices of the options granted in 1999 and 2000.  As a result, in October 2001 Juniper commenced a tender offer to repurchase stock options held by its employees that had an

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

exercise price above $10.00 per share.  The Executive Defendants tendered their backdated stock options, and Juniper canceled them as of November 26, 2001.  Under the requirements of the Financial Accounting Standards Board, employees were precluded from receiving new options for six months and one day after the date of cancellation.  Accordingly, on May 28, 2002 (six months and one day after cancellation), the Executive Defendants were issued replacement options, which were priced at $10.31 per share.  However, as shown above at ¶¶ 97-106, within a few months the Executive Defendants picked up their pattern of options backdating where they had left off, backdating option grants to July 1, 2002, and the following year, to April 1 and September 26, 2003.

241.  Fourth, Juniper's management has been implicated in options backdating.  In its December 20, 2006 press release, Juniper admitted that the misconduct was deliberate: "The Audit Committee determined there were instances in which grant dates were chosen with the benefit of hindsight as to the price of the Company's stock, so as to give favorable prices."  Juniper attributed the misconduct to management, concluding that "there was insufficient exercise by management of responsibility for the stock option process"; raised "serious concerns regarding certain former management"; and noted that "formal documentation often lagged the referenced grant date."  CEO Kriens has issued a public apology to investors, admitting that "[i]n prior years, we should have had better stock option granting processes, controls and oversight in place, and we did not."  These admissions give rise to a strong inference that Juniper management was integrally involved in administering the grant of options and knowingly or recklessly permitted, but did not disclose, Juniper's repeated issuance of backdated in-the-money option grants.

242.  The Executive Defendants also knew full well that truthful disclosure would have required Juniper to record hundreds of millions of dollars in compensation expenses.  It was of enormous significance to Juniper's earnings and business model that the Company qualify for favorable tax treatment under APB 25.  By disguising backdated options by manipulating their grant dates, the Executive Defendants were able to receive additional value for their options while continuing to claim (albeit improperly) favorable accounting treatment, thereby inflating earnings.

243.  In fact, prior to and during the Class Period, the Company was required under GAAP to report in its financial statements contained in Forms 10-K and 10-Q the impact to earnings of

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

applying the alternative accounting methodology of FAS 123.  As shown in Juniper's Form 10-Ks for the years 2003, 2004, and 2005, had the alternative accounting standard been applied, the Company's annual earnings would have been lowered by $59.1 million, $86.9 million, and $193.6 million, respectively.

244.    The potential loss of favorable accounting treatment under APB 25 was so significant that it was included as a risk factor in the Company's SEC filings.  Juniper's 2004 Form 10-K states:

> Recent rulemaking by the Financial Accounting Standards Board will require us to expense equity compensation given to our employees and will significantly harm our operating results and may reduce our ability to effectively utilize equity compensation to attract and retain employees.
>
> We historically have used stock options as a significant component of our employee compensation program in order to align employees' interests with the interests of our stockholders, encourage employee retention, and provide competitive compensation packages.  The Financial Accounting Standards Board has adopted changes that will require companies to record a charge to earnings for employee stock option grants and other equity incentives beginning July 1, 2005.  By causing us to incur significantly increased compensation costs, such accounting changes will reduce our reported earnings and will require us to reduce the availability and amount of equity incentives provided to employees, which may make it more difficult for us to attract, retain and motivate key personnel.  Each of these results could materially and adversely affect our business.

(Emphasis added.)

245.    Juniper's officers and directors therefore devoted their efforts to prolonging favorable tax treatment for stock options under APB 25.  When faced with the impending change in accounting rules under SFAS 123R beginning January 1, 2006, Juniper chose to accelerate almost one-half of the Company's unvested and out-of-the-money options in order to avoid recognizing $153 million in compensation expenses associated with those options as they vested in future periods.  The Company explained its position in its 2005 Form 10-K as follows:

> Acceleration of Unvested and "Out-of-the-Money" Employee Stock Options
>
> On December 16, 2005, our Board of Directors approved the acceleration of the vesting of certain unvested and "out-of-the-money" stock options that had an exercise price per share equal to or greater than $22.00, all of which were previously granted under our stock operation plans and that were outstanding on December 16, 2005.  Options to purchase approximately 21.2 million shares of common stock or 49.3% of

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

our total outstanding unvested options on December 16, 2005 were accelerated. . . . We believe that the acceleration of the unvested and "out-of-money" options was in the best interest of stockholders as it will reduce our reported compensation expense in future periods in light of these accounting regulations. <u>As a result of the acceleration, we expect to reduce the pre-tax stock option expense we otherwise would have been required to record by approximately $153 million subsequent to the adoption of SFAS 123R beginning in 2006.</u>

(Emphasis added).

246.   Finally, each the Executive Defendants sold substantial percentages approaching or exceeding 25 percent of their pre-Class-Period shareholdings, taking into account options which vested during the Class Period, reaping a total of $188 million in proceeds, as indicated in the tables below:

### Scott Kriens – Stock Sales

| Date | No. of Shares Sold | Price Per Share | Proceeds ($) |
| --- | --- | --- | --- |
| 5/17/2003 | 500,000 | 12.0515 | 6,025,750.00 |
| 7/15/2003 | 500,000 | 14.8264 | 7,413,200.00 |
| 10/15/2003 | 155,000 | 15.3406 | 2,377,793.00 |
| 10/15/2003 | 150,000 | 17.2707 | 2,590,605.00 |
| 10/16/2003 | 95,000 | 17.2014 | 1,634,133.00 |
| 10/16/2003 | 100,000 | 17.1439 | 1,714,390.00 |
| 1/21/2004 | 500,000 | 29.7469 | 14,873,450.00 |
| 5/26/2004 | 200,000 | 21.3543 | 4,270,860.00 |
| 5/26/2004 | 300,000 | 21.3510 | 6,405,300.00 |
| 7/16/2004 | 200,000 | 23.9998 | 4,799,960.00 |
| 7/16/2004 | 300,000 | 24.0704 | 7,221,120.00 |
| 10/24/2004 | 200,000 | 24.0111 | 4,802,220.00 |
| 10/24/2004 | 300,000 | 24.0111 | 7,203,330.00 |
| 5/4/2005 | 200,000 | 23.1811 | 4,636,220.00 |
| 5/4/2005 | 50,000 | 23.2221 | 1,161,105.00 |
| 5/4/2005 | 250,000 | 22.7159 | 5,678,975.00 |
| 7/29/2005 | 400,000 | 24.0576 | 9,623,040.00 |
| 8/1/2005 | 100,000 | 24.0524 | 2,405,240.00 |
| 10/26/2005 | 500,000 | 23.1536 | 11,576,800.00 |
| Total | 5,000,000 | | 106,413,491.00 |

### Pradeep Sindhu - Stock Sales

| Date | No. of Shares Sold | Price Per Share | Proceeds ($) |
| --- | --- | --- | --- |
| 4/15/2003 | 200,000 | 9.8869 | 1,977,380.00 |

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**Pradeep Sindhu - Stock Sales**

| Date | No. of Shares Sold | Price Per Share | Proceeds ($) |
|------|-----|-----|-----|
| 5/7/2003 | 100,000 | 12.1948 | 1,219,480.00 |
| 5/12/2003 | 100,000 | 12.5110 | 1,251,098.00 |
| 7/24/2003 | 100,000 | 14.3921 | 1,439,209.00 |
| 8/19/2003 | 100,000 | 14.5949 | 1,459,490.00 |
| 8/20/2003 | 50,000 | 15.3941 | 769,705.00 |
| 8/22/2003 | 50,000 | 15.5240 | 776,200.00 |
| 10/21/2003 | 50,000 | 17.1662 | 858,310.00 |
| 10/28/2003 | 50,000 | 17.3010 | 865,050.00 |
| 10/29/2003 | 25,000 | 17.7000 | 442,500.00 |
| 10/30/2003 | 50,000 | 18.0370 | 901,850.00 |
| 1/21/2004 | 100,000 | 29.6574 | 2,965,740.00 |
| 1/27/2004 | 100,000 | 29.3286 | 2,932,860.00 |
| 5/13/2004 | 50,000 | 22.5192 | 1,125,960.00 |
| 8/3/2004 | 108,895 | 22.7514 | 2,477,513.70 |
| 8/5/2004 | 100 | 22.7500 | 2,275.00 |
| 8/6/2004 | 100,000 | 21.5809 | 2,158,090.00 |
| 8/10/2004 | 91,005 | 21.4712 | 1,953,986.56 |
| 2/2/2005 | 50,000 | 24.6668 | 1,233,340.00 |
| 2/2/2005 | 50,000 | 24.6655 | 1,233,275.00 |
| 2/9/2005 | 50,000 | 23.4997 | 1,174,985.00 |
| 2/9/2005 | 50,000 | 23.4995 | 1,174,975.00 |
| 4/27/2005 | 50,000 | 22.9711 | 1,148,555.00 |
| 4/27/2005 | 50,000 | 22.9692 | 1,148,460.00 |
| 5/4/2005 | 200,000 | 23.0300 | 4,606,000.00 |
| 5/4/2005 | 100,000 | 23.0962 | 2,309,620.00 |
| 5/11/2005 | 50,000 | 23.4926 | 1,174,630.00 |
| 5/11/2005 | 50,000 | 23.3206 | 1,166,030.00 |
| 5/11/2005 | 50,000 | 23.3197 | 1,165,985.00 |
| 5/13/2005 | 50,000 | 24.2655 | 1,213,275.00 |
| 7/27/2005 | 50,000 | 23.4759 | 1,173,795.00 |
| 7/27/2005 | 50,000 | 23.4765 | 1,173,825.00 |
| 8/3/2005 | 50,000 | 24.3315 | 1,216,575.00 |
| 8/3/2005 | 50,000 | 24.3309 | 1,216,545.00 |
| 8/10/2005 | 100,000 | 34.5687 | 3,456,870.00 |
| 10/26/2005 | 50,000 | 23.0317 | 1,151,585.00 |
| 10/26/2005 | 50,000 | 23.0348 | 1,151,740.00 |
| 11/2/2005 | 250,000 | 23.6172 | 5,904,300.00 |
| 11/2/2005 | 50,000 | 23.8683 | 1,193,415.00 |
| 11/2/2005 | 50,000 | 23.8740 | 1,193,700.00 |

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**Pradeep Sindhu - Stock Sales**

| Date | No. of Shares Sold | Price Per Share | Proceeds ($) |
|---|---|---|---|
| 11/9/2005 | 50,000 | 24.4183 | 1,220,915.00 |
| 11/9/2005 | 50,000 | 24.4198 | 1,220,990.00 |
| 1/25/2006 | 50,000 | 21.2985 | 1,064,925.00 |
| 1/25/2006 | 50,000 | 21.2941 | 1,064,705.00 |
| 2/1/2006 | 50,000 | 18.1984 | 909,920.00 |
| 2/8/2006 | 50,000 | 19.0063 | 950,315.00 |
| 2/8/2006 | 50,000 | 18.9939 | 949,695.00 |
| Total | 3,325,000 | | 70,539,642.26 |

**Marcel Gani – Stock Sales**

| Date | No. of Shares Sold | Price Per Share | Proceeds ($) |
|---|---|---|---|
| 5/7/2003 | 50,000 | 12.3448 | 617,240.00 |
| 7/15/2003 | 50,000 | 14.6980 | 734,900.00 |
| 10/14/2003 | 50,000 | 17.6697 | 883,485.00 |
| 11/4/2003 | 50,000 | 18.5850 | 929,250.00 |
| 1/21/2004 | 50,000 | 29.5378 | 1,476,890.00 |
| 5/24/2004 | 50,000 | 20.5123 | 1,025,615.00 |
| 5/24/2004 | 50,000 | 20.5123 | 1,025,615.00 |
| 8/4/2004 | 50,000 | 22.2900 | 1,114,500.00 |
| 8/4/2004 | 50,000 | 22.2900 | 1,114,500.00 |
| 10/20/2004 | 50,000 | 24.1597 | 1,207,985.00 |
| 10/21/2004 | 25,000 | 24.1730 | 604,325.00 |
| 10/23/2004 | 25,000 | 24.1873 | 604,682.50 |
| Total | 550,000 | | 11,338,987.50 |

## INAPPLICABILITY OF SAFE HARBOR

247.    Defendants' false and misleading statements and omissions do not constitute forward-looking statements protected by any statutory safe harbor.  The statements alleged to be false and misleading herein all relate to facts and conditions existing at the time the statements were made.  No statutory safe harbor applies to any of the defendants' material false or misleading statements.

248.    Moreover, the statutory safe harbor is inapplicable with respect to the false and misleading statements included in Juniper's financial statements, which purported to be prepared in accordance with GAAP.

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

249.   To the extent that any statutory safe harbor is intended to apply to any forward-looking statement pled herein, the safe harbor does not apply, because many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Juniper who knew that those statements were false when made.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**THE FRAUD-ON-THE-MARKET DOCTRINE**

250.   The market for Juniper's securities was open, well developed, and efficient at all relevant times, for the following reasons (among others):

a.   the Company's shares met the requirements for listing, and were listed and actively traded, on the NASDAQ National Market System;

b.   as a regulated issuer, Juniper filed periodic public reports with the SEC;

c.   Juniper regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the Company's website, Juniper.com, on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.   the market reacted immediately to publicly disseminated information by and concerning Juniper;

e.   Juniper was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace;

f.    the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Juniper securities; and

g.    without knowledge of the misrepresented or omitted material facts, Plaintiff and the other members of the Class purchased or otherwise acquired Juniper securities between the time defendants made the material misrepresentations and omissions and the time the fraudulent backdating was being disclosed, during which time the price of Juniper securities was inflated by defendants' misrepresentations and omissions.

251.    As a result of the foregoing, the market for Juniper's securities promptly digested current information regarding Juniper from all publicly available sources and reflected such information in Juniper's securities prices.  Under these circumstances, all purchasers and acquirers of Juniper's securities during the Class Period suffered similar injury through their purchase or acquisition of Juniper's securities at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

252.    During the Class Period, as detailed herein, the Executive Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Juniper's securities prices and operated as a fraud or deceit on purchasers of Juniper securities by misrepresenting the Company's financial results and compensation practices.  When the prior misrepresentations and fraudulent conduct began to be disclosed and became apparent to the market, Juniper stock declined as the prior artificial inflation came out of Juniper's securities prices.  As a result of their purchases prior acquisition of Juniper securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

253.    The false and misleading representations concerning Juniper's financial results and management compensation – plus the non-disclosures of material facts concerning the Company's violation of Company and SEC policies and accounting regulations regarding compensation

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

expenses – caused and maintained the artificial inflation in Juniper's securities prices throughout the Class Period and until the truth was slowly revealed to the market.

254.     Starting in May 2006 through the end of the Class Period on August 10, 2006, investors began to learn the truth upon a number of disclosures, including Juniper's admissions, revealing, among other things, that: (a) Juniper had engaged in substantial backdating of stock option grants issued to, among others, senior executives from June 1999 through the end of 2003; (b) Juniper's published financial statements during and prior to the Class Period were materially misleading for failure to record compensation expenses associated with these stock option grants, and the Company's reported earnings were inflated; (c) senior management and directors had not conducted themselves with integrity nor in the best interest of the Company's shareholders; and (d) the Executive Defendants sold shares of Juniper based on material non-public information. These revelations did not happen all at once, but rather were the result of investigation by financial analysts such as CFRA and J.P. Morgan, as well as other academics, journalists and investors, who focused on the impact of Juniper's stock options program in light of the change in accounting treatment under SFAS 123R, which was implemented beginning in January 2006, and pieced together facts concerning the ever-widening abusive stock options issuance practices at other companies and applied that analysis to Juniper to discover the fraud.  As investors and the market became aware of the true facts, which had been obfuscated by the Executive Defendants, the prior artificial inflation came out of Juniper's securities prices, damaging investors.

255.     As a result of these disclosures and the public revelations regarding Juniper's issuance of stock options, and the falsity about Juniper's previous Class Period representations, Juniper's stock price dropped from $16.87 on May 17, 2006 to as low as $12.20 on August 11, 2006.  This drop removed the inflation from Juniper's stock price, causing economic loss to investors who had purchased the securities during the Class Period.

256.     In sum, the economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the Class was a direct result of the fraudulent scheme to artificially inflate Juniper's securities prices and the subsequent significant decline in the value of Juniper's securities when the truth was revealed.

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

257.     In contrast, the post-Class Period rebound of Juniper's stock was attributable to new market conditions, macroeconomic or industry factors and Company-specific facts unrelated to the fraudulent conduct alleged herein.

**CAUSES OF ACTION**
**COUNT I**

**Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**

**(Against Juniper and Defendants Kriens, Sindhu, and Gani)**

258.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

259.     Plaintiff asserts this Count against defendants Juniper, Kriens, Sindhu, and Gani (collectively, the "§ 10b Defendants") under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

260.     During the Class Period, the § 10b Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) increase the value of their stock options by backdating the reported grant dates and disguising this fact from investors; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c) artificially inflate and maintain the market price of Juniper's securities; and (d) cause Plaintiff and other members of the Class to purchase or otherwise acquire Juniper's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the § 10b Defendants, and each of them, took the actions set forth herein.

261.     The § 10b Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading by use of means or instrumentalities of interstate commerce; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers and acquirers of the Company's securities, which artificially inflated the market prices for Juniper's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

262.     As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, the § 10b Defendants had a duty to

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's compensation expenses and stock option practices so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.  The § 10b Defendants' material misrepresentations and omissions as set forth herein violated that duty.

263.    The § 10b Defendants engaged in the fraudulent activity described above knowingly or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class. The § 10b Defendants knowingly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

264.    As a result of the § 10b Defendants' fraudulent activity, the market price of Juniper was artificially inflated during the Class Period.

265.    In ignorance of the true financial condition of Juniper, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Juniper containing the misleading information, purchased or otherwise acquired Juniper securities at artificially inflated prices during the Class Period.

266.    The market price of Juniper's securities declined materially upon the public disclosure of the true facts which had been misrepresented or concealed as alleged herein.

267.    Plaintiff's and the Class' losses were proximately caused by the § 10b Defendants' active and primary participation in Juniper's scheme to defraud the investing public by, *inter alia*, falsifying the Company's financial results through the knowing or reckless failure to properly apply GAAP, and concealing adverse information regarding Juniper's stock option grant practices and the accounting for these compensation costs.  Plaintiff and the members of the Class purchased Juniper securities in reliance on the integrity of the market price of those securities.  Plaintiff's and the Class' losses were a direct and foreseeable consequence of the § 10b Defendants' failure to disclose and their concealment of, *inter alia*, the true state of Juniper's business operations and financial condition.

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

268.     As a direct and proximate cause of the § 10b Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Juniper securities during the Class Period.

## COUNT II

## Violation of Section 20(a) of the Exchange Act

### (Against the Individual Defendants)

269.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

270.     Plaintiff asserts this Count against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

271.     The Individual Defendants, through their positions of control and authority as officers and directors of the Company, were able to and did control, directly and indirectly, the content of the public statements disseminated by the Company, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Juniper's business affairs.

272.     As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Juniper's financial condition and results of operations.

273.     The Individual Defendants had direct involvement in the day-to-day operations of the Company, were senior officers of the Company, corporate officers with direct involvement in the Company's financial reporting and accounting functions, and/or were members of the Board of Directors, including certain of the Individual Defendants who served on its Audit and Compensation Committees, and therefore are presumed to have had the power to control or influence the particular transactions and disclosures giving rise to the securities violations alleged herein, and exercised same.

CONSOLIDATED CLASS ACTION COMPLAINT

274.    Juniper has admitted that its financial statements were materially false and misleading, as described above; and that the actions that materially overstated the financial results were deliberate.  As a result, the market price of Juniper securities was artificially inflated.  These admissions prove Juniper's primary violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

275.    By reason of their management positions and/or control of the Board of Directors, the Individual Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to direct the management and the activities of the Company and its employees, and to cause the Company to engage in the unlawful conduct complained of herein.  Because of their executive, officer and director positions within Juniper and control of the Board of Directors of Juniper, the Individual Defendants had access to adverse non-public financial information about the Company an acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.

276.    By virtue of their positions as controlling persons of Juniper, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

277.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Juniper securities during the Class Period.

## COUNT III

### For Violation of § 11 of the Securities Act

**(Against All Defendants)**

278.    Plaintiff repeats and realleges the allegations in ¶¶ 1-234 and 247-257 above as if fully set forth herein.  For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

279.    Plaintiff brings this Count against defendants pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all Class members who acquired Juniper stock issued pursuant to the NetScreen Registration Statement in exchange for NetScreen shares.

280.    Juniper is the issuer of the common stock issued pursuant to the NetScreen Registration Statement.  As the issuer, Juniper is strictly liable for the false and misleading statements and omissions contained therein under § 11 of the Securities Act.

281.    The Individual Defendants were officers and/or directors of Juniper and each signed the NetScreen Registration Statement.

282.    E&Y consented to its designation as an "expert" in the NetScreen Registration Statement.  As such, it agreed to the inclusion of its opinion on Juniper's 2003 financial statements.

283.    Defendants caused to be issued and participated in the issuance of materially false and misleading statements in the Registration Statement, which misrepresented or failed to disclose, *inter alia*, the adverse facts set forth above.

284.    Plaintiff does not allege in this Count that defendants acted with scienter, or were guilty of any scheme to defraud, or of any misrepresentations that were made knowingly or recklessly.

285.    Plaintiff and other former NetScreen shareholders purchased or received Juniper common stock which was traceable to the false and misleading NetScreen Registration Statement, without knowledge of the untruths or omissions alleged herein regarding the Company's improper accounting and compensation practices.  Plaintiff could not have reasonably discovered the nature of these defendants' untruths and omissions.

286.    As a result of their purchases or acquisitions of the Juniper stock issued pursuant to the NetScreen merger, Plaintiff and other former NetScreen shareholders have suffered damages. By reason of the conduct alleged herein, each of the defendants violated § 11 of the Securities Act.

287.    This action was brought within one year after the discovery of the untrue statements and omissions and less than three years after the NetScreen Registration Statement was issued.

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

## COUNT IV

### For Violations of § 15 of the Securities Act

### (Against the Individual Defendants)

288.    Plaintiff repeats and realleges the allegations in ¶¶ 1-234, 247-257, and 278-287 above as if fully set forth herein.  For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

289.    Plaintiff asserts this Count against the Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

290.    The Individual Defendants at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Juniper's business affairs.

291.    As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Juniper's financial condition and results of operations.

292.    Because of their positions of control and authority as senior officers and directors of Juniper, the Individual Defendants were able to, and did, control the contents of the NetScreen Registration Statement which Juniper has admitted contained materially false financial information, thereby constituting violations of § 11 of the 1933 Act.  The Individual Defendants therefore were "controlling persons" of Juniper within the meaning of § 15 of the 1933 Act.

293.    The NetScreen Registration Statement, at the time it became effective, contained material misrepresentations of fact and omitted facts necessary to make the facts stated therein not misleading.  Juniper has admitted the material falsity of its financial statements which were summarized and incorporated by reference in the NetScreen Registration Statement.

CONSOLIDATED CLASS ACTION COMPLAINT

`

1    294.    Plaintiff received or purchased Juniper common stock traceable to the false and

2  misleading NetScreen Registration Statement.  Plaintiff could not reasonably have discovered the

3  nature of the false and misleading statements.

4    295.    As a result of its purchases or acquisitions of Juniper common stock issued pursuant

5  to the NetScreen Registration Statement, Plaintiff has suffered damages.

6    296.    Plaintiff brought this action within one year after the discovery of the untrue

7  statements and omissions, and within three years after the NetScreen Registration Statement was

8  issued.

## PRAYER FOR RELIEF

9

10  WHEREFORE, Plaintiff prays for relief and judgment, as follows:

11    A.    Determining that this action is a class action under Rule 23, Fed. R. Civ. P.;

12    B.    Awarding compensatory damages in favor of Plaintiff and the other Class members

13  against all defendants, jointly and severally, for all damages sustained as a result of defendants'

14  wrongdoing, in an amount to be proven at trial, including interest thereon;

15    C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

16  action, including counsel fees and expert fees; and

17    D.    Awarding such other and further relief as the Court may deem just and proper.

18

19  ## JURY TRIAL DEMANDED

20    Plaintiff demands a trial by jury.

21

22

23  Dated: January 12, 2007

LOWEY DANNENBERG BEMPORAD
& SELINGER, P.C.

24

25

RICHARD BEMPORAD
26    (Admitted Pro Hac Vice)
NEIL L. SELINGER
27  DAVID C. HARRISON
    (Admitted Pro Hac Vice)
28  One North Lexington Avenue

CONSOLIDATED CLASS ACTION COMPLAINT

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

White Plains, New York  10601-1714
Telephone: 914-997-0500

*Lead Counsel for Lead Plaintiff the New
    York City Pension Funds and the
    Putative Class*

SCHUBERT & REED LLP
WILLEM F. JONCKHEER S.B.N. 178748
Three Embarcadero Center, Suite 1650
San Francisco, California  94111
Telephone: 415-788-4220

*Local Counsel*

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CONSOLIDATED CLASS ACTION COMPLAINT

Page 79