RICHARD BEMPORAD
NEIL L. SELINGER
DAVID C. HARRISON
JEANNE D'ESPOSITO
STACEY E. BLAUSTEIN
LOWEY DANNENBERG BEMPORAD SELINGER & COHEN, P.C.
One North Broadway
White Plains, New York 10601-2310
Telephone: 914-997-0500

*Lead Counsel for the New York City Pension Funds and the Putative Class*

WILLEM F. JONCKHEER S.B.N. 178748
SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1050
San Francisco, California 94111
Telephone: 415-788-4220

*Local Counsel*

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE JUNIPER NETWORKS, INC. SECURITIES LITIGATION

**No. C06-04327-JW**

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Lead Plaintiff, the New York City Pension Funds, as defined herein at ¶¶ 27-32, as the Court-appointed Lead Plaintiff, for its Amended Consolidated Class Action Complaint (the "Complaint"), alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief based upon the investigation made by and through its attorneys as to other matters. This investigation included, *inter alia*, a review and analysis of: (a) public documents pertaining to Juniper Networks, Inc. ("Juniper" or the "Company") and the other defendants named herein; (b) filings with the Securities and Exchange Commission (the "SEC"); (c) the Company's press releases and public statements; (d) analyst reports concerning the Company; (e) newspaper and magazine articles and other media coverage regarding Juniper and its business; and (f) industry

studies concerning abusive practices with respect to the granting of corporate stock options.  Many of the facts supporting the allegations contained herein are known only to defendants or are exclusively within their custody and/or control.

## NATURE OF THE ACTION

1.       This is a securities class action (the "Action") on behalf of all persons and entities who purchased or otherwise acquired the publicly traded securities of Juniper securities from July 12, 2001 through and including August 10, 2006 (the "Class Period") and were damaged thereby, including (a) those who received (acquired) Juniper common stock issued pursuant to a registration statement on Form S-4 dated March 10, 2004 used to issue new Juniper shares in the Company's merger with NetScreen Technologies Inc. (the "NetScreen Registration Statement"), and (b) purchasers of Zero Coupon Convertible Senior Notes due June 15, 2008 (the "Notes") issued pursuant to a registration statement on Form S-3 dated November 20, 2003 (the "Notes Registration Statement"), against Juniper, certain of its officers and/or directors, and the Company's auditors, Ernst & Young LLP ("E&Y"), for violations of the federal securities laws.

2.       This case concerns, among other things, the admitted manipulation of the Company's stock option grants to enrich Juniper's executives and employees in an undisclosed and inherently deceptive manner.  This manipulation caused the Company's financial statements to violate generally accepted accounting principles ("GAAP") by understating compensation expenses and overstating profits over Juniper's seven-year life as a public company, which resulted in Juniper's stock price being artificially inflated throughout the Class Period.

3.       The Company has admitted that some members of management engaged in this scheme knowingly and on a massive scale involving more than one hundred million option shares, or more than three-quarters of the Company's total options grants.  As a result, Juniper was required to record more than $900 million in additional stock-based compensation expenses and associated tax costs from 1999 through March 31, 2006, and has restated its financial results for more than five years.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

4. A stock option granted to an employee of a corporation allows the employee to purchase a specified number of shares of company stock at a set price – called the exercise price – on a future date, typically at the end of a fixed period called the vesting period. Prior to and during the Class Period, Juniper's public filings repeatedly stated that under the Company's stock option plans, options grants gave the holder the right to buy Juniper stock at fair market value, which for public companies is the market price on the date the options are granted. When the exercise price of an option grant is set at the market price on the date of grant, *i.e.*, "at-the-money," company executives and the shareholders will profit only if the stock price goes up over time. In this way, the grant of stock options supposedly created incentives for Juniper executives and employees to boost long-term corporate performance and profitability.

5. Prior to 2006, Juniper benefited from accounting rules – specifically Accounting Principles Board (APB) Opinion No. 25 – that gave favorable treatment to companies that issued at-the-money options. Juniper's financial statements repeatedly represented that because the Company only issued options under its stock plans at market value on the date of the grant, Juniper was not required under GAAP to record any compensation expense with respect to those option grants. In contrast, there is an instant paper gain in value if options are priced below a stock's market price when they are awarded. Under APB No. 25, the Company was required to recognize this gain as compensation expense over the vesting period of the options.

6. Through a series of disclosures beginning near the end of the Class Period, Juniper has admitted improperly accounting for 110.5 million of the 146.0 million stock options granted since it went public in June 1999. Juniper admits in its 2006 Report on Form 10-K for the year ended December 31, 2006 (the "2006 Form 10-K") that from at least June 1999 through June 2003, options grant dates were not based on the market value on their approval dates, but rather were selected based upon a "pattern of consciously looking back for the most favorable dates," *i.e.*, purported grant dates were backdated to when Juniper's shares were trading at lower prices, often just prior to a run-up in the stock price, in order to provide risk-free benefits to the option holders.

7. The Company also identified numerous other accounting violations, including pricing options on the date of a director's election or reelection rather than when they were approved;

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

backdating option grants to newly hired officers prior to the dates their employment began; and awarding officer and director grants which were neither authorized nor documented by the Board of Directors or its Compensation Committee.

8.     A summary of the results of a seven-month investigation by Juniper's Audit Committee was also presented in the 2006 Form 10-K.  The summary reported that Juniper recorded compensation charges for improper accounting of stock options that amounted on average to $7.81 per share for each non-officer option and a staggering $12.23 per share for each option issued to Juniper officers and directors, including Chief Executive Officer Scott Kriens ("Kriens"), co-founder and Chief Technical Officer Pradeep Sindhu ("Sindhu") and former Chief Financial Officer Marcel Gani ("Gani") (together, the "Executive Defendants").

9.     By misrepresenting and disguising the fact that the options were in the money when granted, the Company could continue to issue massive amounts of stock options without recording any compensation expense, while assuring instant and riskless gains to the Executive Defendants and others in Juniper's workforce.

10.     Juniper, through its employees, and the Executive Defendants individually, knowingly or recklessly (a) materially misrepresented and concealed the backdated nature of the option grants and other accounting improprieties in numerous public filings such as Reports on SEC Form 10-K and 10-Q, proxy and registration statements, and Forms 4 and 5; (b) improperly accounted for at least three-quarters of Juniper's stock options under GAAP; (c) misrepresented the adequacy of the company's internal controls with respect to Juniper's financial reporting and disclosures in certifications required by the Sarbanes-Oxley Act of 2002 ("SOX"); and (d) misrepresented critical facts regarding Juniper's executive compensation arrangements.

11.     As a result, the Company's financial results were improperly inflated over a seven-year period, from Juniper's initial trading as a public company in June 1999 through the first quarter of 2006.

12.     In reliance on the integrity of the market and/or defendants' false and misleading statements, Lead Plaintiff and the other members of the Class (as defined herein at ¶ 68) purchased

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

Juniper securities at artificially inflated prices and were damaged after the truth gradually emerged and the value of Juniper's securities declined.

13. This action is also brought against E&Y with respect to, *inter alia*, the issuance of the false and misleading NetScreen Registration Statement, and certain of the non-management directors (the "Director Defendants," defined herein at ¶ 54) with respect to the NetScreen Registration Statement and/or the Notes Registration Statement. Lead Plaintiff's claims against the Director Defendants and E&Y relating to the Registration Statements are based solely on negligence. Lead Plaintiff expressly disclaims any allegations concerning the participation of E&Y and the Director Defendants in the preparation and issuance of the Registration Statements for the NetScreen merger and/or the Notes that could be construed as alleging fraud or intentional or reckless misconduct.

14. On March 18, 2006, *The Wall Street Journal* reported on the government's probe of options backdating at about a dozen companies, but did not mention Juniper as either a current or potential target of that investigation. In May 2006, both the Center for Financial Research and Analysis ("CFRA") and J. P. Morgan Securities, Inc. ("J. P. Morgan") issued independent studies that concluded, based upon statistical analysis of the option grants, that Juniper had a "high risk profile" of backdating stock options to its senior executives. These studies indicated – as Juniper has recently admitted – that from June 1999 through 2003, millions of backdated stock options were issued to the Executive Defendants and other Juniper officers.

15. On August 10, 2006, the end of the Class Period, Juniper admitted that its financial results from 2003 through March 2006 should no longer be relied upon and would be restated. These financial statements were false and misleading because the Company failed to expense compensation costs for backdated stock options, which artificially inflated operating margins and earnings.

16. Following the gradual disclosures beginning in May 2006 concerning the manipulation of and improper accounting for Juniper's stock option grants, the price of Juniper stock declined from $16.87 on May 17, 2006 to $12.20 on August 11, 2006.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

17. On December 20, 2006, Juniper admitted that it was required to take a $900 million charge, an acknowledgment that the improper accounting occurred on a massive scale. This charge is the second largest recorded by the more than 200 companies implicated in the ever-widening government probe of improper corporate stock option practices.

18. Juniper also acknowledged in the December 20 press release that the wrongdoing was both pervasive and deliberate. Under the auspices of Juniper management, there were "numerous instances in which the grant dates were chosen with the benefit of hindsight as to the price of the Company's stock so as to give favorable prices." The Company further faulted management for its handling and oversight of the stock option process.

19. On March 9, 2007, Juniper filed its 2006 Form 10-K and Reports on Form 10-Q for the periods ended June 30, 2006 and September 30, 2006. In the 2006 Forms 10-K and 10-Q, the Company acknowledged that its financial statements, and the related opinions of E&Y, from June 1999 through August 10, 2006, could not be relied upon. Juniper also issued restated financial results for the years 2002 through 2005; for the interim periods of 2005; and for the quarter ended March 31, 2006.

20. In its 2006 Form 10-K, Juniper also admitted that there were material weaknesses in its internal controls extending back to 1999 with respect to the grant, accounting and financial reporting of stock options. Juniper claimed that these internal controls had been strengthened during the last three years. However, during this period, the Company neither disclosed nor corrected the improper accounting which inflated its financial results.

21. In the midst of these revelations, two of the three members of Juniper's Compensation Committee, Frank Marshall and defendant Kenneth Levy, both of whom concurrently served on the boards of directors of other technology companies that were implicated in the government's investigation for stock options backdating, have resigned from Juniper's Board of Directors. Likewise, Juniper's Chief Financial Officer, Robert Dykes, resigned within days of the Company's restatement.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

22. The full details of defendants' misconduct with respect to stock option grants have yet to be disclosed, since Juniper has not publicly released its Audit Committee report, but rather only presented a selected summary of its investigative efforts and findings in the 2006 Form 10-K.

## JURISDICTION AND VENUE

23. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 10b-5; and Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77o.

24. This Court has subject matter jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. §§ 1331 and 1337.

25. Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Many of the acts and transactions constituting the violations of law alleged herein, including the preparation, issuance, and dissemination of materially false and misleading statements, occurred in this District, where Juniper maintains its headquarters.

26. In connection with the acts, transactions, and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange and market.

## THE PARTIES

### Lead Plaintiff

27. Lead Plaintiff the New York City Pension Funds is comprised of the New York City Employees' Retirement System ("NYCERS"), the Teachers' Retirement System of the City of New York ("NYCTRS"), the New York City Fire Department Pension Fund ("FIRE"), the New York City Police Pension Fund ("POLICE"), and five variable supplemental funds: the New York City Police Superior Officers' Variable Supplements Fund ("PSOVSF"), the New York City Police

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

Officers' Variable Supplements Fund ("POVSF"), the New York City Firefighters' Variable Supplements Fund ("FFVSF"), the New York City Fire Officers' Variable Supplements Fund ("FOVSF"), and the New York City Teachers' Retirement System of the City of New York Variable Annuity Program ("NYCTRS Variable A") (collectively, the "NYC Funds," the "Funds," or "Lead Plaintiff"). As of July 31, 2006, the NYC Funds had more than $113 billion in assets, and as of June 30, 2005, had approximately 263,000 retired members and 350,000 active members. On November 20, 2006, the Hon. James Ware appointed the NYC Funds as Lead Plaintiff for this litigation.

28. NYCERS, established under Section 12-102 of the Administrative Code of the City of New York, provides pension benefits to all New York City employees who are not eligible to participate in separate Fire Department, Police Department, or NYCTRS pension funds.

29. NYCTRS maintains two separate retirement programs, the Qualified Pension Plan ("QPP") and the Tax-Deferred Annuity Program ("TDA"). The QPP, established pursuant to Section 13-502 of the Administrative Code of the City of New York, provides pension benefits to those with regular appointments to the pedagogical staff of the Board of Education. The TDA, established pursuant to Internal Revenue Code Section 403(b), provides a means of deferring income tax payments on voluntary tax-deferred contributions.

30. FIRE, established pursuant to Section 13-301 of the Administrative Code of the City of New York, provides pension benefits for full-time uniformed employees of the New York City Fire Department.

31. POLICE, created pursuant to New York Local Law 2 of 1940, provides pension benefits for full-time uniformed employees of the New York City Police Department.

32. PSOVSF, POVSF, FFVSF, FOVSF, and NYCTRS Variable A were established, pursuant to enabling State legislation, to provide certain retirees of the New York City Police Department, the New York City Fire Department, and retirees and members of the New York City Teachers Retirement System, with supplemental benefits from variable supplement funds and/or additional investment options.

33. Each of the NYC Funds purchased or acquired Juniper common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

During the Class Period, the NYC Funds purchased a total of approximately 4,200,000 shares of Juniper common stock on the open market and acquired 85,228 Juniper shares pursuant to the NetScreen merger, as set forth in their amended certifications annexed to the Complaint as Exhibit A.

**The Company**

34. Defendant Juniper is an internet networking equipment company that makes the routers and other equipment that direct data traffic over computer networks. The Company maintains its principal executive offices at 1194 North Matilda Avenue, Sunnyvale, California 94089.

35. Lead Plaintiff asserts claims against Juniper in Counts I, III, and V herein.

**The Executive Defendants**

36. Defendant Kriens has served since October 1996 as Chief Executive Officer and Chairman of Juniper. Defendant Kriens participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's annual reports for fiscal years 2001 through 2005 on Form 10-K, and the registration statements for the NetScreen merger and the Notes offering. Kriens also signed the 2006 Form 10-K.

37. From June 1999 through December 31, 2003, Kriens received at least 3,550,000 backdated stock options. During the Class Period, Kriens sold approximately 7,000,000 shares of Juniper stock, reaping proceeds of approximately $131 million, while in the possession of material adverse information about the Company's improper accounting for stock options.

38. Because of defendant Kriens' executive positions, his involvement in the day-to-day operations of Juniper, his participation in the preparation of the Company's SEC filings and earnings announcements, his involvement in the employee compensation process, his access to internal corporate documents, conversations, and connections with other corporate officers and employees, his attendance at management and/or Board of Directors meetings, his receipt of reports and other information provided to him in connection therewith, and his obligations to certify the accuracy of the Company's financial statements and the effectiveness of its internal controls, Kriens knew or recklessly disregarded that Juniper had issued backdated option grants to him and other executives,

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

directors and employees, and that the Company misrepresented and improperly accounted for this practice in its public filings and financial statements.

39. Defendant Sindhu co-founded Juniper in February 1996 and served as Chief Executive Officer and Chairman of the Board of Directors until September 1996. Since that time, Sindhu has served as Juniper's Chief Technical Officer and as Vice Chairman of the Board of Directors. Defendant Sindhu participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's annual reports for fiscal years 2001 through 2005 on Form 10-K, and the registration statements for the NetScreen merger and the Notes offering. Sindhu also signed the 2006 Form 10-K.

40. From June 1999 through December 31, 2003, Sindhu received at least 1,780,000 backdated stock options. During the Class Period, Sindhu sold approximately 3,400,000 shares of Juniper stock, reaping proceeds of more than $73 million, while in the possession of material adverse information about the Company's improper accounting for stock options.

41. Because of defendant Sindhu's executive positions, his involvement in the day-to-day operations of Juniper, his participation in the preparation of the Company's SEC filings and earnings announcements, his involvement in the employee compensation process, his access to internal corporate documents, conversations, and connections with other corporate officers and employees, his attendance at management and/or Board of Directors meetings, and his receipt of reports and other information provided to him in connection therewith, Sindhu knew or recklessly disregarded that Juniper had issued backdated option grants to him and other executives, directors and employees, and that the Company misrepresented and improperly accounted for this practice in its public filings and financial statements.

42. Defendant Gani served as Juniper's Chief Financial Officer from February 1997 and as Executive Vice President and Chief Financial Officer of the Company from July 2002 through December 31, 2004. Beginning January 1, 2005, Gani assumed the position of Juniper's Chief of Staff. Defendant Gani participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's annual reports on Form 10-K for fiscal years 2001 through 2003, the Company's reports on Form 10-Q for each quarter during

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

2001 through 2004, and the registration statements for the NetScreen acquisition and the Notes offering.

43. From June 1999 through December 31, 2003, Gani received at least 1,580,000 backdated stock options. During the Class Period, Gani exercised 300,000 backdated options and sold the shares for an approximately $3.9 million profit, and he made an additional $8.4 million profit from the sale of another 350,000 shares, while in the possession of material adverse information about the Company's improper accounting for stock options.

44. Because of defendant Gani's executive positions, his involvement in the day-to-day operations of Juniper, his participation in the preparation of the Company's SEC filings and earnings announcements, his involvement as CFO in the employee compensation process, his access to internal corporate documents, conversations, and connections with other corporate officers and employees, his attendance at management and/or Board of Directors meetings, his receipt of reports and other information provided to him in connection therewith, and his obligations with respect to certifying the accuracy of the Company's financial statements and the effectiveness of its internal controls, Gani knew or recklessly disregarded that Juniper had issued backdated option grants to him and other executives, directors and employees, and that the Company misrepresented and improperly accounted for this practice in its public filings and financial statements.

45. Lead Plaintiff asserts claims against the Executive Defendants in Counts I through VI herein.

**The Director Defendants**

46. Defendant Robert M. Calderoni ("Calderoni") has served since October 2003 as a Director of Juniper and a member of the Audit Committee of the Board. As a member of the Audit Committee, Calderoni oversaw and reviewed the Company's financial reporting and public disclosure activities. Defendant Calderoni participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's annual reports on Form 10-K filed with the SEC for the years 2003 through 2005, and the registration statements for the NetScreen merger and the Notes offering. Calderoni also signed the 2006 Form 10-K.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

47.     Defendant Kenneth Goldman ("Goldman") has served since October 2003 as a Director of Juniper and the Chair of the Audit Committee of the Board.  Goldman is identified in Juniper's SEC filings as an "audit committee expert" under SEC rules.  As Chairman of the Audit Committee, Goldman oversaw and reviewed the Company's financial reporting and public disclosure activities.  Defendant Goldman participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's annual reports on Form 10-K filed with the SEC for the years 2003 through 2005, and the registration statements for the NetScreen merger and the Notes offering.  Goldman also signed the 2006 Form 10-K.

48.     Defendant William R. Hearst III ("Hearst") has served since 1996 as a Director of Juniper and has been a member of the Audit Committee since 1999.  As a member of the Audit Committee, Hearst oversaw and reviewed the Company's financial reporting and public disclosure activities.  Defendant Hearst participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's annual reports on Form 10-K filed with the SEC for the years 2001 through 2005, and the registration statements for the NetScreen merger and the Notes offering.  Hearst also signed the 2006 Form 10-K.

49.     Defendant Stratton Sclavos ("Sclavos") has served since May 2000 as a Director of Juniper and a member of the Audit Committee of the Board for the years 2000 through 2002.  As a member of the Audit Committee, Sclavos oversaw and reviewed the Company's financial reporting and public disclosure activities.  Sclavos signed the Company's annual reports on Form 10-K filed with the SEC for the years 2001 through 2006, and the registration statements for the NetScreen merger and the Notes offering.

50.     On May 11, 2000, Sclavos received 40,000 backdated stock options.

51.     Defendant Vinod Khosla ("Khosla") was, from February 1996 through April 15, 2004, a Director of Juniper and a member of the Compensation Committee.  As a member of the Board and the Compensation Committee, Khosla authorized and approved the option grants which Juniper admits were improperly backdated from at least June 1999 through 2003.  Defendant Khosla participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's annual reports on Form 10-K filed with the SEC for 2001

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

through 2003 and the registration statements for the NetScreen merger and the Notes offering, and authorized the inclusion of a false and misleading Compensation Committee Report on Executive Compensation in the Company's proxy statements.

52.     Defendant Kenneth Levy ("Levy") served from 2003 as a Director of Juniper and a member of the Compensation Committee until his resignation on or about February 27, 2007.  As a member of the Board of Directors and/or the Compensation Committee, defendant Levy authorized and approved certain option grants that were improperly backdated.  Defendant Levy participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's annual reports on Form 10-K filed with the SEC for the years 2003 through 2005 and the registration statements for the NetScreen merger and the Notes offering, and authorized the inclusion of a false and misleading Compensation Committee Report on Executive Compensation in Juniper's proxy statements.  Levy also signed the 2006 Form 10-K.

53.     Defendant William R. Stensrud ("Stensrud") has served since October 1996 as a Director of Juniper, and since 2002 as a member of the Compensation Committee.  As a member of the Board of Directors and/or the Compensation Committee, defendant Stensrud authorized and approved certain option grants that were improperly backdated.  Defendant Stensrud participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's annual reports on Form 10-K filed with the SEC for the years 2001 through 2005 and the registration statements for the NetScreen merger and the Notes offering, and authorized the inclusion of a false and misleading Compensation Committee Report on Executive Compensation in the Company's proxy statements.  Stensrud also signed the 2006 Form 10-K.

54.     Defendants Calderoni, Goldman, Hearst, Sclavos, Khosla, Levy, and Stensrud are collectively referred to as the "Director Defendants."  Lead Plaintiff asserts claims against the Director Defendants as "controlling persons" of Juniper in Counts II, IV and VI (excluding Calderoni and Goldman) herein, and as directors and signatories to the NetScreen Registration Statement and/or the Notes Registration Statement in Counts III and V (excluding Calderoni and Goldman) herein.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

55. The Executive Defendants and the Director Defendants are collectively referred to as the "Individual Defendants." Juniper and the Individual Defendants are collectively referred to as the "Juniper Defendants."

**Ernst & Young**

56. Defendant E&Y is headquartered at 5 Times Square, New York, New York, and maintains offices in San Jose, California. E&Y has served as Juniper's independent auditor at least since the corporation became a publicly traded company in June 1999. E&Y has regularly performed audit services for Juniper in this District, including the issuance of unqualified opinions on Juniper's financial statements from 1999 through 2006 for inclusion in Juniper's Reports on Form 10-K for 1999 through 2006 and the Company's registration statements for the NetScreen merger and the Notes offering.

57. Lead Plaintiff asserts a claim against E&Y in Count III herein, based solely on negligence. Lead Plaintiff expressly disclaims any allegations regarding E&Y that could be construed as alleging fraud or intentional or reckless misconduct.

**OBLIGATIONS AND DUTIES OF THE INDIVIDUAL DEFENDANTS**

58. By reason of their positions as directors and/or officers of Juniper, and because of their ability to control the business, corporate and financial affairs of Juniper, each Individual Defendant was obligated to exercise due care and diligence in the management and administration of the affairs of the Company, including in the administration of the Company's stock options and incentive plans and in ensuring that Juniper operated in compliance with all applicable federal and state laws, rules and regulations, including the federal securities laws.

59. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial and corporate affairs of Juniper. By virtue of these duties, Individual Defendants were required, *inter alia*, to

a. Manage, conduct, supervise, and direct the employees, businesses and affairs of Juniper in accordance with laws, rules and regulations, and the charter and by-laws of Juniper;

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

b. Manage and supervise the administration of Juniper's various stock option and incentive plans in a manner consistent with the plans' objectives; and

c. Supervise the preparation, filing, and/or dissemination of any SEC filing, registration statement, press releases, audits, reports, or other information disseminated by Juniper and to examine and evaluate any reports of examinations or investigations concerning the practices, products, or conduct of officers of Juniper.

60. Moreover, SOX requires an issuer (Juniper) and its chief executive officer (Kriens) and chief financial officer (Gani) to certify publicly the accuracy of the corporation's financial statements and the adequacy of its internal controls. More specifically, the executives were required to and did certify that:

a. the Company's reports on Forms 10-K and 10-Q do not contain any untrue statements or omit any material fact, and the financial statements contained therein fairly present the Company's financial condition, results of operations and cash;

b. they have designed or caused to be designed disclosure controls and procedures (i) to ensure that material information is made known to them, and (ii) to provide reasonable assurance as to the reliability of financial reporting and the preparation of the financial statements in accordance with GAAP;

c. they have evaluated the effectiveness of the Company's disclosure controls and procedures and presented their conclusions and disclosed any changes in internal controls in these reports; and

d. they have disclosed to the auditors and the audit committee (i) all material weaknesses in the design or operation of internal controls over financial reporting; and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

61. The Company's Worldwide Code of Business Conduct and Ethics also imposes an obligation of full disclosure upon Company officers and directors:

> As a public company, the Company, through its employees, directors, contractors and agents of Company entities worldwide, has a responsibility to provide full, fair, accurate, timely and understandable disclosure of its business and financial condition in the periodic reports we are required to file with the United States Securities and Exchange Commission. As a result, the integrity of our financial information is paramount. The Company's financial information guides the decisions of our Board of Directors and is relied upon by our stockholders and the financial markets.
>
> - It is the Company's policy to maintain books, records and accounts in reasonable detail to accurately and fairly reflect all of the Company's transactions. The Company and its subsidiaries maintain a system of internal accounting controls designed to reinforce policy compliance.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

62. Further, the Director Defendants generally, and members of the Compensation Committee specifically, were responsible for administering the Company's stock option plans. According to the Company's definitive proxy statement on Schedule 14A dated April 12, 2004 (the "2004 Proxy Statement"), the Compensation Committee is responsible for reviewing and approving the Company's compensation, employee benefits and stock-based programs. The Compensation Committee also negotiates and administers the Company's employment arrangements with its Chief Executive Officer and President, supervises incentive and equity-based compensation for the Company's employees and reviews and monitors directors' compensation programs.

63. Similarly, the Stock Option Committee, which is comprised of Juniper management but not Board members, was responsible for administering Juniper's stock options to the Company's non-officer employees in accordance with the terms of its stock option plans and the Company's representations that stock options were issued in compliance with APB No. 25. While Juniper has not identified the members of the Stock Option Committee in its public filings, upon information and belief, the committee included personnel and officers from the human resources, financial and accounting departments during the Class Period. Juniper's senior management had direct oversight responsibility over the activities of the Stock Option Committee.

64. The Stock Option Committee also coordinated its option grants with the grant of stock options to officers and directors approved by the Compensation Committee. As part of its function, the Stock Option Committee reviewed and gave input regarding the Company's disclosures in its proxy and financial statements with respect to the granting and accounting of Company stock options under its direction.

65. The Director Defendants generally, and the members of the Audit Committee specifically, were responsible for maintaining and establishing adequate internal accounting controls for the Company and ensuring that the Company's financial statements were based on accurate

financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Director Defendants were required to:

a. Make and keep books, records, and accounts, which, in reasonable detail, fairly and accurately reflect the transactions and dispositions of assets of the issuer; and

b. Devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:

i. Transactions are executed in accordance with management's general or specific authorization; and

ii. Transactions are recorded as necessary to permit preparation of financial statements.

66. Juniper's Audit Committee Charter provides that the Audit Committee shall, among other things:

- Assist the Board of Directors in oversight and monitoring of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; . . . (iv) the Company's internal accounting and financial controls, improvements made or to be made in such controls; and (v) the internal audit function.

* * *

- Oversee the internal audit function and review, on a continuing basis, the adequacy of the Company's system of internal controls, including meeting periodically with the Company's management and the independent auditors to review the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure;

* * *

- Review before release the unaudited quarterly operating results in the Company's quarterly earnings release.

67. The members of the Audit Committee (Calderoni, Goldman, Sclavos, and Hearst) failed to comply with these obligations, thereby permitting the systematic falsification of the Company's financial statements for more than seven years.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

## CLASS ACTION ALLEGATIONS

68. Lead Plaintiff the NYC Funds brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class (the "Class") of all persons who purchased or otherwise acquired publicly traded Juniper securities during the period from July 12, 2001 through and including August 10, 2006, and who were damaged thereby, including all persons or entities who (a) received shares of Juniper common stock in the NetScreen merger that were issued pursuant to the NetScreen Registration Statement, and (b) purchased Juniper's Notes issued pursuant to the Notes Registration Statement.

69. Excluded from the Class are defendants; members of the immediate families of the Individual Defendants; any parent, subsidiary, affiliate, officer, or director of defendant Juniper; any entity in which any excluded person has a controlling interest; and the legal representatives, heirs, successors, and assigns of any excluded person.

70. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Lead Plaintiff at present and can only be ascertained from books and records maintained by Juniper and/or its agent(s), Lead Plaintiff believes that there are tens of thousands of members of the Class located throughout the United States. As of February 28, 2007, Juniper had issued and outstanding over 569 million shares of common stock and approximately $400 million principal amount of Notes. Throughout the Class Period, Juniper's securities and Notes were actively traded, with more than 9.0 billion shares traded on the NASDAQ National Market System during the Class Period.

71. Lead Plaintiff's claims are typical of the claims of the members of the Class. Lead Plaintiff and all members of the Class purchased Juniper securities at artificially inflated prices and have sustained damages arising out of the same wrongful course of conduct.

72. Lead Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Lead Plaintiff has retained extremely competent counsel experienced in class and securities litigation, and intends to prosecute this action vigorously. Lead Plaintiff is a member of the Class and does not have interests antagonistic to, or in conflict with, the other members of the Class.

73. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

b. whether defendants participated in and pursued the common course of conduct and fraudulent scheme complained of herein;

c. whether the registration statements issued by Juniper contained material misstatements or omitted to state material facts;

d. whether the statements disseminated to the investing public, including investors in Juniper, during the Class Period omitted and/or misrepresented material facts about Juniper's financial condition and compensation arrangements;

e. whether Juniper's financial results during the Class Period were materially misstated;

f. whether certain of the defendants had knowledge of or were reckless with respect to the improper activities described herein;

g. whether the market prices of Juniper's securities during the Class Period were artificially inflated due to the material omissions and/or misrepresentations complained of herein; and

h. whether Lead Plaintiff and the other members of the Class have sustained damages and, if so, the appropriate measure thereof.

74. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Moreover, because the damages suffered by many individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members individually to seek redress for the wrongful conduct alleged. Lead Plaintiff does not foresee any difficulty in the management of this litigation that would preclude its maintenance as a class action.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

75.     The names and addresses of the record owners of Juniper common stock and Notes purchased during the Class Period are available from Juniper and/or its transfer agent(s).  Notice can be provided to persons who purchased or otherwise acquired Juniper common stock by a combination of published notice and first-class mail, using techniques and forms of notice similar to those customarily used in other class actions arising under the federal securities laws.

76.     On May 24, 2006, a shareholder complaint was filed in the United States District Court for the Northern District of California, (Case 5:06-cv-03396-JW) bearing the caption *Timothy W. Hill, Derivatively on Behalf of Nominal Defendant Juniper Networks Inc., v. Marcel Gani, Steven Haley, William R. Hearst III, Scott Kriens, Stratton Sclavos, Pradeep Sindhu, William R. Stensrud, and Peter Wexler* (the "*Hill* Complaint").  The *Hill* Complaint asserts claims against each of the named defendants under Section 10(b) of the Exchange Act and for breach of fiduciary duty and unjust enrichment.  The misrepresentations alleged in this Complaint relate directly to conduct, transactions, and occurrences alleged in the *Hill* Complaint.  Specifically, they relate to the admitted manipulation of  Juniper's stock option grants over a four year period in an undisclosed and deceptive manner and the misrepresentations contained in Juniper's financial statements caused by that manipulation.  Therefore, in accordance with the provisions of Fed. R. Civ. P. 15, the allegations in this complaint relate back to the filing of the *Hill* Complaint on May 24, 2006 for statute of limitations purposes.

77.     On July 14, 2006, a class action complaint was filed in the United States District Court for the Northern District of California, (Case 3:06-cv-04327-MJJ) bearing the caption *Robert L. Garber, on behalf of himself and all others similarly situated., vs. Juniper Networks, Inc., Marcel Gani, William R. Hearst III, Scott Kriens, Stratton Sclavos, Pradeep Sindhu, and William R. Stensrud* (the "*Garber* Complaint").  The *Garber* Complaint asserts claims against each of the named defendants under Sections 10(b) and 20(a) of the Exchange Act "on behalf of a class of all persons who purchased or otherwise acquired Juniper securities."  The misrepresentations alleged in this Complaint relate directly to conduct, transactions, and occurrences alleged in the *Garber* Complaint.  Specifically, they relate to the admitted manipulation of Juniper's stock option grants over a four year period in an undisclosed and deceptive manner and the misrepresentations

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

contained in Juniper's financial statements caused by that manipulation. Therefore, in accordance with the provisions of Fed. R. Civ. P. 15, the allegations in this complaint relate back to the filing of the *Garber* Complaint for statute of limitations purposes.

**SUBSTANTIVE ALLEGATIONS**

**Juniper's Compensation Philosophy Embraced the Wide Use of Stock Options**

78. The use of stock options surged in the late 1990s, as fledgling firms such as Juniper, that had bright prospects but little revenues, used them to attract and pay executives. As dot-com and telecom share prices soared, stock options became a source of vast wealth for company executives as well as employees who received lucrative stock option packages in connection with their hiring.

79. From its inception as a public company in June 1999, Juniper adopted a policy of compensating defendants Kriens, Sindhu, Gani, and other employees in large part through stock options. In fact, it was Juniper's practice to grant stock options to nearly all full-time employees in connection with their joining the Company. To accomplish this massive undertaking involving the administration of tens of millions of stock option grants, the Board established the Stock Option Committee.

80. Prior to 2003, the Company also exclusively used stock options to compensate non-management directors for their services.

81. Juniper described its compensation philosophy in a proxy statement filed with the SEC on Schedule 14A dated April 13, 2000 (the "2000 Proxy Statement"), as follows:

> The [Compensation] Committee's approach is predicated upon the philosophy that a substantial portion of aggregate annual compensation for executive officers should be contingent upon the Company's performance and an individual's contribution to the Company's success in meeting certain critical objectives. In addition, the Committee strives to align the interests of the Company's executive officers with the long-term interests of stockholders through stock option grants such that grants of stock options should relate the performance of the executive to the market perception of the performance of the Company.
>
> * * *
>
> Stock options are granted at market price on the date of the grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

(Emphasis added.)

82. As reflected in Juniper's proxy statements, Kriens' total cash compensation from salary and bonus from 1999 through 2003 ranged from $175,000 to $436,350; Gani's annual cash compensation ranged from $157,425 to $317,345; and Sindhu's cash compensation ranged from $162,500 to $255,554. However, as shown in the tables below, these compensation figures pale when compared to the tens of millions of dollars the Executive Defendants stood to potentially realize from annual stock option grants, as set forth in the Company's proxy statements:

**Kriens' Annual Stock Option Compensation**

| Year | No. of Stock Options Granted* | Potential Value (5% Price Appreciation) |
|---|---|---|
| 1999 | 1,800,000 | $ 34,361,211 |
| 2000 | 400,000 | $ 23,630,716 |
| 2001 | N/A | N/A |
| 2002 | 2,750,000 | $ 16,232,714 |
| 2003 | 800,000 | $ 7,546,736 |

* Adjusted for stock split.

**Gani's Annual Stock Option Compensation**

| Year | No. of Stock Options Granted* | Potential Value (5% Price Appreciation) |
|---|---|---|
| 1999 | 480,000 | $ 9,162,990 |
| 2000 | 100,000 | $ 5,907,679 |
| 2001 | N/A | N/A |
| 2002 | 1,080,000 | $ 5,549,869 |
| 2003 | 50,000 | $ 4,716,710 |

* Adjusted for stock split.

**Sindhu's Annual Stock Option Compensation**

| Year | No. of Stock Options Granted* | Potential Value (5% Price Appreciation) |
|---|---|---|
| 1999 | 1,080,000 | $ 20,616,727 |
| 2000 | 100,000 | $ 5,907,679 |
| 2001 | N/A | N/A |
| 2002 | 400,000 | $ 1,721,913 |
| 2003 | 300,000 | $ 1,962,162 |

* Adjusted for stock split.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

83. As described herein, the vast majority of Juniper's stock options issued were systematically backdated, and the Company's public filings and financial statements repeatedly misrepresented that the options were issued at the market price on the date of issuance and that no compensation expenses were required to be recorded. Backdating provided options holders, including the Executive Defendants, with built-in, instant gains. This misconduct and other accounting improprieties had to be concealed because these practices violated the Company's stock option plans and disclosure would have subjected Juniper to unfavorable accounting and tax treatment amounting to hundreds of millions of dollars.

**Juniper's Stock Option Plans**

84. Juniper had two stock option plans outstanding prior to and during the Class Period: the Amended and Restated 1996 Stock Options Plan (the "1996 Plan") and the 2000 Nonstatutory Stock Option Plan (the "2000 Plan") (together, the "Plans"). The 1996 Plan provided for the grant of certain stock options to employees, consultants, and non-management directors, whereas the 2000 Plan was designed for employees and consultants only. Options granted under both Plans generally vested over a four-year period beginning on the date of grant and had a maximum term of ten years.

85. Both Plans provided that the exercise price of a stock option would be set by the Board of Directors or a committee designated to administer the Plans, which was the Compensation Committee of the Board in the case of Juniper Officers and Directors. In addition, the Board established the Stock Option Committee to grant stock options to Juniper's non-officer employees. The activities of the Stock Option Committee, which included members of management, were supervised by the Executive Defendants and coordinated with the Compensation Committee of the Board with respect to the timing of stock options grants.

86. The 1996 Plan provided generally that options should be set at "fair market value" on the date of grant. "Fair market value" for publicly traded securities such as Juniper common stock is the closing market price on the last trading day prior to the grant.

87. Paragraph 8 of the 1996 Plan provides in relevant part: Option Exercise Price and Consideration.

(a)   The per share exercise price for the Shares to be issued upon exercise of an Option shall be such price as is determined by the Administrator, but shall be subject to the following:

(i)   In the case of an Incentive Stock Option

(A)   granted to an Employee who, at the time of grant of such Option, owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary, <u>the per Share exercise price shall be no less than 110% of the Fair Market Value per Share on the date of grant</u>.

(B)   granted to any other Employee, <u>the per Share exercise price shall be no less than 100% of the Fair Market Value per share on the date of grant</u>.

(ii)   In the case of a Nonstatutory Stock Option, the per Share exercise price shall be determined by the Administrator [*i.e.*, the Board or Compensation Committee].  In the case of a Nonstatutory Stock Option intended to qualify as "performance-based compensation" within the meaning of Section 162(m) of the [Internal Revenue] Code, <u>the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant</u>.

(Emphasis added.)

88.   While the 2000 Plan provides that "the exercise price for the Shares to be issued upon exercise of an Option shall be such price as is determined by the Administrator," Juniper repeatedly represented in its public filings from 1999 through the end of the Class Period, including the Company's audited financial statements, that "the exercise price of the Company's stock options equals the market price of the underlying stock on the date of grant," and that no stock options "have been granted for less than fair market value on the date of grant."  As demonstrated herein, these representations were false and misleading with respect to stock options granted to the Executive Defendants and other Juniper officers, directors and employees.

**<u>Accounting and Tax Treatment of Stock Options</u>**

89.   Juniper's stated policy of issuing at-the-money stock options under its Plans was designed to enable the Company to receive favorable treatment under then-existing GAAP and IRS rules.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

90. Options are a form of employee compensation. Prior to January 1, 2006, issuers typically accounted for options-related compensation expenses pursuant to the "intrinsic value method" described in APB No. 25. Under the intrinsic value method, the compensation expense attributed to a stock option grant is calculated as the difference of: (a) the exercise price and (b) the quoted market price of the underlying stock on the measurement date, which is defined as the "first date on which are known both (1) the number of shares that an individual employee is entitled to receive and (2) the option or purchase price, if any." Pursuant to most stock option plans, including Juniper's, the measurement date is the date that the stock options grants are formally approved and documented by the Board or its designated committees.

91. Under the intrinsic value method, if the issuer grants an at-the-money option with an exercise price at or above the quoted market price of the stock on the grant date, then the issuer is not required to recognize any compensation-related expense for the option. In fact, the issuer could provide compensation to its executives without incurring any related compensation expense for the life of the option as long as grants are priced at the money. This benefit was particularly important to high-tech start-up companies like Juniper, which needed cash for product development and expansion, and relied heavily on stock options to attract and/or retain employees for their rapidly growing workforces during the late 1990's and early 2000's.

92. In contrast, an issuer that granted an in-the-money option, *i.e.*, an option with an exercise price below the quoted market price of the stock on grant date, was not eligible for favorable treatment under GAAP. Under APB No. 25, if the stock's market price on the date of grant exceeds the exercise price of the option, the company must recognize the difference as an expense during the vesting period, which directly reduces the issuer's net income.

93. One critique of the intrinsic value method is that it does not take into account the possibility that an option granted with an exercise price at or above the quoted market price would someday increase in value as the security's market price rose. Consequently, in October 1995, the Financial Accounting Standards Board ("FASB") offered an alternative method for valuing stock-based awards, FAS Statement 123, "Accounting for Stock-Based Compensation." FAS 123 allowed issuers to either continue valuing options using the intrinsic value method, or use the "fair value"

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

method and employ option pricing models such as the Black-Scholes pricing model. If an issuer continued using the intrinsic value method, it had to disclose in the footnotes to its financial statements a pro forma income calculation of the compensation expense that would have been incurred using the fair value method.

94. Over the next decade, the vast majority of companies, including Juniper, continued to use APB No. 25's intrinsic value method in connection with option grants, because using the fair value accounting method would have required that some compensation expenses be recorded, as compared to the intrinsic value method, where no compensation expenses were required to be recorded for at-the-money options.

95. As reflected in Juniper's annual and quarterly financial statements from 1999 through 2005, the differential in reported earnings under the intrinsic value and the fair value accounting methods amounted to hundreds of millions of dollars. Accordingly, the Defendants were well aware of the importance to Juniper's bottom line of satisfying the requirements of APB No. 25.

96. Juniper was also entitled to take tax deductions under the Internal Revenue Code ("IRC") for at-the-money options, but was not eligible for this favorable tax treatment if the options were granted in-the-money. For example, IRC Section 162(m), 28 U.S.C. § 162(m) ("Section 162(m)"), provides that compensation in excess of $1 million per year (including gains on stock options) paid to a corporation's five most highly compensated officers is tax-deductible only if certain conditions are met. One of those conditions is that the compensation must be payable solely on account of the attainment of one or more performance goals, such as increasing the value of the Company's stock in the future. Tax experts have opined that in-the-money options do not qualify for a Section 162(m) deduction since such grants are not deemed performance-based compensation. As such, Juniper and other companies that backdated options face the prospect of paying significant sums to revise prior years' tax returns, plus interest and penalties.

97. In this case, Juniper did not expense stock option compensation to Juniper executives and employees, even though the backdated stock options at issue were priced below the fair market value of the Company's stock at the date of grant and issuance. As a result, Juniper's financial statements materially inflated margins and earnings in violation of GAAP, which ultimately resulted

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

in requiring the Company to take a $900 million charge to account for compensation expenses and restate its financial results.

**The Backdated Option Grants**

98. The Executive Defendants received stock option grants from Juniper on unusually favorable dates from at least June 1999 through 2003. The grants were numerous and consistently made at or near monthly lows and/or were just before a large increase in the stock price. Juniper has now admitted that, unbeknownst to public investors, millions of option shares were backdated during this period to permit the option holders to reap the largest possible gains. However, months earlier, independent analyses by CFRA and J. P. Morgan identified the grants to the Executive Defendants and other Juniper officers that appeared to have been backdated.

99. The 2000 Proxy Statement indicated that a total of 4,470,000 stock options (adjusted for a subsequent stock split), at an exercise price of $30.36 per share, were purportedly granted to five of the Company's executive officers on October 4, 1999, including Kriens, Sindhu, Gani, Steven Haley, Vice President of Worldwide Sales and Service, and Peter Wexler, Vice President of Engineering.

100. Notably, October 4, 1999, the date of the grants in question, was the lowest closing price of the Company's stock during that month. Even more remarkable, the value of the Company's stock increased considerably during the days following the stock option grants of October 4, 1999. By the close of trading on October 11, 1999, one week after the option grants, Juniper's stock, adjusted for a subsequent split, stood at $40.67, a 34% increase. By the close of trading on October 25, 1999, Juniper's stock traded at $42.96, a 41% increase over its October 4, 1999 close. The Company's closing stock price as of the last trading day of October 1999, adjusted for a subsequent split, was $45.94, an increase of 52%.

101. A graph illustrating the October 1999 trading in relation to the Company's stock option grants is set forth below.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

102. A table showing the reported stock options, and comparing their value on the purported grant date of October 4 with their value on October 25, evidences a $56 million increase in only three weeks.

| Date | Executive | No. of Securities Options Granted | Per Option Gain in Intrinsic Value Between Date of Grant and Oct. 25 | Gain in Intrinsic Value Between Date of Grant and Oct. 25 |
|---|---|---|---|---|
| 10/4/1999 | Kriens | 1,800,000 | $ 12.60 | $ 22,680,000 |
| 10/4/1999 | Sindhu | 1,080,000 | $ 12.60 | $ 13,608,000 |
| 10/4/1999 | Gani | 480,000 | $ 12.60 | $ 6,048,000 |
| 10/4/1999 | Haley | 630,000 | $ 12.60 | $ 7,938,000 |
| 10/4/1999 | Wexler | 480,000 | $ 12.60 | $ 6,048,000 |
| | | 4,470,000 | | $ 56,322,000 |

103. A similar pattern is shown with respect to options granted to senior management in December 2000. According to the Company's definitive proxy statement dated March 28, 2001 (the "2001 Proxy"), a total of 800,000 stock options at an exercise price of $93.9375 were purportedly granted to the same five executives on December 21, 2000.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

104. Once again, the lowest closing price of the Company's stock during the month of December 2000 occurred on December 21, 2000, the reported date of the grants in question. The December 21 low of $93.9375 marked a sharp decline from $131.88 that Juniper stock stood at on December 1, 2000. Moreover, the stock price rose just one week after the December 21 option grant to close on December 28, 2000 at $138.63, an increase of more than 40%.

105. A table showing the reported stock options grants and comparing their value on the purported grant date of December 21 with their value on December 28, 2000 evidences a nearly $36 million gain for these executives in one week.

| Date | Executive | No. of Securities Options Granted | Per Option Gain in Intrinsic Value Between Date of Grant and Dec. 28 | Total Grant Value as of Dec. 28 |
|---|---|---|---|---|
| 12/21/2000 | Kriens | 400,000 | $ 44.69 | $ 17,876,000 |
| 12/21/2000 | Sindhu | 100,000 | $ 44.69 | $ 4,469,000 |
| 12/21/2000 | Gani | 100,000 | $ 44.69 | $ 4,469,000 |
| 12/21/2000 | Haley | 100,000 | $ 44.69 | $ 4,469,000 |
| 12/21/2000 | Wexler | 100,000 | $ 44.69 | $ 4,469,000 |
| | | 800,000 | | $ 35,752,000 |

106. The beneficiaries of stock option backdating were not limited to Juniper executives. According to his Form 4, on May 11, 2000, defendant Sclavos, a Director, received 40,000 stock options at an exercise price of $74.00.

107. The lowest closing price of the Company's stock during the month of May 2000 occurred on May 11, 2000, the reported date of the grant to Sclavos. The May 11 low of $74.00 followed a sharp decline from $109.47 that Juniper stock stood at on May 1, 2000. Moreover, the stock price rebounded less than one week after the May 11 option grant to close on May 16, 2000 at $87.53, an increase of more than 18%. In five days, the options granted to Sclavos increased in value by more than $540,000.

108. A graph illustrating the Company's May 2000 through December 2000 trading in relation to the Company's stock options grants in 2000 is set forth below:

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220



109. In its 2006 Form 10-K, Juniper acknowledged that two option grants to Kriens prior to 2001 had purported grant dates that preceded their approval dates. As noted in ¶¶ 98-105, *supra*, CFRA and J.P. Morgan independently determined, based upon statistical analyses, that the 1999 and 2000 option grants received by Kriens (and other Juniper executives) had a "high-risk profile" for backdating. As Juniper granted stock options to its executives on an annual basis, it follows that the two option grants identified by the analysts as likely backdated are the same ones referenced in the 2006 Form 10-K.

110. With respect to the May 11, 2000 grant to defendant Sclavos described in ¶¶ 106-107, *supra*, the statistical evidence of backdating described above is bolstered by Juniper's admission in its 2006 Form 10-K that option grants dates were often selected "to coincide … with a specific event, such as the appointment or re-election of a director," rather than the dates the options were granted. According to the 2001 Proxy Statement, Sclavos became a Juniper Director in May 2000, at which time he received the 40,000 stock options. The foregoing is strong evidence that the May 11, 2000 grant to Sclavos was backdated to "coincide with [his] appointment [as] a director."

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

111. According to the Company's definitive proxy statement dated March 28, 2003 (the "2003 Proxy Statement"), a total of 1,850,000 stock options at an exercise price of $5.69 were purportedly granted on July 1, 2002 to defendants Kriens, Sindhu, Gani, and Lloyd Carney, Executive Vice President Operations. Carney also was purportedly granted 1,500,000 stock options at an exercise price of $9.32 on February 28, 2002.

112. As with the prior option grants to Juniper executives, the 1.5-million-option reported grant to Carney on February 28 occurred on the date when Juniper shares hit their low for the month at $9.32. By March 11, 2002, the stock rose to $14.71, a 58% gain in less than two weeks.

113. A similar pattern occurred with respect to the options granted on July 1, 2002. The lowest closing price of the Company's stock during July 2002 occurred on July 1, the reported date of the grants in question. However, by July 8, 2002, one week after the option grants, the price of Juniper stock stood at $7.25, an increase of more than 27%. By the end of the month, on July 31, 2002, the Company's shares had increased to $9.21 per share, a gain of 62% over the July 1 price.

114. A graph illustrating the February through July 2002 trading in Juniper stock in relation to the Company's grants of stock options is set forth below.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

115.    The table below shows the reported stock option grants and compares their respective values as of their February 28, 2002 and July 1, 2002 grant dates with their respective values on March 11 and July 17, 2002, and evidences $14 million in gains reaped by these executives as a result of the precipitous rises in Juniper's stock price in a very short time frame.

| Date | Executive | No. of Stock Options Granted | Per Option Gain in Intrinsic Value Between Date of Grant and July 17 | Total Grant Value As Of July 17 |
|---|---|---|---|---|
| 7/1/2002 | Kriens | 550,000 | $ 3.52 | $ 1,936,000 |
| 7/1/2002 | Sindhu | 300,000 | $ 3.52 | $ 1,056,000 |
| 7/1/2002 | Gani | 500,000 | $ 3.52 | $ 1,760,000 |
| 7/1/2002 | Carney | 500,000 | $ 3.52 | $ 1,760,000 |
| | | 1,850,000 | $ 3.52 | $ 6,512,000 |

| Date | Executive | No. of Stock Options Granted | Per Option Gain in Intrinsic Value Between Date of Grant and March 11 | Total Grant Value As Of March 11 |
|---|---|---|---|---|
| 2/28/2002 | Carney | 1,500,000 | $ 5.39 | $ 8,085,000 |

116.    In addition to the statistical evidence of backdating described above, Juniper admits in its 2006 Form 10-K that it improperly accounted for stock options for 1,500,000 shares issued in connection with the hiring of an unidentified Juniper executive. Specifically, the Company acknowledges that there was no support for using the reported grant date as the date of approval because the grant was not approved by the Compensation Committee or the Board of Directors in minutes of a meeting or in an action by unanimous written consent. As a result, the Company was required to record a $6.5 million compensation charge for this option grant using the executive's employment commencement date as the measurement date for when the options were actually "approved."

117.    Juniper incurred its $6.5 million charge with respect to the February 28, 2002 grant of 1.5 million stock options to Lloyd Carney, described in ¶¶ 111-112 and 114-115, *supra*. Juniper's 2003 Proxy Statement states under the heading "Executive Compensation": "Mr. Carney was granted an option for 1,500,000 shares upon his employment with the Company at an exercise

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

price of $9.32 per share." There were no other option grants of 1,500,000 shares to newly hired executives reported from 1999 through 2004, the period of admitted wrongdoing. The compensation charge of $6.5 million with respect to the backdated 1.5-million-share grant reflects a 46% increase in value ($6.5 million divided by 1.5 million shares equals a $4.33-per-share gain) above the exercise price received by Carney.

118. The 2004 Proxy Statement also indicated that a total of 2,350,000 stock options at an exercise price of $15.00 were purportedly granted on September 26, 2003 to five of the Company's executive officers, including Kriens, Sindhu, Gani, James A. Dolce, Jr., Executive Vice President Field Operations and Ashok Krishnamurthi ("Krishnamurthi"), Vice President Engineering. An additional 37,500 stock options at an exercise price of $8.16 were purportedly granted to Krishnamurthi on April 1, 2003.

119. As with the prior options grants described above, the lowest closing price of Juniper's stock during September 2003 occurred on September 26, 2003, the reported date of the option grants in question. This price represented a drop from $17.11, where the Company's stock stood on September 2, 2003. Moreover, within ten trading days following the option grants, Juniper's stock price more than fully recovered from its temporary dip, rising 23% to close at $18.40 on October 9, 2003.

120. Similarly, the lowest closing price of Juniper's stock during April 2003 occurred on April 1, 2003, the reported date of the stock option grant to Krishnamurthi. By April 15, Juniper's stock had increased 22% to close at $9.98, and the price continued to rise to a closing price of $10.24 on April 30, 2003, more than 25% higher than its price on the date the option was purportedly granted.

121. A graph illustrating the trading in Juniper stock in relation to the Company's reported April 2003 and September 2003 grants of stock options is set forth below:

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220





SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

122. The table below shows the executive option grants on April 1, 2003 and September 26, 2003 and compares their respective values on April 30 and October 9, 2003, and evidences a total increase in value of almost $8.0 million as a result of the opportune rise in Juniper's stock price.

| Date | Executive | No. of Stock Options Granted | Per Option Gain in Intrinsic Value Between Date of Grant and Oct. 9 | Total Grant Value As Of Oct. 9 |
|---|---|---|---|---|
| 9/26/2003 | Kriens | 800,000 | $ 3.12 | $ 2,496,000 |
| 9/26/2003 | Sindhu | 300,000 | $ 3.12 | $ 936,000 |
| 9/26/2003 | Gani | 500,000 | $ 3.12 | $ 1,560,000 |
| 9/29/2003 | Dolce | 500,000 | $ 3.12 | $ 1,560,000 |
| 9/29/2003 | Krishnamurthi | 250,000 | $ 3.12 | $ 780,000 |
| | | 2,350,000 | | $ 7,332,000 |

| Date | Executive | No. of Stock Options Granted | Per Option Gain in Intrinsic Value Between Date of Grant and April 30 | Total Grant Value As Of April 30 |
|---|---|---|---|---|
| 4/1/2003 | Krishnamurthi | 37,500 | $ 2.08 | $ 636,480 |

**FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD**

123.    In its 2006 Form 10-K, the Company acknowledged that improper accounting for stock options skewed the Company's financial reporting throughout its reporting history.  The Form 10-K states:

> Financial information included in the reports on Form 10-K, Form 10-Q and Form 8-K filed by us prior to August 10, 2006, and the related opinions of our independent registered public accounting firm, and all earnings press releases and similar communications issued by us, prior to August 10, 2006 should not be relied upon and are superseded in their entirety by this Report and other reports on Form 10-Q and Form 8-K filed by us with the SEC on or after August 10, 2006.

124.    These financial statements were false due to the improper accounting for stock options which understated Juniper's compensation costs, inflated the Company's operating margins and income, and resulted in adverse tax consequences.  As a result, the Company was required to take more than $900 million in compensation charges relating to the grant of these options, and to restate its financial results for over five years, as they were presented in violation of GAAP and SEC rules.

125.    The Company's false financial results for 1999 through March 31, 2006 were included in reports filed with the SEC, including Forms 10-K and 10-Q, and registration statements. The inflated results were also included in earnings releases prepared by the Executive Defendants that were disseminated to the investing public.  The Executive Defendants also reiterated these false financial results and conference calls and other communications with securities analysts.

126.    Defendants Kriens and Gani certified the Company's false and misleading statements during the Class Period in Forms 10-K and 10-Q beginning in the second quarter of 2002, in accordance with SOX.  By certifying those public filings, defendants Kriens and Gani misrepresented, *inter alia*, that Juniper's financial statements were accurate and that the Company had effective internal financial controls to foster the development and preparation of reliable financial statements.

127.    Juniper's compensation practices were also misrepresented in its proxy statements and other SEC filings from 2000 through April 2006.  In these filings, it was repeatedly misrepresented that (a) options under the Company's Plans were granted at fair market value at the

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

date of the grant; (b) the option grants were aligning the interests of investors and shareholders with those of Juniper's executives; and (c) the Board and its designated committees were administering, reviewing and monitoring the grants in accordance with the Company's stock option plans.

**The False Financial Statements**

**A. Fiscal Year 2001 (Q2, Q3, and Q4)**

128. On July 12, 2001, the Company issued a press release entitled "Juniper Networks, Inc. Reports Q2 '01 Financial Results Net Revenue $202.2M up 79%; Pro Forma EPS $0.09" (the "2Q 2001 Release"). The 2Q 2001 Release stated in relevant part:

> Net revenues for the second quarter were $202.2 million, compared with $113.0 million for the same period last year, an increase of 79%. Pro forma net income was $29.3 million or $0.09 per share, compared with pro forma net income of $28.6 million or $0.08 per share for the second quarter of 2000.
>
> * * *
>
> Net revenues for the first six months of 2001 were $534.3 million, compared with $176.9 million for the same six month period in 2000. Pro forma net income for the first six months of 2001 was $121.5 million or $0.35 per share, compared with pro forma net income of $39.1 million or $0.11 per share during the same six month period in 2000. Actual net income for the first six months of 2001 was $21.4 million or $0.16 per share, compared with actual net income of $27.7 million or $0.08 per share during the same six month period in 2000.
>
> "The second quarter represents an example of our priorities during these times-customer growth, financial discipline, and continued investment in innovation," said Scott Kriens, Chairman and CEO of Juniper Networks. "We will continue to use our proven abilities in focus and execution to protect these principles," Kriens said.

129. On or about August 6, 2001, Juniper filed its Report on Form 10-Q for the period ended June 30, 2001 (the "2Q 2001 10-Q"). The 2Q 2001 10-Q reiterated the financial results in the 2Q 2001 Press Release and represented that the financial results and related disclosures were prepared in accordance with SEC rules and provide a "fair presentation of the Company's operating results for the three and six months ended June 30, 2001 and 2000." The 2Q 2001 10-Q was signed by defendant Gani.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

130. On October 11, 2001, the Company issued a press release entitled "Juniper Networks, Inc. Reports Q3'01 Financial Results" (the "3Q 2001 Press Release"). The press release stated in relevant part:

> Net revenues for the third quarter were $201.7 million, compared with $201.2 million for the same period last year. Pro forma net income was $32.5 million of $0.10 per share, compared with pro forma net income of $60.3 million or $0.17 per share for the third quarter of 2000.
>
> * * *
>
> Net revenues for the first nine months of 2001 were $736.00 million, up 95%, compared with $378.1 million for the same nine month period in 2000. Pro forma net income for the first nine months of 2001 was $154.0 million or $0.45 per share, compared with pro forma net income of $99.4 million or $.29 per share during the same nine month period in 2000.

131. On November 1, 2001, the Company filed with the SEC a report on Form 10-Q for the period ended on September 30, 2001 (the "3Q 2001 10-Q"). The 3Q 2001 10-Q reiterated the financial results in the 3Q 2001 Press Release and represented that the financial results and related disclosures were prepared in accordance with SEC rules and provide a "fair presentation of the Company's operating results for the three and six months ended September 30, 2001 and 2000." The 3Q 2001 10-Q was signed by Defendant Gani.

132. The foregoing statements concerning Juniper's 2Q 2001 and 3Q 2001 financial results were materially misleading for the reasons set forth herein at ¶¶ 9-10, 15, 124, and 253.

133. On January 15, 2002, the Company issued a press release entitled "Juniper Networks, Inc. Reports Q4'01 and Year End 2001 Financial Results: Q4'01 Net Revenue $151.01M; Pro Forma EPS $0.05 2001 Net Revenue $887.0M; Pro Forma EPS $0.50" (the "2001 Release"). The 2001 Release stated in relevant part:

> Net revenues for the fourth quarter were $151.0 million, compared with $201.7 million for the third quarter, a decrease of 25%. Pro forma net income was $15.9 million or $0.05 per share, compared with pro forma net income of $32.5 million or $0.10 per share in the third quarter of 2001.
>
> Actual net loss for the fourth quarter, which includes amortization of goodwill and other purchased intangibles of $12.5 million, amortization of deferred compensation of $15.2 million and in-process research and development of $4.2 million was $5.1 million or $0.02

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

> per share, compared with a net loss of $29.7 million or $0.09 per share in the third quarter of 2001.
>
> Net revenues for the year ended December 31, 2001 were $887.0 million, compared with $673.5 million for the year ended December 31, 2000. Pro forma net income for 2001 was $169.9 million or $0.50 per share, compared with $184.0 million or $0.53 per share during 2000. Actual net loss for 2001 was $13.4 million or $0.04 per share, compared with actual net income of $147.9 million or $0.43 per share during 2000.

134. On or about March 29, 2002, Juniper filed with the SEC a Form 10-K for the fiscal year ended December 31, 2001 (the "2001 Form 10-K"). Defendants Gani, Kriens, Sindhu, Hearst, Khosla, Sclavos and Stensrud signed the 2001 Form 10-K. In the 2001 Form 10-K, Juniper reported a net loss of $13.4 million or $0.04 per share for 2001, compared with net income of $147.9 million or $0.43 per share for 2000.

135. The 2001 Form 10-K included the Company's audited consolidated balance sheets and statements of operations for each of the three years in the period ended December 31, 2001. At Note 7 to the consolidated financial statements, under the subsection titled "2000 Nonstatutory Stock Option Plan," the Company described its stock options practices were as follows:

> Nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, <u>no nonstatutory stock options have been granted for less than fair market value on the date of grant</u>. Vesting and exercise provisions are determined by the Board of Directors. Options granted under the 2000 Plan generally become exercisable over a four-year period beginning on the date on grant . . .

(Emphasis added.)

136. At Note 7, the Company also described its accounting treatment of stock options in the subsection titled "Stock-Based Compensation" as follows:

> The Company has elected to follow APB 25 and related interpretations in accounting for its employee stock-based compensation plans. <u>Because the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized</u>.

(Emphasis added.)

137. The foregoing statements concerning Juniper's 4Q 2001 and 2001 year-end financial results and compensation practices were materially false and misleading for the reasons set forth herein at ¶¶ 9-10, 15, 124, and 253.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**B. Fiscal Year 2002**

138. On April 11, 2002, the Company issued a press release entitled "Juniper Networks, Inc. Reports Q1-02 Financial Results Net Revenue $122.2M; Pro Forma EPS $0.00" (the "1Q 2002 Release"). The 1Q 2002 Release stated in relevant part:

> Net revenues for the first quarter were $122.2 million, compared with $332.1 million for the same period last year, a decrease of 63%. Pro forma net income was $423,000 or $0.00 per share, compared with pro forma net income of $85.4 million or $0.25 per share for the first quarter of 2001.
>
> Actual net loss for the first quarter, which includes amortization of deferred compensation of $13.6 million, amortization of purchased intangibles of $1.6 million and write-downs in equity investments totaling $30.6 million, was $46.0 million or ($0.14) per share, compared with net income of $58.6 million or $0.17 per share in the first quarter of 2001.

139. On May 15, 2002, the Company filed with the SEC a report on Form 10-Q for the period ended March 31, 2002 (the "1Q 2002 10-Q"). The Form 10-Q reiterated the financial results in the 1Q 2002 Release and represented that the financial results and related disclosures were prepared in accordance with SEC rules and provide a "fair presentation of the Company's operating results for the three months ended March 31, 2002 and 2001." The 1Q 2002 10-Q was signed by defendant Gani.

140. On July 11, 2002, the Company issued a press release entitled "Juniper Networks, Inc. Reports Q2 '02 Financial Results Net Revenue $117.0M; Pro Forma EPS $0.00" (the "2Q 2002 Release"). The 2Q 2002 Release stated in relevant part:

> Net revenues for the second quarter were $117.0 million, compared with $202.2 million for the same period last year, a decrease of 42%. Pro forma net income was $421,000 or $0.00 per share, compared with Pro Forma net income of $29.3 million or $0.09 per share for the second quarter of 2001.
>
> Actual net income for the second quarter, which includes amortization of purchased intangibles of $1.6 million and a deferred compensation credit of $8.0 million, was $6.2 million or $0.02 per share, compared with a net loss of $37.1 million or $0.12 per share in the second quarter of 2001.
>
> Net revenues for the first six months of 2002 were $239.3 million, compared with $534.3 million for the same six-month period in 2001. Pro forma net income for the first six months of 2002 was $844,000 or $0.00 per share, compared with pro forma net income of $121.5

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

> million or $0.35 per share during the same six-month period in 2001. Actual net loss for the first six months of 2002 was $29.8 million or $0.12 per share, compared with actual net income of $21.4 million or $0.06 per share during the same six-month period in 2001.

141. On August 14, 2002, the Company filed its quarterly report for the period ended June 30, 2002 with the SEC on a Form 10-Q (the "2Q 2002 10-Q"). The 2Q 2002 10-Q reiterated the financial results in the 2Q 2002 Release and represented that the financial results and related disclosures were prepared in accordance with SEC rules and provide a "fair presentation of the Company's consolidated financial position at June 30, 2002 and its operating results for the three and six months ended June 30, 2002 and 2001." The 2Q 2002 10-Q was signed by defendant Gani.

142. Pursuant to SOX, which became effective in August 2002, the 2Q 2002 10-Q contained certifications by defendants Kriens as Chief Executive Officer, and Gani as Chief Financial Officer. The certification stated that the 2Q 2002 10-Q "fairly presents in all material respects the financial condition and results of operations of Juniper Networks, Inc."

143. The foregoing statements concerning Juniper's 1Q 2002 and 2Q 2002 financial results and compensation practices were materially false and misleading for the reasons set forth herein at ¶¶ 9-10, 15, 124, and 253.

144. On October 10, 2002, the Company issued a press release entitled, "Juniper Networks, Inc. Reports Q3 '02 Financial Results" (the "3Q 2002 Press Release"). The 3Q 2002 Release stated in relevant part:

> Net revenues for the third quarter were $152.0 million, compared with $201.7 million for the same period last year, a decrease of 25%. Pro forma net loss was $8.4 million or $0.02 per share, compared with pro forma net income of $32.5 million or $0.10 per share for the third quarter of 2001.
>
> Actual net loss for the third quarter, which includes amortization of purchased intangibles and deferred stock compensation, in-process research and development, restructuring and other operating costs, integration costs, gain on debt extinguishment and losses on equity investment write-downs, was $88.3 million or $0.24 per share, compared with a net loss of $29.7 million or $0.09 per share in the third quarter 2001.
>
> Net revenues for the first nine months of 2002 were $391.3 million, compared with $736.0 million for the same nine-month period in 2001. Pro forma net loss for the first nine months of 2002 was $7.5 million or $0.02 per share, compared with pro forma net income of

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

> $154.0 million or $0.45 per share during the same nine-month period in 2001. Actual net loss for the first nine months of 2002 was $128.1 million or $.37 per share, compared with actual net loss of $8.3 million or $0.03 per share during the same nine-month period in 2001.

145. On November 7, 2002, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2002 with the SEC (the "3Q 2002 10-Q"). The Form 10-Q reiterated the financial results in the 3Q 2002 Press Release and represented that the financial results and related disclosures were prepared in accordance with SEC rules and provide a "fair presentation of the Company's consolidated financial position at September 30, 2002, and its operating results for the three and nine months ended September 30, 2002 and 2001." The 3Q 2002 10-Q was signed by defendant Gani.

146. With respect to the issue of internal controls over financial reporting as of September 30, 2002, it was represented in Item 4 of Part I of the 3Q 2002 10-Q, under the heading "Controls and Procedures":

> (a) Within the 90-day period prior to the date of this report, <u>we carried out an evaluation, under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, of the effectiveness to the design and operation of our disclosure controls and procedures</u> pursuant to Rule 13a-14 of the Securities Exchange Act of 1934 (the "Exchange Act"). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that <u>our disclosure controls and procedures are effective in timely alerting them to material information relating to the Company</u> (including its consolidated subsidiaries) required to be included in our Exchange Act filings.
>
> (b) There have been no significant changes in our internal controls or in other factors, which could significantly affect internal controls subsequent to the date we carried out our evaluation.

(Emphasis added.)

147. Pursuant to SOX, defendant Kriens and Gani signed certifications which were attached as exhibits to the 3Q 2002 10-Q. The certifications represented that the 3Q 2002 10-Q fairly presented in all material respects the financial condition and results of operations of Juniper Networks, Inc.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

148. Moreover, Kriens and Gani each certified that they were responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) and had:

> a. designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;
>
> b. evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and
>
> c. presented in this annual reports our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluations as of the Evaluation Date.

149. Kriens and Gani also certified that they disclosed, based on their most recent evaluation, to the registrant's auditors and the audit committee of Juniper's Board of Directors (or person performing the equivalent function):

> a. all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and
>
> b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls.

150. Finally, Kriens and Gani certified that they indicated in the 3Q 2002 10-Q whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of the most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

151. The foregoing statements concerning Juniper's 3Q 2002 financial results, compensation practices, and internal controls were materially false and misleading for the reasons set forth herein at ¶¶ 9-10, 15, 124, and 253.

152. On January 16, 2003, the Company issued a press release entitled "Juniper Networks, Inc. Reports Q4 '02 and Year End 2002 Financial Results: Q4 '02 Net Revenue $155.3M; Pro forma

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

EPS $0.01; 2002 Net Revenue $546.5M; Pro Forma EPS $(0.01)" (the "2002 Release"). The 2002 Release stated in relevant part:

> Actual net income for the fourth quarter, which includes amortization of purchased intangibles, a deferred compensation credit and change in an estimated restructuring charge, was $8.5 million or $0.02 per share, compared with a net loss of $5.1 million or $0.02 per share in the fourth quarter of 2001.
>
> Net revenues for the year ended December 31, 2002 were $546.5 million, compared with $887.0 million for the year ended December 31, 2001. Pro forma net loss for 2002 was $4.8 million or $0.01 per share, compared on the pro forma net income of $169.9 million or $0.50 per share during 2001. Actual net loss for 2002 was $119.6 million or $0.34 per share, compared with $13.4 million or $0.04 per share during 2001.

153.    On March 10, 2003, Juniper filed with the SEC a Form 10-K for the fiscal year ended December 31, 2001 (the "2002 Form 10-K"). In the 2002 Form 10-K, Juniper reported a net loss of $119.6 million or $.34 per share for 2002, compared to a loss of $13.4 million in 2001 or $.04 per share for 2001. Defendants, Gani, Kriens, Sindhu, Sclavos, Hearst, Khosla, and Stensrud signed the 2002 Form 10-K.

154.    The 2002 Form 10-K included the Company's audited consolidated balance sheets and statements of operations for each of the three years in the period ended December 31, 2002. At Note 10 to the 2002 financial statements, the Company reported that its stock option plans were accounted for under the intrinsic value recognition and measurement principles of APB No. 25 and related interpretations. Juniper represented that since "the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based employee compensation cost, or other than acquisition-related compensation is recognized in net income."

155.    In Note 10 to the 2002 financial statements, Juniper described its purported practice of issuing all stock options at the fair market value on the date of grant. With respect to the Amended and Restated 1996 Stock Option Plan, Juniper stated that incentive stock options to employees and nonstatutory stock options to employees, directors and consultants are granted at an exercise price of not less than the fair value per share of the common stock on the date of grant.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

156. Juniper also stated with respect to the 2000 Nonstatutory Stock Option Plan, that while nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant, "no nonstatutory stock options have been granted for less than fair market value of the date of grant."

157. With respect to Stock-Based Compensation, Juniper stated in the 2002 Form 10-K that the Company has elected to follow APB No. 25 and related interpretations in accounting for its employee stock-based compensation plans. Because the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense was recognized.

158. With respect to the issue of internal controls, Juniper stated in the 2002 Form 10-K that it had concluded that as of December 31, 2002, Juniper's internal controls over financial reporting were effective and that there were no significant changes in the Company's internal controls or in other factors that could significantly affect these controls.

159. Pursuant to SOX, defendants Kriens and Gani signed certifications which were attached as exhibits to the 2002 Form 10-K. In their certifications, Kriens and Gani each certified that they were responsible for establishing and maintaining disclosure controls and procedures and have:

> a. designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;
>
> b. evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and
>
> c. presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluations as of the Evaluation Date.

160. Kriens and Gani also certified that they disclosed, based on their most recent evaluation, to the registrant's auditors and the Audit Committee of Juniper's board of directors (or person performing the equivalent function):

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

> a. all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and
>
> b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls.

161. Finally, Kriens and Gani certified that they had indicated in the annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of the most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

162. The foregoing statements concerning Juniper's 4Q 2002 and 2002 year-end financial results, compensation practices, and internal controls were materially false and misleading for the reasons set forth herein at ¶¶ 9-10, 15, 124, and 253.

**C. Fiscal Year 2003**

163. On April 10, 2003, Juniper issued a press release announcing its purported financial results for the quarter ended March 31, 2003 (the "1Q 2003 Press Release"). The 1Q 2003 Press Release stated in relevant part:

> GAAP net income for the first quarter was $3.7 million or $0.01 per share, compared with a net loss of $46.0 million or $0.14 per share in the first quarter of 2002. Non-GAAP net income, which excludes amortization of purchased intangibles and deferred compensation and a gain on the sale of investments, was $6.3 million or $0.02 per share, compared with non-GAAP net income of $0.4 million or $0.00 per share in the first quarter of 2002.

164. On May 8, 2003, Juniper filed its Report on Form 10-Q with the SEC for the period ended on March 31, 2003 (the "1Q 2003 10-Q"). The 1Q 2003 10-Q reiterated the financial results in the 1Q 2003 Press Release and represented that the financial results and related disclosures were prepared in accordance with GAAP. The 1Q 2003 10-Q was signed by defendant Gani.

165. In Note 2 to the 1Q 2003 consolidated financial statements, the Company's accounting treatment of stock-based compensation was described as follows:

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

> **Stock Based Compensation**
>
> The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees" and related Interpretations. As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based employee compensation cost, other than acquisition-related compensation, is recognized in net income [loss].

(Emphasis added.)

166. Pursuant to SOX, the 1Q 2003 10-Q contained certifications by CEO Kriens and CFO Gani which represented (a) that the 1Q 2003 10-Q accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that they had inspected the Company's disclosure and internal financial reporting controls and found them to be effective, in the same form as detailed in ¶¶ 148-150 herein.

167. The foregoing statements concerning Juniper's 1Q 2003 financial results, compensation practices, and internal controls were materially false and misleading, for the reasons set forth herein at ¶¶ 9-10, 15, 124, and 253.

168. On July 10, 2003, Juniper issued a press release announcing its purported financial results for the quarter ended June 30, 2003 (the "2Q 2003 Press Release"). The 2Q 2003 Press Release stated in relevant part:

> GAAP net income for the second quarter was $13.6 million or $0.03 per share, compared with a GAAP net income of $6.2 million or $0.02 per share in the second quarter of 2002. Non-GAAP net income, which excludes an adjustment to the purchase price of an acquisition, the amortization of purchased intangibles and deferred compensation, the gain on the sale of investments and the gain on the partial retirement of the convertible subordinated notes was $10.3 million or $0.03 per share, compared with non-GAAP net income of $0.4 million or $0.00 per share in the second quarter of 2002.

169. On August 7, 2003, Juniper filed its Report on Form 10-Q with the SEC for the second quarter ended on June 30, 2003 (the "2Q 2003 10-Q"). The 2Q 2003 10-Q reiterated the financial results in the 2Q 2003 Press Release and represented that the financial results and related disclosures were prepared in accordance with GAAP. The 2Q 2003 10-Q was signed by defendant Gani.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

170. In Note 2 to the 2Q 2003 consolidated financial statements, the Company's accounting treatment of stock-based compensation was described as follows:

> **Stock Based Compensation**
>
> The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees" and related Interpretations. As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based employee compensation cost, other than acquisition-related compensation, is recognized in net income (loss).

(Emphasis added.)

171. Pursuant to SOX, the 2Q 2003 10-Q contained certifications by CEO Kriens and CFO Gani which represented (a) that the 2Q 2003 10-Q accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that they had inspected the Company's disclosure and internal financial reporting controls and found them to be effective, in the same form as detailed in ¶¶ 148-150 herein.

172. The foregoing statements concerning Juniper's 2Q 2003 financial results, compensation practices, and internal controls were materially false and misleading, for the reasons set forth herein at ¶¶ 9-10, 15, 124, and 253.

173. On October 9, 2003, Juniper issued a press release announcing its purported financial results for the quarter ended September 30, 2003 (the "3Q 2003 Press Release"). The 3Q 2003 Press Release stated in relevant part:

> GAAP net income for the third quarter was $7.2 million or $0.02 per share, compared with a GAAP net loss of $88.3 million or $0.24 per share in the third quarter of 2002. Non-GAAP net income, which excludes restructuring expenses, in-process research and development expenses, integration expenses, the amortization of purchased intangibles and deferred compensation, the write-down of investments and the gain on the partial retirement of the 4.75% Convertible Subordinated Notes was $14.7 million or $0.04 per share, compared with non-GAAP net loss of $8.4 million or $0.02 per share in the third quarter of 2002.

174. On or about November 14, 2003, Juniper filed its Report on Form 10-Q with the SEC for the third quarter ended on September 30, 2003 (the "3Q 2003 10-Q"). The 3Q 2003 10-Q reiterated the financial results in the 3Q 2003 Press Release and represented that the financial results

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

and related disclosures were prepared in accordance with GAAP. The 3Q 2003 10-Q was signed by defendant Gani.

175. In Note 2 to the 3Q 2003 consolidated financial statements, the Company's accounting treatment of stock-based compensation was described as follows:

> **Stock Based Compensation**
>
> The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees" and related interpretations. As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based employee compensation cost, other than acquisition-related compensation, is recognized in net income (loss).

(Emphasis added.)

176. Pursuant to SOX, the 3Q 2003 10-Q contained certifications by CEO Kriens and CFO Gani which represented (a) that the 3Q 2003 10-Q accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that they had inspected the Company's disclosure and internal financial reporting controls and found them to be effective, in the same form as detailed in ¶¶ 148-150 herein.

177. The foregoing statements concerning Juniper's 3Q 2003 financial results, compensation practices, and internal controls were materially false and misleading, for the reasons set forth herein at ¶¶ 9-10, 15, 124, and 253.

178. On January 15, 2004, Juniper issued a press release announcing its purported financial results for the fourth quarter and year ended December 31, 2003 (the "2003 Press Release"). The 2003 Press Release stated in relevant part:

> GAAP net income for the fourth quarter was $14.7 million or $0.04 per share, compared with a GAAP net income of $8.5 million or $0.02 per share in the fourth quarter of 2002. Non-GAAP net income, which excludes restructuring expenses, the amortization of purchased intangibles and deferred compensation, and the loss on the partial retirement of the 4.75% Convertible Subordinated Notes was $27.7 million or $0.07 per share, compared with non-GAAP net income of $2.7 million or $0.01 per share in the fourth quarter of 2002.

* * *

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

> GAAP net income for the year ended December 31, 2003 was $39.2 million or $0.10 per share, compared with a GAAP net loss of $119.7 million or $0.34 per share for the same period last year. Non-GAAP net income, which excludes restructuring expenses, in-process research and development expenses, integration expenses, the amortization of purchased intangibles and deferred compensation, an adjustment to the purchase price of an acquisition, the gain on the sale of investments, the write-down of investments and the gain (loss) on the partial retirement of the 4.75% Convertible Subordinated Notes was $59.0 million or $0.15 per share, compared with non-GAAP net loss of $4.8 million or $0.01 per share for the same period last year.

179. On or about February 20, 2004, Juniper filed with the SEC a Report on Form 10-K for the fiscal year ended December 31, 2003 (the "2003 Form 10-K"). Defendants Kriens, Gani, Sindhu, Calderoni, Goldman, Khosla, Levy, Hearst, Sclavos, and Stensrud signed the 2003 Form 10-K. In the 2003 Form 10-K, Juniper stated that its net income for 2003 was $39.199 million, compared to a net loss in 2002 of $119.56 million, and earnings per share were $0.10 compared to a loss of $0.34 for 2002.

180. The 2003 Form 10-K included the Company's audited consolidated balance sheets and statements of operations for each of the three years in the period ended December 31, 2003. At Note 2 to the 2003 financial statement, the Company's accounting for stock options was described as follows:

> The Company has employee stock benefit plans, which are described more fully in Note 10, "Stockholders' Equity." The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related Interpretations. <u>As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based employee compensation cost, other than acquisition-related compensation cost, is recognized in net income</u>.

(Emphasis added.)

181. In Note 10 to the 2003 financial statements, the Company described its purported practice under both the 1996 Plan and the 2000 Plan of issuing all stock options at their fair-market value on the date of grant. Note 10 states in relevant part:

> The Company's Amended and Restated 1996 Stock Option Plan (the "1996 Plan") provides for the granting of incentive stock options to employees and nonstatutory stock options to employees, directors and consultants. <u>Incentive stock options are granted at an exercise price of not less than the fair value per share on the date of grant</u>. Nonstatutory stock options may be granted at an exercise price of not less than 85%

> of the fair value per share on the date of grant; however, <u>no nonstatutory stock options have been granted for less than fair market value on the date of grant</u>.
>
> * * *
>
> In July 2000, the Board of Directors adopted the Juniper Networks 2000 Nonstatutory Stock Option Plan (the "2000 Plan"). The 2000 Plan provides for the granting of nonstatutory stock options to employees, directors and consultants. Nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, <u>no nonstatutory stock options have been granted for less than fair market value on the date of grant</u>.

(Emphasis added.)

182. With respect to the issue of internal controls, Juniper stated in Note 18, Item 9A, that:

> We carried out an evaluation, under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective in timely alerting them to material information relating to the Company (including its consolidated subsidiaries) required to be included in our Exchange Act filings.

183. Pursuant to SOX, the 2003 Form 10-K contained certifications by CEO Kriens and CFO Gani which represented that (a) the 2003 Form 10-K accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) they had inspected the Company's disclosure and internal financial reporting controls and found them to be effective, in the same form as detailed in ¶¶ 159-161 herein.

184. The foregoing statements concerning Juniper's 4Q 2003 and year-end 2003 financial results, compensation practices, and internal controls were materially false and misleading, for the reasons set forth herein at ¶¶ 9-10, 15, 124, and 253.

**B. <u>The Notes Offering</u>**

185. On November 20, 2003, Juniper issued $400 million principal amount of Notes pursuant to the Notes Registration Statement. The Notes were originally issued in private placements in May and June 2003 which were exempt from registration under SEC Rule 144A. The private placement notes were subsequently registered pursuant to the Notes Registration Statement,

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

and sold by their holders to the public investors. The Notes Registration Statement was signed by defendants Kriens, Gani, Sindhu, Hearst, Khosla, Levy, Sclavos, and Stensrud.

186. The Notes are convertible to shares of Juniper common stock, subject to certain adjustments, at a rate of 49.6512 shares of common stock per $1006 principal amount of notes, the equivalent of a conversion price of approximately $20.14 per share. Because of the conversion feature, the market price of the Notes is directly related to the price of Juniper common stock.

187. The Notes Registration Statement reported on Juniper's financial condition and stated that the Company's ratio of earnings to fixed charges was 1.99, based on its financial results for the nine months ended September 30, 2003.

188. The Notes Registration Statement also incorporated by reference Juniper's audited consolidated financial statements contained in the 2002 Form 10-K and the quarterly reports on Form 10-Q for the quarters ended March 31, 2003, June 30, 2003, and September 30, 2003.

189. For the reasons set forth herein at ¶¶ 9-10, 15, 124, and 253, the financial statements for 2002 and the interim periods for 2003 which were summarized and incorporated by reference in the Notes Registration Statement were materially false and misleading in failing to disclose, *inter alia*, the option backdating scheme, and to record compensation expenses for those grants, thereby inflating Juniper's earnings.

190. In its 2006 Form 10-K, Juniper issued restated 2002 and 2003 financial results to account for the compensation expenses associated with stock option grants.

**C. <u>The NetScreen Merger</u>**

191. In connection with its merger with NetScreen, Juniper filed with the SEC the NetScreen Registration Statement, which became effective on March 10, 2004. The NetScreen Registration Statement was signed by defendants Kriens, Gani, Sindhu, Calderoni, Goldman, Hearst, Khosla, Levy, Sclavos, and Stensrud.

192. The NetScreen Registration Statement included a joint proxy statement/prospectus dated March 10, 2004 (the "Proxy Statement/Prospectus"). At separate special meetings of stockholders held on April 16, 2004, Juniper shareholders approved the issuance of Juniper common stock in connection with the merger, and NetScreen shareholders adopted the merger agreement

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

between Juniper and NetScreen, pursuant to which NetScreen became a wholly-owned subsidiary of Juniper. Upon completion of the merger, NetScreen shareholders received 1.404 shares of Juniper common stock for each share of NetScreen common stock held by them. According to Juniper's consolidated statements of stockholders' equity, contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2004 (the "2004 Form 10-K"), approximately 132,000,000 Juniper shares were issued to NetScreen common stockholders in connection with the NetScreen Merger.

193. The NetScreen Registration Statement and the Proxy Statement/Prospectus contained therein set forth a summary of Juniper's reported financial statements for the years 1999 through 2003, and incorporated by reference Juniper's audited consolidated financial statements contained in the 2003 Form 10-K. The NetScreen Registration Statement stated that the complete financial statements were intended to be read together with the summary financial data in the joint Proxy Statement/Prospectus.

194. For the reasons specified herein at ¶¶ 9-10, 15, 124, and 253, the financial information for 1999 through 2003, including the audited financial statements for 2003, which were summarized and incorporated by reference in the NetScreen Registration Statement, were materially false and misleading in failing to disclose, *inter alia*, the option backdating scheme, and to record compensation expenses for those grants, thereby inflating Juniper's earnings.

195. Juniper's 2003 financial results were supported by the unqualified opinion of E&Y contained in the 2003 Form 10-K, which was incorporated by reference in the NetScreen Registration Statement. E&Y's report, entitled "Report of Independent Auditors" dated January 13, 2004 (except for Note 18, which was dated as of February 9, 2004), stated:

> We have audited the accompanying consolidated balance sheets of Juniper Networks, Inc. as of December 31, 2003 and 2002, and the related consolidated statements of operations, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2003. Our audits also included the financial statement schedule listed in the Index at Item 15(a). These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.
>
> We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

> we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Juniper Networks, Inc. at December 31, 2003 and 2002, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States.

196. E&Y's opinion on the 2003 financial statements contained material misrepresentations because the 2003 financial statements did not conform to GAAP in failing to report compensation expenses for millions of backdated in-the-money stock options as required under APB No. 25, thereby overstating 2001 through 2003 earnings reported in the Company's consolidated statement of operations.

197. The NetScreen Registration Statement highlighted E&Y's expertise in auditing financials, as follows:

> **EXPERTS**
>
> The consolidated financial statements and schedule of Juniper Networks, Inc. appearing in Juniper Networks, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2003, have been audited by Ernst & Young LLP, independent auditors, as set forth in their report thereon included therein and incorporated herein by reference. Such consolidated financial statements and schedule are incorporated herein by reference in reliance upon such report given on the authority of such firm as experts in accounting and auditing.

198. This representation was materially misleading in failing to disclose the material fact that Juniper's audited 2003 financials overstated earnings, and were not in compliance with GAAP. In its 2006 Form 10-K, Juniper issued restated 2003 financial results to account for compensation expenses associated with stock option grants.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**D. Fiscal Year 2004**

199. On April 21, 2004, Juniper issued a press release announcing its purported financial results for the first quarter ended March 31, 2004 (the "1Q 2004 Press Release"). The 1Q 2004 Press Release stated in relevant part:

> GAAP net income for the first quarter was $33.5 million or $0.08 per share, compared with a GAAP net income of $3.7 million or $0.01 per share in the first quarter of 2003. Non-GAAP net income, which excludes the amortization of purchased intangibles and deferred compensation and the gain on the sale of investments, was $36.4 million or $0.09 per share, compared with non-GAAP net income of $6.3 million or $0.02 per share in the first quarter of 2003.

200. On May 3, 2004, Juniper filed with the SEC a Report on Form 10-Q for the first quarter ended March 31, 2004 (the "1Q 2004 Form 10Q"). The 1Q 2004 Form 10-Q reiterated the financial results reported in the 1Q 2004 Press Release and represented that the 1Q 2004 financial results had been prepared in accordance with GAAP. The 1Q 2004 Form 10-Q was signed by defendant Gani.

201. With respect to the issue of internal controls over financial reporting as of September 30, 2002, it was represented in Item 4 of Part I of the 1Q 2004 10-Q, under the heading "Controls and Procedures":

> (a) Within the 90-day period prior to the date of this report, <u>we carried out an evaluation, under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, of the effectiveness to the design and operation of our disclosure controls and procedures</u> pursuant to Rule 13a-14 of the Securities Exchange Act of 1934 (the "Exchange Act"). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that <u>our disclosure controls and procedures are effective in timely alerting them to material information relating to the Company</u> (including its consolidated subsidiaries) required to be included in our Exchange Act filings.
>
> (b) There have been no significant changes in our internal controls or in other factors, which could significantly affect internal controls subsequent to the date we carried out our evaluation.

(Emphasis added.)

202. In Note 2 to the financial statements, Juniper's accounting treatment for stock options was described as follows:

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

> **Stock-Based Compensation**
>
> The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations. As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based compensation cost, other than acquisition-related compensation, is recognized in net income.

(Emphasis added.)

203. Pursuant to SOX, the Form 10-Q contained signed certifications by defendants Kriens and Gani representing (a) that the 1Q 2004 Form 10-Q accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that they had inspected the Company's disclosure and internal financial reporting controls and found them to be effective, in the same form as detailed in ¶¶ 148-150 herein.

204. The foregoing statements concerning Juniper's 1Q 2004 financial results, compensation practices, and internal controls were materially false and misleading, for the reasons set forth herein at ¶¶ 9-10, 15, 124, and 253.

205. On July 13, 2004, Juniper issued a press release announcing its purported financial result for the second quarter ended June 30, 2004 (the "2Q 2004 Press Release"). The 2Q 2004 Press Release stated in relevant part:

> GAAP net loss for the second quarter was $12.6 million or $0.02 per share, compared with a GAAP net income of $13.6 million or $0.03 per share in the second quarter of 2003. Non-GAAP net income was $42.7 million or $0.08 per share, compared with non-GAAP net income of $10.3 million or $0.03 per share in the second quarter of 2003. See the table at the bottom of the Non-GAAP Condensed Consolidated Statements of Operations for a reconciliation of the non-GAAP net income to the GAAP net loss.

206. On August 5, 2004, Juniper filed with the SEC a Report on Form 10-Q for the second quarter ended June 30, 2004 (the "2Q 2004 Form 10-Q"). The 2Q 2004 Form 10-Q reiterated financial results reported in the 2Q 2004 Press Release and represented that the 2Q 2004 financial results had been prepared in accordance with GAAP. The 2Q 2004 Form 10-Q was signed by defendant Gani.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

207. In Note 2 to the financial statement, Juniper's accounting treatment for stock options was described as follows:

> **Stock-Based Compensation**
>
> The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations. As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based compensation cost, other than acquisition-related compensation, is recognized in net income (loss).

(Emphasis added.)

208. Pursuant to SOX, the 2Q 2004 Form 10-Q contained signed certifications by defendants Kriens and Gani representing (a) that the 2Q 2004 Form 10-Q accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that they had inspected the Company's disclosure and internal financial reporting controls and found them to be effective, in the same form as detailed in ¶¶ 148-150 herein.

209. The foregoing statements concerning Juniper's 2Q 2004 financial results, compensation practices, and internal controls were materially false and misleading, for the reasons set forth herein at ¶¶ 9-10, 15, 124, and 253.

210. On October 14, 2004, Juniper issued a press release announcing its purported financial results for the third quarter ended September 30, 2004 (the "3Q 2004 Press Release"). The 3Q 2004 Press Release stated in relevant part:

> GAAP net income for the third quarter was $48.8 million or $0.09 per share, compared with a GAAP net income of $7.2 million or $0.02 per share in the third quarter of 2003. Non-GAAP net income was $73.5 million or $0.13 per share, compared with non-GAAP net income of $14.7 million or $0.04 per share in the third quarter of 2003. See the table at the bottom of the Non-GAAP Condensed Consolidated Statements of Operations for a reconciliation of the non-GAAP net income to the GAAP net income.

211. On November 2, 2004, Juniper filed with the SEC a Report on Form 10-Q for the third quarter ended September 30, 2004 (the "3Q 2004 Form 10-Q"). The 3Q 2004 Form 10-Q reiterated financial results reported in the 3Q 2004 Press Release and represented that the 3Q 2004

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

financial statements had been prepared in accordance with GAAP. The 3Q 2004 Form 10-Q was signed by defendant Gani.

212. In Note 2 to the financial statement, Juniper's accounting treatment for stock options was described as follows:

> **Stock-Based Compensation**
>
> The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations. As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based compensation cost, other than acquisition-related compensation, is recognized in net income.

(Emphasis added.)

213. Pursuant to SOX, the 3Q 2004 Form 10-Q contained signed certifications by defendants Kriens and Gani representing (a) that the 3Q 2004 Form 10-Q accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that they had inspected the Company's disclosure and internal financial reporting controls and found them to be effective, in the same form as detailed in ¶¶ 148-150 herein.

214. The foregoing statements concerning Juniper's 3Q 2004 financial results, compensation practices, and internal controls were materially false and misleading, for the reasons set forth herein at ¶¶ 9-10, 15, 124, and 253.

215. On January 18, 2005, Juniper issued a press release announcing its purported financial results for the fourth quarter and year ended December 31, 2004 (the "2004 Press Release"). The 2004 Press Release stated in relevant part:

> GAAP net income for the fourth quarter was $66.0 million or $0.11 per share, compared to $14.7 million or $0.03 per share in the fourth quarter of 2003. Non-GAAP net income was $85.9 million or $0.15 per share, compared to $27.7 million or $0.06 per share in the fourth quarter of 2003. See the table at the bottom of the Non-GAAP Condensed Consolidated Statements of Operations for a reconciliation of the non-GAAP net income to the GAAP net income.
>
> * * *
>
> GAAP net income for calendar year 2004 was $135.7 million or $0.25 per share, compared to $39.2 million or $0.09 per share during calendar year 2003. Non-GAAP net income for calendar year 2004

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

> was $238.6 million or $0.44 per share, compared to $59.0 million or $0.14 per share during calendar year 2003. See the table at the bottom of the Non-GAAP Condensed Consolidated Statements of Operations for a reconciliation of the non-GAAP net income to the GAAP net income.

216. On or about March 4, 2005, Juniper filed with the SEC its 2004 Form 10-K, which was signed by defendants Kriens, Sindhu, Calderoni, Goldman, Hearst, Levy, Sclavos, and Stensrud. In the 2004 Form 10-K, Juniper reported 2004 net income of $135.746 million, compared to $39.199 million in 2003, and earnings per share of $0.25, compared to $0.09 in 2003.

217. The 2004 Form 10-K included the Company's audited consolidated balance sheets and statements of operations for each of the three years in the period ended December 31, 2004. At Note 2 to the 2004 financial statement, the Company's accounting for stock options was described as follows:

> The Company has employee stock benefit plans, which are described more fully in Note 10, "Stockholders' Equity." The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related Interpretations. <u>As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based employee compensation cost, other than acquisition-related compensation cost, is recognized in net income</u>.

(Emphasis added.)

218. Note 10 to the 2004 financial statements described the Company's purported practice under the 1996 Plan and the 2000 Plan of issuing all stock options at their fair-market value on the date of grant. Note 10 states in relevant part:

> The Company's Amended and Restated 1996 Stock Option Plan (the "1996 Plan") provides for the granting of incentive stock options to employees and nonstatutory stock options to employees, directors and consultants. <u>Incentive stock options are granted at an exercise price of not less than the fair value per share on the date of grant</u>. Nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, <u>no nonstatutory stock options have been granted for less than fair market value on the date of grant</u>.
>
> * * *
>
> In July 2000, the Board of Directors adopted the Juniper Networks 2000 Nonstatutory Stock Option Plan (the "2000 Plan"). The 2000 Plan provides for the granting of nonstatutory stock options to

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

> employees, directors and consultants. Nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, no nonstatutory stock options have been granted for less than fair market value on the date of grant.

(Emphasis added.)

219. With respect to the issue of internal controls, Juniper stated in Note 16, Item 9A, that it had assessed the effectiveness of Juniper's internal control over financial reporting as of December 31, 2004 and that it had concluded that "as of December 31, 2004, Juniper Networks Inc.'s internal control over financial reporting is effective."

220. Pursuant to SOX, defendant Kriens signed the certification included as an exhibit to the Form 10-K, in which he represented (a) that the 2004 Form 10-K accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that he had inspected the Company's disclosure and internal financial reporting controls and found them to be effective, in the same form as detailed in ¶¶ 159-161 herein.

221. The foregoing statements concerning Juniper's 4Q and year-end 2004 financial results, compensation practices, and internal controls were materially false and misleading, for the reasons set forth herein at ¶¶ 9-10, 15, 124, and 253.

**E. Fiscal Year 2005**

222. On April 19, 2005, Juniper issued a press release announcing its purported financial results for the first quarter ended March 31, 2005 (the "1Q 2005 Press Release"). The 1Q 2005 Press Release stated in relevant part:

> GAAP net income for the first quarter was $75.4 million or $0.13 per share, compared to a GAAP net income of $33.5 million or $0.08 per share in the first quarter of 2004. Non-GAAP net income was $91.9 million or $0.16 per share, compared to non-GAAP net income of $36.4 million or $0.08 per share in the first quarter of 2004. See the table at the bottom of the Non-GAAP Condensed Consolidated Statements of Operations for a reconciliation of the non-GAAP net income to the GAAP net income.

223. On April 28 and April 29, 2005, respectively, the Company filed with the SEC Reports on Forms 10-Q and 10-Q/A for the first quarter ended March 31, 2005 (together, the "1Q 2005 Form 10-Q"). The 1Q 2005 Form 10-Q reiterated the financial results reported in the 1Q 2005

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

Press Release and represented that the 1Q 2005 financial results had been prepared in accordance with GAAP.

224. In Note 2 to the financial statements, Juniper's accounting treatment for stock options was described as follows:

> **Stock-Based Compensation**
>
> The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations. As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based employee compensation cost, other than acquisition-related compensation, is recognized in net income.

(Emphasis added.)

225. Pursuant to SOX, the 1Q 2005 Form 10-Q contained a certification by defendant Kriens representing (a) that the Form 10-Q accurately portrayed Juniper's financial condition and was not materially false or misleading, and (b) that he had inspected the Company's disclosure and internal financial reporting controls and found them to be effective, in the same form as detailed in ¶¶ 148-150 herein.

226. The foregoing statements concerning Juniper's 1Q 2005 financial results, compensation practices, and internal controls were materially false and misleading, for the reasons set forth herein at ¶¶ 9-10, 15, 124, and 253.

227. On July 19, 2005, Juniper issued a press release announcing its purported financial results for the second quarter ended June 30, 2005 (the "2Q 2005 Press Release"). The 2Q 2005 Press Release stated in relevant part:

> GAAP net income for the second quarter was $89.0 million or $0.15 per share, compared with a GAAP net loss of $12.6 million or $0.02 per share in the second quarter of 2004. Non-GAAP net income was $104.3 million or $0.18 per share, compared with non-GAAP net income of $42.7 million or $0.08 per share in the second quarter of 2004. See the table at the bottom of the Non-GAAP Condensed Consolidated Statements of Operations for a reconciliation of the non-GAAP net income to the GAAP net loss.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

228. On August 2, 2005, the Company filed with the SEC a Report on Form 10-Q for the second quarter ended June 30, 2005 (the "2Q 2005 Form 10-Q"). The 2Q 2005 Form 10-Q reiterated the financial results reported in the 2Q 2005 Press Release and represented that the 2Q 2005 financial statements had been prepared in accordance with GAAP.

229. In Note 2 to the financial statements, Juniper's accounting treatment for stock options was described as follows:

> **Stock-Based Compensation**
>
> The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations. As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based compensation cost, other than acquisition-related compensation, is recognized in net income.

(Emphasis added.)

230. Pursuant to SOX, the 2Q 2005 Form 10-Q contained a certification by defendant Kriens representing (a) that the 2Q 2005 Form 10-Q accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that he had inspected the Company's disclosure and internal financial reporting controls and found them to be effective, in the same form as detailed in ¶¶ 148-150 herein.

231. The foregoing statements concerning Juniper's 2Q 2005 financial results, compensation practices, and internal controls were materially false and misleading, for the reasons set forth herein at ¶¶ 9-10, 15, 124, and 253.

232. On October 19, 2005, Juniper issued a press release announcing its purported financial results for the third quarter ended September 30, 2005 (the "3Q 2005 Press Release"). The 3Q 2005 Press Release stated in relevant part:

> GAAP net income for the third quarter was $84.1 million or $0.14 per share, compared with a GAAP net income of $48.8 million or $0.08 per share in the third quarter of 2004. Non-GAAP net income was $114.7 million or $0.19 per share, compared with non-GAAP net income of $73.5 million or $0.13 per share in the third quarter of 2004. See the table at the bottom of the Non-GAAP Condensed Consolidated Statements of Operations for a reconciliation of the non-GAAP net income to the GAAP net income.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

233. On November 3, 2005, Juniper filed with the SEC a Report on Form 10-Q for the third quarter ended September 30, 2005 (the 3Q 2005 Form 10-Q"). The 3Q 2005 Form 10-Q reiterated financial results reported in the 3Q 2005 Press Release and represented that the 3Q 2005 financial statements had been prepared in accordance with GAAP.

234. In Note 2 to the financial statements, Juniper's accounting treatment for stock options was described as follows:

> **Stock-Based Compensation**
>
> The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations. As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based compensation cost, other than acquisition-related compensation, was recognized in net income.

(Emphasis added.)

235. Pursuant to SOX, the 3Q 2005 Form 10-Q contained a signed certification by defendant Kriens representing (a) that the 3Q 2005 Form 10-Q accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that he had inspected the Company's disclosure and internal financial reporting controls and found them to be effective, in the same form as detailed in ¶¶ 148-150 herein.

236. The foregoing statements concerning Juniper's 3Q 2005 financial results, compensation practices, and internal controls were materially false and misleading, for the reasons set forth herein at ¶¶ 9-10, 15, 124, and 253.

237. On January 25, 2006, Juniper issued a press release announcing its purported financial results for the fourth quarter and year ended December 31, 2005 (the "2005 Press Release"). The 2005 Press Release stated in relevant part:

> Net income on a generally accepted accounting principles (GAAP) basis for the fourth quarter of 2005 was $105.5 million or $0.17 per share, compared with a GAAP net income of $66.0 million or $0.11 per share for the fourth quarter of 2004. Non-GAAP net income was $119.6 million or $0.20 per share, compared with non-GAAP net income of $85.9 million or $0.15 per share for fourth quarter of 2004.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

> A reconciliation between non-GAAP and GAAP net income is provided in a table immediately following the Non-GAAP Condensed Consolidated Statements of Operations.
>
> * * *
>
> GAAP net income for fiscal 2005 was $354.0 million or $0.59 per share, compared to $135.7 million or $0.25 per share for fiscal 2004. Non-GAAP net income for fiscal 2005 was $430.6 million or $0.72 per share, compared to $238.6 million or $0.44 per share, for fiscal 2004. A reconciliation between non-GAAP and GAAP net income is provided in a table immediately following the Non-GAAP Condensed Consolidated Statements of Operations.

238. On or about March 7, 2006, Juniper filed with the SEC a Form 10-K for the fiscal year ended December 31, 2005 (the "2005 Form 10-K"). Defendants Kriens, Sindhu, Hearst, Calderoni, Goldman, Levy, Sclavos, and Stensrud signed Juniper's 2005 Form 10-K. In the 2005 Form 10-K, Juniper reported 2005 net income of $354 million as compared to 2004 net income of $135.7 million, and earnings per share on a diluted basis of $0.59 as compared to $0.25 for 2004.

239. The 2005 Form 10-K included the Company's audited consolidated balance sheets and statements of operations for each of the three years in the period ended December 31, 2005. At Note 2 to the 2005 financial statements, the Company's accounting for stock options was described as follows:

> The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations. <u>As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based employee compensation cost, other than acquisition-related compensation cost, was recognized in net income</u>.

(Emphasis added.)

240. Note 10 to the 2005 financial statements described the Company's purported practice under the 1996 Plan and the 2000 Plan of issuing all stock options at their fair-market value on the date of grant. Note 10 states in relevant part:

> The Company's Amended and Restated 1996 Stock Option Plan (the "1996 Plan") provides for the granting of incentive stock options to employees and nonstatutory stock options to employees, directors and consultants. <u>Incentive stock options are granted at an exercise price of not less than the fair value per share of the common stock on the date of grant</u>. Nonstatutory stock options may be granted at an exercise

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

price of not less than 85% of the fair value per share on the date of grant; however, no nonstatutory stock options have been granted for less than fair market value on the date of grant.

* * *

In July 2000, the Board of Directors adopted the Juniper Networks 2000 Non-statutory Stock Option Plan (the "2000 Plan"). The 2000 Plan provides for the granting of non-statutory stock options to employees, directors and consultants. Non-statutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, no nonstatutory stock options have been granted for less than fair market value on the date of grant.

(Emphasis added.)

241. Pursuant to SOX, defendant Kriens signed the certifications included as exhibits to the 2005 Form 10-K, representing (a) that the 2005 Form 10-K accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that he had inspected the Company's disclosure and internal financial reporting controls and found them to be effective, in the same form as detailed in ¶¶ 159-161 herein.

242. With respect to the issue of internal controls, Juniper stated that it had assessed the effectiveness of Juniper's internal control over financial reporting as of December 31, 2005 and that it had concluded that "as of December 31, 2005, Juniper Networks Inc.'s internal control over financial reporting is effective."

243. The foregoing statements concerning Juniper's 4Q 2005 and year-end 2005 financial results, compensation practices, and internal controls were materially false and misleading, for the reasons set forth herein at ¶¶ 9-10, 15, 124, and 253.

**F. First Quarter 2006**

244. On April 19, 2006, Juniper issued a press release announcing its purported financial results for the first quarter ended March 31, 2006 (the "1Q 2006 Press Release"). The 2006 Press Release explained the change in accounting standards regarding stock option compensation as follows:

With the adoption of Statement of Financial Accounting Standards No. 123R (FAS 123R) as of January 1, 2006, Juniper is reporting stock-based compensation expense in its generally accepted accounting principles (GAAP) results for the first time. Net income on a GAAP basis for the first quarter of 2006 was $75.8 million or $0.13 per share,

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

> compared with a GAAP net income of $75.4 million or $0.13 per share in the first quarter of 2005.
>
> * * *
>
> For comparative purposes, net income excluding stock-based compensation for the first quarter of 2006 was $91.9 million or $0.15 per share, compared with a net income excluding stock-based compensation of $77.8 million or $0.13 per share for the first quarter of 2005.

245. On May 8, 2006, Juniper filed with the SEC a Report on Form 10-Q for the first quarter ended March 31, 2006 (the "1Q 2006 Form 10-Q"). The 1Q 2006 Form 10-Q reiterated financial results reported in the 1Q 2006 Press Release and represented that the 1Q 2006 financial statements had been prepared in accordance with GAAP.

246. In Note 1 to the 1Q 2006 financial statements, Juniper reported that:

> On January 1, 2006, the Company adopted Statement of Financial Accounting Standards No. 123 (revised 2004), *Share-Based Payment* ("SFAS 123R"), which requires the measurement and recognition of compensation expense for all stock-based payment awards made to employees and directors including employee stock options . . . based on estimated fair values. SFAS 123R supersedes the previous accounting under Accounting Principles Board Opinion No. 25.

247. The net effect of the accounting change under SFAS 123R is to require the Company to record millions of dollars of compensation expenses in connection with stock option grants, which reduced the Company's reported earnings under GAAP. Note 1 described the impact of SFAS 123R as follows:

> <u>Prior to the adoption of SFAS 123R, no stock-based compensation expense had been recognized in the Company's consolidated statement of operations</u>, other than those related to acquisitions. <u>As a result of adopting SFAS 123R, pre-tax stock-based compensation expense recorded for the three months ended March 31, 2006 of $23.1 million was related to employee stock options, RSUs, and employee stock purchases under the Company's Employee Stock Purchase Plan</u>. Pre-tax stock-based compensation expense of $3.4 million for the three months ended March 31, 2005, which the Company recorded under APB 25, was related to options assumed from acquisitions. <u>The pre-tax compensation expense was $18.8 million higher than the expense that would have been recorded had the Company continued to account for stock-based compensation under APB 25</u>.

(Emphasis added.)

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

248. As a result of the change in accounting under SFAS 123R, Juniper reported net income of $75.8 million, or $0.13 per share, for 1Q 2006, approximately $16 million, or $0.02 per share, lower than earnings would have been under APB 25's methodology.

249. Notwithstanding that the 1Q 2006 financial statements included in the 1Q 2006 10-Q and 1Q 2006 Press Release were prepared using SFAS 123R, which required that compensation expenses be recorded for stock options, the financial statements were materially false and misleading in failing to disclose the options backdating scheme. The stock options were also improperly valued and expensed based on the backdated grant dates rather than the actual grant dates. Accordingly, the Company's financial results for 1Q 2006 were inflated.

250. Juniper also did not restate prior period results in the 1Q 2006 financial statements to account for the change in accounting methodology. Accordingly, the Company's financial results for prior-year periods included in the 1Q 2006 10-Q and the 1Q 2006 Press Release were inflated.

251. Note 6 to the 1Q 2006 financial statements also reiterated the misrepresentation in Juniper's previous SEC filings that all stock options issued under the 1996 Plan and the 2000 Plan were granted at an exercise price "no less than the fair value on the date of grant."

252. Pursuant to SOX, the 1Q 2006 Form 10-Q contained a signed certification by defendant Kriens representing (a) that the 1Q 2006 Form 10-Q accurately portrayed Juniper's financial condition, and was not materially false or misleading, and (b) that he had inspected the Company's disclosure and internal financial reporting controls and found them to be effective, in the same form as detailed in ¶¶ 148-150 herein.

253. The foregoing statements set forth above under the heading "The False Financial Statements" concerning Juniper's financial results, compensation practices, and internal controls were each materially false and misleading when made because they misrepresented or omitted the following material adverse facts:

a. that, contrary to the affirmative representations in Juniper's public filings, stock options issued to Juniper employees under the Plans were not issued at the fair market value of the Company's stock on the date of the grant; rather, option grant dates were manipulated at least from June 1999 through 2003 to coincide with particularly low share prices so as to benefit Company executives, directors and employees;

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

b.     that the Company had not consistently followed the dictates in APB No. 25 in that (i) options priced below a stock's fair market value when they are awarded results in the holder receiving an instant paper gain; and (ii) Juniper did not treat that gain in value as a cost to the corporation in its financial statements, thus inflating the Company's net earnings;

c.     that Company officers, directors, and employees, including defendants Kriens, Sindhu, and Gani, received backdated in-the-money options and thus took excess and unjustified compensation at the expense of the investing public;

d.     that the Company's financial statements for at least the years 1999-2005 and 1Q 2006 violated GAAP and, as a result, E&Y's unqualified opinions on Juniper's financial results for these years were materially false and misleading;

e.     that the procedures for and control of the making, accounting for, and reporting of stock options grants were insufficient to prevent manipulation; and

f.     that the illicit scheme vis-à-vis backdating stock option grant dates potentially subjected Juniper to substantial regulatory fines, penalties, and other legal action, thereby compromising the Company's overall financial condition and prospects.

**The False Proxy Statements**

254.     Juniper's annual proxy statements from 2000 to 2006, which were disseminated to shareholders and filed with the SEC, contained similar material misstatements and omissions falling into four general categories: (a) misstatements that the options granted under the Plans were priced at the fair market value on the date of the grant; (b) misstatements that stock options would not provide value to executive officers until the price of Juniper's stock increased over the exercise price, when in fact many options were issued in the money; (c) misstatements relating to the compensation received by the Executive Defendants prior to and during the Class Period; and (d) statements failing to disclose that the stated purpose of option grants to Juniper executives – *i.e.*, linking a significant portion of their compensation to the future performance of the Company – was significantly undermined because the option grants described in the proxies were backdated and in the money.

255.     For example, each of the Company's proxy statements for years 2000 through 2006 includes a "Compensation Committee Report on Executive Compensation" which represents as follows:

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

> **Stock Option Grants**. Grants of stock options to executive officers are based upon each executive officer's relative position, responsibilities, historical and expected contributions to the Company, and the executive officer's existing stock ownership and previous option grants. Stock Options are granted at the fair market value on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price.

(Emphasis added.)

256. This representation was materially false and misleading in failing to disclose that from June 1999 through 2003, Juniper issued backdated in-the-money stock options to Company executives and employees who received an immediate gain in value because the exercise price of the options was below the market price on the dates of the grants.

257. Similarly, the 2000 Proxy Statement included a table titled "Option/SAR Grant in Last Fiscal Year" which set forth the details of the stock options granted in 1999 to the named executive officers and the potential realizable value, assuming an annual appreciation of either 5% or 10%. Footnote (2) to that table states: "Options were granted at an exercise price equal to the fair market value of the Company's common stock, as determined in good faith by the Board of Directors. As of the effective date of the initial public offering, options are granted at fair market value on the date of the grant." (Emphasis added.)

258. Likewise, Note 2 to the table entitled "Option/SAR Grants In Last Fiscal Year," contained in Juniper's 2001 definitive proxy statement filed with the SEC on Schedule 14A on March 31, 2001 (the "2001 Proxy Statement"), represented that "Options are granted at fair market value on the date of grant."

259. The statements in ¶¶ 255 and 257-258 were materially false and misleading because many of Juniper's stock options were not "granted at fair market value on the date of grant."

260. In each of the Company's Proxy Statements for 2000 through 2006, the Compensation Committee Report on Executive Compensation included a substantially similar discussion of the purpose and administration of the stock option plan. For example, the 2004 Proxy Statement provides as follows:

> The Compensation Committee's approach is predicated upon the philosophy that a substantial portion of aggregate annual compensation for executive officers should be contingent upon the Company's

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

> performance and an individual's contribution to the Company's success in meeting certain critical objectives. . . . In this regard, the Compensation Committee's overall philosophy regarding compensation is to encourage creation of long-term value for stockholders, employee retention, and equity ownership through stock option grants.

(Emphasis added.)

261. The foregoing representation was materially misleading in failing to disclose the backdating scheme involving in-the-money options from June 1999 through 2003 which undermined the goal of linking a significant portion of the Executive Defendants' compensation to the future performance of the Company.

262. Finally, the Summary Compensation Table included in the 2000-2006 Proxy Statements materially misstated the compensation of, and failed to disclose, the illicit compensation received from the Company by the Executive Defendants and other Juniper officers in fiscal years 1999 through 2003 as a result of their receipt of fraudulently backdated stock options at less than fair market value.

263. Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of [any] bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered." 17 C.F.R. § 229.402(b)(2)(iii)(B). Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further require that the following items be disclosed in the Summary Compensation Table:

> i. For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.
>
> ii. Above-market earnings or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period . . .
>
> iii. The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

264. The disclosures of "Annual Compensation" and "Securities Underlying Options" are materially misleading absent the disclosure of the additional compensation received by the

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

Executive Defendants as a result of the backdated options. Additionally, the Option/SAR Grants In Last Fiscal Year table in the 2000 through 2004 Proxy Statements is materially misleading because it fails to include an additional column showing the market price on the date of the grant, as required by Item 402(c)(2)(iv), since the options granted during this period were backdated. Finally, the Proxy Statements were misleading in failing to disclose that the options grants were backdated in light of Item 402(c)(3), which required the disclosure of any material term of option grants.

**THE TRUTH IS GRADUALLY REVEALED**

265. On March 18, 2006, *The Wall Street Journal* (weekend edition) published an exposé entitled "The Perfect Payday," which implicated the CEOs at several public companies in the potential backdating of stock option grants beginning in the mid-1990s. The *Wall Street Journal* article described a striking pattern where option grants at those companies were consistently dated just before a rise in the stock price, often at a bottom of a steep drop. The article concluded that there was effectively a zero probability of the reported grant dates occurring at random.

266. According to *The Wall Street Journal*, the opportunity to backdate options without detection was facilitated by lax reporting requirements under SEC rules. Until 2002, companies were permitted to report option grants up to 45 days after the company's fiscal year end. The extended reporting period made it easier to engage in backdating because it provided a fairly long time period within which to identify and disclose (albeit falsely) a purported date with a low stock price as the option grant date.

267. The SEC reporting requirements were tightened with the passage of SOX. Section 16(a) of the Exchange Act and SEC Rule 16a-3 promulgated thereunder require executives to disclose stock option grants within two business days following the option grant. The effect of this reporting change is to reduce, but by no means eliminate, the ability to engage in backdating. Indeed, Juniper has admitted that its option grants were backdated during 2003.

268. *The Wall Street Journal* also reported that companies that issued backdated options may have violated their stock option plans; may be subject to liability under the federal securities

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

laws for misrepresenting compensation arrangements and inflating reported earnings in violation of GAAP; and could also face potential tax liabilities to the IRS.

269. The article stated that the SEC was currently examining about a dozen companies' option grants, and suggested that the problem could be far more widespread based on *The Wall Street Journal*'s analysis of grant dates and stock movements. However, the article did not identify Juniper as a current or potential target of the government investigation, and the market price of Juniper stock on the next trading day, March 20, 2006, did not react to the *Wall Street Journal* article.

270. Following the publication of the *Wall Street Journal* article, financial analysts began investigating and identifying potential candidates for option backdating. On or about May 16, 2006, the CFRA released a study of the top 100 North American companies ranked by stock-based compensation as a percentage of revenues. CFRA identified Juniper as one of 17 companies which showed a "high-risk profile" for option-backdating. CFRA considered a company's option backdating risk to be significant when a company has, on three or more occasions, granted options at exercise prices and dates that matched exactly or were close to a 40-day low in the Company's stock, and the stock price rebounded at least 10% from the low during this period.

271. Based on CFRA's analysis of individual option grants during the period 1997-2002, CFRA identified suspicious grants for Juniper in October 1999, December 2000 and February 2002 (options were "exchanged" by the Executive Defendants in 2001).

272. On May 18, 2006, J. P. Morgan analyst Ehud A. Gelblum, Ph.D. issued a report that also identified Juniper as a likely candidate for backdating. The J. P. Morgan report stated that based on its review of price and grant data for the named executives (including Kriens, Sindhu, and Gani) in Juniper's proxy statements from 1999 through 2005, it found that 6 option grants out of 15 were issued on the dates when Juniper's stock price hit monthly lows. The grant dates identified by J. P. Morgan were the same ones independently selected by CFRA, plus additional grant dates in July 2002, April 2003, and September 2003.

273. Also on May 18, 2006, *The Wall Street Journal* issued an article entitled "Affiliated Computer Gets Subpoena." The *Wall Street Journal* article reported that federal prosecutors in New

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

York were conducting criminal probes of options-granting practices at UnitedHealth Group, Inc. and Comverse Technology, Inc. It also reported that following the announcement a few days earlier by Affiliated Computer Services, Inc. ("ACS") that it would take a $32 million charge relating to improper accounting for backdated stock options, ACS had subsequently received a grand jury subpoena issued by the U.S. District Court for the Southern District of New York.

274. The May 18, 2006 *Wall Street Journal* article further reported that the SEC investigation had expanded to about 20 companies, and highlighted CFRA's report identifying Juniper as one of 17 companies having "the highest risk of having backdated options." The May 18 article stated:

> Wall Street's interest in identifying potential options problems at companies is also on the rise. An accounting-research firm this week identified 17 companies it termed as having "the highest risk of having backdated options." The research firm, the Center for Financial Research and Analysis, based its analysis on regulatory records and trading patterns.
>
> Marc Siegel, director of research at CFRA, said the firm's clients, which include investment managers, have been seeking to identify companies with risky option patterns. CFRA looked at 100 companies that issued a high proportion of options relative to their total executive compensation. It then identified those that, on three or more occasions, granted options at exercise prices that matched, or were close to, lows of the company stock price between 1997 and 2002, followed by a bounce of at least 10% in share price.
>
> Among the 17 were Juniper Networks Inc., a Sunnyvale, Calif., networking-equipment company; . . . Half of the grants to Juniper were considered at risk by CFRA.

275. On May 19, 2006, TheStreet.com issued an article which summarized the CFRA and JP Morgan reports concerning the risk of option backdating at Juniper. The May 19 article states in relevant part:

> Concerns over stock-option timing broadened this week to include tech shops Juniper (JNPR:Nasdaq) and F5 Networks (FFIV:Nasdaq).
>
> Analysts sorting through public filings found that option grants at Juniper and F5 were repeatedly priced over seven years at the stocks' monthly lows. To market watchers, these patterns suggest that the options could have been timed or backdated to maximize their value to company executives.
>
> Wall Street, already jittery over inflation news, has shown little sympathy for companies that have come under scrutiny in a growing options-backdating scandal.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

> Shares of Juniper fell 4% Thursday and F5 has slid 12% in the past three days on worries that these stock-option grants will invite investigations and costly legal battles.
>
> * * *
>
> Juniper and F5 were pulled into the options-timing spotlight this week after analysts flagged patterns of questionable grant dates. Accounting muckrakers at Center for Financial Research and Analysis identified 17 companies that may have to explain some troublesome option datings.
>
> And JPMorgan analyst Ehud Gelblum released a report Thursday reviewing executive-option grants for 14 companies dating back to 1998. Three of the companies – Motorola (MOT:NYSE), Juniper and F5 – show a suspicious pattern of grants at their stock's low for a given month.

276. *The Los Angeles Times*' May 19, 2006 edition also gave wide coverage to the CFRA report. The article, entitled "Report Suggests Companies Backdated Stock Option Grants," quoted Marc A. Siegel, CFRA research director, as follows: "We're trying to identify companies that may have a high-risk profile [of backdating] and warrant further attention." Mr. Siegel further explained in the article:

> Until 2002, the Securities and Exchange Commission allowed companies to report option grants several weeks after the date of the actual grant. The loophole tempted companies to select the most beneficial date to maximize the value of the grants . . . So if a company's stock price hit a 40-day low near the time of the public filing, the company could pick that date as the issue date. The low price then became the base price, giving executives even more money than they would otherwise have received when they sold it at a higher price later. In the study, the center matched grant dates to within weeks of those periodic lows in the companies' stock prices . . . Those grant dates were deemed "at risk." The 17 high-risk companies [including Juniper] had at least three such grant dates over the five-year period.

277. Following the widespread coverage of the CFRA and J. P. Morgan reports which identified Juniper as a high risk candidate for options backdating, the price of Juniper stock declined 11% from a closing price of $16.87 on May 17, 2006 to close at $15.06 on May 19, 2006.

278. On May 22, 2006, Juniper issued a press release announcing that the Company had received a request for information from the office of the United States Attorney for the Eastern District of New York relating to the Company's granting of stock options. Juniper indicated that it was responding to this request for information, and that its Audit Committee was reviewing the

Company's historical stock option granting practices. On the release of this news, Juniper shares dropped to a 52-week low of $14.62 during morning trading on May 22, 2006.

279. Securities analysts covering Juniper also raised concerns over the adverse implications of Juniper's becoming embroiled in the options backdating investigation. On May 22, 2006, Bear Stearns stated that "[n]ew concerns over options backdating may impact the stock further." That same day, Morgan Keegan & Co., Inc. elaborated on its concerns as follows:

**JNPR: Business Sound, Options Concerns Create A Cloud**

- Juniper's stock down 7% last week, reflects concerns from options expensing. Juniper was cited in a recent report along with others as companies that may have exploited a past loophole in SEC regulations regarding pricing options prior to Sarbanes-Oxley in 2002.

- The situation presents risks to the stock. The stock could remain under pressure from a witch hunt mentality. Negative scenarios include potential SEC investigations, restatements, filing delays, and tarnished management credibility.

280. On July 19, 2006, the Company issued a press release announcing net revenues for the second quarter of 2006 of $567.5 million, compared with $493.0 million for the same quarter of 2005, an increase of 15 percent. In conjunction with these positive financial results, the Company also made a short, non-committal disclosure about the Audit Committee investigation. The release stated that the Audit Committee had reached a preliminary conclusion that the actual measurement dates for financial accounting purposes of certain stock option grants issued in the past differed from the recorded grant dates of such awards. However, the release continued, the Board had not yet determined the scope or amount of any charges it might record, nor had it determined the potential tax and accounting impact, including whether a restatement was required. Juniper also stated that it would defer filing its quarterly report on Form 10-Q for the quarter ended June 30, 2006 until after completion of the investigation, which it anticipated would occur after the filing deadline under SEC rules.

281. On August 9, 2006, Juniper's Board of Directors, upon the recommendation of the Audit Committee, concluded that the Company's financial statements and all earnings press releases and similar communications relating to the period beginning January 1, 2003 should no longer be

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

relied upon, including the Company's financial statements for 2003, 2004, and 2005 and the interim periods contained therein, and 1Q 2006.

282. On August 10, 2006, the Company issued a press release entitled "Juniper Networks Announces Update Regarding Stock Option Investigation." The press release in relevant part stated:

> Although the investigation is ongoing, upon the recommendation of management and the Audit Committee, the Juniper Board of Directors has concluded that the Company will need to restate historical financial statements to record additional non-cash charges for stock-based compensation expense related to past option grants. The Company has not determined the amount of such charges, the resulting tax and accounting impact, or which specific periods require restatement. Accordingly, the Company today filed a Form 8-K with the SEC stating that the financial statements and all earnings press releases and similar communications issued by the Company relating to periods beginning on or after January 1, 2003 should therefore not be relied upon.

(Emphasis added.)

283. On August 10, 2006, the market price of Juniper stock dropped to $12.90 from a close of $13.41 on August 9, and the price continued to fall to $12.20 on August 11, 2006. This $1.21 drop represented a two-day decline of nine percent.

284. On November 20, 2006, Juniper announced that the NASDAQ Stock Market had sent Juniper a notice of noncompliance with NASDAQ rules for failing to timely file its 3Q 2006 Form 10-Q due to the Audit Committee's ongoing investigation into the Company's historical stock option practices. Juniper also reported that it had had a hearing before the NASDAQ Listing Qualifications Panel on September 26, 2006, and was awaiting a decision concerning its NASDAQ listing.

285. On December 20, 2006, the Company announced that as a result of the Audit Committee's seven-month review, Juniper had determined to record non-cash charges of approximately $900 million resulting from the improper accounting for backdated option granted between June 9, 1999 and December 31, 2003. The December 20 release broadly outlined the irregularities found by the Audit:

- There were numerous instances where option grants were backdated, so as to give favorable exercise prices.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

- The Audit Committee identified serious concerns regarding the actions of certain former management in connection with the stock option granting process.
- Formal documentation of stock option grants often lagged the reported grant dates.
- Management failed to exercise sufficient responsibility for the stock option granting process.
- CEO Kriens received two option grants prior to 2001 in which the reported grant dates were prior to the actual date his options were approved.

286. CEO Kriens also admitted that the Company had failed to establish adequate controls over the stock option granting process: "In prior years, we should have had better stock option granting processes, controls and oversight in place, and we did not."

287. On or about March 9, 2007, Juniper filed its 2006 Form 10-K and June 30, 2006 Form 10-Q and September 30, 2006 Form 10-Q. The 2006 Form 10-K and 10-Qs included the restatement of "selected consolidated financial data for the years 2002 through 2005, plus restated unaudited quarterly financial information for the interim periods of 2005 and the first quarter ended March 31, 2006."

288. In its 2006 Form 10-K, Juniper admitted that from 1999 through 2004, the Company had improperly accounted for an astounding 110.5 million in stock options, or 76% of the 146 million in stock options issued during the period.

289. As a result, Juniper was required to record approximately $900 million in additional compensation charges and associated tax costs which negatively impacted earnings over its seven-year life as a public company from June 1999 through March 31, 2006. A table reflecting the impact on Juniper's pre-tax and net income from recognizing these compensation expenses is annexed as Exhibit B.

290. In Item 6 of the 2006 Form 10-K, Juniper provided a summary of the Audit Committee's investigation since May 2006 and its findings. The Audit Committee's full report, which covers an analysis of all Juniper option grants from June 24, 1999 to May 23, 2006, has not been publicly released.

291. The Audit Committee's findings of improper accounting and other evidence of management's wrongdoing were summarized in the 2006 Form 10-K as follows:

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

> The Company has concluded that the measurement dates of a large number of grants to non-Officers during the period between June 1999 and December 2004 were incorrect. The Company's practice has been to grant stock options, except where prohibited, to nearly all full-time employees in connection with joining the Company. To facilitate the granting of options to Juniper Networks' rapidly growing workforce, the Board of Directors established a Stock Option Committee to grant options to non-Officer employees. <u>Between June 1999 and June 2003, the dates for a large number of grants made by the Stock Option Committee were chosen with the benefit of hindsight as to the price of the Company's stock, so as to give favorable exercise prices. Moreover, the Stock Option Committee's process for finalizing and documenting these grants was often completed after the originally assigned grant date</u>. Beginning with grants dated June 20, 2003, the Company implemented a number of new procedures and policies regarding the granting of options to non-Officer employees. After that, the pattern of consciously looking back for the most favorable dates for the employees ceased. However, the documentation and written approvals of grant dates still generally trailed the recorded grant dates. Based on all available facts and circumstances, <u>the originally recorded measurement dates for the grants made by the Stock Option Committee during the period from July 1999 through December 2004 can not be relied upon in isolation</u>.

(Emphasis added.)

292. The Audit Committee also found improper accounting during the same period with respect to officer and director options:

> The Company has concluded that the measurement dates of several grants to executive officers who were "reporting persons" as that term is defined under Section 16 of the Securities Exchange Act of 1934, as amended ("Officers") and members of the Board of Directors made between June 1999 and June 2003 were incorrect…. <u>There were several instances in which grants to Officers or directors were given grant dates (and corresponding exercise prices) prior to the date on which formal corporate action making the grant was taken. In general, this appears to have been done to make the grant date coincide with either a specific event, such as the appointment or re-election of a director or with the purported date options were granted to non-Officers.</u> In these cases, the Company has determined that the correct measurement date is the date on which the Board or Compensation Committee took the action to approve the grant.

(Emphasis added.)

293. The Audit Committee also described numerous other accounting improprieties relating to the granting of options to officers and directors, including (a) grants were made by persons or committees who did not have the authority to make the grants in question; (b) grant dates were given for new employees prior to the date that employee commenced working for Juniper; and

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

(c) grants were made without any documentation evidencing approval by the Board of Directors or Compensation Committee.

294. Juniper was required to record $86.8 million in compensation charges with respect to 7.1 million officer and director stock options, and $807.9 million in compensation expenses with respect to 103.4 million non-officer stock options to correct the Company's improper accounting.

295. Juniper has also admitted that as a result of the Audit Committee investigation, the Company had identified "material weaknesses in our internal control over financial reporting related to our stock option granting practices and the related accounting in periods ending prior to June 30, 2006." Juniper admitted that prior to 2003 "we did not have sufficient safeguards in place to monitor our control practices regarding stock option pricing and related financial reporting." The Company stated that over the next four years (June 2003 through 2006), Juniper implemented numerous improvements. Such improvements included, but were not limited to:

- In response to the requirements of SOX, documenting accounting policies, processes and procedures; and assessing the design and operation effectiveness of internal controls over financial reporting. These efforts led to segregating responsibilities, adding reviews and reconciliations, and redefining roles and responsibilities.
- Implementing the practice of using the receipt of the final Board of Directors, Compensation Committee or Stock Option Committee approval as the grant and measurement date for stock option grants.
- Also in response to certain of the reporting requirements of SOX, which requires executive officers to report stock option grants within two business days, implementing new procedures for stock option grants that were designed to provide reasonable assurance that stock options were priced on the actual grant date.
- Effective January 1, 2006, adopting SFAS No. 123R and added controls in stock administration, human resources and finance functions to ensure that stock-based compensation expenses are recorded correctly.
- Obtaining additional resources with responsibilities for financial reporting, internal controls, compliance and stock accounting and administration.
- Upgrading systems and system controls that support the stock option granting processes.

296. However, prior to the filing of the 2006 Form 10-K, the Juniper Defendants had not reported any problems with the Company's internal disclosure controls or the nature and extent of its accounting improprieties. On the contrary, the Juniper Defendants repeatedly misrepresented that the internal controls were adequate, that the Company's financial statements were prepared in

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

accordance with GAAP, and that Juniper was not required to record compensation expenses for option grants because they were priced as of the date the grants were approved.

297. In conjunction with the Company's release of the Audit Committee's findings and the restatement of financial results in the 2006 Form 10-K, Frank Marshall and defendant Levy, two of the three members of the Compensation Committee, resigned from the Board of Directors.

298. Both Levy and Marshall are affiliated with other technology companies that were linked to improper accounting for stock options and that have restated or intend to restate their historic financial results.

299. Levy is the founder and former CEO, and served as Chairman of the Board, of KLA-Tencor Corp. ("KLA") until October 16, 2006, when he resigned. KLA has admitted backdating stock options and will take an accounting charge exceeding $375 million.

300. Levy is also on the Board of Directors of Extreme Network Inc. ("Extreme Network"), and has served on Extreme Network's Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee. Extreme Network has also admitted that it will take compensation charges for improper accounting of stock option grants, and its financial reports for 2000 through 2005 and the interim quarters of 2006 should no longer be relied upon.

301. Frank Marshall was a Juniper director and a member of the Compensation Committee from 2004 until his resignation on February 20, 2007 amidst the Audit Committee investigation relating to Juniper's stock option grants. Marshall was concurrently a director of PMC-Sierra, Inc. ("PMC"). PMC has admitted that as a result of improper accounting for stock options, it intends to restate its financial statements and record compensation charges up to $100 million.

302. Robert Dykes, who had served as Juniper's CFO from January 2005, also resigned immediately following Juniper's release of its 2006 10-K and 10-Q reports for the second and third quarters of 2006. During his tenure, Juniper (a) continued to improperly account for stock options issued through year-end 2004, thereby inflating its reported financial results; (b) misrepresented the

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

Company's compensation practices under its stock option plans; and (c) misrepresented that the Juniper's internal controls regarding financial reporting were adequate.

303. Dykes signed Juniper's Form 10-K Reports for 2004 through 2006 and the Company's Form 10-Q reports for the interim quarters for 2005 and 2006. Dykes also signed certifications pursuant to SOX in connection with each of these reports, attesting to the accuracy of the Company's financial statements and related disclosures, and the effectiveness of its internal disclosure controls and procedures.

## ADDITIONAL SCIENTER ALLEGATIONS

304. Juniper and each of the Executive Defendants knew or recklessly disregarded that (a) the Company issued options grants which were backdated and otherwise violated the Company's stock option plans, and (b) these stock options were improperly accounted for in the Company's financial statements.

### The Juniper Defendants' Admissions

305. The Juniper Defendants have made numerous admissions that establish or raise a strong inference against Juniper and the Executive Defendants:

a. In its 2006 Form 10-K, the Company conceded that it had **improperly accounted for "options covering a total of 110.5 million, or 76%, of the 146.0 million shares of common stock covered by options granted during the relevant period."** In fact, the percentage of options grants that failed to comply with APB No. 25 was closer to 90%, when the 21 million option shares that were issued in May 2002 pursuant to the Company's options exchange and repricing program (described herein at ¶ 310) are excluded from the calculations. These options were not issued as part of Juniper's annual compensation and were subject to specific accounting rules which established the same grant date for all holders, including the Executive Defendants, who exchanged their stock options for options with a lower exercise price.

b. In its 2006 Form 10-K, the Company also admitted that **"[b]etween June 1999 and June 2003, the dates for a large number of grants made by the Stock Option**

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**Committee were chosen with the benefit of hindsight as to the price of the Company's stock, so as to give favorable exercise prices. Moreover, the Stock Option Committee's process for finalizing and documenting these grants was often completed after the originally assigned grant date."** Management on the Stock Option Committee was responsible not only for the grant and administration of stock options, but also for reviewing and providing input relating to the Company's disclosures with respect to stock option compensation in proxy statements and financial statements that were included in the Company's Forms 10-K and 10-Q.

c. The Company also conceded in its 2006 Form 10-K that **between June 1999 and June 2003, "grants to Officers or directors were given grant dates (and corresponding exercise prices) prior to the date on which formal corporate action making the grant was taken" in order to "coincide" with grant dates (admittedly backdated) selected by the Stock Option Committee.**

d. The Company acknowledges that the backdating occurred after August 29, 2002, which is the date SOX changed the requirements for reporting option grants. Under SOX, option grants had to be reported to the SEC within two days of the grant. The fact that the options misconduct occurred after this provision was enacted suggests a knowing violation of securities laws or at least severe recklessness.

e. In its 2006 Form 10-K, the Company admits numerous other instances of improper accounting for officer and director options that violated the terms of stock option plans and GAAP, including pricing options to coincide with the appointment or reelection of a director; pricing options prior to the date newly hired officers began their employment; and recording grants that were not authorized by the Board or the Compensation Committee.

f. In its 2006 Form 10-K, Juniper admits that it should have taken $86.8 million in stock-based compensation expenses under APB No. 25 to account for the grants to officers and directors that resulted in immediate gains. The Company also admits that two grants (*i.e.*, 1999 and 2000) to Kriens prior to 2001 were backdated.

g. In its December 20, 2006 press release, Juniper implicated management, finding that **"the Audit Committee identified serious concerns regarding the actions of certain**

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**former management" and that "Management failed to exercise sufficient responsibility for the stock option granting process."**

h. CEO Kriens admitted in the December 20 release that contrary to his and Gani's (and later Dykes') direct oversight responsibility of the Stock Option Committee and their repeated certifications under SOX that Juniper's internal controls were adequate, in fact there were material weaknesses in Juniper's "option granting processes, controls and oversight" extending back to 1999. The Company reiterated in its 2006 Form 10-K that there were "material weaknesses in our internal control over financial reporting relating to stock option granting practice and the related accounting in periods ending prior to June 30, 2006."

**Violations of the Company's Stock Option Plans**

306. A strong inference of scienter is supported by Juniper's admissions that the option grants deviated from the terms of the Company's stock option plans and the representations in the Company's proxy statements (and other SEC filings) that "stock options are granted at market price on the date of the grant, and will provide value to the executive officers only when the Company's common shares increase over the exercise price." The Company has admitted that, over a four-year period, millions of officer and director option grants were priced on dates that preceded their approval dates in order to coincide with (a) the backdated grant dates chosen by the Stock Option Committee, (b) the appointment or reelection of directors. Grant dates were also selected for newly-hired officers prior to the commencement of their employment. In other instances, grants were made by persons or corporate bodies that had no authority to issue officer and director grants. At other times, grants dates were selected without formal approval by the Board or the Compensation Committee.

307. A strong inference of scienter is also supported by the fact that the primary accounting rule at issue – APB No. 25 – was simple and straightforward in its application by Juniper – options were supposedly priced on the date final approval was received from the Board, the Compensation Committee or the Stock Option Committee. However, this practice was ignored to such an extent that the Stock Option Committee could not reliably document that the reported grant dates for 100 million option shares from 1999 through 2004 were, in fact, the dates of approval.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

Instead, the Company was ultimately required to account for the option grants by using the dates that the grants were entered into the Company's internal "Equity Edge" computer system, which was used to monitor and administer the stock options grants. In other cases, electronic data indicated that the granting instrument and schedule of recipients were created prior to entering the data in the Equity Edge system. As a result of these post-hoc adjustments for improper accounting, Juniper was required to record nearly $800 million in compensation charges covering more than 100 million stock option grants to non-officer employees.

**Duration, Magnitude and Pervasiveness of the Wrongdoing**

308. The duration, magnitude, and pervasiveness of the scheme support a strong inference of fraudulent conduct by Juniper and the Executive Defendants. Juniper admits that option grants deviated from the Company's reported practices for more than five years, from June 1999 through 2004, and covered options grants for over 110 million shares, representing 76% of the Company's options granted during this period. (In fact, closer to 90% of the options were improperly granted, as explained herein at ¶ 310.) Moreover, the Company concedes that most of the options were deliberately backdated from at least July 1999 through June 2003.

309. The Company also admits in its 2006 Form 10-K that Juniper's financial statements issued during the Company's life as a public company (from June 1999 until August 10, 2006) can no longer be relied upon, and has restated five years of financial statements. Juniper has also taken a massive $900 million charge for compensation expenses associated with backdated stock options that has reduced earnings for seven years of financial results.

310. The backdating scheme was so pervasive that the Defendants were able to continue it even after the "technology bubble" burst and their options were repriced. In 2001, the market prices of Juniper stock and those of other high-tech companies plummeted to prices well below the exercise prices of the options granted in 1999 and 2000. As a result, in October 2001 Juniper commenced a tender offer to repurchase stock options held by its employees that had an exercise price above $10.00 per share. Juniper option holders, including the Executive Defendants, tendered their backdated stock options, and Juniper canceled them as of November 26, 2001. Under the requirements of the Financial Accounting Standards Board, employees were precluded from

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

receiving new options for six months and one day after the date of cancellation. Accordingly, on or about May 28, 2002 (six months and one day after cancellation), approximately 21 million replacement options, with an exercise price of $10.31 per share, were issued to Juniper option holders, including the Executive Defendants. However, as shown above at ¶¶ 111-122, within a few months the Executive Defendants resumed their pattern of options backdating. Juniper admits that the backdating occurred at least through June 2003.

**Purported Compliance With APB No. 25 Was**
**Essential to Maintaining Juniper's Profitable Performance**

311. Given the enormous amount of stock options issued as compensation to Juniper's entire workforce, Juniper and the Executive Defendants were keenly aware of the potentially devastating impact on Juniper's financial condition that would result if the Company failed to comply with APB No. 25 and was required to record compensation expenses for gains incurred in connection with its options grants. During 1999-2003, the acknowledged period of backdating, Juniper reported $46 million in net income. Had the Company been required to record compensation expenses, these earnings would have been wiped out many times over, as evidenced by the hundreds of millions of dollars of expenses recorded in the Company's restated financial results. Moreover, Juniper would have reported an accumulated deficit from the time it went public until the fourth quarter of 2005.

312. Accordingly, it was of enormous significance to Juniper's earnings and business model that the Company qualify for favorable tax treatment under APB 25. By disguising backdated options by manipulating their grant dates, the Executive Defendants and other recipients of Juniper options were able to receive additional immediate value for their options while Juniper continued to claim (albeit improperly) favorable accounting treatment, thereby inflating earnings.

313. In fact, as described in ¶ 93, *supra*, prior to and during the Class Period, the Company was required under GAAP to report in its financial statements contained in Forms 10-K and 10-Q the negative impact to earnings of applying the alternative accounting methodology of FAS 123. As shown in Juniper's Reports on Form 10-K for the years 2001 through 2005, had the alternative accounting standard been applied, the Company's annual earnings would have been

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

reduced during those years by $105 million, $90 million, $59.1 million, $86.9 million, and $193.6 million, respectively.

314. The potential loss of favorable accounting treatment under APB 25 was so significant that it was included as a risk factor in the Company's SEC filings that could "materially and adversely affect our business." Juniper's 2004 Form 10-K states:

> Recent rulemaking by the Financial Accounting Standards Board will require us to expense equity compensation given to our employees and will significantly harm our operating results and may reduce our ability to effectively utilize equity compensation to attract and retain employees.
>
> * * *
>
> By causing us to incur significantly increased compensation costs, such accounting changes will reduce our reported earnings and will require us to reduce the availability and amount of equity incentives provided to employees, which may make it more difficult for us to attract, retain and motivate key personnel. Each of these results could materially and adversely affect our business.

315. Juniper's officers and directors therefore devoted their efforts to prolonging favorable tax treatment for stock options under APB 25. When faced with the impending change in accounting rules under SFAS 123R beginning January 1, 2006, Juniper chose to accelerate almost one-half of the Company's unvested and out-of-the-money options in order to avoid recognizing $153 million in compensation expenses associated with those options as they vested in future periods. The Company explained in its 2005 Form 10-K that "<u>[a]s a result of the acceleration, we expect to reduce the pre-tax stock option expense we otherwise would have been required to record by approximately $153 million subsequent to the adoption of SFAS 123R beginning in 2006.</u>" (Emphasis added).

**<u>The False Certifications Under SOX</u>**

316. The certifications pursuant to SOX signed by defendants Kriens and Gani (and later Dykes) included in the Forms 10-K and 10-Q from 2Q 2002 through 1Q 2006 were materially false and misleading in certifying the accuracy of Juniper's financial statements and the effectiveness of its internal controls regarding financial reporting for stock option grants. In fact, as Juniper admits in its 2006 Form 10-K, there were "material weaknesses in our internal controls over financial

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

reporting related to our stock options granting practices and related accounting in period ending prior to June 30, 2006."

317. Moreover, Kriens and Gani misrepresented that they designed or caused to be designed sufficient disclosure controls to ensure that they were provided with material information relating to Juniper and that the financial reporting was reliable. Given the vital importance of compliance with APB No. 25 to Juniper's profitability, it was incumbent upon these defendants to design controls to assure and document that stock options were priced on the dates they were approved. However, as Juniper admits in its 2006 Form 10-K, "before 2003, we did not have sufficient safeguards in place to monitor our control practices regarding stock option pricing and related financial reporting," the result of which was massive options backdating and other accounting irregularities, which remained undetected for years.

318. In this regard, defendants Kriens and Gani falsely certified that they carried out an evaluation within 90 days prior to filing the Reports and concluded that the disclosure controls were effective. Had they conducted an appropriate evaluation, they would have discovered, as Juniper now admits in its 2006 Form 10-K, that there was no systematic documentation for over 100 million stock option grants made by the Stock Options Committee from July 1999 through December 2004. As a result, it was impossible to reliably determine that the reported grants were actually priced on their approval dates in accordance with APB No. 25 rather than backdated. Had these defendants conducted an appropriate evaluation, they would have detected the absence of documentation evidencing when the grants were in fact made, and disclosed these critical facts – which, when ultimately detected, led to the financial restatements at issue – to the Company's auditors and Audit Committee.

319. Kriens' and Gani's false certifications on matters of such enormous magnitude give rise to a strong inference that they either knew or were reckless in not knowing that employee and executive stock options were being granted without formal Board of Directors or Compensation Committee approval and were inconsistent with the internal policies and procedures established by the Board of Directors or Compensation Committee for granting stock options, and that the

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

Company's disclosure controls and procedures were insufficient to detect and prevent this continuing misconduct.

**The Executive Defendants' Potential Profits From the Option Grants and Insider Trading**

320. The Executive Defendants were highly motivated to deceive investors because each of them reaped millions of dollars in instant gains from the backdating of their stock option grants, which was by far the largest component of their compensation. Based upon the backdating scenarios described above at ¶¶ 98-122, in the money option grants could have increased the value of the Executive Defendants' options alone by more than $98 million (depending on the actual grant date), as summarized in the table below.

**In the Money Options**
**Immediate Gain In Intrinsic Value ($)**

| Year | Kriens | Sindhu | Gani |
|---|---|---|---|
| 1999 | 22,689,000 | 13,614,400 | 6,050,400 |
| 2000 | 17,877,000 | 24,133,950 | 4,469,250 |
| 2002 | 1,936,000 | 1,056,000 | 1,760,000 |
| 2003 | 2,496,000 | 936,000 | 1,560,000 |
| | 44,998,000 | 39,740,350 | 13,839,650 |

Total Gains = $98,578,000

321. Moreover, at least one Executive Defendant, then-CFO Gani, profited more than $3,800,000 from the exercise of 300,000 of his backdated stock options and the simultaneous sale of his stock during the Class Period, as follows:

**Gani's Profits from Backdated Stock Options**

| Date of Exercise and Stock Sale | Shares | Exercise Price | Stock Sale Price | Profit ($) |
|---|---|---|---|---|
| 7/15/03 | 50,000 | 5.69 | 14.6980 | 450,400.00 |
| 5/24/04 | 50,000 | 5.69 | 20.5123 | 741,115.00 |
| 8/4/04 | 50,000 | 5.69 | 22.2900 | 830,000.00 |
| 10/20/04 | 50,000 | 5.69 | 24.1597 | 923,485.00 |
| 10/21/04 | 50,000 | 5.69 | 24.1730 | 462,075.00 |
| 10/22/04* | 50,000 | 5.69 | 24.1873 | 462,432.50 |
| Total | 300,000 | | | 3,869,507.50 |

* Options were exercised on 10/22/04 and sold on 10/23/04.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

322. Gani sold his stock while in possession of material, non-public adverse information concerning Juniper, namely, the Company's improper accounting for stock option grants that inflated Juniper's earnings. Accordingly, Gani's insider trading supports a strong inference of scienter.

323. Each of the Executive Defendants also sold substantial amounts of their shareholdings before and during the Class Period, while the backdating of options was concealed and Juniper's earnings were inflated. In total, the Executive Defendants reaped a total of approximately $217,000,000 in proceeds from Class Period sales, as indicated in the tables below:

**Scott Kriens – Stock Sales**

| Date | No. of Shares Sold | Price Per Share | Proceeds ($) |
|---|---|---|---|
| 10/17/2001 | 150,000 | 23.0730 | 3,460,950.00 |
| 10/17/2001 | 200,000 | 23.7038 | 4,740,760.00 |
| 10/18/2001 | 150,000 | 22.0900 | 3,313,500.00 |
| 7/31/2002 | 9,200 | 8.3100 | 76,452.00 |
| 8/19/2002 | 490,000 | 8.3819 | 4,113,856.15 |
| 11/22/2002 | 500,000 | 8.6673 | 4,333,650.00 |
| 2/19/2003 | 500,000 | 9.0382 | 4,519,100.00 |
| 5/7/2003 | 500,000 | 12.0515 | 6,025,750.00 |
| 7/15/2003 | 500,000 | 14.8264 | 7,413,200.00 |
| 10/15/2003 | 155,000 | 15.3406 | 2,377,793.00 |
| 10/15/2003 | 150,000 | 17.2707 | 2,590,605.00 |
| 10/16/2003 | 95,000 | 17.2014 | 1,634,133.00 |
| 10/16/2003 | 100,000 | 17.1439 | 1,714,390.00 |
| 1/21/2004 | 500,000 | 29.7469 | 14,873,450.00 |
| 5/26/2004 | 200,000 | 21.3543 | 4,270,860.00 |
| 5/26/2004 | 300,000 | 21.3510 | 6,405,300.00 |
| 7/16/2004 | 200,000 | 23.9998 | 4,799,960.00 |
| 7/16/2004 | 300,000 | 24.0704 | 7,221,120.00 |
| 10/24/2004 | 200,000 | 24.0111 | 4,802,220.00 |
| 10/24/2004 | 300,000 | 24.0111 | 7,203,330.00 |
| 5/4/2005 | 200,000 | 23.1811 | 4,636,220.00 |
| 5/4/2005 | 50,000 | 23.2221 | 1,161,105.00 |
| 5/4/2005 | 250,000 | 22.7159 | 5,678,975.00 |
| 7/29/2005 | 400,000 | 24.0576 | 9,623,040.00 |
| 8/1/2005 | 100,000 | 24.0524 | 2,405,240.00 |
| 10/26/2005 | 500,000 | 23.1536 | 11,576,800.00 |
| Total | 6,999,200 | | 130,971,759.15 |

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**Pradeep Sindhu – Stock Sales**

| Date | No. of Shares Sold | Price Per Share | Proceeds ($) |
|---|---|---|---|
| 10/19/2001 | 50,000 | 21.5900 | |
| 10/24/2001 | 40,000 | 25.2375 | 1,009,500.00 |
| 10/26/2001 | 40,000 | 25.5100 | 1,020,400.00 |
| 4/15/2003 | 200,000 | 9.8869 | 1,977,380.00 |
| 5/7/2003 | 100,000 | 12.1948 | 1,219,480.00 |
| 5/12/2003 | 100,000 | 12.5110 | 1,251,098.00 |
| 7/24/2003 | 100,000 | 14.3921 | 1,439,209.00 |
| 8/19/2003 | 100,000 | 14.5949 | 1,459,490.00 |
| 8/20/2003 | 50,000 | 15.3941 | 769,705.00 |
| 8/22/2003 | 50,000 | 15.5240 | 776,200.00 |
| 10/21/2003 | 50,000 | 17.1662 | 858,310.00 |
| 10/28/2003 | 50,000 | 17.3010 | 865,050.00 |
| 10/29/2003 | 25,000 | 17.7000 | 442,500.00 |
| 10/30/2003 | 50,000 | 18.0370 | 901,850.00 |
| 1/21/2004 | 100,000 | 29.6574 | 2,965,740.00 |
| 1/27/2004 | 100,000 | 29.3286 | 2,932,860.00 |
| 5/13/2004 | 50,000 | 22.5192 | 1,125,960.00 |
| 8/3/2004 | 108,895 | 22.7514 | 2,477,513.70 |
| 8/5/2004 | 100 | 22.7500 | 2,275.00 |
| 8/6/2004 | 100,000 | 21.5809 | 2,158,090.00 |
| 8/10/2004 | 91,005 | 21.4712 | 1,953,986.56 |
| 2/2/2005 | 50,000 | 24.6668 | 1,233,340.00 |
| 2/2/2005 | 50,000 | 24.6655 | 1,233,275.00 |
| 2/9/2005 | 50,000 | 23.4997 | 1,174,985.00 |
| 2/9/2005 | 50,000 | 23.4995 | 1,174,975.00 |
| 4/27/2005 | 50,000 | 22.9711 | 1,148,555.00 |
| 4/27/2005 | 50,000 | 22.9692 | 1,148,460.00 |
| 5/4/2005 | 200,000 | 23.0300 | 4,606,000.00 |
| 5/4/2005 | 100,000 | 23.0962 | 2,309,620.00 |
| 5/11/2005 | 50,000 | 23.4926 | 1,174,630.00 |
| 5/11/2005 | 50,000 | 23.3206 | 1,166,030.00 |
| 5/11/2005 | 50,000 | 23.3197 | 1,165,985.00 |
| 5/13/2005 | 50,000 | 24.2655 | 1,213,275.00 |
| 7/27/2005 | 50,000 | 23.4759 | 1,173,795.00 |
| 7/27/2005 | 50,000 | 23.4765 | 1,173,825.00 |
| 8/3/2005 | 50,000 | 24.3315 | 1,216,575.00 |
| 8/3/2005 | 50,000 | 24.3309 | 1,216,545.00 |
| 8/10/2005 | 100,000 | 34.5687 | 3,456,870.00 |

**Pradeep Sindhu – Stock Sales**

| Date | No. of Shares Sold | Price Per Share | Proceeds ($) |
|---|---|---|---|
| 10/26/2005 | 50,000 | 23.0317 | 1,151,585.00 |
| 10/26/2005 | 50,000 | 23.0348 | 1,151,740.00 |
| 11/2/2005 | 250,000 | 23.6172 | 5,904,300.00 |
| 11/2/2005 | 50,000 | 23.8683 | 1,193,415.00 |
| 11/2/2005 | 50,000 | 23.8740 | 1,193,700.00 |
| 11/9/2005 | 50,000 | 24.4183 | 1,220,915.00 |
| 11/9/2005 | 50,000 | 24.4198 | 1,220,990.00 |
| 1/25/2006 | 50,000 | 21.2985 | 1,064,925.00 |
| 1/25/2006 | 50,000 | 21.2941 | 1,064,705.00 |
| 2/1/2006 | 50,000 | 18.1984 | 909,920.00 |
| 2/8/2006 | 50,000 | 19.0063 | 950,315.00 |
| 2/8/2006 | 50,000 | 18.9939 | 949,695.00 |
| Total | 3,455,000 | | 73,649,042.26 |

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**Marcel Gani – Stock Sales**

| Date | No. of Shares Sold | Price Per Share | Proceeds ($) |
|---|---|---|---|
| 11/25/2002 | 100,000 | 9.5629 | 956,290.00 |
| 5/7/2003 | 50,000 | 12.3448 | 617,240.00 |
| 7/15/2003 | 50,000 | 14.6980 | 734,900.00 |
| 10/14/2003 | 50,000 | 17.6697 | 883,485.00 |
| 11/4/2003 | 50,000 | 18.5850 | 929,250.00 |
| 1/21/2004 | 50,000 | 29.5378 | 1,476,890.00 |
| 5/24/2004 | 50,000 | 20.5123 | 1,025,615.00 |
| 5/24/2004 | 50,000 | 20.5123 | 1,025,615.00 |
| 8/4/2004 | 50,000 | 22.2900 | 1,114,500.00 |
| 8/4/2004 | 50,000 | 22.2900 | 1,114,500.00 |
| 10/20/2004 | 50,000 | 24.1597 | 1,207,985.00 |
| 10/21/2004 | 25,000 | 24.1730 | 604,325.00 |
| 10/23/2004 | 25,000 | 24.1873 | 604,682.50 |
| Total | 650,000 | | 12,295,277.50 |

324. Each of the Executive Defendants sold his stock while in possession of material adverse non-public information concerning Juniper, namely, the Company's improper accounting for stock option grants that inflated Juniper's earnings. Accordingly, the Executive Defendants' massive insider trading supports a strong inference of scienter.

**The Resignations of Two Compensation Committee Directors and Juniper's CFO Support A Strong Inference of Scienter**

325. Juniper's knowledge and intent with respect to backdating and improper accounting for stock options is further supported by the fact that two of the three members of the Compensation Committee, Frank Marshall and defendant Levy, (a) resigned near the close of the Audit Committee's investigation regarding options backdating, and (b) such conduct occurred at other companies with which they were involved.

326. Levy is KLA's founder and former CEO, and served as Chairman of its Board of Directors until his October 16, 2006 resignation. The U.S. Department of Justice has launched an investigation into KLA's option grants. Moreover, KLA has admitted in its 2006 Form 10-K that "stock options, primarily those granted from July 1, 1997 to June 30, 2002 had been retroactively priced for all employees who received the grants and the retroactive pricing of options was intentional." KLA has restated its financial results for 2002 through 2005 and taken a stock-based compensation expense exceeding $375 million.

327. On October 16, 2006, KLA announced that in connection with Levy's resignation from KLA's Board of Directors, the company intended to reprice his outstanding backdated options to the market price on the date they were actually issued.

328. Levy is also currently on the Board of Directors of Extreme Network. According to Extreme Network's 2005 Proxy Statement, Levy has served as a director of the Board of Directors since October 2001, and served on Extreme Network's Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee. The U.S. Department of Justice has launched an investigation into Extreme Network's option grants. Moreover, Extreme Network has admitted that it would record compensation charges for option grants relating to fiscal periods 2000 through 2005 and the first, second and third quarters of 2006.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

329. Frank Marshall was also a Juniper director and a member of the Compensation Committee from 2004 until his resignation in February 2007 as the restated financials and the Audit Committee's findings were about to be publicly released. Marshall was concurrently a director of PMC. The U.S. Department of Justice has launched an investigation into PMC stock option grants. Moreover, PMC has admitted that as a result of improper accounting, it intends to restate its financial statements and record compensation charges up to $100 million.

330. Similarly, the resignation of CFO Robert Dykes immediately following Juniper's release of its 2006 10-K and 10-Qs for the second and third quarters 2006 supports a strong inference of at least recklessness in continuing to improperly account for the stock option grants in the Company's financial statements, in misrepresenting the Company's stock option practices, and in misrepresenting that the Company's internal control regarding financial reporting were effective.

**INAPPLICABILITY OF SAFE HARBOR**

331. Defendants' false and misleading statements and omissions do not constitute forward-looking statements protected by any statutory safe harbor. The statements alleged to be false and misleading herein all relate to facts and conditions existing at the time the statements were made. No statutory safe harbor applies to any of the defendants' material false or misleading statements.

332. Moreover, the statutory safe harbor is inapplicable with respect to the false and misleading statements included in Juniper's financial statements, which purported to be prepared in accordance with GAAP.

333. To the extent that any statutory safe harbor is intended to apply to any forward-looking statement pled herein, the safe harbor does not apply, because many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Juniper who knew that those statements were false when made.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**THE FRAUD-ON-THE-MARKET DOCTRINE**

334. The market for Juniper's securities was open, well developed, and efficient at all relevant times, for the following reasons (among others):

a. the Company's shares met the requirements for listing, and were listed and actively traded, on the NASDAQ National Market System;

b. as a regulated issuer, Juniper filed periodic public reports with the SEC;

c. Juniper regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the Company's website, Juniper.com, on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d. the market reacted immediately to publicly disseminated information by and concerning Juniper;

e. Juniper was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

f. the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Juniper securities; and

g. without knowledge of the misrepresented or omitted material facts, Lead Plaintiff and the other members of the Class purchased or otherwise acquired Juniper securities between the time defendants made the material misrepresentations and omissions and

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

the time the fraudulent backdating was being disclosed, during which time the price of Juniper securities was inflated by defendants' misrepresentations and omissions.

335. As a result of the foregoing, the market for Juniper's securities promptly digested current information regarding Juniper from all publicly available sources and reflected such information in Juniper's securities prices. Under these circumstances, all purchasers and acquirers of Juniper's securities during the Class Period suffered similar injury through their purchase or acquisition of Juniper's securities at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

336. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Juniper's securities prices and operated as a fraud or deceit on purchasers of Juniper securities by misrepresenting the Company's financial results, compensation practices, and internal controls. When the prior misrepresentations and fraudulent conduct began to be disclosed and became apparent to the market, Juniper stock declined as the prior artificial inflation came out of Juniper's securities prices. As a result of their purchases or acquisition of Juniper securities during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

337. The false and misleading representations concerning Juniper's financial results and management compensation – plus the non-disclosures of material facts concerning the Company's violation of Company and SEC policies and accounting regulations regarding compensation expenses – caused and maintained the artificial inflation in Juniper's securities prices throughout the Class Period and until the truth was slowly revealed to the market.

338. Starting in May 2006 through the end of the Class Period on August 10, 2006, investors began to learn the truth upon a number of disclosures, including Juniper's admissions, revealing, among other things, that: (a) Juniper had engaged in substantial backdating of stock option grants issued to, among others, officers, directors, and employees from June 1999 through the end of 2003; (b) Juniper's published financial statements during and prior to the Class Period were

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

materially misleading for failing to record compensation expenses associated with these stock option grants, and the Company's reported earnings were inflated; (c) senior management and directors had neither conducted themselves with integrity nor in the best interest of the Company's shareholders; and (d) the Executive Defendants sold shares of Juniper based on material non-public information. These revelations did not happen all at once, but rather were the result of investigation by financial analysts such as CFRA and J.P. Morgan, as well as other academics, journalists and investors, who pieced together facts concerning the ever-widening abusive stock options issuance practices at other companies and applied that analysis to Juniper to discover the fraud. As investors and the market became aware of the true facts, which had been misrepresented or obfuscated in Juniper's public filings, the prior artificial inflation came out of Juniper's securities prices, damaging investors.

339. As a result of these disclosures and the public revelations regarding Juniper's issuance of stock options, and the falsity about Juniper's previous Class Period representations, Juniper's stock price dropped from $16.87 on May 17, 2006 to as low as $12.20 on August 11, 2006. This drop removed the inflation from Juniper's stock price, causing economic loss to investors who had purchased the securities during the Class Period.

340. In sum, the economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other members of the Class was a direct result of the fraudulent scheme to artificially inflate Juniper's securities prices and the subsequent significant decline in the value of Juniper's securities when the truth was revealed.

341. In contrast, the post-Class Period rebound of Juniper's stock was attributable to new market conditions, macroeconomic or industry factors and Company-specific facts unrelated to the fraudulent conduct alleged herein.

## CAUSES OF ACTION

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

### (Against Juniper and Defendants Kriens, Sindhu, and Gani)

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

342. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

343. Lead Plaintiff asserts this Count against defendants Juniper, Kriens, Sindhu, and Gani (collectively, the "§ 10b Defendants") under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

344. During the Class Period, the § 10b Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) increase the value of Juniper stock options by backdating the reported grant dates and disguising this fact from investors; (b) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (c) artificially inflate and maintain the market price of Juniper's securities; and (d) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire Juniper's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the § 10b Defendants, and each of them, took the actions set forth herein.

345. The § 10b Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading by use of means or instrumentalities of interstate commerce; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers and acquirers of the Company's securities, which artificially inflated the market prices for Juniper's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

346. As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, the § 10b Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's compensation expenses and stock option practices so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information. The § 10b Defendants' material misrepresentations and omissions as set forth herein violated that duty.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

347. The § 10b Defendants engaged in the fraudulent activity described above knowingly or in such a reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the Class. The § 10b Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

348. As a result of the § 10b Defendants' fraudulent activity, the market price of Juniper was artificially inflated during the Class Period.

349. In ignorance of the true financial condition of Juniper, Lead Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Juniper containing the misleading information, purchased or otherwise acquired Juniper securities at artificially inflated prices during the Class Period.

350. The market price of Juniper's securities declined materially upon the public disclosure of the true facts which had been misrepresented or concealed as alleged herein.

351. Lead Plaintiff's and the Class' losses were proximately caused by the § 10b Defendants' active and primary participation in Juniper's scheme to defraud the investing public by, *inter alia*, falsifying the Company's financial results through the knowing or reckless failure to properly apply GAAP, and concealing adverse information regarding Juniper's stock option grant practices and the accounting for these compensation costs. Lead Plaintiff and the members of the Class purchased Juniper securities in reliance on the integrity of the market price of those securities. Lead Plaintiff's and the Class' losses were a direct and foreseeable consequence of the § 10b Defendants' failure to disclose and their concealment of, *inter alia*, the true state of Juniper's business operations and financial condition.

352. As a direct and proximate cause of the § 10b Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Juniper securities during the Class Period.

353. By virtue of the provisions of Fed. R. Civ. P. 15(c), this cause of action relates back to the filing of the *Hill* and *Garber* Complaints and thus was brought within two years after the discovery of the untrue statements and omissions and less than five years after the beginning of the Class Period.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**COUNT II**

**Violation of Section 20(a) of the Exchange Act**

**(Against the Individual Defendants)**

354. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

355. Lead Plaintiff asserts this Count against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

356. The Individual Defendants, through their positions of control and authority as officers and directors of the Company, were able to and did control, directly and indirectly, the content of the public statements disseminated by the Company, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Juniper's business affairs.

357. As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Juniper's financial condition and results of operations.

358. The Individual Defendants had direct involvement in the day-to-day operations of the Company, were senior officers of the Company, corporate officers with direct involvement in the Company's financial reporting and accounting functions, and/or were members of the Board of Directors, including certain of the Individual Defendants who served on its Audit and Compensation Committees, and therefore are presumed to have had the power to control or influence the particular transactions and disclosures giving rise to the securities violations alleged herein, and exercised same.

359. Juniper has admitted that its financial statements were materially false and misleading, as described above; and that the actions that materially overstated the financial results were deliberate. As a result, the market price of Juniper securities was artificially inflated. These admissions prove Juniper's primary violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

360. By reason of their management positions and/or control of the Board of Directors, the Individual Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to direct the management and the activities of the Company and its employees, and to cause the Company to engage in the unlawful conduct complained of herein. Because of their executive, officer and director positions within Juniper and control of the Board of Directors of Juniper, the Individual Defendants had access to adverse non-public financial information about the Company and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.

361. By virtue of their positions as controlling persons of Juniper, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

362. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Juniper securities during the Class Period.

363. By virtue of the provisions of Fed. R. Civ. P. 15(c), this cause of action relates back to the filing of the *Hill* and *Garber* Complaints and thus was brought within two years after the discovery of the untrue statements and omissions and less than five years after the beginning of the Class Period.

**COUNT III**

**For Violation of § 11 of the Securities Act**
**In Connection with the NetScreen Registration Statement**

**(Against All Defendants)**

364. Lead Plaintiff repeats and realleges the allegations in ¶¶ 1-303 and 331-341 above as if fully set forth herein. For purposes of this Count, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

365. Lead Plaintiff brings this Count against defendants pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all Class members who purchased or acquired Juniper stock issued pursuant to the NetScreen Registration Statement in exchange for NetScreen shares.

366. Juniper is the issuer of the common stock issued pursuant to the NetScreen Registration Statement. As the issuer, Juniper is strictly liable for the false and misleading statements and omissions contained therein under § 11 of the Securities Act.

367. The Individual Defendants were officers and/or directors of Juniper and each signed the NetScreen Registration Statement.

368. E&Y consented to its designation as an "expert" in the NetScreen Registration Statement. As such, it agreed to the inclusion of its opinion on Juniper's 2003 financial statements.

369. Defendants caused to be issued and participated in the issuance of materially false and misleading statements in the Registration Statement, which misrepresented or failed to disclose, *inter alia*, the adverse facts set forth above.

370. Lead Plaintiff does not allege in this Count that defendants acted with scienter, or were guilty of any scheme to defraud, or of any misrepresentations that were made knowingly or recklessly.

371. Lead Plaintiff and other Class members purchased or acquired Juniper common stock which was traceable to the false and misleading NetScreen Registration Statement, without knowledge of the untruths or omissions alleged herein regarding the Company's improper accounting and compensation practices. Lead Plaintiff could not have reasonably discovered the nature of these defendants' untruths and omissions.

372. As a result of their purchases or acquisitions of the Juniper stock issued pursuant to the NetScreen merger, Lead Plaintiff and other Class members have suffered damages. By reason of the conduct alleged herein, each of the defendants violated § 11 of the Securities Act.

373. By virtue of the provisions of Fed. R. Civ. P. 15(c), this cause of action relates back to the filing of the *Hill* and *Garber* Complaints and thus was brought within one year after the discovery of the untrue statements and omissions and less than three years after the NetScreen Registration Statement was issued.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**COUNT IV**

**For Violations of § 15 of the Securities Act**
**In Connection with the NetScreen Registration Statement**

**(Against the Individual Defendants)**

374. Lead Plaintiff repeats and realleges the allegations in ¶¶ 1-303, 331-341, and 364-373 above as if fully set forth herein. For purposes of this Count, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

375. Lead Plaintiff asserts this Count against the Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

376. The Individual Defendants at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Juniper's business affairs.

377. As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Juniper's financial condition and results of operations.

378. Because of their positions of control and authority as senior officers and directors of Juniper, the Individual Defendants were able to, and did, control the contents of the NetScreen Registration Statement which Juniper has admitted contained materially false financial information, thereby constituting violations of § 11 of the 1933 Act. The Individual Defendants therefore were "controlling persons" of Juniper within the meaning of § 15 of the 1933 Act.

379. The NetScreen Registration Statement, at the time it became effective, contained material misrepresentations of fact and omitted facts necessary to make the facts stated therein not misleading. Juniper has admitted the material falsity of its financial statements which were summarized and incorporated by reference in the NetScreen Registration Statement.

380. Lead Plaintiff and other Class members received or purchased Juniper common stock traceable to the false and misleading NetScreen Registration Statement. Lead Plaintiff and the other

Class members could not reasonably have discovered the nature of the false and misleading statements.

381. As a result of their purchases or acquisitions of Juniper common stock issued pursuant to the NetScreen Registration Statement, Lead Plaintiff and other Class members have suffered damages.

382. By virtue of the provisions of Fed. R. Civ. P. 15(c), this cause of action relates back to the filing of the *Hill* and *Garber* Complaints and thus was brought within one year after the discovery of the untrue statements and omissions and less than three years after the NetScreen Registration Statement was issued.

**COUNT V**

**For Violation of § 11 of the Securities Act**
**In Connection with the November 2003 Notes Offering**

**(Against All Defendants (Excluding E&Y, Calderoni and Goldman))**

383. Lead Plaintiff repeats and realleges the allegations in ¶¶ 1-303, 331-341 and 364-382 above as if fully set forth herein. For purposes of this Count, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

384. Lead Plaintiff brings this Count against defendants (excluding E&Y, Calderoni and Goldman) pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all Class members who purchased or acquired the Notes issued pursuant to the Notes Registration Statement.

385. Juniper is the issuer of the Notes issued pursuant to the Notes Registration Statement. As the issuer, Juniper is strictly liable for the false and misleading statements and omissions contained therein under § 11 of the Securities Act.

386. The Individual Defendants (excluding E&Y, Calderoni and Goldman) were officers and/or directors of Juniper and each signed the Notes Registration Statement.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

387. Defendants (excluding E&Y, Calderoni and Goldman) caused to be issued and participated in the issuance of materially false and misleading statements in the Notes Registration Statement, which misrepresented or failed to disclose, *inter alia*, the adverse facts set forth above.

388. Lead Plaintiff does not allege in this Count that defendants (excluding E&Y, Calderoni and Goldman) acted with scienter, or were guilty of any scheme to defraud, or of any misrepresentations that were made knowingly or recklessly.

389. Lead Plaintiff and other Class did not have knowledge of the untruths or omissions alleged herein regarding the Company's improper accounting and compensation practices, and could not have reasonably discovered the nature of these defendants' untruths and omissions.

390. Purchasers of the Juniper Notes issued pursuant to or traceable to the Notes Registration Statement have suffered damages. By reason of the conduct alleged herein, each of the defendants (excluding E&Y, Calderoni and Goldman) violated § 11 of the Securities Act.

391. By virtue of the provisions of Fed. R. Civ. P. 15(c), this cause of action relates back to the filing of the *Hill* and *Garber* Complaints and thus was brought within one year after the discovery of the untrue statements and omissions and less than three years after the Notes Registration Statement was issued.

## COUNT VI

### For Violations of § 15 of the Securities Act In Connection with the November 2003 Notes Offering

### (Against the Individual Defendants (Excluding Calderoni and Goldman))

392. Lead Plaintiff repeats and realleges the allegations in ¶¶ 1-303, 331-341, and 364-391 above as if fully set forth herein. For purposes of this Count, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

393. Lead Plaintiff asserts this Count against the Individual Defendants (excluding Calderoni and Goldman) for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

394.    The Individual Defendants (excluding Calderoni and Goldman) at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Juniper's business affairs.

395.    As officers and directors of a publicly owned company, the Individual Defendants (excluding Calderoni and Goldman) had a duty to disseminate accurate and truthful information with respect to Juniper's financial condition and results of operations.

396.    Because of their positions of control and authority as senior officers and directors of Juniper, the Individual Defendants (excluding Calderoni and Goldman) were able to, and did, control the contents of the Notes Registration Statement which Juniper has admitted contained materially false financial information, thereby constituting violations of § 11 of the 1933 Act.  The Individual Defendants (excluding Calderoni and Goldman) therefore were "controlling persons" of Juniper within the meaning of § 15 of the 1933 Act.

397.    The Notes Registration Statement, at the time it became effective, contained material misrepresentations of fact and omitted facts necessary to make the facts stated therein not misleading.  Juniper has admitted the material falsity of its financial statements which were summarized and incorporated by reference in the Notes Registration Statement.

398.    Lead Plaintiff did not have knowledge of the untruths or omissions alleged herein, and could not reasonably have discovered the nature of the false and misleading statements.

399.    Purchasers of Juniper Notes issued pursuant to or traceable to the Notes Registration Statement have suffered damages.

400.    By virtue of the provisions of Fed. R. Civ. P. 15(c), this cause of action relates back to the filing of the *Hill* and *Garber* Complaints and thus was brought within one year after the discovery of the untrue statements and omissions, and within three years after the Notes Registration Statement was issued.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a class action under Rule 23, Fed. R. Civ. P.;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Lead Plaintiff demands a trial by jury.

Dated: April 9, 2007

LOWEY DANNENBERG BEMPORAD SELINGER & COHEN, P.C.

Richard Bemporad

RICHARD BEMPORAD (Admitted Pro Hac Vice)
NEIL L. SELINGER (Admitted Pro Hac Vice)
DAVID C. HARRISON (Admitted Pro Hac Vice)
JEANNE D'ESPOSITO
STACEY E. BLAUSTEIN
One North Broadway
White Plains, New York 10601-2310
Telephone: 914-997-0500

*Lead Counsel for Lead Plaintiff the New York City Pension Funds and the Putative Class*

SCHUBERT & REED LLP
WILLEM F. JONCKHEER S.B.N. 178748
Three Embarcadero Center, Suite 1650
San Francisco, California 94111
Telephone: 415-788-4220

*Local Counsel*

# EXHIBIT A

AMENDED CERTIFICATION RE: LEAD PLAINTIFF

I, Lewis Finkelman, as Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, hereby certify as follows:

1. I am fully authorized to enter into and execute this Amended Certification on behalf of the New York City Teachers' Retirement System (hereinafter "Teachers").

2. Teachers did not purchase or acquire the securities of Juniper Networks, Inc. ("Juniper") at the direction of counsel or in order to participate in any private action under the federal securities laws.

3. I have reviewed the Amended Consolidated Class Action Complaint filed against Juniper and others, captioned *In re Juniper Networks, Inc. Securities Litigation*, 06-CV-04327 (JW), alleging violations of the securities laws on behalf of all those who purchased or otherwise acquired Juniper securities from July 12, 2001 through and including August 10, 2006 (the "Class Period"). As of this date, Teachers adopts these claims and Class Period.

4. Teachers is willing to serve as lead plaintiff in these consolidated cases, including providing testimony at deposition and trial, if necessary.

5. Teachers' transactions in the securities of Juniper during the Class Period are identified in the annexed chart.

6. Teachers has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years.

7. Teachers will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: April 6, 2007

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller

***New York City Teachers Retirement System***

***Juniper Networks Inc. Common Stock Transactions (Amended)***

| Trade Date | Trans | Shares Bought | Shares Sold | Price / Share | (Cost) / Proceeds |
|---|---|---|---|---|---|
| 10/15/01 | Buy | 1,631.00 | | 20.5250 | (33,476.27) |
| 10/15/01 | Buy | 5,969.00 | | 20.3110 | (121,238.75) |
| 10/31/01 | Buy | 10,824.00 | | 22.1900 | (240,184.56) |
| 10/31/01 | Buy | 9,776.00 | | 22.1950 | (216,978.32) |
| 01/31/03 | Buy | 1,249.00 | | 8.7750 | (10,959.98) |
| 01/31/03 | Buy | 20,193.00 | | 8.7700 | (177,092.61) |
| 03/14/03 | Buy | 20,500.00 | | 8.5500 | (175,270.90) |
| 12/01/03 | Buy | 47,700 | | $19.085 | ($910,354.500) |
| 12/02/03 | Buy | 16,200 | | $18.821 | ($304,900.200) |
| 01/30/04 | Sell | | (10,800) | $28.649 | $309,409.200 |
| 01/30/04 | Sell | | (1,500) | $28.814 | $43,221.000 |
| 02/19/04 | Buy | 19,112 | | $26.692 | ($510,137.504) |
| 02/27/04 | Buy | 12,607 | | $25.888 | ($326,363.713) |
| 03/01/04 | Sell | | (15,000) | $25.670 | $385,056.000 |
| 04/20/04 | Sell | | (11,600.00) | $25.380 | $294,408.00 |
| 04/22/04 | Shares Rec'd in Merger w/ Netscreen Techs. | 4,640.00 | | $25.170 | ($116,788.80) |
| 04/22/04 | Shares Rec'd in Merger w/ Netscreen Techs. | 19,936.00 | | $25.170 | ($501,789.12) |
| 04/30/04 | Buy | 6,800.00 | | $24.200 | ($164,560.00) |
| 05/01/04 | Fraction of shares rec'd in merger | 0.80 | | $25.170 | ($20.14) |
| 05/01/04 | Sell | | (0.80) | $20.070 | $20.07 |
| 05/07/04 | Buy | 13,089.00 | | $23.540 | ($308,115.06) |
| 05/25/04 | Buy | 2,240.00 | | $21.620 | ($48,428.80) |
| 06/01/04 | Fraction of shares rec'd in merger | 0.22 | | $25.170 | ($5.54) |
| 06/01/04 | Sell | | (0.22) | $25.091 | $5.52 |
| 06/15/04 | Buy | 10,966.00 | | $20.760 | ($227,654.16) |
| 06/15/04 | Buy | 8,659.00 | | $20.760 | ($179,760.84) |
| 06/24/04 | Buy | 8,700.00 | | $23.170 | ($201,579.00) |
| 06/25/04 | Buy | 92,574.00 | | $24.220 | ($2,242,142.28) |
| 06/25/04 | Buy | 24,700.00 | | $24.240 | ($598,728.00) |
| 07/31/04 | Sell | | (17,185.00) | $21.875 | $375,923.59 |
| 07/31/04 | Sell | | (16,515.00) | $22.150 | $365,798.99 |
| 10/26/04 | Buy | 4,971.00 | | $24.250 | ($120,546.75) |
| 11/24/04 | Sell | | (4,800.00) | $0.000 | $137,424.00 |
| 01/26/05 | Sell | | (3,400.00) | $24.570 | $83,538.00 |
| 08/11/05 | Buy | 3,600.00 | | $23.790 | ($85,644.00) |
| 06/30/06 | Buy | 5,400.00 | | $15.990 | ($86,346.00) |

**AMENDED CERTIFICATION RE: LEAD PLAINTIFF**

I, Lewis Finkelman, as Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, hereby certify as follows:

1. I am fully authorized to enter into and execute this Amended Certification on behalf of the New York City Fire Department Pension Fund (hereinafter "Fire").

2. Fire did not purchase or acquire the securities of Juniper Networks, Inc. ("Juniper") at the direction of counsel or in order to participate in any private action under the federal securities laws.

3. I have reviewed the Amended Consolidated Class Action Complaint filed against Juniper and others, captioned *In re Juniper Networks, Inc. Securities Litigation*, 06-CV-04327 (JW), alleging violations of the securities laws on behalf of all those who purchased or otherwise acquired Juniper securities from July 12, 2001 through and including August 10, 2006 (the "Class Period"). As of this date, Fire adopts these claims and Class Period .

4. Fire is willing to serve as lead plaintiff in these consolidated cases, including providing testimony at deposition and trial, if necessary.

5. Fire's transactions in the securities of Juniper during the Class Period are identified in the annexed chart.

6. Fire has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years, except in *In re Take Two Interactive Securities Litigation*, Civil Action No. 1:06-CV-00803-SWK (S.D.N.Y.).

7. Fire will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: April 6, 2007

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller

*New York City Fire Department Pension Fund*

*Juniper Networks Inc. Common Stock Transactions (Amended)*

| Trade Date | Trans | Shares Bought | Shares Sold | Price / Share | (Cost) / Proceeds |
|---|---|---|---|---|---|
| 07/13/01 | Buy | 2,300.00 | | 29.2490 | (67,272.93) |
| 09/25/01 | Sell | | (800.00) | 11.8610 | 9,488.72 |
| 10/09/01 | Buy | 500.00 | | 15.0230 | (7,511.65) |
| 10/12/01 | Buy | 3,900.00 | | 20.2390 | (78,932.88) |
| 10/12/01 | Buy | 40,200.00 | | 20.4300 | (821,286.00) |
| 10/16/01 | Buy | 8,900.00 | | 22.0590 | (196,320.65) |
| 10/17/01 | Buy | 700.00 | | 22.6330 | (15,843.03) |
| 10/19/01 | Buy | 2,000.00 | | 22.7760 | (45,551.60) |
| 10/23/01 | Buy | 1,600.00 | | 24.2120 | (38,739.84) |
| 10/25/01 | Buy | 20,200.00 | | 26.2240 | (529,720.76) |
| 10/30/01 | Buy | 300.00 | | 23.7200 | (7,116.00) |
| 11/14/01 | Buy | 400.00 | | 23.8900 | (9,556.00) |
| 11/15/01 | Buy | 3,200.00 | | 25.0510 | (80,163.52) |
| 11/28/01 | Sell | | (1,600.00) | 24.4000 | 39,039.65 |
| 11/30/01 | Buy | 300.00 | | 24.5780 | (7,373.49) |
| 12/03/01 | Buy | 2,200.00 | | 23.5040 | (51,709.90) |
| 12/14/01 | Sell | | (2,900.00) | 20.2520 | 58,730.00 |
| 12/14/01 | Sell | | (20,400.00) | 20.1980 | 412,029.54 |
| 12/20/01 | Sell | | (48,900.00) | 19.1880 | 938,271.70 |
| 01/17/02 | Sell | | (400.00) | 17.3840 | 6,953.45 |
| 02/15/02 | Sell | | (4,000.00) | 10.4800 | 41,919.36 |
| 02/19/02 | Sell | | (200.00) | 10.5160 | 2,103.12 |
| 02/19/02 | Sell | | (200.00) | 10.5690 | 2,113.82 |
| 02/19/02 | Sell | | (200.00) | 10.1400 | 2,027.94 |
| 03/06/02 | Sell | | (3,500.00) | 12.3170 | 43,107.80 |
| 06/28/02 | Buy | 100.00 | | 5.6500 | (565.00) |
| 06/28/02 | Buy | 4,600.00 | | 5.6000 | (25,761.38) |
| 03/10/03 | Buy | 500.00 | | 8.5800 | (4,290.00) |
| 05/28/03 | Buy | 66,125 | | $13.913 | ($919,997.125) |
| 06/30/03 | Buy | 900 | | $12.348 | ($11,113.200) |
| 06/30/03 | Buy | 400 | | $12.470 | ($4,988.000) |
| 06/30/03 | Sell | | (4,700) | $12.470 | $58,609.000 |
| 07/17/03 | Buy | 23,100 | | $13.955 | ($322,360.500) |
| 07/18/03 | Buy | 400 | | $13.773 | ($5,509.200) |
| 07/21/03 | Buy | 5,500 | | $13.625 | ($74,937.500) |
| 07/21/03 | Buy | 31,000 | | $13.750 | ($426,250.000) |
| 07/22/03 | Buy | 83 | | $13.955 | ($1,158.265) |
| 08/06/03 | Sell | | (29,600) | $13.212 | $391,075.200 |
| 08/06/03 | Sell | | (36,525) | $13.178 | $481,326.450 |
| 08/22/03 | Sell | | (5,100) | $15.588 | $79,498.800 |
| 09/03/03 | Sell | | (13,300) | $17.732 | $235,835.600 |
| 09/04/03 | Sell | | (3,900) | $17.840 | $69,576.000 |
| 09/08/03 | Sell | | (3,100) | $17.630 | $54,653.000 |
| 09/09/03 | Sell | | (3,800) | $17.951 | $68,213.800 |
| 09/11/03 | Sell | | (3,800) | $16.704 | $63,475.200 |
| 09/12/03 | Sell | | (3,700) | $17.057 | $63,110.900 |

| | | | | | |
|---|---|---|---|---|---|
| 10/10/03 | Buy | 1,100 | | $17.666 | ($19,432.600) |
| 10/15/03 | Buy | 500 | | $17.222 | ($8,611.000) |
| 01/02/04 | Buy | 63,150 | | $19.491 | ($1,230,856.650) |
| 01/09/04 | Sell | | (6,600) | $22.081 | $145,734.600 |
| 01/09/04 | Buy | 10,450 | | $22.025 | ($230,161.250) |
| 01/12/04 | Sell | | (900) | $22.397 | $20,157.300 |
| 01/12/04 | Buy | 15,800 | | $23.265 | ($367,587.000) |
| 01/13/04 | Sell | | (4,500) | $23.026 | $103,617.000 |
| 01/14/04 | Buy | 7,100 | | $22.736 | ($161,425.600) |
| 01/16/04 | Buy | 9,700 | | $28.198 | ($273,520.600) |
| 01/29/04 | Buy | 12,700 | | $27.774 | ($352,729.800) |
| 01/30/04 | Buy | 900 | | $28.445 | ($25,600.500) |
| 01/30/04 | Buy | 3,300 | | $28.743 | ($94,851.900) |
| 02/02/04 | Buy | 4,800 | | $28.945 | ($138,936.000) |
| 02/03/04 | Sell | | (6,400) | $28.320 | $181,248.000 |
| 02/04/04 | Buy | 3,900 | | $28.131 | ($109,710.900) |
| 02/04/04 | Buy | 1,300 | | $27.960 | ($36,348.000) |
| 02/06/04 | Buy | 11,300 | | $29.490 | ($333,237.000) |
| 02/19/04 | Buy | 6,300 | | $27.325 | ($172,147.500) |
| 02/24/04 | Buy | 24,425 | | $24.901 | ($608,211.810) |
| 02/24/04 | Sell | | (11,383) | $24.766 | $281,912.858 |
| 02/25/04 | Sell | | (1,200) | $25.259 | $30,310.800 |
| 02/25/04 | Sell | | (1,400) | $25.012 | $35,016.800 |
| 03/02/04 | Buy | 5,700 | | $26.008 | ($148,246.740) |
| 03/12/04 | Buy | 5,800 | | $25.196 | ($146,138.540) |
| 03/16/04 | Buy | 5,800 | | $24.606 | ($142,716.540) |
| 03/17/04 | Buy | 5,900 | | $24.930 | ($147,084.640) |
| 03/25/04 | Buy | 4,600 | | $24.445 | ($112,447.000) |
| 03/25/04 | Buy | 5,200 | | $24.930 | ($129,636.000) |
| 03/29/04 | Buy | 3,000 | | $26.577 | ($79,731.000) |
| 04/02/04 | Buy | 5,400.00 | | $26.990 | ($145,746.00) |
| 04/07/04 | Buy | 5,500.00 | | $27.000 | ($148,500.00) |
| 04/16/04 | Sell | | (32,350.00) | $25.240 | $816,514.00 |
| 04/16/04 | Sell | | (8,225.00) | $25.210 | $207,352.25 |
| 04/22/04 | Shares Rec'd in Merger w/ Netscreen Techs. | 2,666.00 | | $25.170 | ($67,103.22) |
| 04/22/04 | Shares Rec'd in Merger w/ Netscreen Techs. | 3,931.00 | | $25.170 | ($98,943.27) |
| 04/22/04 | Buy | 5,600.00 | | $26.360 | ($147,616.00) |
| 04/27/04 | Buy | 6,300.00 | | $25.370 | ($159,831.00) |
| 04/30/04 | Sell | | (56,700.00) | $23.200 | $1,315,440.00 |
| 04/30/04 | Buy | 5,700.00 | | $22.410 | ($127,737.00) |
| 05/01/04 | Fraction of shares rec'd in merger | 0.20 | | $25.170 | ($5.03) |
| 05/01/04 | Sell | | (0.20) | $0.000 | $0.00 |
| 05/04/04 | Buy | 6,300.00 | | $22.940 | ($144,522.00) |
| 05/04/04 | Buy | 16,000.00 | | $23.270 | ($372,320.00) |

| | | | | | |
|---|---|---|---|---|---|
| 05/12/04 | Buy | 6,400.00 | | $22.080 | ($141,312.00) |
| 05/25/04 | Buy | 4,200.00 | | $21.700 | ($91,140.00) |
| 05/31/04 | Buy | 6,800.00 | | $20.880 | ($141,984.00) |
| 06/04/04 | Buy | 7,600.00 | | $20.350 | ($154,660.00) |
| 06/07/04 | Buy | 7,400.00 | | $19.900 | ($147,260.00) |
| 06/10/04 | Buy | 10,000.00 | | $20.840 | ($208,400.00) |
| 06/25/04 | Buy | 6,900.00 | | $24.220 | ($167,118.00) |
| 06/25/04 | Buy | 4,800.00 | | $24.240 | ($116,352.00) |
| 06/30/04 | Buy | 300.00 | | $23.900 | ($7,170.00) |
| 06/30/04 | Fraction of shares rec'd in merger | 0.20 | | $25.170 | ($5.03) |
| 06/30/04 | Sell | | (0.20) | $0.000 | $5.02 |
| 06/30/04 | Sell | | (15,100.00) | $24.000 | $362,400.00 |
| 07/14/04 | Buy | 56,775.00 | | $24.690 | ($1,401,774.75) |
| 07/26/04 | Buy | 100.00 | | $21.800 | ($2,180.00) |
| 08/17/04 | Buy | 6,200.00 | | $20.670 | ($128,154.00) |
| 08/24/04 | Buy | 5,900.00 | | $21.950 | ($129,505.00) |
| 08/25/04 | Buy | 100.00 | | $22.620 | ($2,262.00) |
| 09/03/04 | Buy | 200.00 | | $23.170 | ($4,634.00) |
| 10/04/04 | Buy | 34,925.00 | | $24.980 | ($872,426.50) |
| 10/26/04 | Buy | 100.00 | | $24.250 | ($2,425.00) |
| 11/04/04 | Buy | 300.00 | | $27.010 | ($8,103.00) |
| 11/09/04 | Buy | 100.00 | | $27.150 | ($2,715.00) |
| 11/22/04 | Sell | | (10,500.00) | $27.730 | $291,165.00 |
| 12/22/04 | Sell | | (200.00) | $27.050 | $5,410.00 |
| 12/22/04 | Sell | | (300.00) | $27.050 | $8,115.00 |
| 12/31/04 | Sell | | (80,504.00) | $27.140 | $2,184,878.56 |
| 12/31/04 | Sell | | (20,096.00) | $27.190 | $546,410.24 |
| 01/03/05 | Buy | 500.00 | | $27.040 | ($13,520.00) |
| 01/03/05 | Buy | 300.00 | | $27.150 | ($8,145.00) |
| 01/03/05 | Buy | 600.00 | | $26.960 | ($16,176.00) |
| 01/06/05 | Buy | 500.00 | | $25.800 | ($12,900.00) |
| 01/07/05 | Buy | 300.00 | | $25.650 | ($7,695.00) |
| 01/10/05 | Buy | 900.00 | | $25.760 | ($23,184.00) |
| 01/10/05 | Buy | 800.00 | | $25.860 | ($20,688.00) |
| 01/12/05 | Buy | 5,500.00 | | $26.060 | ($143,330.00) |
| 01/18/05 | Buy | 600.00 | | $26.380 | ($15,828.00) |
| 01/18/05 | Buy | 200.00 | | $26.360 | ($5,272.00) |
| 01/18/05 | Buy | 100.00 | | $26.370 | ($2,637.00) |
| 01/18/05 | Buy | 600.00 | | $26.340 | ($15,804.00) |
| 01/18/05 | Buy | 200.00 | | $26.320 | ($5,264.00) |
| 01/18/05 | Buy | 100.00 | | $26.320 | ($2,632.00) |
| 01/19/05 | Buy | 900.00 | | $25.680 | ($23,112.00) |
| 01/19/05 | Buy | 900.00 | | $25.880 | ($23,292.00) |
| 01/19/05 | Sell | | (36,325.00) | $25.530 | $927,377.25 |
| 01/24/05 | Buy | 200.00 | | $25.130 | ($5,026.00) |
| 01/24/05 | Buy | 700.00 | | $24.740 | ($17,318.00) |
| 01/25/05 | Sell | | (5,625.00) | $24.750 | $139,218.75 |
| 02/01/05 | Buy | 700.00 | | $24.940 | ($17,458.00) |
| 02/03/05 | Buy | 200.00 | | $23.180 | ($4,636.00) |
| 02/03/05 | Buy | 400.00 | | $23.210 | ($9,284.00) |

| | | | | | |
|---|---|---|---|---|---|
| 02/03/05 | Buy | 500.00 | | $23.200 | ($11,600.00) |
| 02/03/05 | Sell | | (49,750.00) | $23.200 | $1,154,200.00 |
| 02/28/05 | Buy | 4,734.00 | | $21.630 | ($102,396.42) |
| 02/28/05 | Buy | 6,300.00 | | $21.830 | ($137,529.00) |
| 02/28/05 | Buy | 6,865.00 | | $21.540 | ($147,872.10) |
| 02/28/05 | Buy | 38.00 | | $21.290 | ($809.02) |
| 02/28/05 | Buy | 1,003.00 | | $21.540 | ($21,604.62) |
| 02/28/05 | Buy | 10,660.00 | | $21.540 | ($229,616.40) |
| 03/07/05 | Buy | 26,575.00 | | $23.020 | ($611,756.50) |
| 03/07/05 | Buy | 10,600.00 | | $22.990 | ($243,694.00) |
| 03/08/05 | Buy | 9,300.00 | | $22.740 | ($211,482.00) |
| 03/31/05 | Buy | 500.00 | | $21.990 | ($10,995.00) |
| 04/20/05 | Buy | 600.00 | | $23.240 | ($13,944.00) |
| 04/20/05 | Buy | 1,700.00 | | $22.910 | ($38,947.00) |
| 04/20/05 | Sell | | (26,800.00) | $23.070 | $618,276.00 |
| 04/25/05 | Buy | 9,500.00 | | $22.840 | ($216,980.00) |
| 05/03/05 | Sell | | (13,400.00) | $22.920 | $307,128.00 |
| 05/04/05 | Sell | | (13,450.00) | $23.170 | $311,636.50 |
| 06/23/05 | Sell | | (1,800.00) | $27.440 | $49,392.00 |
| 06/24/05 | Sell | | (3,400.00) | $25.770 | $87,618.00 |
| 06/24/05 | Sell | | (1,300.00) | $25.600 | $33,280.00 |
| 06/24/05 | Sell | | (1,700.00) | $25.630 | $43,571.00 |
| 06/24/05 | Sell | | (900.00) | $25.620 | $23,058.00 |
| 06/27/05 | Sell | | (900.00) | $25.490 | $22,941.00 |
| 07/25/05 | Sell | | (3,625.00) | $23.000 | $83,375.00 |
| 07/25/05 | Sell | | (23,375.00) | $23.320 | $545,105.00 |
| 07/25/05 | Buy | 100.00 | | $23.030 | ($2,303.00) |
| 07/26/05 | Sell | | (17,675.00) | $23.230 | $410,590.25 |
| 07/28/05 | Sell | | (700.00) | $23.970 | $16,779.00 |
| 08/11/05 | Buy | 2,600.00 | | $23.590 | ($61,334.00) |
| 08/12/05 | Buy | 1,000.00 | | $23.360 | ($23,360.00) |
| 08/12/05 | Buy | 400.00 | | $23.500 | ($9,400.00) |
| 08/15/05 | Buy | 900.00 | | $23.530 | ($21,177.00) |
| 08/16/05 | Buy | 200.00 | | $23.570 | ($4,714.00) |
| 08/16/05 | Buy | 1,100.00 | | $23.590 | ($25,949.00) |
| 08/17/05 | Buy | 1,500.00 | | $23.550 | ($35,325.00) |
| 08/18/05 | Buy | 200.00 | | $23.390 | ($4,678.00) |
| 09/08/05 | Buy | 100.00 | | $24.080 | ($2,408.00) |
| 09/08/05 | Sell | | (500.00) | $24.060 | $12,030.00 |
| 09/27/05 | Sell | | (500.00) | $22.760 | $11,380.00 |
| 09/28/05 | Sell | | (300.00) | $23.560 | $7,068.00 |
| 11/02/05 | Buy | 15,000.00 | | $24.180 | ($362,700.00) |
| 11/02/05 | Buy | 15,125.00 | | $24.000 | ($363,000.00) |
| 11/03/05 | Buy | 23,250.00 | | $24.160 | ($561,720.00) |
| 11/21/05 | Buy | 100.00 | | $23.410 | ($2,341.00) |
| 01/03/06 | Sell | | (14,850.00) | $21.190 | $314,671.50 |
| 01/04/06 | Sell | | (5,600.00) | $21.180 | $118,608.00 |
| 01/04/06 | Sell | | (10,775.00) | $21.380 | $230,369.50 |
| 01/05/06 | Sell | | (8,700.00) | $21.690 | $188,703.00 |
| 01/05/06 | Sell | | (4,100.00) | $21.580 | $88,478.00 |
| 01/06/06 | Sell | | (6,525.00) | $21.810 | $142,310.25 |
| 01/06/06 | Sell | | (8,425.00) | $21.980 | $185,181.50 |

| | | | | | |
|---|---|---|---|---|---|
| 01/25/06 | Sell | | (300.00) | $21.620 | $6,486.00 |
| 01/26/06 | Buy | 16,600.00 | | $17.000 | ($282,200.00) |
| 01/30/06 | Sell | | (3,800.00) | $18.270 | $69,426.00 |
| 02/02/06 | Sell | | (100.00) | $18.150 | $1,815.00 |
| 02/03/06 | Sell | | (300.00) | $18.270 | $5,481.00 |
| 02/06/06 | Sell | | (500.00) | $18.450 | $9,225.00 |
| 02/06/06 | Sell | | (10,900.00) | $18.410 | $200,669.00 |
| 03/08/06 | Sell | | (11,600.00) | $19.400 | $225,040.00 |
| 03/31/06 | Sell | | (2,800.00) | $19.180 | $53,704.00 |
| 05/03/06 | Buy | 2,700.00 | | $18.130 | ($48,951.00) |
| 05/17/06 | Buy | 2,900.00 | | $16.740 | ($48,546.00) |
| 05/17/06 | Buy | 17,700.00 | | $16.820 | ($297,714.00) |
| 05/19/06 | Buy | 10,300.00 | | $15.650 | ($161,195.00) |
| 05/22/06 | Buy | 5,700.00 | | $15.460 | ($88,122.00) |
| 05/22/06 | Buy | 15,900.00 | | $15.440 | ($245,496.00) |
| 06/07/06 | Buy | 2,100.00 | | $16.850 | ($35,385.00) |
| 06/30/06 | Sell | | (1,200.00) | $16.000 | $19,200.00 |
| 7/12/2006 | Sell | | (1,800) | $14.75 | $26,550.00 |
| 7/12/2006 | Sell | | (10,000) | $14.75 | $147,500.00 |
| 7/13/2006 | Sell | | (4,700) | $14.54 | $68,338.00 |
| 7/13/2006 | Sell | | (13,000) | $14.60 | $189,800.00 |
| 7/14/2006 | Sell | | (11,200) | $14.19 | $158,928.00 |
| 7/14/2006 | Sell | | (8,900) | $14.18 | $126,202.00 |
| 7/25/2006 | Sell | | (8,100) | $13.54 | $109,674.00 |
| 7/25/2006 | Sell | | (13,300) | $13.55 | $180,215.00 |
| 7/25/2006 | Sell | | (1,100) | $13.62 | $14,982.00 |
| 7/26/2006 | Sell | | (2,000) | $13.60 | $27,200.00 |
| 7/26/2006 | Sell | | (5,300) | $13.66 | $72,398.00 |
| 7/26/2006 | Sell | | (3,300) | $13.47 | $44,451.00 |

**AMENDED CERTIFICATION RE: LEAD PLAINTIFF**

I, Lewis Finkelman, as Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, hereby certify as follows:

1. I am fully authorized to enter into and execute this Amended Certification on behalf of the New York City Police Department Pension Fund (hereinafter "Police").

2. Police did not purchase or acquire the securities of Juniper Networks, Inc. ("Juniper") at the direction of counsel or in order to participate in any private action under the federal securities laws.

3. I have reviewed the Amended Consolidated Class Action Complaint filed against Juniper and others, captioned *In re Juniper Networks, Inc. Securities Litigation*, 06-CV-04327 (JW), alleging violations of the securities laws on behalf of all those who purchased or otherwise acquired Juniper securities from July 12, 2001 through and including August 10, 2006 (the "Class Period"). As of this date, Police adopts these claims and Class Period.

4. Police is willing to serve as lead plaintiff in these consolidated cases, including providing testimony at deposition and trial, if necessary.

5. Police's transactions in the securities of Juniper during the Class Period are identified in the annexed chart.

6. Police has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years, except in *In re Take Two Interactive Securities Litigation*, Civil Action No. 1:06-CV-00803-SWK (S.D.N.Y.).

7. Police will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: April 6, 2007

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller

***New York City Police Pension Fund Article 2***
***Juniper Networks Inc. Common Stock Transactions (Amended)***

| Trade Date | Trans | Shares Bought | Shares Sold | Price / Share | (Cost) / Proceeds |
|---|---|---|---|---|---|
| 10/12/01 | Buy | 24,200.00 | | 20.2390 | (489,788.64) |
| 10/12/01 | Buy | 79,100.00 | | 20.4300 | (1,616,013.00) |
| 10/16/01 | Buy | 17,500.00 | | 22.0590 | (386,023.75) |
| 10/19/01 | Buy | 12,100.00 | | 22.7760 | (275,587.18) |
| 10/23/01 | Buy | 9,700.00 | | 24.2120 | (234,860.28) |
| 10/25/01 | Buy | 39,800.00 | | 26.2240 | (1,043,707.24) |
| 12/14/01 | Sell | | (18,100.00) | 20.2520 | 366,556.21 |
| 12/14/01 | Sell | | (40,200.00) | 20.1980 | 811,940.57 |
| 12/20/01 | Sell | | (96,200.00) | 19.1880 | 1,845,843.30 |
| 02/15/02 | Sell | | (24,300.00) | 10.4800 | 254,660.16 |
| 02/19/02 | Sell | | (1,000.00) | 10.5160 | 10,515.64 |
| 02/19/02 | Sell | | (1,100.00) | 10.1400 | 11,153.72 |
| 02/19/02 | Sell | | (1,200.00) | 10.5690 | 12,682.96 |
| 02/20/02 | Sell | | (300.00) | 10.0030 | 3,000.76 |
| 06/28/02 | Buy | 400.00 | | 5.6500 | (2,260.00) |
| 06/28/02 | Buy | 16,300.00 | | 5.6000 | (91,284.89) |
| 07/30/02 | Buy | 15,100.00 | | 8.4030 | (126,880.77) |
| 07/30/02 | Sell | | (1,100.00) | 7.5400 | 8,293.74 |
| 07/31/02 | Sell | | (30,200.00) | 8.3590 | 252,446.27 |
| 01/13/03 | Buy | 2,700.00 | | 9.3200 | (25,164.00) |
| 01/29/03 | Buy | 3,000.00 | | 9.1450 | (27,435.00) |
| 02/21/03 | Buy | 7,200.00 | | 8.9790 | (64,645.92) |
| 02/21/03 | Buy | 2,200.00 | | 8.7850 | (19,327.00) |
| 03/10/03 | Sell | | (1,200.00) | 8.5800 | 10,296.00 |
| 03/10/03 | Sell | | (2,300.00) | 8.7160 | 20,045.96 |
| 05/07/03 | Buy | 2,100 | | $11.951 | ($25,097.100) |
| 05/28/03 | Buy | 18,800 | | $13.934 | ($261,959.200) |
| 05/28/03 | Buy | 161,875 | | $13.913 | ($2,252,166.875) |
| 06/30/03 | Sell | | (5,400) | $12.371 | $66,803.400 |
| 06/30/03 | Buy | 1,800 | | $12.348 | ($22,226.400) |
| 06/30/03 | Buy | 700 | | $12.470 | ($8,729.000) |
| 08/06/03 | Sell | | (72,525) | $13.212 | $958,200.300 |
| 08/06/03 | Sell | | (89,350) | $13.178 | $1,177,454.300 |
| 12/01/03 | Buy | 41,900 | | $19.085 | ($799,661.500) |
| 12/02/03 | Buy | 14,200 | | $18.821 | ($267,258.200) |
| 01/02/04 | Buy | 180,375 | | $19.491 | ($3,515,689.125) |
| 01/16/04 | Buy | 27,700 | | $28.198 | ($781,084.600) |
| 01/30/04 | Sell | | (9,500) | $28.649 | $272,165.500 |
| 01/30/04 | Sell | | (1,300) | $28.814 | $37,458.200 |
| 02/06/04 | Buy | 16,900 | | $29.490 | ($498,381.000) |
| 02/24/04 | Buy | 4,300 | | $25.644 | ($110,270.060) |
| 02/24/04 | Buy | 69,800 | | $24.901 | ($1,738,103.760) |
| 03/01/04 | Sell | | (13,100) | $25.619 | $335,614.140 |
| 03/25/04 | Buy | 8,900 | | $24.930 | ($221,877.000) |
| 04/13/04 | Buy | 4,400.00 | | $26.170 | ($115,148.00) |
| 04/16/04 | Sell | | (92,400.00) | $25.240 | $2,332,176.00 |
| 04/16/04 | Sell | | (23,525.00) | $25.210 | $593,065.25 |

| | | | | | |
|---|---|---|---|---|---|
| 04/20/04 | Sell | | (10,200.00) | $25.380 | $258,876.00 |
| 04/22/04 | Shares Rec'd in Merger w/ Netscreen Techs. | 15,022.00 | | $25.170 | ($378,103.74) |
| 04/22/04 | Shares Rec'd in Merger w/ Netscreen Techs. | 7,722.00 | | $25.170 | ($194,362.74) |
| 04/30/04 | Sell | | (161,950.00) | $23.200 | $3,757,240.00 |
| 06/01/04 | Fraction of shares rec'd in merger | 0.80 | | $25.170 | ($20.14) |
| 06/01/04 | Sell | | (0.80) | $0.000 | $20.07 |
| 06/24/04 | Buy | 7,700.00 | | $23.170 | ($178,409.00) |
| 06/25/04 | Buy | 16,400.00 | | $24.240 | ($397,536.00) |
| 06/25/04 | Buy | 34,800.00 | | $24.220 | ($842,856.00) |
| 06/30/04 | Sell | | (25,800.00) | $24.000 | $619,200.00 |
| 07/14/04 | Buy | 162,200.00 | | $24.690 | ($4,004,718.00) |
| 07/19/04 | Buy | 1,400.00 | | $23.410 | ($32,774.00) |
| 07/26/04 | Sell | | (800.00) | $21.915 | $17,531.74 |
| 07/26/04 | Sell | | (8,600.00) | $21.800 | $187,480.00 |
| 07/27/04 | Sell | | (20,200.00) | $22.170 | $447,834.00 |
| 08/25/04 | Buy | 600.00 | | $22.620 | ($13,572.00) |
| 10/04/04 | Buy | 99,775.00 | | $24.980 | ($2,492,379.50) |
| 10/26/04 | Buy | 100.00 | | $24.250 | ($2,425.00) |
| 10/31/04 | Sell | | (1,300.00) | $25.820 | $33,566.00 |
| 11/09/04 | Buy | 400.00 | | $27.150 | ($10,860.00) |
| 11/24/04 | Sell | | (2,900.00) | $28.630 | $83,027.00 |
| 12/31/04 | Sell | | (18,736.00) | $27.190 | $509,431.84 |
| 12/31/04 | Sell | | (75,053.00) | $27.140 | $2,036,938.42 |
| 01/03/05 | Buy | 2,300.00 | | $27.040 | ($62,192.00) |
| 01/03/05 | Buy | 1,700.00 | | $27.150 | ($46,155.00) |
| 01/03/05 | Buy | 2,700.00 | | $26.960 | ($72,792.00) |
| 01/10/05 | Buy | 3,800.00 | | $25.760 | ($97,888.00) |
| 01/10/05 | Buy | 3,000.00 | | $25.860 | ($77,580.00) |
| 01/18/05 | Buy | 2,400.00 | | $26.380 | ($63,312.00) |
| 01/18/05 | Buy | 600.00 | | $26.360 | ($15,816.00) |
| 01/18/05 | Buy | 500.00 | | $26.370 | ($13,185.00) |
| 01/18/05 | Buy | 2,000.00 | | $26.340 | ($52,680.00) |
| 01/18/05 | Buy | 900.00 | | $26.320 | ($23,688.00) |
| 01/18/05 | Buy | 300.00 | | $26.320 | ($7,896.00) |
| 01/19/05 | Sell | | (65,800.00) | $25.530 | $1,679,874.00 |
| 01/19/05 | Buy | 3,400.00 | | $25.680 | ($87,312.00) |
| 01/19/05 | Buy | 3,400.00 | | $25.880 | ($87,992.00) |
| 01/24/05 | Buy | 800.00 | | $25.130 | ($20,104.00) |
| 01/24/05 | Buy | 2,700.00 | | $24.740 | ($66,798.00) |
| 02/01/05 | Buy | 2,800.00 | | $24.940 | ($69,832.00) |
| 02/03/05 | Sell | | (102,386.00) | $23.200 | $2,375,355.20 |
| 02/03/05 | Buy | 600.00 | | $23.180 | ($13,908.00) |
| 02/03/05 | Buy | 100.00 | | $23.250 | ($2,325.00) |
| 02/03/05 | Buy | 1,500.00 | | $23.210 | ($34,815.00) |
| 02/03/05 | Buy | 1,900.00 | | $23.200 | ($44,080.00) |
| 02/22/05 | Sell | | (200.00) | $21.450 | $4,290.00 |
| 03/07/05 | Buy | 54,375.00 | | $23.020 | ($1,251,712.50) |

| | | | | | |
|---|---|---|---|---|---|
| 03/07/05 | Buy | 21,675.00 | | $22.990 | ($498,308.25) |
| 03/08/05 | Buy | 19,025.00 | | $22.740 | ($432,628.50) |
| 03/15/05 | Buy | 44,800.00 | | $22.040 | ($987,392.00) |
| 03/28/05 | Sell | | (4,800.00) | $21.220 | $101,856.00 |
| 04/20/05 | Buy | 1,400.00 | | $23.240 | ($32,536.00) |
| 04/20/05 | Buy | 3,900.00 | | $22.910 | ($89,349.00) |
| 04/22/05 | Buy | 12,100.00 | | $22.790 | ($275,759.00) |
| 04/22/05 | Buy | 15,081.00 | | $22.790 | ($343,695.99) |
| 04/22/05 | Buy | 9,000.00 | | $22.790 | ($205,110.00) |
| 04/30/05 | Sell | | (125.00) | $22.240 | $2,780.00 |
| 05/02/05 | Buy | 17,000.00 | | $22.620 | ($384,540.00) |
| 07/25/05 | Sell | | (57,527.00) | $23.320 | $1,341,529.64 |
| 07/25/05 | Sell | | (8,935.00) | $23.000 | $205,505.00 |
| 07/25/05 | Sell | | (400.00) | $23.030 | $9,212.00 |
| 07/26/05 | Sell | | (43,569.00) | $23.230 | $1,012,107.87 |
| 11/02/05 | Buy | 35,825.00 | | $24.180 | ($866,248.50) |
| 11/02/05 | Buy | 36,100.00 | | $24.000 | ($866,400.00) |
| 11/03/05 | Buy | 55,575.00 | | $24.160 | ($1,342,692.00) |
| 01/03/06 | Sell | | (35,475.00) | $21.190 | $751,715.25 |
| 01/04/06 | Sell | | (25,725.00) | $21.380 | $550,000.50 |
| 01/04/06 | Sell | | (15,300.00) | $21.180 | $324,054.00 |
| 01/05/06 | Sell | | (9,800.00) | $21.580 | $211,484.00 |
| 01/05/06 | Sell | | (20,800.00) | $21.690 | $451,152.00 |
| 01/06/06 | Sell | | (15,575.00) | $21.810 | $339,690.75 |
| 01/06/06 | Sell | | (20,125.00) | $21.980 | $442,347.50 |
| 01/26/06 | Buy | 17,800.00 | | $17.000 | ($302,600.00) |
| 01/30/06 | Sell | | (10,700.00) | $18.270 | $195,489.00 |
| 02/06/06 | Sell | | (1,200.00) | $18.450 | $22,140.00 |
| 02/06/06 | Sell | | (29,900.00) | $18.410 | $550,459.00 |
| 03/08/06 | Sell | | (12,600.00) | $19.400 | $244,440.00 |
| 04/24/06 | Buy | 12,800.00 | | $17.540 | ($224,512.00) |
| 05/17/06 | Buy | 3,100.00 | | $16.740 | ($51,894.00) |
| 05/17/06 | Buy | 19,100.00 | | $16.820 | ($321,262.00) |
| 05/19/06 | Buy | 11,200.00 | | $15.650 | ($175,280.00) |
| 05/22/06 | Buy | 6,200.00 | | $15.460 | ($95,852.00) |
| 05/22/06 | Buy | 17,100.00 | | $15.440 | ($264,024.00) |
| 06/07/06 | Buy | 14,200.00 | | $16.860 | ($239,412.00) |
| 06/30/06 | Sell | | (4,400.00) | $16.000 | $70,400.00 |
| 06/30/06 | Sell | | (4,900.00) | $16.010 | $78,449.00 |
| 06/30/06 | Sell | | (1,600.00) | $15.990 | $25,584.00 |
| 7/12/2006 | Sell | | (1,800) | $14.75 | $26,550.00 |
| 7/12/2006 | Sell | | (10,900) | $14.75 | $160,775.00 |
| 7/13/2006 | Sell | | (5,100) | $14.54 | $74,154.00 |
| 7/13/2006 | Sell | | (14,000) | $14.60 | $204,400.00 |
| 7/14/2006 | Sell | | (12,100) | $14.19 | $171,699.00 |
| 7/14/2006 | Sell | | (9,600) | $14.18 | $136,128.00 |
| 7/25/2006 | Sell | | (14,300) | $13.55 | $193,765.00 |
| 7/25/2006 | Sell | | (1,200) | $13.62 | $16,344.00 |
| 7/25/2006 | Sell | | (8,700) | $13.54 | $117,798.00 |
| 7/26/2006 | Sell | | (2,200) | $13.60 | $29,920.00 |
| 7/26/2006 | Sell | | (5,700) | $13.66 | $77,862.00 |
| 7/26/2006 | Sell | | (3,500) | $13.47 | $47,145.00 |

# AMENDED CERTIFICATION RE: LEAD PLAINTIFF

I, Lewis Finkelman, as Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, hereby certify as follows:

1. I am fully authorized to enter into and execute this Amended Certification on behalf of the New York City Employees' Retirement System (hereinafter "NYCERS").

2. NYCERS did not purchase or acquire the securities of Juniper Networks, Inc. ("Juniper") at the direction of counsel or in order to participate in any private action under the federal securities laws.

3. I have reviewed the Amended Consolidated Class Action Complaint filed against Juniper and others, captioned *In re Juniper Networks, Inc. Securities Litigation*, 06-CV-04327 (JW), alleging violations of the securities laws on behalf of all those who purchased or otherwise acquired Juniper securities from July 12, 2001 through and including August 10, 2006 (the "Class Period"). As of this date, NYCERS adopts these claims and Class Period.

4. NYCERS is willing to serve as lead plaintiff in these consolidated cases, including providing testimony at deposition and trial, if necessary.

5. NYCERS' transactions in the securities of Juniper during the Class Period are identified in the annexed chart.

6. NYCERS has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years, except in *In re Take Two Interactive Securities Litigation*, Civil Action No. 1:06-CV-00803-SWK (S.D.N.Y.); and *Vogel v. Jobs, et al.*, Civil Action No. 06-CV-05208 (JF) (N.D. Cal.).

7. NYCERS will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: April 6, 2007

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller

*New York City Employees' Retirement System*
*Juniper Networks Inc. Common Stock Transactions (Amended)*

| Trade Date | Trans | Shares Bought | Shares Sold | Price / Share | (Cost) / Proceeds |
|---|---|---|---|---|---|
| 07/13/01 | Buy | 5,100.00 | | 29.2490 | (149,170.41) |
| 08/09/01 | Sell | | (4,900.00) | 23.5160 | 115,227.49 |
| 08/10/01 | Sell | | (4,100.00) | 22.8660 | 93,750.75 |
| 08/13/01 | Sell | | (5,900.00) | 22.8810 | 134,997.52 |
| 08/14/01 | Sell | | (4,150.00) | 23.6590 | 98,185.72 |
| 09/21/01 | Buy | 9,500.00 | | 11.1000 | (105,450.00) |
| 09/21/01 | Buy | 600.00 | | 11.1050 | (6,663.00) |
| 09/24/01 | Buy | 9,000.00 | | 12.2900 | (110,610.00) |
| 11/15/01 | Buy | 7,300.00 | | 25.0510 | (182,873.03) |
| 11/30/01 | Buy | 1,200.00 | | 24.5800 | (29,496.00) |
| 12/05/01 | Buy | 2,200.00 | | 25.2300 | (55,506.00) |
| 12/12/01 | Buy | 1,600.00 | | 24.0530 | (38,484.00) |
| 01/17/02 | Sell | | (1,200.00) | 17.3840 | 20,860.36 |
| 02/22/02 | Sell | | (3,900.00) | 9.2600 | 36,112.28 |
| 02/28/02 | Sell | | (15,385.00) | 9.3150 | 143,309.11 |
| 02/28/02 | Sell | | (11,915.00) | 9.3200 | 111,046.13 |
| 03/06/02 | Sell | | (11,200.00) | 12.3170 | 137,944.96 |
| 03/28/02 | Sell | | (900.00) | 12.6200 | 11,358.00 |
| 04/01/02 | Sell | | (900.00) | 12.9790 | 11,681.10 |
| 04/02/02 | Sell | | (5,500.00) | 12.4070 | 68,239.19 |
| 04/02/02 | Sell | | (1,600.00) | 12.9660 | 20,745.93 |
| 08/30/02 | Buy | 13,800.00 | | 7.2550 | (100,113.48) |
| 11/25/02 | Buy | 4,000.00 | | 9.5520 | (38,206.40) |
| 01/10/03 | Buy | 11,942.00 | | 9.4460 | (112,807.71) |
| 01/21/03 | Buy | 8,500.00 | | 9.0880 | (77,245.45) |
| 01/21/03 | Buy | 8,500.00 | | 9.2530 | (78,653.90) |
| 01/31/03 | Buy | 783.00 | | 8.7750 | (6,870.83) |
| 01/31/03 | Buy | 12,656.00 | | 8.7700 | (110,993.12) |
| 02/13/03 | Buy | 14,200.00 | | 8.3020 | (117,881.30) |
| 03/14/03 | Buy | 6,900.00 | | 8.6000 | (59,340.00) |
| 03/14/03 | Buy | 9,200.00 | | 8.7550 | (80,541.40) |
| 03/26/03 | Buy | 10,200.00 | | 8.5610 | (87,323.22) |
| 03/27/03 | Buy | 500.00 | | 8.5840 | (4,291.95) |
| 03/28/03 | Buy | 900.00 | | 8.4540 | (7,608.60) |
| 05/06/03 | Sell | | (4,700) | $12.266 | $57,650.200 |
| 05/28/03 | Buy | 1,800 | | $13.866 | ($24,958.800) |
| 06/30/03 | Buy | 6,600 | | $12.348 | ($81,496.800) |
| 06/30/03 | Buy | 2,500 | | $12.470 | ($31,175.000) |
| 07/11/03 | Buy | 7,400 | | $14.056 | ($104,014.400) |
| 08/07/03 | Buy | 3,000 | | $13.144 | ($39,432.000) |
| 08/13/03 | Buy | 100 | | $13.646 | ($1,364.600) |
| 08/20/03 | Buy | 6,000 | | $15.195 | ($91,170.000) |
| 09/23/03 | Buy | 4,100 | | $16.131 | ($66,137.100) |
| 09/23/03 | Buy | 800 | | $16.022 | ($12,817.600) |
| 10/10/03 | Buy | 5,100 | | $17.666 | ($90,096.600) |
| 10/15/03 | Buy | 2,000 | | $17.222 | ($34,444.000) |
| 10/27/03 | Sell | | (2,300) | $16.799 | $38,637.700 |

| | | | | | |
|---|---|---|---|---|---|
| 11/25/03 | Sell | | (1,400) | $18.599 | $26,038.600 |
| 01/09/04 | Buy | 37,970 | | $22.025 | ($836,289.250) |
| 01/12/04 | Buy | 57,200 | | $23.265 | ($1,330,758.000) |
| 01/14/04 | Buy | 25,900 | | $22.736 | ($588,862.400) |
| 01/27/04 | Buy | 13,146 | | $28.798 | ($378,578.508) |
| 02/03/04 | Sell | | (23,500) | $28.320 | $665,520.000 |
| 02/06/04 | Buy | 28,700 | | $29.490 | ($846,363.000) |
| 02/19/04 | Buy | 1,472 | | $26.692 | ($39,290.624) |
| 02/25/04 | Sell | | (1,000) | $25.259 | $25,259.000 |
| 03/25/04 | Buy | 12,200 | | $25.077 | ($305,936.960) |
| 03/25/04 | Buy | 21,800 | | $24.330 | ($530,394.000) |
| 03/25/04 | Buy | 15,100 | | $24.930 | ($376,443.000) |
| 04/14/04 | Buy | 2,000.00 | | $26.040 | ($52,080.00) |
| 04/22/04 | Shares Rec'd in Merger w/ Netscreen Techs. | 23,306.00 | | $25.170 | ($586,612.02) |
| 04/30/04 | Buy | 20,700.00 | | $22.410 | ($463,887.00) |
| 05/04/04 | Buy | 58,200.00 | | $23.270 | ($1,354,314.00) |
| 05/07/04 | Buy | 18,415.00 | | $23.540 | ($433,489.10) |
| 05/13/04 | Buy | 1,300.00 | | $22.600 | ($29,380.00) |
| 05/25/04 | Buy | 1,526.00 | | $21.620 | ($32,992.12) |
| 06/09/04 | Sell | | (3,300.00) | $20.700 | $68,310.00 |
| 06/10/04 | Buy | 36,800.00 | | $20.840 | ($766,912.00) |
| 06/15/04 | Buy | 324.00 | | $20.760 | ($6,726.24) |
| 06/15/04 | Buy | 411.00 | | $20.760 | ($8,532.36) |
| 06/25/04 | Buy | 76,934.00 | | $24.220 | ($1,863,341.48) |
| 06/25/04 | Buy | 59,100.00 | | $24.220 | ($1,431,402.00) |
| 06/25/04 | Sell | | (2,600.00) | $24.240 | $63,024.00 |
| 06/25/04 | Sell | | (2,100.00) | $23.950 | $50,295.00 |
| 06/30/04 | Sell | | (41,700.00) | $24.000 | $1,000,800.00 |
| 07/26/04 | Buy | 200.00 | | $21.800 | ($4,360.00) |
| 08/25/04 | Sell | | (1,600.00) | $22.620 | $36,192.00 |
| 09/03/04 | Buy | 800.00 | | $23.170 | ($18,536.00) |
| 09/27/04 | Sell | | (6,162.00) | $24.160 | $148,873.92 |
| 09/30/04 | Buy | 1,600.00 | | $23.530 | ($37,648.00) |
| 10/26/04 | Sell | | (300.00) | $24.250 | $7,275.00 |
| 11/09/04 | Buy | 100.00 | | $27.380 | ($2,738.00) |
| 11/09/04 | Buy | 900.00 | | $27.230 | ($24,507.00) |
| 11/22/04 | Sell | | (38,600.00) | $27.730 | $1,070,378.00 |
| 12/16/04 | Buy | 1,300.00 | | $27.580 | ($35,854.00) |
| 12/16/04 | Buy | 100.00 | | $27.070 | ($2,707.00) |
| 12/17/04 | Buy | 100.00 | | $26.590 | ($2,659.00) |
| 12/22/04 | Sell | | (1,200.00) | $27.050 | $32,460.00 |
| 12/27/04 | Sell | | (2,000.00) | $26.843 | $53,685.74 |
| 12/27/04 | Sell | | (2,971.00) | $26.930 | $80,009.03 |
| 01/12/05 | Buy | 19,800.00 | | $26.060 | ($515,988.00) |
| 01/19/05 | Buy | 5,700.00 | | $25.720 | ($146,604.00) |
| 02/03/05 | Buy | 5,000.00 | | $23.300 | ($116,500.00) |
| 02/04/05 | Buy | 3,400.00 | | $23.170 | ($78,778.00) |
| 02/18/05 | Buy | 6,000.00 | | $21.980 | ($131,880.00) |
| 02/23/05 | Sell | | (8,404.00) | $21.500 | $180,686.00 |

| | | | | | |
|---|---|---|---|---|---|
| 03/24/05 | Buy | 1,000.00 | | $21.110 | ($21,110.00) |
| 03/31/05 | Buy | 2,300.00 | | $21.990 | ($50,577.00) |
| 04/20/05 | Sell | | (97,200.00) | $23.070 | $2,242,404.00 |
| 05/03/05 | Sell | | (44,600.00) | $22.920 | $1,022,232.00 |
| 05/04/05 | Sell | | (52,670.00) | $23.170 | $1,220,363.90 |
| 05/24/05 | Buy | 100.00 | | $25.800 | ($2,580.00) |
| 05/25/05 | Sell | | (5,715.00) | $25.380 | $145,046.70 |
| 05/25/05 | Sell | | (600.00) | $25.380 | $15,228.00 |
| 06/13/05 | Buy | 200.00 | | $25.170 | ($5,034.00) |
| 06/14/05 | Buy | 2,000.00 | | $25.350 | ($50,700.00) |
| 06/24/05 | Sell | | (7,000.00) | $25.600 | $179,200.00 |
| 06/24/05 | Sell | | (8,500.00) | $25.630 | $217,855.00 |
| 06/27/05 | Sell | | (323.00) | $25.270 | $8,162.21 |
| 06/27/05 | Sell | | (4,149.00) | $25.280 | $104,886.72 |
| 06/29/05 | Sell | | (1,800.00) | $25.230 | $45,414.00 |
| 07/26/05 | Buy | 5,900.00 | | $23.220 | ($136,998.00) |
| 07/27/05 | Buy | 100.00 | | $24.130 | ($2,413.00) |
| 08/02/05 | Buy | 400.00 | | $24.240 | ($9,696.00) |
| 08/03/05 | Buy | 6,900.00 | | $24.570 | ($169,533.00) |
| 08/26/05 | Sell | | (4,124.00) | $22.970 | $94,728.28 |
| 09/07/05 | Sell | | (600.00) | $23.830 | $14,298.00 |
| 09/27/05 | Sell | | (2,600.00) | $22.760 | $59,176.00 |
| 09/27/05 | Buy | 10,600.00 | | $22.710 | ($240,726.00) |
| 09/28/05 | Sell | | (1,800.00) | $23.560 | $42,408.00 |
| 09/29/05 | Sell | | (1,500.00) | $23.680 | $35,520.00 |
| 10/28/05 | Sell | | (600.00) | $22.670 | $13,602.00 |
| 11/21/05 | Sell | | (6,400.00) | $23.360 | $149,504.00 |
| 11/21/05 | Sell | | (500.00) | $23.410 | $11,705.00 |
| 11/22/05 | Sell | | (5,400.00) | $23.530 | $127,062.00 |
| 11/23/05 | Sell | | (6,100.00) | $24.210 | $147,681.00 |
| 12/01/05 | Sell | | (13,000.00) | $22.680 | $294,840.00 |
| 12/16/05 | Sell | | (7,800.00) | $21.840 | $170,352.00 |
| 12/16/05 | Buy | 1,154.00 | | $21.840 | ($25,203.36) |
| 12/16/05 | Buy | 6,299.00 | | $21.590 | ($135,995.41) |
| 01/03/06 | Sell | | (6,200.00) | $21.440 | $132,928.00 |
| 01/06/06 | Sell | | (18,800.00) | $21.920 | $412,096.00 |
| 01/25/06 | Sell | | (1,700.00) | $21.620 | $36,754.00 |
| 02/02/06 | Sell | | (500.00) | $18.150 | $9,075.00 |
| 02/03/06 | Sell | | (1,800.00) | $18.270 | $32,886.00 |
| 03/01/06 | Sell | | (12,500.00) | $18.860 | $235,750.00 |
| 03/16/06 | Sell | | (100.00) | $19.740 | $1,974.00 |
| 03/16/06 | Sell | | (100.00) | $19.600 | $1,960.00 |
| 03/17/06 | Sell | | (1,700.00) | $19.340 | $32,878.00 |
| 05/01/06 | Buy | 2,400.00 | | $18.030 | ($43,272.00) |
| 06/01/06 | Buy | 68,400.00 | | $17.420 | ($1,191,528.00) |
| 06/07/06 | Buy | 30,900.00 | | $16.860 | ($520,974.00) |
| 06/14/06 | Buy | 60.00 | | $15.730 | ($943.80) |
| 06/16/06 | Buy | 400.00 | | $16.750 | ($6,700.00) |
| 06/27/06 | Buy | 20.00 | | $15.520 | ($310.40) |
| 06/27/06 | Sell | | (2,400.00) | $15.500 | $37,200.00 |
| 06/28/06 | Buy | 20.00 | | $15.250 | ($305.00) |
| 06/29/06 | Buy | 19.00 | | $15.630 | ($296.97) |

| | | | | | |
|---|---|---|---|---|---|
| 06/30/06 | Buy | 1,538.00 | | $15.990 | ($24,592.62) |
| 06/30/06 | Buy | 2,134.00 | | $15.990 | ($34,122.66) |
| 06/30/06 | Sell | | (19,000.00) | $16.010 | $304,190.00 |
| 06/30/06 | Sell | | (6,300.00) | $15.990 | $100,737.00 |
| 06/30/06 | Buy | 10.00 | | $15.950 | ($159.50) |
| 7/3/2006 | Buy | 20 | | $15.98 | ($319.60) |
| 7/5/2006 | Buy | 9 | | $16.05 | ($144.45) |
| 7/6/2006 | Buy | 2 | | $15.96 | ($31.92) |
| 7/18/2006 | Buy | 2,441 | | $14.11 | ($34,442.51) |

**AMENDED CERTIFICATION RE: LEAD PLAINTIFF**

I, Lewis Finkelman, as Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, hereby certify as follows:

1. I am fully authorized to enter into and execute this Certification on behalf of the New York City Police Superior Officers' Variable Supplements Fund (hereinafter "PSOVSF").

2. PSOVSF did not purchase or acquire the securities of Juniper Networks, Inc. ("Juniper") at the direction of counsel or in order to participate in any private action under the federal securities laws.

3. I have reviewed the Amended Consolidated Class Action Complaint filed against Juniper and others, captioned *In re Juniper Networks, Inc. Securities Litigation*, 06-CV-04327 (JW), alleging violations of the securities laws on behalf of all those who purchased or otherwise acquired Juniper securities from July 12, 2001 through and including August 10, 2006 (the "Class Period"). As of this date, PSOVSF adopts these claims and Class Period.

4. PSOVSF is willing to serve as lead plaintiff in these consolidated cases, including providing testimony at deposition and trial, if necessary.

5. PSOVSF's transactions in the securities of Juniper during the Class Period are identified in the annexed chart.

6. PSOVSF has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years.

7. PSOVSF will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: April 6, 2007

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller

***New York City Police Superior Officers Var. Supl. Fund***
***Juniper Networks Inc. Common Stock Transactions (Amended)***

| Trade Date | Trans | Shares Bought | Shares Sold | Price / Share | (Cost) / Proceeds |
|---|---|---|---|---|---|
| 03/10/03 | Buy | 600.00 | | 8.5800 | (5,148.00) |
| 06/30/03 | Buy | 1,300 | | $12.348 | ($16,052.400) |
| 06/30/03 | Buy | 300 | | $12.470 | ($3,741.000) |
| 03/25/04 | Buy | 1,600 | | $24.574 | ($39,318.000) |
| 04/22/04 | Shares Rec'd in Merger w/ Netscreen Techs. | 2,808.00 | | $25.170 | ($70,677.36) |
| 06/25/04 | Buy | 4,700.00 | | $24.220 | ($113,834.00) |
| 07/26/04 | Buy | 100.00 | | $21.800 | ($2,180.00) |
| 08/25/04 | Buy | 100.00 | | $22.620 | ($2,262.00) |
| 11/09/04 | Buy | 100.00 | | $27.150 | ($2,715.00) |
| 11/23/04 | Sell | | (1,800.00) | $28.400 | $51,120.00 |
| 12/22/04 | Buy | 100.00 | | $27.050 | ($2,705.00) |
| 02/22/05 | Buy | 100.00 | | $21.450 | ($2,145.00) |
| 06/08/05 | Buy | 2,300.00 | | $24.640 | ($56,672.00) |
| 06/24/05 | Sell | | (1,200.00) | $25.600 | $30,720.00 |
| 06/24/05 | Sell | | (1,500.00) | $25.630 | $38,445.00 |
| 07/25/05 | Buy | 100.00 | | $23.030 | ($2,303.00) |
| 09/08/05 | Buy | 200.00 | | $24.080 | ($4,816.00) |
| 12/08/05 | Sell | | (2,000.00) | $22.310 | $44,620.00 |
| 02/17/06 | Buy | 1,500.00 | | $18.360 | ($27,540.00) |
| 06/07/06 | Buy | 700.00 | | $16.850 | ($11,795.00) |
| 06/30/06 | Sell | | (800.00) | $16.010 | $12,808.00 |
| 06/30/06 | Sell | | (300.00) | $15.990 | $4,797.00 |

**AMENDED CERTIFICATION RE: LEAD PLAINTIFF**

I, Lewis Finkelman, as Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, hereby certify as follows:

1. I am fully authorized to enter into and execute this Amended Certification on behalf of the New York City Police Officers' Variable Supplements Fund (hereinafter "POVSF").

2. POVSF did not purchase or acquire the securities of Juniper Networks, Inc. ("Juniper") at the direction of counsel or in order to participate in any private action under the federal securities laws.

3. I have reviewed the Amended Consolidated Class Action Complaint filed against Juniper and others, captioned *In re Juniper Networks, Inc. Securities Litigation*, 06-CV-04327 (JW), alleging violations of the securities laws on behalf of all those who purchased or otherwise acquired Juniper securities from July 12, 2001 through and including August 10, 2006 (the "Class Period"). As of this date, POVSF adopts these claims and Class Period.

4. POVSF is willing to serve as lead plaintiff in these consolidated cases, including providing testimony at deposition and trial, if necessary.

5. POVSF's transactions in the securities of Juniper during the Class Period are identified in the annexed chart.

6. POVSF has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years.

7. POVSF will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: April 6, 2007

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller

***New York City Police Officers' Var. Supl. Fund***
***Juniper Networks Inc. Common Stock Transactions (Amended)***

| Trade Date | Trans | Shares Bought | Shares Sold | Price / Share | (Cost) / Proceeds |
|---|---|---|---|---|---|
| 03/10/03 | Buy | 100.00 | | 8.5800 | ($858.00) |
| 06/30/03 | Buy | 1,500 | | $12.348 | ($18,522.000) |
| 06/30/03 | Buy | 600 | | $12.470 | ($7,482.000) |
| 02/24/04 | Buy | 1,800 | | $24.579 | ($44,242.020) |
| 04/22/04 | Shares Rec'd in Merger w/ Netscreen Techs. | 1,544.00 | | $25.170 | ($38,862.48) |
| 05/30/04 | Fraction of shares rec'd in merger | 0.40 | | $25.170 | ($10.07) |
| 05/30/04 | Sell | | (0.40) | $0.000 | $10.04 |
| 06/25/04 | Buy | 5,300.00 | | $24.220 | ($128,366.00) |
| 08/25/04 | Buy | 100.00 | | $22.620 | ($2,262.00) |
| 10/26/04 | Buy | 100.00 | | $24.250 | ($2,425.00) |
| 11/23/04 | Sell | | (1,300.00) | $28.390 | $36,907.00 |
| 12/22/04 | Buy | 100.00 | | $27.050 | ($2,705.00) |
| 02/22/05 | Buy | 100.00 | | $21.450 | ($2,145.00) |
| 06/24/05 | Sell | | (300.00) | $25.600 | $7,680.00 |
| 06/24/05 | Sell | | (400.00) | $25.630 | $10,252.00 |
| 07/25/05 | Buy | 100.00 | | $23.030 | ($2,303.00) |
| 09/08/05 | Buy | 100.00 | | $24.080 | ($2,408.00) |
| 12/08/05 | Sell | | (1,200.00) | $22.310 | $26,772.00 |
| 02/17/06 | Buy | 1,900.00 | | $18.360 | ($34,884.00) |
| 06/07/06 | Buy | 900.00 | | $16.860 | ($15,174.00) |
| 06/30/06 | Sell | | (900.00) | $16.010 | $14,409.00 |
| 06/30/06 | Sell | | (300.00) | $15.990 | $4,797.00 |

**AMENDED CERTIFICATION RE: LEAD PLAINTIFF**

I, Lewis Finkelman, as Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, hereby certify as follows:

1. I am fully authorized to enter into and execute this Amended Certification on behalf of the New York City Fire Officers' Variable Supplements Fund (hereinafter "FOVSF").

2. FOVSF did not purchase or acquire the securities of Juniper Networks, Inc. ("Juniper") at the direction of counsel or in order to participate in any private action under the federal securities laws.

3. I have reviewed the Amended Consolidated Class Action Complaint filed against Juniper and others, captioned *In re Juniper Networks, Inc. Securities Litigation*, 06-CV-04327 (JW), alleging violations of the securities laws on behalf of all those who purchased or otherwise acquired Juniper securities from July 12, 2001 through and including August 10, 2006 (the "Class Period"). As of this date, FOVSF adopts these claims and Class Period.

4. FOVSF is willing to serve as lead plaintiff in these consolidated cases, including providing testimony at deposition and trial, if necessary.

5. FOVSF's transactions in the securities of Juniper during the Class Period are identified in the annexed chart.

6. FOVSF has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years.

7. FOVSF will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: April 6, 2007

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller

***New York City Fire Officers Var. Supl. Fund***
***Juniper Networks Inc. Common Stock Transactions***

| Trade Date | Trans | Shares Bought | Shares Sold | Price / Share | (Cost) / Proceeds |
|---|---|---|---|---|---|
| 06/01/06 | Buy | 7,500.00 | | $17.420 | ($130,650.00) |
| 7/25/2006 | Buy | 500 | | $13.65 | ($6,825.00) |
| | | | | | |

**AMENDED CERTIFICATION RE: LEAD PLAINTIFF**

I, Lewis Finkelman, as Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller, hereby certify as follows:

1. I am fully authorized to enter into and execute this Amended Certification on behalf of the New York City Firefighters' Variable Supplements Fund (hereinafter "FFVSF").

2. FFVSF did not purchase or acquire the securities of Juniper Networks, Inc. ("Juniper") at the direction of counsel or in order to participate in any private action under the federal securities laws.

3. I have reviewed the Amended Consolidated Class Action Complaint filed against Juniper and others, captioned *In re Juniper Networks, Inc. Securities Litigation*, 06-CV-04327 (JW), alleging violations of the securities laws on behalf of all those who purchased or otherwise acquired Juniper securities from July 12, 2001 through and including August 10, 2006 (the "Class Period"). As of this date, FFVSF adopts these claims and Class Period.

4. FFVSF is willing to serve as lead plaintiff in these consolidated cases, including providing testimony at deposition and trial, if necessary.

5. FFVSF's transactions in the securities of Juniper during the Class Period are identified in the annexed chart.

6. FFVSF has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years.

7. FFVSF will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: April 6, 2007

LEWIS FINKELMAN
Deputy Comptroller for Legal Affairs and General Counsel for the Office of the New York City Comptroller

***New York City Firefighters Var. Supl. Fund***

***Juniper Networks Inc. Common Stock Transactions (Amended)***

| Trade Date | Trans | Shares Bought | Shares Sold | Price / Share | (Cost) / Proceeds |
|---|---|---|---|---|---|
| 11/19/01 | Buy | 100.00 | | 26.0700 | (2,607.00) |
| 07/17/02 | Buy | 300.00 | | 8.9730 | (2,691.99) |
| 09/05/02 | Buy | 600.00 | | 6.8600 | (4,116.00) |
| 12/03/02 | Buy | 300.00 | | 9.0300 | (2,709.00) |
| 01/23/03 | Buy | 100.00 | | 9.1550 | (915.50) |
| 05/05/03 | Buy | 100 | | $12.120 | ($1,212.000) |
| 05/08/03 | Buy | 100 | | $12.105 | ($1,210.500) |
| 05/28/03 | Buy | 100 | | $13.920 | ($1,392.000) |
| 06/30/03 | Buy | 100 | | $12.369 | ($1,236.900) |
| 07/02/03 | Buy | 100 | | $13.360 | ($1,336.000) |
| 07/16/03 | Buy | 100 | | $14.655 | ($1,465.500) |
| 06/01/04 | Shares Rec'd in Merger w/ Netscreen Techs. | 1,684.80 | | $25.170 | ($42,406.42) |
| 06/01/04 | Sell | | (0.80) | $0.000 | $20.07 |
| 06/25/04 | Buy | 1,900.00 | | $24.240 | ($46,056.00) |
| 06/30/04 | Buy | 200.00 | | $23.920 | ($4,784.00) |
| 11/17/04 | Buy | 100.00 | | $28.870 | ($2,887.00) |
| 05/25/05 | Sell | | (200.00) | $25.380 | $5,076.00 |
| 12/12/05 | Sell | | (1,100.00) | $22.460 | $24,706.00 |
| 05/03/06 | Buy | 900.00 | | $18.130 | ($16,317.00) |
| 06/30/06 | Sell | | (500.00) | $16.000 | $8,000.00 |

**AMENDED CERTIFICATION RE: LEAD PLAINTIFF**

I, Diane Sisenwein, Director of Investment Administration of the Teachers Retirement System of City of New York, hereby certifies as follows:

1. I am fully authorized to enter into and execute this Amended Certification on behalf of the New York City Teachers' Retirement System Variable Annuity Program (hereinafter "Teachers Variable A").

2. Teachers Variable A did not purchase or acquire the securities of Juniper Networks, Inc. ("Juniper") at the direction of counsel or in order to participate in any private action under the federal securities laws.

3. I have reviewed the Amended Consolidated Class Action Complaint filed against Juniper and others, captioned *In re Juniper Networks, Inc. Securities Litigation*, 06-CV-04327 (JW), alleging violations of the securities laws on behalf of all those who purchased or otherwise acquired Juniper securities from July 12, 2001 through and including August 10, 2006 (the "Class Period"). As of this date, Teachers Variable A adopts these claims and Class Period.

4. Teachers Variable A is willing to serve as lead plaintiff in these consolidated cases, including providing testimony at deposition and trial, if necessary.

5. Teachers Variable A's transactions in the securities of Juniper during the Class Period are identified in the annexed chart.

6. Teachers Variable A has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years.

7. Teachers Variable A will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: April 6, 2007

DIANE SISENWEIN
Director of Investment Administration of the Teachers Retirement System of the City of New York

***New York City Teachers Variable A Program***

***Juniper Networks Inc. Common Stock Transactions (Amended)***

| Trade Date | Transaction | Shares Bought | Shares Sold | Price / Share | (Cost) / Proceeds |
|---|---|---|---|---|---|
| 09/25/01 | Sell Long | | (3,700.00) | 11.6459 | 43,089.87 |
| 09/25/01 | Sell Long | | (3,900.00) | 11.6459 | 45,419.05 |
| 09/25/01 | Sell Long | | (7,500.00) | 11.6459 | 87,344.32 |
| 09/25/01 | Sell Long | | (9,100.00) | 11.6459 | 105,977.78 |
| 10/12/01 | Sell Long | | (11,203.00) | 20.2823 | 227,222.99 |
| 10/12/01 | Sell Long | | (98.00) | 20.3387 | 1,993.19 |
| 10/12/01 | Sell Long | | (98.00) | 20.3387 | 1,993.19 |
| 10/12/01 | Sell Long | | (400.00) | 20.2815 | 8,112.61 |
| 10/12/01 | Sell Long | | (600.00) | 20.2815 | 12,168.91 |
| 10/12/01 | Sell Long | | (700.00) | 20.2815 | 14,197.06 |
| 11/14/01 | Buy | 3,100.00 | | 25.0420 | (77,630.31) |
| 11/14/01 | Buy | 15,600.00 | | 23.9080 | (372,964.80) |
| 11/14/01 | Buy | 18,400.00 | | 23.7490 | (436,981.60) |
| 12/14/01 | Buy | 39,000.00 | | 20.3695 | (794,410.50) |
| 01/17/02 | Sell Long | | (39,000.00) | 17.4050 | 678,796.51 |
| 01/24/02 | Sell Long | | (257.00) | 17.2861 | 4,442.53 |
| 01/24/02 | Sell Long | | (1,394.00) | 17.2624 | 24,063.74 |
| 01/24/02 | Sell Long | | (2,144.00) | 17.2673 | 37,021.12 |
| 01/24/02 | Sell Long | | (1,006.00) | 17.2711 | 17,374.68 |
| 01/24/02 | Sell Long | | (115.00) | 17.2668 | 1,985.68 |
| 01/24/02 | Sell Long | | (1,984.00) | 17.2646 | 34,252.96 |
| 01/24/02 | Sell Long | | (3,100.00) | 17.2668 | 53,527.00 |
| 01/24/02 | Sell Long | | (15,600.00) | 17.2668 | 269,361.63 |
| 01/24/02 | Sell Long | | (18,400.00) | 17.2668 | 317,708.60 |
| 11/21/02 | Buy | 10,500.00 | | 8.6938 | (91,284.90) |
| 11/22/02 | Buy | 1,800.00 | | 8.7691 | (15,784.38) |
| 11/25/02 | Buy | 300.00 | | 9.0500 | (2,715.00) |
| 11/26/02 | Buy | 1,900.00 | | 9.3624 | (17,788.56) |
| 01/29/04 | Buy | 17,400.00 | | $27.724 | ($482,397.600) |
| 01/30/04 | Buy | 5,800.00 | | $28.632 | ($166,065.600) |
| 02/02/04 | Buy | 6,600.00 | | $28.875 | ($190,575.000) |
| 02/04/04 | Buy | 7,200.00 | | $28.059 | ($202,024.800) |
| 02/19/04 | Buy | 8,800.00 | | $27.280 | ($240,064.000) |
| 03/02/04 | Buy | 7,900.00 | | $25.948 | ($204,989.200) |
| 03/12/04 | Buy | 8,000.00 | | $25.151 | ($201,208.000) |
| 03/16/04 | Buy | 8,000.00 | | $24.561 | ($196,488.000) |
| 03/17/04 | Buy | 8,100.00 | | $24.885 | ($201,568.500) |
| 03/29/04 | Buy | 7,600.00 | | $26.532 | ($201,643.200) |
| 03/31/04 | Buy | 7,600.00 | | $26.242 | ($199,439.200) |
| 04/02/04 | Buy | 7,400.00 | | $26.990 | ($199,726.000) |
| 04/05/04 | Buy | 7,400.00 | | $27.300 | ($202,020.000) |
| 04/07/04 | Buy | 7,600.00 | | $27.000 | ($205,200.000) |
| 04/22/04 | Buy | 7,700.00 | | $26.365 | ($203,010.500) |
| 05/04/04 | Buy | 8,600.00 | | $22.938 | ($197,266.800) |
| 05/12/04 | Buy | 8,800.00 | | $21.534 | ($189,499.200) |
| 05/27/04 | Buy | 9,300.00 | | $20.882 | ($194,202.600) |
| 06/04/04 | Buy | 12,000.00 | | $20.355 | ($244,260.000) |

| | | | | | |
|---|---|---|---|---|---|
| 06/07/04 | Buy | 10,100.00 | | $19.906 | ($201,050.600) |
| 08/17/04 | Buy | 9,200.00 | | $20.587 | ($189,400.400) |
| 08/24/04 | Buy | 8,700.00 | | $21.817 | ($189,807.900) |
| 09/24/04 | Buy | 7,700.00 | | $25.071 | ($193,046.700) |
| 10/04/04 | Buy | 8,300.00 | | $24.894 | ($206,620.200) |
| 11/12/04 | Sell | | (24,300.00) | $27.700 | $673,110.000 |
| 01/25/05 | Buy | 500.00 | | $24.806 | ($12,403.000) |
| 02/16/05 | Sell | | (750.00) | $22.950 | $17,212.500 |
| 05/09/05 | Buy | 525.00 | | $22.853 | ($11,997.825) |
| 06/17/05 | Sell | | (31,600.00) | $26.240 | $829,184.000 |
| 07/27/05 | Buy | 3,100.00 | | $23.615 | ($73,205.880) |
| 07/28/05 | Buy | 500.00 | | $23.980 | ($11,990.000) |
| 07/28/05 | Buy | 2,800.00 | | $23.988 | ($67,166.960) |
| 07/29/05 | Buy | 800.00 | | $24.000 | ($19,200.000) |
| 08/01/05 | Buy | 600.00 | | $23.977 | ($14,385.960) |
| 08/03/05 | Buy | 1,600.00 | | $24.356 | ($38,970.240) |
| 08/10/05 | Buy | 6,000.00 | | $23.567 | ($141,403.800) |
| 08/11/05 | Buy | 2,550.00 | | $23.587 | ($60,145.575) |
| 08/11/05 | Buy | 950.00 | | $23.587 | ($22,407.175) |
| 08/12/05 | Buy | 500.00 | | $23.502 | ($11,751.050) |
| 08/12/05 | Buy | 1,300.00 | | $23.356 | ($30,363.190) |
| 08/15/05 | Buy | 1,200.00 | | $23.535 | ($28,241.520) |
| 08/16/05 | Buy | 1,500.00 | | $23.594 | ($35,390.850) |
| 08/16/05 | Buy | 300.00 | | $23.571 | ($7,071.420) |
| 08/17/05 | Buy | 2,000.00 | | $23.547 | ($47,094.600) |
| 08/18/05 | Buy | 300.00 | | $23.387 | ($7,016.190) |
| 08/25/05 | Buy | 8,275.00 | | $23.478 | ($194,278.795) |
| 09/01/05 | Buy | 4,700.00 | | $22.925 | ($107,747.030) |
| 09/02/05 | Buy | 2,800.00 | | $23.177 | ($64,896.720) |
| 09/02/05 | Buy | 2,100.00 | | $23.177 | ($48,672.540) |
| 09/02/05 | Buy | 2,000.00 | | $23.195 | ($46,389.200) |
| 09/06/05 | Buy | 2,200.00 | | $23.293 | ($51,245.040) |
| 09/07/05 | Buy | 600.00 | | $23.809 | ($14,285.400) |
| 09/07/05 | Buy | 1,400.00 | | $23.655 | ($33,117.420) |
| 09/08/05 | Buy | 1,200.00 | | $24.005 | ($28,806.360) |
| 09/19/05 | Sell | | (950.00) | $23.240 | $22,078.000 |
| 10/10/05 | Sell | | (700.00) | $22.130 | $15,491.000 |
| 10/24/05 | Buy | 600.00 | | $23.257 | ($13,954.020) |
| 10/24/05 | Buy | 6,000.00 | | $23.280 | ($139,680.600) |
| 11/04/05 | Sell | | (820.00) | $24.154 | $19,805.952 |
| 12/19/05 | Buy | 9,625.00 | | $22.239 | ($214,052.300) |
| 01/04/06 | Buy | 10,700.00 | | $21.385 | ($228,816.290) |
| 01/17/06 | Sell | | (2,300.00) | $21.694 | $49,895.050 |
| 01/25/06 | Sell | | (4,000.00) | $21.500 | $86,000.000 |
| 01/27/06 | Sell | | (11,900.00) | $17.312 | $206,009.230 |
| 01/31/06 | Sell | | (11,675.00) | $18.350 | $214,240.920 |
| 02/01/06 | Sell | | (12,600.00) | $18.115 | $228,247.740 |
| 03/28/06 | Sell | | (10,200.00) | $19.250 | $196,350.000 |
| 04/20/06 | Sell | | (23,800.00) | $18.085 | $430,430.140 |
| 05/01/06 | Sell | | (850.00) | $18.000 | $15,300.000 |
| 05/15/06 | Sell | | (7,150.00) | $17.100 | $122,265.000 |
| 05/15/06 | Sell | | (7,150.00) | $16.860 | $120,549.000 |

| | | | | | |
|---|---|---|---|---|---|
| 05/16/06 | Sell | | (9,625.00) | $16.337 | $157,245.550 |
| 05/19/06 | Sell | | (3,800.00) | $15.526 | $58,998.420 |
| 05/19/06 | Sell | | (825.00) | $15.450 | $12,746.250 |
| 05/19/06 | Sell | | (6,800.00) | $15.589 | $106,005.200 |
| 05/26/06 | Sell | | (11,050.00) | $15.604 | $172,424.200 |
| 06/08/06 | Buy | 28,300.00 | | $16.782 | ($474,919.280) |
| 07/12/06 | Sell | | (400.00) | $14.780 | $5,912.000 |
| 07/12/06 | Sell | | (23,425.00) | $14.678 | $343,839.178 |
| 07/14/06 | Sell | | (8,800.00) | $14.180 | $124,784.880 |
| 07/18/06 | Sell | | (300.00) | $14.280 | $4,284.000 |

# EXHIBIT B

**EXHIBIT B**

**JUNIPER NETWORKS, INC.**

**Impact of Stock-based Compensation Expense On Consolidated Statement of Operations (In $ Millions):**

| Fiscal Year | Pre-Tax: Reported Income | Pre-Tax: Stock Expense Adjustment | Pre-Tax: Restated Income | Pre-Tax: Stock Expense as % of Reported Income | After-Tax: Reported Income | After-Tax: Stock Expense Adjustment | After-Tax: Restated Income | After-Tax: Stock Expense as % of Reported Income |
|---|---|---|---|---|---|---|---|---|
| FY 1999 Annual | (6.6) | (15.3) | (22)* | 232% | (9.0) | (15.3) | (24)* | 170% |
| FY 2000 Annual | 230.0 | (283.3) | (53)* | 123% | 148.0 | (201.6) | (73)* | 136% |
| FY 2001 Annual | 16.5 | (513.1) | (497)* | 3,109% | (13.4) | (488.1) | (475)* | 3,643% |
| FY 2002 Annual | (115.0) | (48.0) | (163) | 42% | (120.0) | ( 48.0) | (168) | 40% |
| FY 2003 Annual | 59.0 | (19.3) | 40 | 33% | 39.0 | (8.5) | 31 | 22% |
| FY 2004 Annual | 219.0 | (10.9) | 208 | 5% | 135.0 | (7.5) | 128 | 5.6% |
| FY 2005 Q1 | 111.2 | (1.7) | 109.5 | | 75.4 | (1.2) | 74.2 | |
| Q2 | 131.9 | (1.2) | 130.7 | | 89.0 | (0.8) | 88.2 | |
| Q3 | 125.2 | (0.8) | 124.4 | | 84.1 | (0.6) | 83.5 | |
| Q4 | 133.8 | (0.9) | 104.9 | | 105.5 | (0.6) | 104.9 | |
| Annual | 502.1 | (4.6) | 469.5 | 1% | 354.0 | 3.3 | 350.7 | 1% |
| FY 2006 Q1 | 110.6 | (0.6) | | 0.54% | | N/A | | |

*2006 Form 10-K reported expense adjustment, but not restated income.