1    BARBARA HART (*pro hac vice*)
     DAVID C. HARRISON (*pro hac vice*)
     TODD GARBER (*pro hac vice*)
2    LOWEY DANNENBERG COHEN & HART, P.C.
     One North Broadway, Suite 509
3    White Plains, NY 10601-2310
     Telephone: 914-997-0500
4    Facsimile:  914-997-0035

5    *Lead Counsel for the New York City Pension Funds and the Putative Class*

6    WILLEM F. JONCKHEER S.B.N. 178748
     SCHUBERT JONCKHEER KOLBE & KRALOWEC LLP
7    Three Embarcadero Center, Suite 1650
     San Francisco, CA 94111
8    Telephone: 415-788-4220
     Facsimile:  415-778-0160

9
     *Local Counsel*

10

11                    UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                          SAN JOSE DIVISION

14                                              No. C06-04327-JW

15                                              **LEAD PLAINTIFF'S REPLY**
                                                **MEMORANDUM IN SUPPORT OF**
16   IN RE JUNIPER NETWORKS, INC.               **CLASS CERTIFICATION**
     SECURITIES LITIGATION
17                                              DATE:        September 14, 2009
                                                TIME:        9:00 a.m.
18                                              BEFORE:      Hon. James Ware

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

ARGUMENT ..........................................................................................................................5

I.   COMMON QUESTIONS OF LAW
     AND FACT PREDOMINATE.........................................................................................5

     A.   Lead Plaintiff Is Entitled To The Presumption Of
          Reliance Based Upon The Uncontested Showing That
          Juniper's Stock Traded In An Efficient Market........................................................5

     B.   Proof Of Loss Causation Is Not A Requirement
          For Fraud-On-The-Market Presumption...................................................................6

     C.   Proof Of Materiality Is Not Required For
          Fraud-On-The-Market Presumption .........................................................................7

II.  DEFENDANTS HAVE NOT REBUTTED THE
     FRAUD ON-THE-MARKET PRESUMPTION

     A.   While Not Required, Lead Plaintiff Has Established Loss Causation.....................7

          1.   The August 10, 2006 Restatement Announcement
               And Subsequent Price Drop Constitutes Undisputed
               Evidence Of Loss Causation At the End Of The Class Period....................7

     B.   Lead Plaintiff's Theory Of Loss Causation, Based
          Upon A Multi-Day Event Window For Partial
          Disclosures On May 18 And May 19, 2006, Is
          Consistent With The Efficient Market Theory .........................................................8

     C.   While Not Required, Lead Plaintiff Has Established The
          Misrepresentations And Omissions Were Material ...................................................9

     D.   Institutional Investors' Failure To Change Their Investment
          Strategies Regarding Juniper Does Not Rebut The Fraud-On-The-Market
          Presumption Of Reliance .......................................................................................11

III. LEAD PLAINTIFF'S CLAIMS ARE TYPICAL OF THE CLASS ...............................15

     A.   Post-Partial-Curative Disclosure Do Not Defeat Typicality..................................15

     B.   Lead Plaintiff's Use of Investment Managers And Their Decision
          Not To Sell After A Partial Disclosure Does Not Defeat Typicality....................16

IV.  THE CLASS IS APPROPRIATELY DEFINED ...........................................................17

     A.   The Class Period Should End On August 10, 2006................................................17

     B.   The Class Should Include Recipients Of The CFRA Report.................................18

     C.   The Class Should Include In-And-Out Traders .....................................................19

V.    A NOTEHOLDER CLASS SHOULD BE CERTIFIED...................................................20

CONCLUSION.................................................................................................................20

PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION – CASE NO. 06-04327-JW

{1964 / BRF / 00096739.DOC v16}

# TABLE OF AUTHORITIES

## CASES

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
  --- F.3d ----, 2009 WL 1740648 (5th Cir. June 19, 2009)...................................18

*Arrington v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
  651 F.2d 615 (9th Cir. 1981) ............................................................................16

*Basic v. Levinson*,
  485 U.S. 224 (1988)............................................................................... *passim*

*Blackie v. Barrack*,
  524 F.2d 891 (9th Cir. 1975) ................................................................. *passim*

*Cromer Finance Ltd. v. Berger*,
  205 F.R.D. 113 (S.D.N.Y. 2001) .......................................................................15

*Cross v. 21st Century Holding Co.*,
  No. 00 CIV.4333 AGS, 2002 WL 31158901 (S.D.N.Y. Sept. 27, 2002).........................10

*Desai v. Deutsche Bank Sec. Ltd.*,
  --- F.3d ----, 2009 WL 2245223 (9th Cir. July 29, 2009) ...............................14

*Dukes v. Wal-Mart, Inc.*,
  474 F.3d 1214 (9th Cir. 2007), *withdrawn and superseded on denial of reh'g*,
  509 F.3d 1168 (9th Cir. 2007), *reh'g en banc granted*,
  556 F.3d 919 (9th Cir. 2009) ..............................................................................3

*Duncan v. Theratx Inc.*,
  775 A.2d 1019 (Del. 2001) ...............................................................................19

*Epstein v. MCA, Inc.*,
  50 F.3d 646 (9th Cir. 1995) .................................................................................2

*Feder v. Elec. Data Sys. Corp.*,
  429 F.3d 125 (5th Cir. 2005) .............................................................................16

*Folger Adam Co. v. PMI Indus. Inc.*,
  938 F.2d 1529 (2d Cir. 1991)............................................................................11

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ...............................................................................3

*Huberman v. Tag-It Pac. Inc.*,
  Civ. No. 07-55648, 2009 WL 485053 (9th Cir. Feb. 11, 2009) ............................5

*In re Adobe Sys., Inc. Sec. Litig.*,
  139 F.R.D. 150 (N.D. Cal. 1991)........................................................................16

*In re BearingPoint, Inc. Sec. Litig.*,
  232 F.R.D. 534 (E.D. Va. 2006) ........................................................................20

*In re Boston Scientific Corp. Sec. Litig.*,
    604 F. Supp. 2d 275 (D. Mass. 2009) ............................................................5, 6

*In re Bradley Pharms., Inc. Sec. Litig.*,
    421 F. Supp. 2d 822 (D.N.J. 2006) ...........................................................9

*In re Cirrus Logic Sec. Litig.*,
    155 F.R.D. 654 (N.D. Cal. 1994)..............................................................15

*In re Comverse Tech., Inc. Sec. Litig.*,
    543 F. Supp. 2d 134 (E.D.N.Y. 2008) .......................................................12

*In re Connectics Corp. Sec. Litig.*,
    257 F.R.D 572 (N.D. Cal. 2009).......................................................5, 6, 16, 20

*In re Cooper Cos. Inc. Sec. Litig.*,
    254 F.R.D. 628 (S.D. Cal. 2009) ......................................................6, 17

*In re DRDGOLD Ltd. Sec. Litig.*,
    472 F. Supp. 2d 562 (S.D.N.Y. 2007)......................................................10

*In re DVI Inc. Sec. Litig.*,
    249 F.R.D. 196 (E.D. Pa. 2008) .......................................................10, 16

*In re Emulex Corp., Sec. Litig.*,
    210 F.R.D. 717 (C.D. Cal. 2002) .......................................................16

*In re Fed. Nat'l Mortg. Ass'n, Sec., Deriv. & "ERISA" Litig.*,
    247 F.R.D. 32 (D.C. Cir. 2008) .......................................................18

*In re Gilead Sciences Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) .......................................................10

*In re HealthSouth Corp. Sec. Litig.*,
    257 F.R.D. 260 (N.D. Ala. 2009)......................................................6

*In re Hollinger Intern., Inc. Sec. Litig.*,
    No. 04C 0834, 2006 WL 1806382 (N.D. Ill. June. 28, 2006) .........................10

*In re Infineon Techs. AG Sec. Litig.*,
    No. C 04-04156-JW, slip op. (N.D. Cal. Mar. 6, 2009), *appeal docketed*,
    No. 09-80053 (9th Cir. Mar. 20, 2009)..........................................2, 17

*In re Interpublic Sec. Litig.*,
    No. 02 Civ. 6527(DLC), 2003 WL 22509414 (S.D.N.Y. Nov. 6, 2003)...........18

*In re Juniper Networks, Inc., Sec. Litig.*,
    542 F. Supp. 2d 1037 (N.D. Cal. 2008) .......................................3, 20

*In re LDK Solar Sec. Litig.*,
    255 F.R.D. 519 (N.D. Cal. 2009).............................................. *passim*

*In re LTV Sec. Litig.*,
    88 F.R.D. 134 (N.D. Tex. 1980) .......................................................18

{1964 / BRF / 00096739.DOC v16}

*In re Magma Design Automation, Inc. Sec. Litig.*,
   No. C 05-2394 CRB, 2007 WL 2344992 (N.D. Cal. Aug. 16, 2007)..............................17

*In re Marvell Techs. Group Ltd. Sec. Litig.*,
   No. C-06-06286 RMW, 2008 WL 4544439 (N.D. Cal. Sept. 29, 2008).........................8

*In re Maxim Integrated Prods. Inc., Sec. Litig.*,
   No. C 08-00832 JW, 2009 WL 213969 (N.D. Cal. July 16, 2009) ........................3, 10, 11

*In re MetLife Demutualization Litig.*,
   229 F.R.D. 369 (E.D.N.Y. 2005), *mot. to vacate denied*,
   No. CV 00-2258(TCP)(AKT), 2007 WL 1395560 (E.D.N.Y. May 9, 2007) ...................7

*In re Metropolitan Sec. Litig.*,
   No. CV-04-25-FVS, 2008 WL 5102303 (E.D. Wash. Nov. 25, 2008)..............................6

*In re Micron Techs., Inc. Sec. Litig.*,
   247 F.R.D. 627 (D. Idaho 2007) ...........................................................................5, 6

*In re Mills Corp. Sec. Litig.*,
   No. 1:06-cv-077, 2009 WL 1032792 (E.D. Va. Apr. 16, 2009)........................................6

*In re Monster Worldwide, Inc., Sec. Litig.*,
   251 F.R.D. 132 (S.D.N.Y. 2008) ..................................................................................16

*In re Monster Worldwide, Inc. Sec. Litig.*,
   No. 07 Civ 2237, 2008 WL 2721806 (S.D.N.Y. July 14, 2008) ...................................12

*In re Nature's Sunshine Prod.'s Inc. Sec. Litig.*,
   251 F.R.D. 656 (D. Utah 2008) ......................................................................................6

*In re Oxford Health Plans, Inc., Sec. Litig.*,
   191 F.R.D. 369 (S.D.N.Y. 2000) ..................................................................................15

*In re Providian Fin. Corp. Sec. Litig.*,
   No. C 01-03952 CRB, 2004 WL 5684494 (N.D. Cal. Jan. 15, 2004) ........................15, 16

*In re Rent-Way Sec. Litig.*,
   218 F.R.D. 101 (W.D. Pa. 2003) ..................................................................................20

*In re Royal Dutch/Shell Transp. Sec. Litig.*,
   404 F. Supp. 2d 605 (D.N.J. 2005) ..............................................................................18

*In re Salomon Analyst Metromedia Litig.*,
   544 F.3d 474 (2d. Cir. 2008)...........................................................................................5

*In re Sepracor Inc.*,
   233 F.R.D. 52 (D. Mass. 2005).....................................................................................20

*In re Sipex Corp. Sec. Litig.*,
   No. C 05-00392 WHA, 2005 WL 3096178 (N.D. Cal. Nov. 17, 2005).........................12

*In re Valence Tech. Sec. Litig.*,
   No. C-95-20459 JW, 1996 WL 119468 (N.D. Cal. Mar. 14, 1996) ..........................16, 17

vi

*In re WorldCom, Inc. Sec. Litig.,*
   219 F.R.D. 267 (S.D.N.Y. 2003), *appeal granted in part,*
   *Hevesi v. Citigroup Inc.*, 366 F.3d 70 (2d Cir. 2004) ............................................16, 18, 20

*Kriendler v. Chem. Waste Mgmt., Inc.,*
   877 F. Supp. 1140 (N.D. Ill. 1995) .................................................................................18

*No. 84 Employer-Teamster Joint Council Pension*
   *Trust Fund v. America West Holding Corp.,*
   320 F.3d 920 (9th Cir. 2003) .........................................................................................10

*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.,*
   487 F.3d 261 (5th Cir. 2007) ........................................................................................6, 8

*Oran v. Stafford,*
   226 F.3d 275 (3rd Cir. 2000) .........................................................................................10

*Peil v. Nat'l Semiconductor Corp.,*
   86 F.R.D. 357 (E.D. Pa. 1980) ......................................................................................18

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.,*
   No. C 01-20418 JW, 2004 WL 5326262 (N.D. Cal. May 27, 2004) ...............................2

*Rolex Employees Ret. Trust v. Mentor Graphics Corp.,*
   136 F.R.D. 658 (D. Or. 1991) ........................................................................................16

*Schaefer v. Overland Express Family of Funds,*
   169 F.R.D. 124 (S.D. Cal. 1996) ...................................................................................17

*Semerenko v. Cendant Corp.,*
   223 F.3d 165 (3d Cir. 2000) ..........................................................................................18

*Siemers v. Wells Fargo & Co.,*
   No. C 05-04518 WHA, 2007 WL 1140660 (N.D. Cal. Apr. 17, 2007) ...........................12

*TSC Indus. v. Northway, Inc.,*
   426 U.S. 438 (1976) .....................................................................................................7, 11

*Yammer v. Boich,*
   No. C-92-20597 RPA, 1994 WL 514035 (N.D. Cal. Sept. 15, 1994) .............................15

## <u>SECONDARY AUTHORITIES</u>

DMITRY KRIVIN ET AL., NERA ECON. CONSULTING, DETERMINATION OF THE APPROPRIATE
   EVENT WINDOW LENGTH IN INDIVIDUAL STOCK EVENT STUDIES (2003)
   HTTP://PAPERS.SSRN.COM/SOL3/PAPERS.CFM?ABSTRACT_ID=466161. ...............................11

**INTRODUCTION**

On July 21, 1999, Juniper Network Inc.'s ("Juniper" or the "Company") Board of Directors established the Stock Option Committee ("SOC") to administer stock option grants which Juniper issued to nearly all new full-time employees. Harrison Reply Dec. Ex. 1.[1] One week later, on July 28, 1999, Juniper set its options backdating fraud in motion. As detailed in a confidential memorandum describing a meeting with one member of the SOC, then-General Counsel, Vice President and Corporate Secretary Lisa Berry:

> The committee will not predetermine a meeting date, but will instead select the date that is "most advantageous to the employee". This means there could potentially be a 2-3 month waiting period for newhires [*sic*] to obtain information regarding their grant price. Vesting will continue to be on the date of the hire.
>
> **Effectively, what will happen is that the committee will look back upon the last few months and select the date in which the stock reached its lowest point, and use that as the "committee meeting date". This information is not to be disseminated to employees.**

Harrison Reply Dec. Ex. 2 (emphasis added).

In order to implement this fraud, Juniper falsified its corporate records, misrepresented its options granting practices, and inflated its income by hundreds of millions of dollars in its earnings releases and Securities and Exchange Commission ("SEC") filings.[2] This litigation will therefore focus on the alleged misconduct by Juniper and its senior executives and Ernst & Young LLC, which has resulted in a $900 million restatement covering most of Juniper's life as a public company. As aptly put by the Ninth Circuit, securities fraud cases like this one, where

---

[1] References to "Harrison Reply Dec. Ex." are to exhibits attached to the Reply Declaration of David Harrison in support of Lead Plaintiff's Motion for Class Certification. References to "Harrison Decl. Ex." are to exhibits attached to the Declaration of David Harrison in support of Lead Plaintiff's Motion for Class Certification. References to "Allen Dep." are to deposition transcript of Lucy P. Allen dated July 22, 2009 attached as Exhibit 3 to Harrison Reply Dec. References to "Marek Dec." are to Declaration of Michael Marek in Support of Class Certification. References to "Marek Reb." are to Rebuttal Declaration of Michael Marek. References to "Opp." are to the Opposition to Motion for Class Certification. References to "Opp. Ex." are to exhibits filed with Joni Ostler's Declaration. References to "Opp. App." are to appendices to the Opposition to Motion for Class Certification.

[2] Juniper's financial statements repeatedly misrepresented that no compensation costs were recognized for stock options grants, because the exercise prices of all options granted were equal to the market prices of the stock on the grant dates. Harrison Decl. Ex. 2.

1   "[t]he question of [defendant's] liability are the same" for an extensive class of shareholders, fit

2   Rule 23 "like a glove." *Epstein v. MCA, Inc.*, 50 F.3d 646, 668 (9th Cir. 1995).[3]

3       Defendants concede virtually every Rule 23 element as to Counts I and II brought under

4   Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule SEC 10b-5. They do

5   not challenge Lead Plaintiff's showing of numerosity, commonality and adequacy under Rule

6   23(a), nor do they contest the satisfaction of Rule 23(b)(3)'s superiority requirement. Further,

7   Defendants acknowledge Lead Plaintiff's showing that Juniper's stock traded in an efficient

8   market for purposes of invoking the fraud-on-the-market presumption of reliance established in

9   *Basic v. Levinson*, 485 U.S. 224 (1988).[4] Under fraud-on-the-market, investors are presumed to

10   rely on the integrity of the market price, which was distorted during the Class Period by

11   Defendants' materially false public disclosures.[5] *Id.* at 242-43. As such, common questions

12   concerning Defendants' course of misconduct will predominate over questions concerning the

13   reliance and damages of individual investors.

14       Nonetheless, Defendants seek to rebut *Basic*'s presumption by asserting that Lead

15   Plaintiff has failed to establish loss causation relating to an alleged **partial** corrective disclosure

16   during the Class Period. They argue that if Juniper's stock price did not decline immediately, on

17   the same day when information began to trickle out to certain institutions suggesting that

18   Juniper's representations about its stock option practices were untrue, then it must follow that

19   none of the Company's misrepresentations during the Class Period inflated Juniper's stock price

20   in the first instance.

---

21

22   [3] Defendants do not dispute that Plaintiff's claims under the Securities Act of 1933 are appropriate for class treatment. As a result, the claims relating to the issuance of Juniper common stock in connection with its merger

23   with NetScreen Technologies, Inc. (Counts III-IV of the Amended Consolidated Class Action Complaint (the "Complaint")), and the registration of zero-coupon notes (the "Notes") (Counts V-VI of the Complaint), should be

24   certified.

25   [4] Defendants' expert, Dr. Lucy Allen, "didn't study whether or not Juniper stock is efficient." *See* Allen Dep. pp. 17-18. Nor did she consider the *Cammer* factors used for determining market efficiency. *Id.* pp. 26-27.

26   [5] Lead Plaintiff's *prima facie* showing of market efficiency is uncontested. *See* Marek Dec. That is all that is required to invoke the *Basic* presumption of reliance. *See, e.g., In re Infineon Techs. AG Sec. Litig.*, C04-04156-JW,

27   slip op. at 17-18, (N.D. Cal. Mar. 6, 2009); *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, No. C 01-20418 JW, 2004 WL 5326262, at *5 (N.D. Cal. May 27, 2004) (finding plaintiff's expert had made "a *prima*

28   *facie* showing that the market was efficient during the relevant period").

{1964 / BRF / 00096739.DOC v16}

1    Defendants thereby inject what is fundamentally a merits inquiry into the class

2    certification inquiry by requiring Lead Plaintiff to prove loss causation as an additional Rule 23

3    element in order for Lead Plaintiff to avail itself of the fraud-on-the-market presumption.

4    Defendants are well aware that this approach has been rejected by the courts within the Ninth

5    Circuit and other jurisdictions as contrary to *Basic* and Ninth Circuit authority. In *Basic*, the

6    Supreme Court held that it was inappropriate during the class inquiry for a district court to delve

7    into whether the statements at issue could have actually misinformed or cured the market and

8    changed the price of a security. "Proof of that sort is a matter for trial." *Basic,* 485 U.S. at 249

9    n.29.[6] Yet, the merits inquiry that Defendants seek – unrelated to Rule 23 – is precisely the type

10   of determination that this Court considered unnecessary in rejecting an open-ended discovery

11   schedule on class certification. *See* Order dated February 4, 2009 (Dkt. No. 192).

12        Defendants' premature challenge to loss causation relates to a partial corrective

13   disclosure in a May 16, 2006 report posted on the proprietary, subscriber-based website of a

14   boutique financial analyst, the Center for Financial Research and Analysis ("CFRA"). The

15   CFRA Report initially identified 17 companies, including Juniper, which had a high risk of

16   options backdating. When the information in the CFRA report and additional relevant facts were

17   made public on May 18 and May 19, 2006 by *The Wall Street Journal*, JP Morgan and the

18   financial media, Juniper's stock price promptly declined by 11% during these two days.

19   Defendants do not claim otherwise.[7] Rather, Defendants posit that the efficient market doctrine

20   requires that institutional investors would all immediately have rushed for the exits upon the

21   quite limited release of the CFRA Report, causing Juniper stock to decline on May 16, and not

---

[6] Contrary to Defendants' argument, in deciding a motion for class certification, a court should consider, without deciding, the merits only to determine whether the requirements of Rule 23 have been met. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992). Defendants are off base in claiming that Plaintiff cited *Dukes v. Wal-Mart, Inc.*, 474 F.3d 1214 (9th Cir. 2007), *withdrawn and superseded on denial of reh'g*, 509 F.3d 1168 (9th Cir. 2007), *reh'g en banc granted*, 556 F.3d 919 (9th Cir. 2009), for an incorrect standard of review on class certification. Lead Plaintiff never directly cited *Dukes* because rehearing *en banc* had been ordered and it was no longer precedent. Defendants, on the other hand, rely extensively on *Dukes* to support a misapplication of Ninth Circuit law that would extend broad-based merits determinations far outside the traditional bounds of Rule 23.

[7] *See In re Juniper Networks, Inc., Sec. Litig.*, 542 F. Supp. 2d 1037, 1050 (N.D. Cal. 2008); *In re Maxim Integrated Prods. Inc., Sec. Litig.*, No. C 08-00832 JW, 2009 WL 213969, at *8 (N.D. Cal. July 16, 2009) ("Loss causation may be alleged through a series of partial disclosures.") (citing *Juniper Networks*, 542 F. Supp. 2d at 1050).

1   two days later, when the **full market** was deluged with broad disclosure of far more information

2   implicating Juniper.

3       Defendants' argument conflicts with *Basic's* presumption of fraud on the market and

4   ignores the fact that Juniper's price inflation is independently evidenced by the stock declines

5   associated with its August 10, 2006 restatement announcement.  Their argument also conflicts

6   both with the deposition testimony in this case of its own expert and with the published opinion

7   of their defense industry consultant, NERA.  *See* Points I(A) and III(B)(1), *infra.* [8]  In addition,

8   Defendants' argument is premised upon exaggerated speculation that, because a few fund

9   managers and analysts accessed the CFRA Report, the institutions they worked for were in a

10  position to sell off their Juniper positions immediately.  *See* Point II(D), *infra.*  Defendants, at

11  most, raise a possibility of rebutting reliance as to certain institutions, which is best relegated to

12  post-trial proceedings related to individual Class member damages.

13      Finally, Defendants' argument that Lead Plaintiff is atypical because certain of its

14  investment advisors, after receiving the CFRA Report (1) did not sell the Funds' position or

15  (2) purchased additional shares, is not well taken.  The courts have routinely rejected similar

16  attacks on lead plaintiffs based upon their individual investment decisions or reliance on

17  investment advisors.  Further, Defendants' argument is disingenuous given that, as late as July

18  2006, Juniper was seeking to lull the market by claiming it was still uncertain of the need, if any,

19  for a financial restatement or the size and scope of any charges it might record.  Cmpt. ¶ 210.

20  Only after Juniper's August 10, 2006 announcement of a multi-year restatement at the end of the

21  Class Period, which was accompanied by a price decline of 9.2%, was the market fully corrected.

22      Accordingly, it was reasonable for Lead Plaintiff or other Class members to continue to

23  hold or to purchase new shares after Juniper's May 2006 partial disclosures.

24

---

25  [8] Under *Basic*, the market price reflects the actions of all market participants to material, publicly available
26  information.  *Basic*, 485 U.S. at 241-42.  Consistent with *Basic*, the fact that Juniper's rapid price declined over a
    two-day period once the information was disseminated to the full market on May 18 and May 19, 2006 supports the
27  inference that Juniper's misrepresentations inflated its stock price during the Class Period.  In contrast, Defendants'
    attempt to infer the absence of price inflation during the Class Period because a select group of institutions failed to
28  quickly sell based upon proprietary, nonpublic information is at odds with *Basic's* presumption.

1

**ARGUMENT**

2

**I.      COMMON QUESTIONS OF LAW AND FACT PREDOMINATE**

3

    **A.      Lead Plaintiff Is Entitled To The Presumption Of
Reliance Based Upon The Uncontested Showing That
Juniper's Stock Traded In An Efficient Market**

4

5

    Defendants, in effect, argue that they have rebutted *Basic*'s fraud-on-the-market

6

presumption of reliance by casting doubt on loss causation.  Under their theory, a detailed merits

7

inquiry is needed to determine whether the market reacted quickly enough to the information in

8

the May 16, 2006 CFRA Report in order to invoke the fraud-on-the-market presumption of

9

reliance. [9]  However, under Ninth Circuit law, resolution of this detailed fact-based dispute

10

regarding market impact is not relevant to class certification. [10]  Rather, it is the existence of the

11

efficient market – not the presence or absence of loss causation – that permits common issues to

12

be tried on a classwide basis.  In *Huberman v. Tag-It Pacific Inc.*, Civ. No. 07-55648, 2009 WL

13

485053, at *3 (9th Cir. Feb. 11, 2009), the Ninth Circuit reversed the denial of class certification,

14

concluding that "at this stage of the proceeding, *Huberman* satisfied Rule 23(b)(3)'s superiority

15

requirement by presenting evidence that Tag-It traded on an efficient market, thereby

16

establishing the application of the fraud-on-the-market presumption. . . .  Common questions of

17

fact and law predominate over individual questions pursuant to Rule 23(b)(3)."  Likewise, in *In

18

re Connectics Securities Litigation*, 257 F.R.D. 572, 578-9 (N.D. Cal. 2009), the Court held that

19

"Plaintiff has met its burden at this stage in the litigation by demonstrating that it traded on an

20

---

21

[9] Defendants' argument can be boiled down to a challenge to the "length over which price reaction can be properly measured (the event window)."  In rebuttal, Lead Plaintiff has met its burden with evidence that once the information in the CFRA Report and additional relevant facts became public, Juniper's price declined sharply on May 18 and 19, 2006.  *See* Marek Reb. ¶¶ 16-31.

22

23

[10] Defendants rely on the Second Circuit's decision in *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474 (2d. Cir. 2008), for their contention that the inquiry as to whether the fraud-on-the-market presumption applies necessarily requires the Court to make merits determinations as to whether the presumption has been rebutted. However, this approach has been repeatedly rejected within the Ninth Circuit, *see, e.g.*, *In re Micron Techs., Inc. Sec. Litig.*, 247 F.R.D. 527, 634 (D. Idaho 2007) ("While Defendants are entitled to rebut that presumption, that issue is appropriate for **resolution only after discovery**") (emphasis added); *In re Connectics Corp. Sec. Litig.*, 257 F.R.D 572, 578-9 (N.D. Cal. 2009) (same), and by at least one district court outside the Second Circuit.  *See In re Boston Scientific Corp. Sec. Litig.*, 604 F. Supp. 2d 275, 284-87 (D. Mass. 2009) (Authority indicates that evaluation of evidence of market impact at the class certification stage should differ from the Fifth Circuit and Second Circuit approaches because this merits inquiry does not implicate the Rule 23 criteria).

24

25

26

27

28

1   efficient market and is therefore entitled to the presumption of reliance." *Id.* As with

2   *Huberman, Connectics*, and other cases in the Ninth Circuit, the undisputed showing of market

3   efficiency entitles Lead Plaintiff to the presumption of reliance.

### B.    Proof Of Loss Causation Is Not A Requirement For Fraud-On-The-Market Presumption

Defendants' underlying contention that they are entitled to rebut the presumption of

reliance at the class certification stage by disproving loss causation has been specifically <u>rejected</u>

by the Courts in the Ninth Circuit and other jurisdictions that have considered the question.

These courts have repeatedly rejected the approach of the Fifth Circuit, which in *Oscar Private*

*Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007), became the only

Circuit to add loss causation as a requirement for class certification. *See, e.g., In re LDK Solar*

*Sec. Litig.*, 255 F.R.D. 519, 530 (N.D. Cal. 2009); *In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D.

628, 640-41 (S.D. Cal. 2009); *Micron*, 247 F.R.D. 627; *In re Metropolitan Sec. Litig.*, No. CV-

04-25-FVS, 2008 WL 5102303, at *2 (E.D. Wash. Nov. 25, 2008).[11] They have universally

rejected *Oscar* as incorrectly decided and as an extreme departure from the Supreme Court's

decision in *Basic*:

> The breadth of the *Oscar* holding is striking. It essentially injects
> what is a fundamental merits inquiry into the class certification
> inquiry through the back door: it requires plaintiff to prove loss
> causation in order to avail itself of the benefit of the fraud-on-the-
> market presumption (without which certification is virtually
> impossible).
>
> This order declines to adopt *Oscar*'s loss-causation requirement for
> class-certification. *Oscar* places the Fifth Circuit in the minority –
> indeed, apparently solitary – stance among circuits; it is in no small
> amount of tension with the Supreme Court's decision in *Basic v.*

---

[11] *See also In re Mills Corp. Sec. Litig.*, No. 1:06-cv-077, 2009 WL 1032792, at *7 (E.D. Va. Apr. 16, 2009) ("Requiring a plaintiff to 'prove' loss causation at class certification risks converting class certification into a hearing on the merits"); *Boston Scientific*, 604 F. Supp. 2d at 286 ("Recent **First Circuit** authority indicates that evaluation of evidence of market impact at the class certification stage should differ from the approaches of the Fifth Circuit and Second Circuit") (emphasis added) (internal quotes and citation omitted); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260 (N.D. Ala. 2009) ("the Oscar case has never been followed in the **Eleventh Circuit** and this court will not be the first to adopt it") (emphasis added); *In re Nature's Sunshine Prod.'s Inc. Sec. Litig.*, 251 F.R.D. 656, 665 (D. Utah 2008) ("Oscar appears to be in conflict with Supreme Court and **Tenth Circuit** precedent which warn against determining the merits at the class certification stage") (emphasis added).

1   *Levinson* . . . [T]his Circuit's precedent strongly suggests it would reject such a rule.

2   *LDK Solar*, 255 F.R.D. at 530. This Court should follow the unanimous decisions from courts

3   both within and outside this Circuit and reject *Oscar*'s loss causation requirement. As the Court

4   succinctly explained in *LDK Solar*, "[i]f the fraud did *not* inflate the market and subsequently

5   cause losses, the plaintiff will simply have failed to prove the merits of the case. Either way, it is

6   unclear how proof of loss causation becomes a prerequisite to *Rule 23* certification." *LDK Solar*,

7   255 F.R.D. at 531 (emphasis in original).

8       **C.    Proof Of Materiality Is Not Required For**
        **Fraud-On-The-Market Presumption**

9       Because the materiality of Juniper's admitted misstatements is another common issue to

10  be resolved at trial, Defendants' attack on materiality is no obstacle to class certification.[12]  The

11  Supreme Court has held that determinations of materiality are rarely appropriate, even at

12  summary judgment, as "these assessments are peculiarly ones for the trier of fact." *TSC Indus. v.*

13  *Northway, Inc.*, 426 U.S. 438, 450 (1976).

14      Lead Plaintiff has shown that Juniper stock traded in an efficient market – a conclusion

15  that Defendants have not challenged. Allen Dep. pp. 19, 22-7. Moreover, because the efficient

16  market is presumed to have absorbed all material information, and the question whether the false

17  disclosures were material is one that is shared by all class members, Lead Plaintiff has

18  established that common issues concerning reliance and materiality predominate.

19  **II.    DEFENDANTS HAVE NOT REBUTTED THE**
        **FRAUD ON-THE-MARKET PRESUMPTION**
20

21      **A.    While Not Required, Lead Plaintiff Has Established Loss Causation**

22      Defendants argue they have rebutted the fraud-on-the-market presumption because they

23  have shown that although the May 16, 2006 CFRA Report was available to certain institutional

24  investors, Juniper's stock price did not decline until May 18 and 19, rather than on May 16 or 17,

25

---

26  [12]  *See Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975) ("[e]very class member shares an overriding common
     interest in establishing the existence and materiality of misrepresentations"); *In re MetLife Demutualization Litig.*,
27  229 F.R.D. 369, 380 (E.D.N.Y. 2005) ("[T]he question of materiality alone . . . give[s] rise to a common issue to all
     members of the proposed class" and typically causes "'the predominance hurdle [to] have been cleared'").

28                                                                                                                      7

2006. Defendants rely primarily on the loss causation standard used by the Fifth Circuit, which "require[s] proof that the [defendant's] misstatement *actually moved* the market" to invoke the fraud-on-the-market presumption. *Oscar*, 487 F.3d at 265 (emphasis in original). Even if *Oscar* were the standard in the Ninth Circuit, which it is not, Lead Plaintiff has established that Juniper's stock price quickly dropped by 11.0% and 9.2%, respectively, in response to the curative disclosures in May and August 2006.[13]

### 1.   The August 10, 2006 Restatement Announcement And Subsequent Price Drop Constitutes Undisputed Evidence Of Loss Causation At The End Of The Class Period

As a threshold matter, Defendants miss the mark in focusing solely on the price impact of the May 2006 partial disclosures. The truth about Juniper's finances was not fully revealed until Juniper's announcement of a multi-year restatement, after the market close on August 10, 2006. Juniper's stock then reacted immediately on August 11, 2006, sustaining a statistically significant decline of 5.4%, on extraordinary trading volume of 35 million shares. Marek Dec. ¶ 75 and Ex. L. These facts are highly indicative of loss causation, and are confirmed by the views of market commentators. For example, *TheStreet.com* reported on August 11, 2006: "Juniper Networks . . . slumped 6% after the company said it could have to restate three years of earnings reports after it found backdated stock option grants." Marek Reb. Ex. O. A recent decision in this Circuit also supports this conclusion. *In re Marvell Techs. Group Ltd. Sec. Litig.*, No. C-06-06286 RMW, 2008 WL 4544439, at *10 (N.D. Cal. Sept. 29, 2008) (restatement announcement satisfies loss causation). Accordingly, even under *Oscar*, loss causation is satisfied, entitling Lead Plaintiff to the fraud-on-the-market presumption and setting the end of the Class Period. *See* Marek Reb. ¶¶ 41-43. Because a portion of the Class Period inflation can be independently linked to the August 10 announcement, whether or not inflation is also

---

[13] Dr. Allen's "Total Effect" analysis of the alleged curative disclosures in the Complaint is fundamentally flawed because: (1) it is not based on the same statistical procedure that Marek used in his declaration; and (2) it excludes from consideration May 19, 2006 and August 10, 2006, dates that Lead Plaintiff positively identified as associated with curative disclosure. *See* Marek Reb. ¶¶ 35-47.

1    attributable to the stock price decline in May 2006 is purely a damages issue that has no bearing

2    on class certification.  *See Blackie,* 524 F.2d at 906 n.22.

3    **B.    Lead Plaintiff's Theory Of Loss Causation, Based Upon A**
         **Multi-Day Event Window For Partial Disclosures On May 18 And**
4        **May 19, 2006, Is Consistent With The Efficient Market Theory**

5            Lead Plaintiff's theory of loss causation relating to the May 2006 price decline is

6    straightforward.  Starting on May 16 and continuing through May 19, partial disclosures about

7    Juniper's involvement in options backdating made their way into the market.  As new relevant

8    disclosures were widely disseminated by *The Wall Street Journal,* JP Morgan, and the financial

9    media, and the issue of options backdating itself garnered more importance and attention in the

10   market, the price of Juniper stock declined 4.5% and 6.5% on May 18 and 19, respectively, or a

11   total of 11%, on extraordinary trading volume of 18 million and 34 million shares, respectively.

12   Marek Reb. ¶¶ 19-31.[14]  As with the August 10 price drop, the financial media had no difficulty

13   attributing Juniper's stock declines to revelations about Juniper's stock option granting practices.

14   *Id.* at ¶¶ 25-26 and Exs. G, H.[15]  An event study conducted by Lead Plaintiff's expert confirms

15   what common sense suggests that (1) the price declines on May 18 and May 19 were attributable

16   to corrective partial disclosures about Juniper's option backdating fraud and were statistically

17   significant; (2) no other information or events relating to Juniper could have precipitated its stock

18   price declines on those two days; and (3) the May 18 and May 19 price drops are consistent with

19   the efficient market theory.  *Id.* at ¶¶ 19-34.

20           The Ninth Circuit has repeatedly rejected the approach Defendants advance – "a bright

---

[14] On May 18, 2006, *The Wall Street Journal* published an article primarily reporting on the criminal probe into options backdating at United Health Group and other companies.  The article first disclosed to the public that Juniper had been identified in a proprietary report issued by the CFRA as one of 17 companies that CFRA considered to have the "highest risk of having backdated options."  The same day, JP Morgan issued a report which applied a different method of analysis, but also identified Juniper as a backdating candidate, and identified new grant dates (a total of six), each one issued when Juniper's stock was at monthly lows.  *See* Marek Reb. ¶ 20.

[15] *TheStreet.com* reported that "Shares of Juniper fell 4% Thursday [May 18] on worries that the stock option grants will invite investigation and costly legal battles."  On May 19, another industry commentator reported: "The options scare appeared to be weighing on Juniper shares, which lost $1.04 (6.46%) to $15.06 in trading today [May 19]." "Options Scare Hits SafeNet, Juniper," Light Reading.  Similarly, Morgan Keegan attributed Juniper's May 18 and May 19 declines to "concerns from options expensing" in a May 22, 2006 report.  Marek Reb. ¶ 22 and Ex. E.  *See In re Bradley Pharms., Inc. Sec. Litig.,* 421 F. Supp. 2d 822, 829 (D.N.J. 2006) (together with stock price reaction, "unusually high volume of trading activity" is relevant to determining when market corrected price of stock).

1    line rule requiring an immediate market reaction" to new information – and instead holds that the

2    Courts must engage in a "fact-specific inquiry." *No. 84 Employer-Teamster Joint Council*

3    *Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003) (citing

4    *Basic*, 485 U.S. at 246-48).  The Court also specifically declined "to adopt any particular theory

5    of how quickly and completely publicly available information is reflected in the market price."[16]

6    In *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008), a case Defendants fail to cite,

7    the Ninth Circuit reaffirmed that *America West* "applies with equal force to the loss causation

8    requirement": "[a] limited temporal gap between the time a misrepresentation is publicly

9    revealed and the subsequent decline in stock value does not render a plaintiff's theory of loss

10   causation *per se* implausible." *Id.* at 1057; *see also Maxim*, 2009 WL 213969, at *6 (reiterating

11   *Gilead*'s holding that "there is no bright-line rule requiring an immediate market reaction.").[17]

12   Moreover, in *Gilead*, plaintiff adequately pled loss causation despite a temporal gap of three

13   months between an initial partial disclosure, and a fuller disclosure that was then followed

14   immediately by a 12% price drop. *Gilead*, 536 F.3d at 1058.  Here, the temporal gap is only two

15   days from the limited release of the CFRA Report on May 16 to the more broadly disseminated

---

16   [16] Defendants concede that *America West* expressly rejected the bright-line rule in *Oran v. Stafford*, 226 F.3d 275
17   (3rd Cir. 2000).  Defendants however, incorrectly argue that *America West* is inapposite because the time lag in
     *America West* was due to defendants' false assurances to investors, whereas here, Lead Plaintiff has purportedly not
18   provided a tenable reason for delay in Juniper's price reaction.  Opp. at 13-14 n.11.  Lead Plaintiff however, has
     adduced numerous facts supporting a multi-day delay in price reaction: (1) the May 16, CFRA Report was primarily
19   available to, and accessed by, paying subscribers.  There is no indication from the review of publicly available
     information that knowledge of the existence of the CFRA Report was publicly available until May 18, 2006; (2) the
20   first conventional market-wide disclosure relating to Juniper's options backdating was not made until May 18, 2006;
     (3) contemporaneous market commentary attributing Juniper's May 18 and 19, 2006 common stock price declines to
21   disclosure of backdating-related issues; (4) the market climate and risk assessment regarding backdating disclosures
     changed daily and dramatically after May 16, 2006; (5) Juniper misrepresented to the market as late as May 9, 2006,
22   in its Form 10-Q for the quarter ending March 31, 2006, that stock options were issued at the market price on the
     reported date of the grant; and (6) Juniper repeated this false representation in response to numerous inquiries about
23   the CFRA Report by institutional investors.  Marek Reb. ¶¶ 14-34.  See notes 23 and 35, *infra*.

24   [17] *See also In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196, 211 (E.D. Pa. 2008) (two-day reaction was "indicative of a
     cause-and-effect relationship"); *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 575 (S.D.N.Y. 2007) (loss
25   causation where initial price increase following disclosure was followed by a decline of 12.5% over three days); *In
     re Hollinger Intern., Inc. Sec. Litig.*, No. 04C 0834, 2006 WL 1806382, at *13 (N.D. Ill. Jun. 28, 2006) (loss
26   causation despite absence of initial decline, where price dropped for several days after; *Cross v. 21st Century
     Holding Co.*, No 00 CIV 4333 AGS, 2002 WL 31158901, at *6-7 (S.D.N.Y. Sept. 27, 2002) (declined to adopt rule
27   that the "fraud-on-the-market theory must fail where a relatively brief period of price stability follows a public
     disclosure, especially where the few days of price stability is followed by a relatively steady decline in share price").

28

media reports on May 18, and an immediate 11% price drop on May 18 and 19.[18]  Furthermore,

additional enhanced curative information about Juniper's backdating was widely disseminated

during the intervening two day time period.  Finally, Lead Plaintiff's expert opinion is not alone

in supporting a finding of loss causation here, where the market reacted over multiple days.

Marek Reb. ¶¶ 12-31.  Both Defendants' expert Dr. Allen and NERA, where she serves as a

Senior Vice President, support allowing multi-day windows for market reaction when conducting

an event study with a small number of securities or a single security such as Juniper common

stock.[19]  In this case, there are several reasons that call for the expansion of the event window

with regard to the May 16 disclosure.[20]

Therefore, the presumption of reliance afforded by the fraud-on-the-market theory is not

rebutted by the fact that Juniper's share price did not start to decline until May 18, 2006.

**C.    While Not Required, Lead Plaintiff Has Established
        The Misrepresentations And Omissions Were Material**

A misrepresentation or omission is material if there is a substantial likelihood that a

reasonable investor would consider the misrepresentation or omission important.  *TSC Indus.,*

426 U.S. at 449.[21]  Defendants did not contest materiality on the motion to dismiss, and based

upon the size and scope of the restatement, the intentional nature of the massive wrongdoing, and

the statistically significant price declines responding to the corrective disclosures, Lead Plaintiff

will easily prove materiality.  *See In re Sipex Corp. Sec. Litig.*, No. C 05-00392 WHA, 2005 WL

---

[18] In *Maxim* plaintiff failed to plead a causal connection between a disclosure and a price drop 8 months later. *Maxim*, 2009 WL 213969, at *7.  Similar problems do not exist in this case.

[19] See Allen Dep. pp. 101, 111 ("I've done price reactions that have been longer than one day" and "I think there are a number of academic studies.  As I said, I think some academic studies look at, you know, monthly reactions.  So I think there are academic studies that look at periods different than one day"); DMITRY KRIVIN ET AL., NERA ECON. CONSULTING, DETERMINATION OF THE APPROPRIATE EVENT WINDOW LENGTH IN INDIVIDUAL STOCK EVENT STUDIES (2003) ("it is not necessary for a stock price to fully incorporate all information immediately" holding "nothing in the theory of efficient markets requires that the new correct valuation be arrived at immediately"). Available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=466161.

[20] *See* note 16, *supra* for full description.

[21] Furthermore, information "need not be important enough that it 'would have caused the reasonable investor to change his [decision]. . . . Rather, the information need only be important enough that it 'would have assumed actual significance in the deliberations of the reasonable shareholder.'"  *Folger Adam Co. v. PMI Indus. Inc.*, 938 F.2d 1529, 1533 (2d Cir. 1991) (quoting *TSC Indus.*, 426 U.S. at 449).

1  3096178, at *1 (N.D. Cal. Nov. 17, 2005) (admission that financial reports "would be 'restated'

2  meant that the as-issued reports were materially inaccurate under GAAP").

3      Moreover, while Defendants argue that the lack of immediate price movement on May

4  16, 2006 shows that institutional investors were not influenced by stock option disclosures in

5  valuing Juniper, "a price impact is not required for a finding of materiality.  The Ninth Circuit

6  specifically rejected any such requirement."  *LDK Solar*, 255 F. Supp. 2d at 531 (citing *America*

7  *West*, 320 F.2d at 934).  In addition, the Company's internal documents reveal that Defendants

8  themselves considered stock option information to be highly material to investors.  For example,

9  on March 14, 2003, in an e-mail from former Chief Financial Officer Marcel Gani to defendant

10  Lisa Berry regarding an analyst report issued by JP Morgan, he stated: **"It was worth tweaking**

11  **this stock option number as it seems like the first thing that these guys look at these days."**

12  Harrison Reply Dec. Ex. 4 (emphasis added).  Similarly, in an undated letter from Gani to

13  Juniper's employees, he wrote "[I]f we were to have expensed our stock program in 2004, net

14  income would have been reduced by $93.7m or 57%.  **Shareholders, especially institutional**

15  **shareholders, are assessing the 'true cost' of employee stock programs and the impact on**

16  **shareholder value."**  Harrison Reply Dec. Ex. 5 (emphasis added).

17      Furthermore, CEO Scott Kriens and CFO Gani certified the false statements in the

18  Company's Forms 10-K and 10-Q, and General Counsel Berry signed the false proxy statements

19  and Notes registration statements incorporating false financial information, directly impugning

20  Juniper management's integrity, which has repeatedly been found highly material to investors.[22]

21  As managing director Kari Montanus of J.W. Seligman & Co., explained, "[I]t is important for

22  me to note that I do not condone a company's backdating of options, especially if done

23  knowingly and with the intent to mislead investors."  Opp. Ex. 40 ¶ 8.  Defendants recognized

24

25

26

---

27  [22] *See Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2007 WL 1140660, at *8 (N.D. Cal. Apr. 17, 2007);
*In re Comverse Tech. Inc. Sec. Litig.*, 543 F. Supp. 2d 134 (E.D.N.Y. 2008) (options backdating); *In re Monster*

28  *Worldwide, Inc. Sec. Litig.*, No. 07 Civ. 2237, 2008 WL 2721806, at *8 (S.D.N.Y. July 14, 2008) (same).

1   this fact in an internal employee presentation stating: "Anything that puts [management] integrity

2   or brand at risk will have a negative effect on valuations."[23]  Harrison Reply Dec. Ex. 6.

3   **D.   Institutional Investors' Failure To Change Their**
        **Investment Strategies Regarding Juniper Does Not**
4       **Rebut The Fraud-On-The-Market Presumption Of Reliance**

5          Defendants' argument assumes that because 34 of Juniper's top 100 institutional

6   shareholders of Juniper stock were given notice of the CFRA Report, (1) the individuals that

7   received notice within these institutions actually read the CFRA Report; (2) they understood the

8   CFRA Report's potential ramifications on Juniper's stock price; (3) they had trading authority

9   over hundreds of millions of shares; (4) they would have acted immediately to sell Juniper stock

10  if they had considered the information in the CFRA Report material; and (5) the fact that

11  Juniper's stock price did not immediately decline due to a mass exodus by the institutions means

12  that the false profits and other misrepresentations about stock options during the Class Period did

13  not inflate Juniper stock.  Defendants' argument is based on a series of speculative assumptions

14  and *non-sequiturs* that are not supported by the facts.

15         Beyond the narrow fact that the e-mail regarding the CFRA Report was received by at

16  least one person at subscribing institutions owning Juniper stock, Defendants are unable to trace

17  the actual number of actual shares owned and tradable by portfolio managers who received and

18  read the CFRA Report, and who had authority to trade Juniper stock.  Notwithstanding the vast

19  amount of information amassed by Defendants from documents, subpoenas and depositions of

20

21

22

---

23  [23] The fact that institutional holders contacted Juniper and CFRA regarding options pricing belies Defendants' argument that institutions did not consider this information to be important.  Moreover, the Juniper Defendants' concealment of the truth demonstrates the importance of this information.  For example, Amy Raskin from Alliance Bernstein, Juniper's largest shareholder, e-mailed Juniper on May 12, 2006 asking about "Juniper's policy around issuing options."  Harrison Reply Dec. Ex. 7.  Ms. Raskin felt that the topic of backdating was "gaining increasing momentum," and with United Health having "gotten creamed because of concerns around inappropriate pricing," she clearly thought information relating to potential inappropriate options pricing at Juniper was material.  Defendants responded by misleading Ms. Raskin: "Juniper's options receive an exercise price equal to the closing market price on the date of the grant."  Harrison Reply Dec. Ex 8.  Similarly, Artisan's having commissioned its own backdating study is evidence of the materiality of the issue.  Opp. Ex. 40 ¶ 8 ("the risk of options backdating was one of the many factors that I considered").

institutions, their 13-page 8"x14" spreadsheet submission reveals only that a few fund managers actually accessed the CFRA Report.[24] *See* Opp. App. A.

Defendants' contention (Opp. at 15 & n.13) that these institutions should have quickly sold off their positions to avoid the price decline once the rest of the market was apprised, ignores the reality that had the institutions liquidated even a small fraction of their hundreds of millions of shares, they would have caused the very price decline Defendants claim selling would have obviated. *See Desai v. Deutsche Bank Sec. Litig.*, --- F.3d ---, 2009 WL 2245223, at *1 (9th Cir. July 29, 2009) ("The problem with this [sell-off] model, however, is that as the [holder] sells off his shares he depresses the price"). Moreover, Defendants' Opp. Ex. 84 shows that at least between 43.9 and 52.6 million of the shares held by Juniper's top 100 institutional owners were held in "index" funds. Marek Reb. ¶ 18. These funds do not buy and sell securities on the basis of fundamental information, rather they hold Juniper common stock in a predetermined relation to an equity market index (e.g., the S&P 500 Index or the Russell 3000 Index). *Id.* In addition, Lead Plaintiff allocated certain assets to index managers who are required by contract or investment style to maintain the portfolios' exposure to individual stocks, even when those stocks are the subject of adverse developments, and who, therefore, could not have sold their Juniper shares in any event.

Accordingly, an institution's failure to sell on a particular day in response to bad news does not provide a reliable indication whether or not it believed the information was important, or whether it relied on the market price when it initially purchased their stock.[25] "No purchaser

---

[24] Defendants' submission reveals that very few managers accessed the CFRA Report on May 16, 2006: 1 manager at AllianceBernstein, L.P. (4 persons total accessed the report); 1-3 managers at T. Rowe Price Associates (5 persons total); 2 managers at Fidelity Management & Research (12 persons total); 2 managers at MFS Investment Management (0 total); 2 managers at Artisan Partners L.P. (2 persons total); 0 manager at RiverSource Investments, LLC (1 person total); 0 manager at Smith Barney Asset Management (0 total); 0 manager at Barclays Global Investors, N.A. (1 person total); 0 manager at Oppenheimer Funds, Inc. (1 person total); 0 manager at Manning & Napier Advisors, Inc. (no one read the CFRA report; 2 analysts received emails that listed Juniper as one of the CFRA's high risk companies for options backdating).

[25] By way of example, Juniper's second largest shareholder, T. Rowe Price, believed the stock option revelations were highly material information that created a buying opportunity in the wake of an expected price decline. *See* Research Report dated May 23, 2006, Harrison Reply Dec. Ex. 9.

1  of securities regardless of trading methodology or strategy would knowingly trade where

2  material information has been misstated or withheld by an issuer."[26]  After all, "Who would

3  knowingly roll the dice in a crooked crap game?"  *Basic*, 485 U.S. at 246-47.

4          In short, Defendants' conclusion that Juniper stock was not inflated during the Class

5  Period because institutions who received the CFRA Report did not immediately sell their

6  holdings is wholly unsupported.

7  **III.    LEAD PLAINTIFF'S CLAIMS ARE TYPICAL OF THE CLASS**

8          Rule 23's typicality requirement focuses on whether (1) class members' claims arise from

9  the same course of conduct resulting in similar injuries, and (2) class members make similar

10  legal arguments to prove liability.  *In re Cirrus Logic Sec. Litig.*, 155 F.R.D. 654, 657 (N.D. Cal.

11  1994).  Accordingly, "differences in the amount of damages, the size or manner of [stock]

12  purchase, the nature of the purchase will not render a claim atypical in most securities cases."

13  *Yammer v. Boich*, No. C-92-20597 RPA, 1994 WL 514035, at *4 (N.D. Cal. Sept. 15, 1994).

14      **A.    Post-Partial-Curative-Disclosure Purchases Do Not Defeat Typicality**

15          Defendants argue that the fact that some of Lead Plaintiff's financial advisors made

16  purchases of Juniper stock after May 26, 2006 undercuts Lead Plaintiff's reliance on the integrity

17  of the market and makes it atypical.[27]  They are wrong on the facts and the law.  Lead Plaintiff

18  was not a net purchaser; it was a **net seller** of approximately 1.5 million shares of Juniper stock

19  between May 26 and August 10.  Harrison Reply Dec. Ex. 10.

20          Moreover, the overwhelming majority of courts – including those within this Circuit –

21  have rejected the proposition that a plaintiff's purchases after a partial disclosure subjects it to

22  unique defenses that make it atypical under Rule 23(a)(3).  *See, e.g., In re Providian Fin. Corp.*

---

[26] *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 376 (S.D.N.Y. 2000) (granting class certification despite plaintiff's "propriety trading methodology," noting that regardless of the trading strategy or methodology employed, all claims "rely on the same statutory provisions"); *Cromer Finance Ltd. v. Berger*, 205 F.R.D. at 129 n.19 ("Even where an investor seeks a risky investment and losses are foreseeable, he is entitled to truthful and accurate information in making decisions.").

[27] Defendants select May 26th because, by that date, the CFRA Report had prompted internal and government institutions and a derivative lawsuit was filed, thereby raising "serious questions . . . regarding the accuracy of Juniper's prior statements about its stock options granting practices. . . ." Opp. at 26-27.

1   *Sec. Litig.*, No. C 01-03952 CRB, 2004 WL 5684494, at *3-5 (N.D. Cal. Jan. 15, 2004).[28]  In

2   *LDK Solar*, the Court explained that "courts have held that where the fraud is only partially

3   revealed (and the stock price only partially adjusted), or where factual uncertainty persists

4   regarding the extent to which a disclosure prevented the fraud, the presumption is not defeated,

5   and the class can contain members who purchased both before and after the alleged corrective

6   disclosure." *LDK Solar*, 255 F.R.D. at 528 (citing cases).[29]

### B.   Lead Plaintiff's Use Of Investment Managers And Their Decision Not To Sell After A Partial Disclosure Does Not Defeat Typicality

Citing the decision in *Arrington v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d

615 (9th Cir. 1981), Defendants claim that Lead Plaintiff is atypical because certain of its

investment advisors received the CFRA report but did not immediately sell Juniper stock on May

16 to "mitigate" damages.  Opp. at 25-6.  However, the fact that Lead Plaintiff retained managers

who employed a variety of strategies is not unique, nor does it render Lead Plaintiff atypical.

"Making careful investment decisions does not disqualify an investor from representing a class

of defrauded investors or from relying on the presumption of reliance that is ordinarily available

. . . in securities fraud actions." *Providian*, 2004 WL 5684494, at *3 (quoting *In re Worldcom,

Inc. Sec. Litig.*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003)).

Moreover, this Court expressly rejected Defendants' argument in *In re Valence*

*Technology Securities Litigation*, No. C-95-20459 JW, 1996 WL 119468 (N.D. Cal. Mar. 14,

1996).  In *Valence*, the Court held that defendants' reliance on *Arrington*'s failure-to-mitigate

language "amount[s] to the contention that [Plaintiff] is a sophisticated investor [but] [e]ven after

---

[28] *See also In re Emulex Corp., Sec. Litig.*, 210 F.R.D. 717, 719 (C.D. Cal. 2002); *In re Adobe Sys., Inc. Sec. Litig.*, 139 F.R.D. 150, 155 (N.D. Cal. 1991); *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 137 (5th Cir. 2005) (surveying case law) ("EDS"); *In re Monster Worldwide, Inc., Sec. Litig.*, 251 F.R.D. 132 (S.D.N.Y. 2008); *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 203-04 (E.D. Pa. 2008).  Defendants rely on a few outlier cases which, under the circumstances in those cases, found that typicality was not present.  As recognized by the great weight of authority, however, the holding in those few cases rejecting typicality "is not generally accepted." *Feder*, 429 F.3d at 137. Moreover, even if Defendants were able to articulate a defense that was unique to Plaintiff, typicality would not be destroyed, as Defendants have failed to establish that Plaintiff would be "preoccupied" with the purported unique defense such that it would become a "major focus" of the litigation.  *See Providian*, 2004 WL 5684494, at *4.

[29] Defendants reliance on *Rolex Employees Retirement Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658 (D. Or. 1991) is misplaced as it has been consistently rejected both within and without this district.  *See, e.g., Connectics*, 257 F.R.D. at 575 (citing *Feder*, 429 F.3d at 137 (finding that view espoused in *Rolex* is "not generally accepted")).

1   *Hanon*, this is not sufficient reason to deny certification as a class representative." *Valence*,

2   1996 WL 119468, at *6 (citing *Blackie*, 524 F.2d at 905).[30]  This Court's reasoning in *Valence*

3   applies with equal force to Lead Plaintiff: "To the extent that any difference exists among

4   shareholders in terms of their actual reliance [or] . . . damages . . . such issues may be addressed

5   during subsequent phases of the trial." *In re Magma Design Automation, Inc. Sec. Litig.*, 2007

6   WL 2344992, at *2-3 (citing *Blackie*, 524 F.2d at 902).

7   **IV.   THE CLASS IS APPROPRIATELY DEFINED**

8       **A.   The Class Period Should End On August 10, 2006**

9           Defendants' argument for shortening the Class Period ending date to May 26, 2006 – a

10   date after just partial corrective disclosures, and before full disclosure -- is without merit.  The

11   Court in *LDK Solar* recently rejected a similar argument, explaining:

12           If some tentative or partial disclosure of fraud is published but the
   truth is not fully revealed, there would be no reason to assume that

13           the market fully recovered from the impact of the
   misrepresentation or omission.  Investors who purchased after such

14           a disclosure may well have done so at a price still inflated by the
   same fraud (even if less so) and may suffer losses when the **full**

15           details of the fraud are exposed.  Not every . . . partial disclosure of
   fraud immediately rebuts the fraud-on-the-market presumption.

16
   *LDK Solar*, 255 F.R.D. at 528-29 (emphasis in original).[31]  *See also Infineon Techs.*, Slip op. at

17
   15 ("The finding that an ordinary investor had sufficient information to conduct a reasonable

18
   investigation into the veracity of representations by Infineon and its officers is not equivalent to a

19
   finding that the market had sufficient corrective information to render the fraud-on-the-market

20
   presumption unreasonable").  Harrison Reply Dec. Ex. 11.

21

22   ───────────────────

23   [30] *See Cooper*, 254 F.R.D. at 640 ("Issues such as certain members' damages, timing of sales and purchases, or standing to file suit, do not have the same primacy . . .  The common issues predominate over the individual ones") (emphasis added); *Schaefer v. Overland Express Family of Funds*, 169 F.R.D. 124, 128-29 (S.D. Cal. 1996)

24   ("differences in the amount of damages, the size or manner of purchase, the nature of the purchase, and even the specific document influencing the purchase will not render a claim atypical in most securities cases").

25

26   [31] Defendants try to distinguish *LDK* on the grounds that the company negated the partial disclosure by denying any misconduct.  On the contrary, *LDK* found that the partial disclosure broached "few details of [the] allegations,"

27   whereas a subsequent corrective article "went into far greater detail regarding . . . [the] allegations . . . [and] the stock price performance confirms as much." 255 F.R.D. at 529.  Moreover, Juniper, like LDK, both publicly and

28   privately, misled investors as to the truth after the partial disclosure.  *See* pp. 10, 13, 19 and nn. 16, 23, 35.

PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION – CASE NO. 06-04327-JW

{1964 / BRF / 00096739.DOC v16}

1    As shown above in Point II(A)(1), the facts overwhelmingly demonstrate that August 10,

2    2006 is the proper Class Period end date.  On that date, Juniper admitted that its accounting for

3    stock options had been improper and advised investors not to rely on its historic financial results.

4    Juniper's stock price fell by a total of 9.2% over the course of August 10 and 11, 2006.[32]  This

5    statistically significant decline in the stock price is compelling evidence that the market was not

6    cured by the earlier disclosures in May.  *Alaska Elec. Pension Fund v. Flowserve Corp.*, --- F.3d

7    ----, 2009 WL 1740648, at *9 (5th Cir. June 19, 2009); *LDK Solar*, 255 F.R.D. at 528-29.

8    Indeed, as late as July 2006, Defendants claimed they were uncertain whether a financial

9    restatement was even warranted.  Cmpt. ¶ 210.  The event study prepared by Mr. Marek further

10   supports the conclusion that the market was not fully cured prior to the August 10

11   announcement.  *See* Marek Reb. ¶¶ 41-44 and Ex. L.

12   **B.**      **The Class Should Include Recipients Of The CFRA Report**

13   Defendants advance a variation of their "failure to mitigate" argument in claiming that

14   institutions that received the CFRA report prior to May 17, 2006 should as a matter of law be

15   excluded from the Class for immediately failing to sell.  However, since the full details of the

16   fraud were not revealed on August 10, it was impossible for recipients of the CFRA report to

17   "mitigate" their damages.  In any event, the federal securities laws do not obligate an investor to

18   "cut and run" in order to recover damages.  *See In re Royal Dutch/Shell Transp. Sec. Litig.*, 404

19   F. Supp. 2d 605, 608 (D.N.J. 2005) ("Nothing in Section 21D(e) requires a sale of the subject

20

21

22   [32] Courts have emphasized that "certification of a broader class period is appropriate when questions of fact remain
     as to whether a purportedly curative press release effected a complete cure of the market." *In re Interpublic*, No. 02
23   Civ. 6527(DLC), 2003 WL 22509414, at 5 (S.D.N.Y. Nov. 6, 2003). *See also WorldCom*, 219 F.R.D. at 307
     (refusing to shorten class period at class certification where "significant questions of fact remain as to whether the
24   disclosures provided an effective cure").  Several cases cited by Defendants also support ending the class period
     with the disclosure of the restatement. *See, e.g., Semerenko v. Cendant Corp.*, 223 F.3d at 181-2 (class period ended
25   when company disclosed accounting irregularities and warned investors not to rely on its prior financial statements);
     *In re Fed. Nat'l Mortg. Ass'n, Sec., Deriv. & "ERISA" Litig.*, 247 F.R.D. 32, 38-40 (D.C. Cir. 2008) (same); *In re
26   LTV Sec. Litig.*, 88 F.R.D. 134, 147-8 (N.D. Tex. 1980) (same). *See also Peil v. Nat'l Semiconductor Corp.*, 86
     F.R.D. 357, 369 n.12 (E.D. Pa 1980) (class period end date when retracted earlier projections); *Kriendler v. Chem.
27   Waste Mgmt, Inc.*, 877 F. Supp. 1140 (N.D. Ill. 1995) (class period end date when company announced risk of
     material write down).

28

PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION – CASE NO. 06-04327-JW          18

{1964 / BRF / 00096739.DOC v16}

1   securities . . . in order for a plaintiff potentially to be eligible for damages.  Requiring a sale of

2   the subject security thus would be inconsistent with this statutory scheme").[33]

3        Here, the institutions employed a wide variety of investment strategies.[34]  The reliance on

4   these strategies does not disqualify institutions as members of the Class.  Nor does it mean that

5   they did not consider the misstatements to be material.  Strikingly, Defendants seek to exclude

6   from the Class some of the very institutions that Juniper specifically and falsely assured that the

7   Company had not engaged in an options backdating fraud.  For example, when Amy Raskin

8   from Alliance Bernstein asked Juniper about its options pricing practices on May 12, 2006,

9   Juniper reiterated its public misrepresentations that "Juniper's options receive an exercise price

10  equal to the closing market price on the date of the grant."  Harrison Reply Dec. Ex. 8.[35]

11       For the same reasons that the Class Period should not be truncated and that Lead Plaintiff

12  is not atypical based on its failure to sell Juniper stock after a partial disclosure (*see* Point III(B),

13  *supra*), institutions that received the CFRA report prior to May 17, 2006 should not be excluded

14  from the Class.  *See Blackie*, 524 F.2d at 906.

15       **C.    The Class Should Include In-And-Out Traders**

16       Defendants' argument that "in-and-out" purchasers (those that both buy and sell within

17  the class period) should be excluded from the Class is not appropriate at this stage.  Whether a

18  particular in-and-out purchaser is damaged will depend on the different levels of inflation in the

19

20  [33] *See also Duncan v. Theratx Inc.*, 775 A.2d 1019, 1026 (Del. 2001) ("The suggestion that stockholders reasonably
21  could have acted to avoid unnecessary harm by selling or retaining the shares assumes that the stockholders know
    that the share price is set to decline or rise at the time they make their decision").

22  [34] Ms. Raskin from Alliance Bernstein testimony at deposition supported Lead Plaintiffs' understanding of market
    behavior despite Defendants' counsel's effort to elicit contrary evidence.  She stated: "we are long-term investors, so
23  – and I'll speak for myself, but when I recommend a stock, there tends to be many reasons and a fully vetted thesis.
    So rarely does a piece of information come out that would, in and of itself, invalidate the whole thesis and cause a
24  quick change in my opinion on the stock.  **You kept iterating the "quick" part of that.  Things change over
    time.**" Harrison Reply Dec. Ex. 12 (emphasis added).

25  [35] Artisan Partners also contacted Juniper about its options pricing practices, and it too was told "Juniper's options
    receive an exercise price equal to the closing price on the date of the grant."  Harrison Reply Dec. Ex. 13.  T. Rowe
26  Price contacted CFRA "pushing back about JNPR's inclusion in our options backdating" because it thought
    Juniper's inclusion in the CFRA report was unwarranted.  Opp. Ex. 60 at CFRA 199A.  T. Rowe Price then
27  contacted Juniper and was given the company line regarding the structured procedures in place for stock option
    grants and Juniper had no indication of backdating.  Harrison Reply Dec. Ex. 14.

28

1 | securities at the times of those transactions; however, such a finding is unnecessary for any

2 | element of Rule 23.[36]

3 | **V.      A NOTEHOLDER CLASS SHOULD BE CERTIFIED**

4 | Defendants erroneously assert that Lead Plaintiff lacks standing to assert Note

5 | purchasers' claims. Opp. at 17-18. In denying Defendants' motion to dismiss, this Court ruled

6 | that "Plaintiffs have standing to represent the noteholders' claims because Lead Plaintiffs' claims

7 | are based on allegations of improper conduct in issuing the same false financial statements upon

8 | which the noteholders' claim would be based." *Juniper*, 542 F. Supp. 2d at 1052. Under the law

9 | of the case, Lead Plaintiff has standing to seek recovery for Note purchasers. Moreover, this

10 | identical argument was rejected less than two months ago by another court in this District. *See*

11 | *Connectics,* 257 F.R.D. at 579 (certifying bondholder class where plaintiff held only common

12 | stock). Here, the stock purchasers and bond purchasers have common claims regarding

13 | Defendants' Class Period securities violations, and will need to develop the same facts to prove

14 | their claims at trial.[37]

15 | **CONCLUSION**

16 | For the reasons stated above, Lead Plaintiff has met its burden of showing that the

17 | elements of Rule 23 are satisfied. Accordingly, Lead Plaintiff respectfully requests the Court to:

18 | (1) certify the Class; (2) appoint the New York City Pension Funds as Class Representative; and

19 | (3) appoint Lowey Dannenberg Cohen & Hart, P.C. as Class Counsel.

20 |

21 | DATED: August 7, 2009

22 |

23 |

24 |

---

[36] *See, e.g., In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 543-44 (E.D. Va. 2006) (considering *Dura*, and finding that "[i]n cases where . . . there are multiple disclosures, in-and-out traders may well be able to show a loss"); *In re Rent-Way Sec. Litig.*, 218 F.R.D. 101, 119 (W.D. Pa. 2003) ("The degree of price inflation on any given day during the class period may well differ from the degree of inflation on a different day during the same period").

[37] *See WorldCom*, 219 F.R.D., at 280; *In re Sepracor Inc.*, 233 F.R.D. 52, 56 (D. Mass. 2005) ("purchasers of different types of securities have often been found qualified to represent purchasers of other types of securities of the same issuer").

PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION – CASE NO. 06-04327-JW

{1964 / BRF / 00096739.DOC v16}

20

1

2
LOWEY, DANNENBERG COHEN & HART, P.C.

3

4
BARBARA J. HART
DAVID C. HARRISON
5
TODD S. GARBER
One North Broadway, 5th Floor
6
White Plains, NY  10601-2310
914-733-7228 (telephone)
7
914-997-0035 (facsimile)

8
*Counsel for Lead Plaintiff*

9

10
WILLEM F. JONCKHEER
SCHUBERT JONCKHEER KOLBE
   & KRALOWEC LLP
11
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
12
415-788-4220 (telephone)
415-788-0161 (facsimile)

13

14
*Local Counsel*

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                                                                21