1  BARBARA HART (*pro hac vice*)
   DAVID C. HARRISON (*pro hac vice*)
2  TODD GARBER (*pro hac vice*)
   LOWEY DANNENBERG COHEN & HART, P.C.
3  One North Broadway, Suite 509
   White Plains, NY 10601-2310
4  Telephone: 914-997-0500
   Facsimile:  914-997-0035
5
6  *Lead Counsel for the New York City Pension Funds and the Putative Class*

7  WILLEM F. JONCKHEER S.B.N. 178748
   SCHUBERT JONCKHEER KOLBE & KRALOWEC LLP
8  Three Embarcadero Center, Suite 1650
   San Francisco, CA 94111
9  Telephone: 415-788-4220
   Facsimile:  415-778-0160

10 *Local Counsel*

11            UNITED STATES DISTRICT COURT

12          NORTHERN DISTRICT OF CALIFORNIA

13                SAN JOSE DIVISION

14

15 |                                        | No. C06-04327-JW                        |
   | IN RE JUNIPER NETWORKS, INC. SECURITIES LITIGATION | **LEAD PLAINTIFF'S OPPOSITION TO THE JUNIPER DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS RELATING TO THE MAY 2006 DISCLOSURES** |

16

17

18
   DATE:        November 2, 2009
19 TIME:        9:00 a.m.
   BEFORE:      Hon. James Ware
20

21

22

23

24

25

26

27

28

LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW

{1964 / BRF / 00097850.DOC v9}

1

## TABLE OF CONTENTS

2   TABLE OF AUTHORITIES ............................................................................................... ii

3   INTRODUCTION .......................................................................................................... 1

4   STATEMENT OF FACTS .............................................................................................. 4

5   ARGUMENT

6   I.      THE JUNIPER DEFENDANTS' MOTION UNDER RULE
        12(C) SHOULD BE REJECTED AS UNTIMELY AND
7       PROCEDURALLY DEFECTIVE SINCE THE RELIEF
        THEY SEEK WOULD DISPOSE OF NEITHER THE
8       ENTIRE COMPLAINT NOR ANY CLAIM FOR RELIEF
        OF THE COMPLAINT ............................................................................... 8

9
    II.     THE JUNIPER DEFENDANTS' UNTIMELY MOTION
10          FOR RECONSIDERATION OF THIS COURT'S DECISION
        ON THE MOTION TO DISMISS SHOULD BE DENIED ............................... 8
11
    III.    LOSS CAUSATION RELATING TO THE MAY 2006
12          DISCLOSURES IS LAW OF THE CASE ...................................................... 9

13          A.      Motion to Dismiss ............................................................................ 9

14          B.      Class Certification ........................................................................... 10

15  IV.     THE MAY 2006 DISCLOSURES REVEALED FACTS
        WHICH WERE CURATIVE IN THE MARKET,
16      THEREBY SATISFYING LOSS CAUSATION

17          A.      The Standard for Pleading Loss Causation .......................................... 11

18          B.      Lead Plaintiff Alleges Strong Factual
                Support for Its Theory of Loss Causation .......................................... 14
19
            C.      *Metzler* Is Not An Intervening Change in the Law ............................. 16
20
    CONCLUSION ............................................................................................................ 20

21

22

23

24

25

26

27

28

LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING
TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW                                          i

{1964 / BRF / 00097850.DOC v9}

1

## **TABLE OF AUTHORITIES**

2

### **CASES**

3

*Benhabib v. Hughes Elecs. Corp.*,
    No. CV 04-0095CAS (VBKx), 2007 WL 4144940 (C.D. Cal. Mar. 30, 2007) .................5

4

*Berson v. Applied Signal Technology, Inc.*,
    527 F.3d 982 (9th Cir. 2008) .......................................................... 3, 13, 18-20

5

*Coffman v. Fed. Labs.*,
    171 F.2d 94 (3d Cir. 1948)...........................................................................8

6

7

*Commonwealth Ins. Co. of New York v. O. Henry Tent and Awning Co.*,
    266 F.2d 200 (7th Cir. 1959) ........................................................................8

8

*Doyle v. Raley's Inc.*,
    158 F.3d 1012 (9th Cir. 1998) ......................................................................8

9

10

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................ *passim*

11

*Fidelity Nat'l Title Ins. Co. v. Intercounty Nat'l Title Ins. Co.*,
    No. 00 C 5658, 2002 WL 1466806 (N.D. Ill. Jul. 8, 2002) ..................................8

12

13

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
    189 F.3d 971 (9th Cir. 1999) ........................................................................1

14

*Holloway v. Best Buy Co.*,
    No. C 05-5056 PJH, 2009 WL 1533668 (N.D. Cal. May 28, 2009) ......................8

15

16

*In re Amica, Inc.*,
    130 B.R. 792 (Bankr. N.D. Ill. 1991) .............................................................8

17

*In re Avista Corp. Sec. Litig.*,
    15 F. Supp. 2d 1214 (E.D. Wash. 2005)..........................................................1

18

19

*In re Bradley Pharms., Inc. Sec. Litig.*,
    421 F. Supp. 2d 822 (D.N.J. 2006) ................................................................7

20

*In re Bristol-Meyers Squibb Sec. Litig.*,
    No. 00-1990, 2005 WL 20070048 (D.N.J. Aug. 17, 2005) ................................12

21

22

*In re Connetics Sec. Litig.*,
    No. C 07-02940-SI, 2008 WL 3842938 (N.D. Cal. Aug. 14, 2008)....................16

23

*In re Daou Sys. Inc. Sec. Litig.*,
    411 F.3d 1006 (9th Cir. 2005) ............................................................... *passim*

24

25

*In re Gilead Sciences Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008), *cert. denied*, 129 S.Ct. 1993 (2009)........................ *passim*

26

27

28

LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING
TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW      ii

{1964 / BRF / 00097850.DOC v9}

*In re Juniper Networks, Inc. Sec. Litig.*,
   Case No. 5:06-cv-04327-JW, Order dated Feb. 4, 2009 (N.D. Cal.)..................................14

*In re Juniper Networks, Inc. Sec. Litig.*,
   Case No. 5:06-cv-04327-JW, Order dated Sept. 25, 2009 (N.D. Cal.)...................2, 10, 14

*In re Juniper Networks, Inc. Sec. Litig.*,
   542 F. Supp. 2d 1037 (N.D. Cal. 2008) ............................................... 2, 3, 9-10

*In re LDK Solar Sec. Litig.*,
   584 F. Supp. 2d 1230 (N.D. Cal. 2008) ..........................................................15

*In re Maxim Sec. Litig.*,
   No. C 08-00832 (JW), 2009 WL 2136939 (N.D. Cal. July 16, 2009)................ 3, 8, 18-19

*In re Shoretel, Inc. Sec. Litig.*,
   No. C 08-0027, 2009 WL 2588881 (N.D. Cal. Aug. 19, 2009)...................................13, 16

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008)..........................................................15

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009) ..........................................................12

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*,
   No. 08-MD-1919 MJP, 2009 WL 1393679 (D. Wash. May 15, 2009) ...........................12

*Kendall McGaw Labs., Inc. v. Cmty. Mem'l Hosp.*,
   125 F.R.D. 420 (D.N.J. 1989)..........................................................................8

*Lormand v. U.S. Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ......................................................11, 12, 13

*Metzler Inv. GmbH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ....................................................... *passim*

*MGIC Indem. Corp. v. Weisman*,
   803 F.2d 500, 504 (9th Cir. 1986) .........................................................1

*Mullis v. U.S. Bankruptcy Ct. for Dist. of Nevada*,
   828 F.2d 1385, n.9 (9th Cir. 1987) ....................................................1

*Nidec Corp. v. Victor Co. of Japan, Ltd.*,
   No. C 05-0686 SBA, 2007 WL 4108092 (N.D. Cal. Nov. 16, 2007)) ........................9

*Patel v. Contemporary Classics of Beverly Hills*,
   259 F.3d 123 (2d Cir. 2001)...........................................................7-8

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys, Inc.*,
   411 F. Supp. 2d 1172 (N.D. Cal. 2005) .................................................12

*Police and Fire Retirement Sys. of City of Detroit v. Safenet, Inc.*,
   No. 06 Civ. 5797 (PAC), 2009 WL 2391849 (S.D.N.Y. Aug. 5, 2009)....................15

LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING      iii
TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW

{1964 / BRF / 00097850.DOC v9}

*Ravens v. Iftikar,*
    174 F.R.D. 651 (N.D. Cal. 1997)........................................................................................1

*Richardson v. United States,*
    841 F.2d 993 (9th Cir. 1988) ............................................................................................9

*Ritter v. Hughes Aircraft Co.,*
    58 F.3d 454 (9th Cir. 1995) ..............................................................................................1

*Rudolph v. UTStarcom,*
    560 F. Supp. 2d 880 (N.D. Cal. 2008) ............................................................................14

*Rudolph v. UTStarcom,*
    No. 07-04578, 2008 WL 4002855 (N.D. Cal. Aug. 21, 2008) ...................................15, 19

*U.S. v. W.R. Grace,*
    504 F.3d 745 (9th Cir. 2007), *cert. denied*, 128 S.Ct. 2964 (2008).....................................1

## STATUTES

Fed. R. Civ. P. 8(a) ...................................................................................................................2

Fed. R. Civ. P. 12(c) .............................................................................................................7-8

Fed. R. Civ. P. 59(e) ...............................................................................................................8

LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING
TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW                                          iv

{1964 / BRF / 00097850.DOC v9}

# INTRODUCTION

Juniper Networks, Inc. ("Juniper" or the "Company") is liable for a massive fraud, in which executives backdated stock option grants, and filed false financial reports that by the Company's own calculations failed to record $900 million in compensation expenses.  Juniper has already conceded the falsity of its SEC filings and financial reports.

The impact of the May 2006 revelations that Juniper had likely backdated options for millions of shares granted to Juniper's directors or officers over several years period is beyond doubt.  Once these facts were publicly disseminated in corrective disclosures on May 18 and 19, 2006 (the "May 2006 Disclosures"), they immediately put into question the accuracy of Juniper's historic financial results, and the Company's representations that options were granted at fair market price on the date they were issued.  The price of Juniper stock immediately plunged by 11 percent, which Lead Plaintiff's expert, Michael Marek, has determined to be statistically significant.[1]  Contemporaneous market commentators uniformly attributed the steep drop in Juniper's stock price to the May 2006 Disclosures about options backdating at Juniper.[2]  Based upon these facts, Juniper's internal audit committee, the U.S. Attorney's office and the Securities and Exchange Commission commenced investigations into the Company's option granting practices.  Numerous derivative and class actions were soon filed by aggrieved investors.[3]

---

[1]  *See* Declaration of Michael A. Marek in Rebuttal to the Declaration of Lucy Allen dated August 7, 2009 ("Marek Reb.") (Dkt. No. 311), ¶¶ 19-26 and Ex. L thereto.  The Court may take judicial notice of these historical stock prices and market index information.  *See In re Avista Corp. Sec. Litig.*, 415 F. Supp. 2d 1214, 1218-19 (E.D. Wash. 2005) (judicial notice of Dow Jones Utility Average) (collecting cases); *Ravens v. Iftikar*, 174 F.R.D. 651, 661 (N.D. Cal. 1997) (judicial notice of NASDAQ composite index).  The Court may also take judicial notice of court filings. *See MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) (taking judicial notice of papers it filed in another action); *Mullis v. U.S. Bankruptcy Ct. for Dist. of Nevada*, 828 F.2d 1385, n.9 (9th Cir. 1987) (same).

[2]  To the extent not included in the Complaint, the Court may take judicial notice of the market commentators.  *U.S. v. W.R. Grace*, 504 F.3d 745, 766 (9ᵗʰ Cir. 2007), *cert. denied*, 128 S.Ct. 2964 (2008); *Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 458-59 (9th Cir. 1995) (judicial notice taken of report of layoffs which concerned matter generally known in Southern California and subject to accurate and ready determination); *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981, n.18  (9th Cir. 1999) ("We take judicial notice that the market was aware of the information contained in news articles submitted by the defendants").

[3]  On August 10, 2006, Juniper admitted that it would need to restate its earnings for more than three years to record compensation expenses relating to past option grants.  As a result, the Company's stock price fell again, sustaining a statistically significant decline of 9% on extraordinary trading volume on August 10 and 11, 2006.  Complaint ¶¶ 282-83; Marek Decl. ¶¶ 40-43 and Ex. L.

LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING                 1
TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW

1   This Court has twice rejected the Juniper Defendants' challenges to Lead Plaintiff's

2   allegations of loss causation as they relate to the May 2006 Disclosures and the resulting sharp

3   drops in Juniper's stock price.[4]  The first time around, this Court, relying on the Supreme Court

4   decision in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005), and the Ninth

5   Circuit authority in *In re Daou Sys. Inc. Sec. Litig.*, 411 F.3d 1006, 1025-26 (9th Cir. 2005),

6   sustained allegations that "the revelation of Juniper's backdating practices caused the stock price

7   to fall significantly from the initial disclosure of potential accounting irregularities [in May

8   2006] to the final admission of identified irregularities [in August 2006]."  *In re Juniper*

9   *Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1049 (N.D. Cal. 2008).[5]

10   More recently, this Court rejected the Juniper Defendants' attempt to rebut the fraud-on-

11   the-market presumption of reliance by disproving loss causation as to the May 2006 Disclosures.

12   In granting class certification, the Court held that the fact that "on May 18 and 19, [2006,]

13   Juniper's stock price declined by a total of 11% when news articles publicly disclosed the CFRA

14   Report and another report by JP Morgan that identified Juniper as a company at risk for

15   backdating," established the requisite causal link between Juniper's misstatements and its

16   inflated stock price.  *See* Order Granting Lead Plaintiff's Motion for Class Certification dated

17   September 25, 2009 ("September 25 Order") (Dkt. No. 342), at 12-13.

18   Notwithstanding that this Court has validated the sufficiency of both Lead Plaintiff's

19   allegations and its evidentiary submission in support of its theory of loss causation, the Juniper

20   Defendants now, in a procedurally defective motion, launch a third equally deficient challenge to

21   an issue settled by both the law of the case and well-established precedent.  In a motion for

22   judgment on the pleadings directed at the April 2007 complaint, they ignore the basic

23   requirements of Fed. R. Civ. P. 12(c), and then distort well-settled Ninth Circuit precedent in

---

[4]  Indeed, if one recognizes the Juniper Defendants' motion for reconsideration of the Court's Class Certification Order as yet another challenge to these same disclosure dates, the Juniper Defendants are currently taking a third stab at this argument.

[5]  Furthermore, while this Court has twice rejected the Juniper Defendants' challenges to Lead Plaintiff's allegations as they relate to the May 2006 Disclosures, to the extent that the Juniper Defendants' are seeking an adjudication of this issue on the merits, this Court has also twice held such motions are premature.  *In re Juniper Networks, Inc. Sec. Litig.*, Case No. 5:06-cv-04327-JW, (D.K. 192 and 204).

LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING          2
TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW

{1964 / BRF / 00097850.DOC v9}

1   order to advance once again arguments that the Court rejected when it denied the Juniper

2   Defendants' similar motion to dismiss on March 31, 2008.  *In re Juniper Networks, Inc. Sec.*

3   *Litig.*, 542 F. Supp. 2d at 1049.

4          The Juniper Defendants contend that the decision in *Metzler Inv. GmbH v. Corinthian*

5   *Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008), and two subsequent district court decisions, *In re*

6   *Maxim Sec. Litig.*, No. C 08-00832 (JW), 2009 WL 2136939 (N.D. Cal. July 16, 2009), and

7   *Teamsters Local 617 Pension and Welfare Funds, v. Apollo Group, Inc.*, 633 F. Supp. 2d 763 (D.

8   Ariz. 2009), represent an new intervening change in the law "clarifying the pleading

9   requirements for loss causation" under the Supreme Court's decision in *Dura*.  Def. Br. at 2.

10  More specifically, the Juniper Defendants claim that these cases create a new definition of

11  "corrective disclosure" for purposes of pleading loss causation.  *Id.* at 3.  Under the Juniper

12  Defendants' reading of *Metzler*, only disclosures which establish that "defendants affirmatively

13  engaged in fraud" are actionable under Rule 10b-5, whereas disclosures that merely establish that

14  the "defendant *may have* engaged in fraud" fall short as a matter of law, regardless of market

15  reaction to the disclosure.  *Id.* at 4.  Under the Juniper Defendants' view, disclosures of

16  misconduct that convey anything less than the certainty of fraud to investors are merely

17  "speculation" which is insufficient to allege loss causation.  *Id.*

18         The Juniper Defendants' interpretation of *Metzler* would turn the law on pleading loss

19  causation on its head by excluding from recovery all disclosures other than a company's *mea*

20  *culpa* admission that its prior representations were false.  The Juniper Defendants' position

21  directly contradicts the teachings of *Dura*, *Daou* and the more recent authorities in the Ninth

22  Circuit, *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008), *cert. denied*, 129 S.Ct.

23  1993 (2009), and *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982 (9th Cir. 2008), which

24  are contemporaneous with *Metzler*.  In fact, these Ninth Circuit authorities, including *Metzler*,

25  have established a liberal standard of pleading loss causation under Rule 8(a).  So long as a

26  plaintiff alleges facts that support a plausible theory of causation, *i.e.*, that the market price

27  declined after learning that a defendant's prior representations *might* be false, a complaint will be

28  ──────────────────────────────

LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING          3
TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW

{1964 / BRF / 00097850.DOC v9}

1    sustained.  Lead Plaintiff here has set forth far more.  This Court has twice upheld Lead

2    Plaintiff's theory of loss causation, and later authorities fully support its rationale and holding.

3    The Juniper Defendants' new effort is inappropriate in form and wrong, and should be rejected

4    for the same reasons as the last two.

5                               **STATEMENT OF FACTS**

6            On March 18, 2006, *The Wall Street Journal* published an exposé entitled "The Perfect

7    Payday."  The article described a striking pattern where options issued to the CEOs at six public

8    companies were consistently dated as if granted on a date just before a rise in the price, often at

9    the bottom of a steep drop.  The article concluded that this repeated "V-shaped" pattern of

10   reported grant dates effectively had a zero probability of occurring at random.[6]  Complaint

11   ¶ 265.[7]

12           According to *The Wall Street Journal*, the opportunity to backdate options without

13   detection was facilitated by lax reporting requirements under SEC rules.  Until 2002, companies

14   had been permitted to report option grants up to 45 days after the company's fiscal year end.

15   The extended reporting period made it easier to engage in backdating because of the fairly long

16   period within which to identify and disclose (albeit falsely) a purported date with a low stock

17   price as the option grant date.  These reporting requirements were tightened with the enactment

18   of the Sarbanes-Oxley Act ("SOX") in late 2002.  Complaint ¶¶ 266-67.

19           The March 18 *Wall Street Journal* article also described the serious consequences of

20   backdating, including liability under the federal securities laws for misrepresenting their

21   compensation practices and inflating reported earnings by not recording compensation expenses

22   associated with "in-the-money" option grants, and potential tax liabilities to the IRS.  *Id.* ¶ 268.

23           The article stated that the SEC was then investigating about twelve companies,

24

25   [6]  The *Wall Street Journal* article stated: "Just lucky?  A Wall Street Journal analysis suggests the odds of this
     happening by chance are extraordinarily remote – around one in 300 billion.  The odds of winning the multi-state
     Powerball lottery with a $1 ticket are one in 146 million."  *See* Declaration of David Harrison dated October 9, 2009
26   filed herewith (hereinafter "Harrison Decl.") Ex. 1.

27   [7] References to "Complaint ¶ ___" refer to the Amended Consolidated Class Action Complaint filed April 9, 2007
     (Dkt. No. 73).

28   LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING         4
     TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW

     {1964 / BRF / 00097850.DOC v9}

1   suggesting that the problem was widespread.  However, the *Wall Street Journal* did not mention

2   Juniper, nor did Juniper's price react in response to the article.  *Id.* ¶¶ 269-70.

3        Following the publication of the March 18 *Wall Street Journal* article, financial analysts

4   began investigating and identifying potential candidates for options backdating and the *Wall*

5   *Street Journal* continued to report on the topic.  On May 16, 2006, the Center for Financial

6   Research and Analysis ("CFRA"), a company that performs forensic accounting, e-mailed a

7   proprietary options backdating study to its subscribers, evaluating the top 100 North American

8   companies.  To identify the options backdating candidates, CFRA focused on companies which

9   utilized a high ratio of stock-based compensation.  CFRA examined all North American

10  companies with $1 billion or more in market capitalization and ranked the top 100 companies

11  based upon the ratio of total stock compensation to revenues during the several years prior to the

12  passage of SOX.[8]

13       The report identified a "high-risk profile" for options backdating at Juniper and 16 other

14  companies.  CFRA considered a company's option backdating risk to be significant when the

15  company had, on three or more occasions, granted options at exercise prices and dates that

16  matched or were close to a 40-day low in the company's stock, and the stock price rebounded at

17  least 10% from the low during this period.  This was the same "V-shaped" price pattern that *The*

18  *Wall Street Journal* had identified in its March 18 article on options backdating.  *Id.* ¶¶ 270-71.

19  The CFRA Report reported that as of the date of publication, two of the 17 companies that it had

20  identified as high-risk using this methodology had already admitted improperly accounting for

21  option grants, and were restating their financial results.  *See* CFRA Report p. 1, nn.1 and 2, Ex. 1

22  to Ostler Decl.; Harrison Decl. Ex. 2.[9]

23       Two days later, on May 18, 2006, *The Wall Street Journal* publicized CFRA's results that

24  cited 17 companies, including Juniper, as being at the "highest risk of having backdated options"

25  violations.  The article stated:

---

26  [8]  *See* CFRA Report dated May 16, 2006, Ex. 1 to Declaration of Joni Ostler (Dkt. No. 320).

27  [9]  *See, e.g., Benhabib v. Hughes Elecs. Corp.*, No. CV 04-0095CAS (VBKx), 2007 WL 4144940, at *5, n.11 (C.D. Cal. Mar. 30, 2007) (court may take judicial notice of SEC filings).

28  LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW      5

{1964 / BRF / 00097850.DOC v9}

1

2

3

4

5

6

7

> Wall Street's interest in identifying potential options problems at companies is also on the rise.  An accounting-research firm this week identified 17 companies it termed as having "the highest risk of having backdated options."
>
>         \*      \*      \*
>
> Among the 17 were Juniper Networks Inc., a Sunnyvale, Calif., networking-equipment company . . . <u>Half of the grants to Juniper were considered at risk by CFRA</u>.[10]

(Emphasis added.)

8

9

10

11

12

13

      The *Wall Street Journal* article provided widespread publicity and credibility to CFRA's Report and methodology, which had already proven to be accurate with respect to two targeted high-tech companies that were Juniper's peers.  The article also reported on the commencement of criminal investigations regarding options backdating and was the first to link publicly Juniper to an existing federal criminal probe – all new material corrective information in the market.  *See* Complaint, ¶¶ 273-76.

14

15

16

17

18

19

20

      On May 18, 2006, JP Morgan also issued a report identifying Juniper as a likely backdating candidate, but using a different method of analysis.  The JP Morgan report focused on options grants occurring at Juniper and its peer communications companies after passage of SOX, and newly disclosed three additional dates on which Juniper granted options at *monthly lows*: July 2002, April 2003, and September 2003.  Of the 14 companies JP Morgan reviewed, it reported that Juniper's percentage of suspicious grants to overall grants, was among the *highest* of its peers, at 40 percent.

21

22

23

24

25

      While the Juniper Defendants make much of the fact that CFRA and JP Morgan formally disclaimed opining on whether Juniper had, in fact, backdated options, the new and accurate factual analysis disclosed in the CFRA and JP Morgan reports directly led the market to decide

26

27

28

---

[10]  Juniper issued options for 4,500,000 shares to senior executives with reported grant dates of October 4, 1999, December 21, 2000, and February 28, 2002.  Complaint ¶¶ 98-122.  Juniper ultimately recorded an $84 million charge for these grants in its financial restatement.

LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW

6

{1964 / BRF / 00097850.DOC v9}

1  for the first time that Juniper had likely improperly backdated options, and might need to restate

2  earnings.

3      On May 18 and 19, 2006, as the information in the CFRA Report and a JP Morgan report

4  was widely disseminated by *The Wall Street Journal* and other financial media, the price of

5  Juniper stock plunged 11% on extraordinary volume of 18 million and 34 million shares,

6  respectively.  Complaint ¶ 273-279; Marek Reb. ¶¶ 19-31.  Contemporaneous market

7  commentary attributed the sharp decline in Juniper's stock price to the May 2006 Disclosures

8  about options backdating.  For example, on May 19, 2006, reports by *TheStreet.com*[11] and the

9  *Los Angeles Times*[12] gave wide coverage to the CFRA and JP Morgan reports.[13]  *See* Complaint

10  ¶¶ 273-79.  These articles and others analyzed the findings of the CFRA and JP Morgan reports,

11  mentioning Juniper and in the larger context reporting federal criminal investigations of other

12  companies by the SEC and/or U.S. Attorney.  *Id.*

13      The Juniper Defendants also acknowledge that on May 18 and 19 a number of companies

14  announced they had received subpoenas or were being investigated, which further fueled

15  investors' reasonable belief that Juniper was next.  *See* Marek Reb. (Dkt. No. 311), ¶ 23 and Ex.

16  F.  This belief turned out to be true.  Juniper was in fact subpoenaed on Friday, May 19, although

17  it did not publicly disclose the investigation until Monday, May 22.  *Id.*, ¶ 23; Complaint ¶ 278.

18

19

20

21

22

---

[11]  5/19/2006 – "Options Talk Hits Juniper, F5."

23

[12]  5/19/2006 – "Report Suggests Companies Backdated Stock Option Grants."

24

[13]  *TheStreet.com* stated "Concerns over stock-option timing broadened this week to include tech shops Juniper . . . . Shares of Juniper fell 4% Thursday."  Complaint ¶¶  275-76.  On May 19, another industry commentator reported: "The options scare appeared to be weighing on Juniper shares, which lost $1.04 (6.46%) to $15.06 in trading today [May 19]."  "Options Scare Hits SafeNet, Juniper," Light Reading.  Similarly, Morgan Keegan attributed Juniper's May 18 and May 19 declines to "concerns from options expensing" in a May 22, 2006 report.  Complaint ¶ 279; Marek Reb. ¶ 22 and Ex. E.  *See In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 829 (D.N.J. 2006) (together with stock price reaction, "unusually high volume of trading activity" is relevant to determining when market corrected price of stock).

28
LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING        7
TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW

## ARGUMENT

### I.   THE JUNIPER DEFENDANTS' MOTION UNDER RULE 12(c) SHOULD BE REJECTED AS UNTIMELY AND PROCEDURALLY DEFECTIVE SINCE THE RELIEF THEY SEEK WOULD DISPOSE OF NEITHER THE ENTIRE COMPLAINT NOR ANY CLAIM FOR RELIEF OF THE COMPLAINT

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). The court must construe "all material allegations of the non-moving party as contained in the pleadings as true, and [construe] the pleadings in the light most favorable to the [non-moving] party." *Doyle v. Raley's Inc.*, 158 F.3d 1012, 1014 (9th Cir. 1998).

Rule 12(c) of the Federal Rules of Civil Procedure is *not* intended or available to narrow one part of one claim for relief. Rather, "[p]artial judgment on the pleadings is not possible in federal pleading unless it disposes entirely of one or more counts of the complaint." *In re Amica, Inc.*, 130 B.R. 792, 796 (Bankr. N.D. Ill. 1991). The *Amica* court reached this conclusion after considering the similarity between Rule 12(c) and Rule 56 and noting that many courts reject the granting of partial summary judgment on a portion of one claim.[14] Accordingly, since the Juniper Defendants are asking the Court to reject only some portion of the disclosures that support loss causation, use of judgment on the pleadings is inappropriate and should be denied.

### II.   THE JUNIPER DEFENDANTS' UNTIMELY MOTION FOR RECONSIDERATION OF THIS COURT'S DECISION ON THE MOTION TO DISMISS SHOULD BE DENIED

As a threshold matter, the Juniper Defendants' motion is procedurally deficient. The

---

[14] *See, e.g., Commonwealth Ins. Co. of New York v. O. Henry Tent and Awning Co.*, 266 F.2d 200, 201-02 (7th Cir. 1959) (finding that courts cannot issue partial summary judgment to one claim); *Coffman v. Fed. Labs.*, 171 F.2d 94, 98 (3d Cir. 1948) (internal quotations omitted) (finding that Rule 56 "does not contemplate a summary judgment for a portion of a single claim in suit. Neither does any other rule of the Rules of Civil Procedure so contemplate, as far as we are aware"); *Fidelity Nat'l Title Ins. Co. v. Intercounty Nat'l Title Ins. Co.*, No. 00 C 5658, 2002 WL 1466806, at *12 (N.D. Ill. Jul. 8, 2002) ("Rule 56(c) of the Federal Rules of Civil Procedure does not permit parcing [sic] claims into sub-issues for resolution on summary judgment"); *Kendall McGaw Labs., Inc. v. Cmty. Mem'l Hosp.*, 125 F.R.D. 420, 421 (D.N.J. 1989) ("Summary judgment may be had as to one claim among many, but it is well settled that neither subsection allows such a judgment as to one portion a claim"). *Holloway v. Best Buy Co.*, No. C 05-5056 PJH, 2009 WL 1533668 (N.D. Cal. May 28, 2009), does not hold differently, as there, the court held it appropriate to decide motion for partial judgment under Rule 12(c) where "each cause of action in the [complaint] alleges what could be construed as several separate claims."

LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW                                    8

{1964 / BRF / 00097850.DOC v9}

Juniper Defendants are essentially requesting reconsideration of this Court's March 31, 2008 opinion.  However, the ten-day time limit prescribed by Fed. R. Civ. P. 59(e) for filing a motion for reconsideration has long passed, indeed by years.  Even if this Court is inclined to consider the motion, the Juniper Defendants present no new law or facts compelling reconsideration, as required by Local Rule 7-9.  *Nidec Corp. v. Victor Co. of Japan, Ltd.*, No. C 05-0686 SBA, 2007 WL 4108092, *2 (N.D. Cal. Nov. 16, 2007).  The Juniper Defendants are arguing that *Metzler*, *Apollo*, and *Maxim* represent new law.  The fact is that each of the decisions cited by the Juniper Defendants simply applies the same controlling authority in *Dura* and *Daou* law that was applied by this Court in its March 31, 2008 decision on the motion to dismiss and in its class certification order.  For these reasons alone, the Court should deny, or in the alternative, strike, the Juniper Defendants' untimely motion.

## III.   LOSS CAUSATION RELATING TO THE MAY 2006 DISCLOSURES IS LAW OF THE CASE

The Juniper Defendants unsuccessfully challenged loss causation as it relates to the May 2006 Disclosures in their Rule 12(b)(6) motion to dismiss, and more recently in opposing class certification.  *See* Dkt. Nos. 84 and 267.  Under Ninth Circuit law, this brings the present motion under the purview of the "law of the case doctrine."  "Under the law of the case doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case."  *Richardson v. United States*, 841 F.2d 993, 996 (9th Cir. 1988) (internal citations omitted).

### A.   Motion to Dismiss

The Court previously considered and decided whether Lead Plaintiff had both adequately pleaded and provided sufficient evidence to prove its theory of loss causation.  In denying the Juniper Defendants' motion to dismiss, the Court enunciated the standards set forth in *Dura* and *Daou* as follows:

> To plead loss causation adequately, a plaintiff must allege a causal connection between a defendant's material misrepresentation and the plaintiff's loss; that is, the "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  15 U.S.C. § 78u-

LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW

9

{1964 / BRF / 00097850.DOC v9}

1

> 4(b)(4); *Dura*, 544 U.S. at 341, 125 S.Ct. 1627; *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2nd Cir. 2005). (Citations omitted.)

2

3

*   *   *

4

> Pleading loss causation under the fraud on market theory requires a plaintiff to (1) identify the fraudulent statement that causes the stock price to increase, (2) identify the statements or acts which revealed to the market that the statement was fraudulent, and (3) show a decline in stock price after the revelation. *See id.* at 346, 125 S.Ct. 1627; *In re Daou*, 411 F.3d at 1025-26.

5

6

7

*Juniper Networks*, 542 F. Supp 2d at 1049.

8

        Applying this standard, this Court rejected Defendants' claims that "Plaintiffs cannot

9

base loss causation . . .on the various disclosures made in May 2006." The Juniper Defendants'

10

Motion to Dismiss (Dkt. No. 84). On the contrary, the Court held that the complaint sufficiently

11

alleged that: "(1) Juniper made fraudulent representations to the market concerning the accuracy

12

of its financial statements, (2) certain statements and reports [*i.e.*, CFRA and JPMorgan]

13

concerning Juniper's involvement in backdating stock options revealed the falsity of Juniper's

14

prior representations, and (3) declines in Juniper's stock price followed the revelations that

15

Juniper's representations were fraudulent." *In re Juniper Networks*, 542 F. Supp. 2d at 1049.

16

### B.    Class Certification

17

        Moreover, the Juniper Defendants made the May 2006 Disclosures the centerpiece of

18

their recent opposition to class certification. First, they argued that the failure to prove loss

19

causation as to the May 2006 Disclosures rebutted the presumption of reliance under the fraud on

20

the market theory. However, the Court was "unpersuaded by Defendants' argument in light of

21

the fact that on May 18 and May 19 Juniper's stock price declined by a total of 11% when news

22

articles publicly disclosed the CFRA Report and another report by JP Morgan [*i.e.*, corrective

23

disclosures] that identified Juniper as a company at risk for backdating." *Id.* Second, the Juniper

24

Defendants sought to shorten the close of the Class Period based on the fact that the May 2006

25

Disclosures were corrective in the market. In making their argument, they candidly

26

acknowledged that following the May 2006 Disclosures, "serious questions had been raised

27

regarding the accuracy of Juniper's prior statements about its stock option granting practices."

28

LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW

10

{1964 / BRF / 00097850.DOC v9}

1    Juniper Defendants' Opposition to Class Certification (D.K. 267); *see* September 25 Order at 12-

2    16. Having lost on this issue, the Juniper Defendants now reverse their position and attempt to

3    re-characterize those fulsome disclosures as mere speculation.

4         Since the issue of loss causation relating to the May 2006 Disclosures was before the

5    Court and decided in both of these decisions, and there has been no change in the law, the

6    Court's prior rulings represent the law of the case and should not be reconsidered.

7    **IV.   THE MAY 2006 DISCLOSURES REVEALED FACTS WHICH WERE**
         **<u>CURATIVE IN THE MARKET, THEREBY SATISFYING LOSS CAUSATION</u>**

8         **A.   <u>The Standard for Pleading Loss Causation</u>**

9         The Juniper Defendants contend that they are entitled to judgment on the pleadings

10   because *Metzler* constituted a significant change in the law on loss causation. Under their

11   reading of *Metzler*, only those disclosures that conclusively establish the falsity of defendants'

12   prior representations are sufficiently "corrective" to adequately plead loss causation. Def. Br. at

13   4. Conversely, new facts which alert the market to the risk, likelihood, or probability that

14   defendants' representations were inaccurate would be excluded as a matter of law because they

15   fall short of a conclusive finding of fraud.

16        This distorted reading of *Metzler* cannot be squared with *Dura*, *Daou* and more recent

17   decisions in the Ninth Circuit and other Courts of Appeals that address loss causation, including

18   the plain language of *Metzler* itself. Indeed, if the Juniper Defendants' position that only facts

19   that establish fraud with certainty satisfy loss causation were the law, it would be impossible to

20   establish proximate cause in virtually every instance other than a company's own admission of

21   guilt, such as Juniper's restatement announcement on August 10, 2006. However, the courts

22   have never required such a high level of certainty to plead or prove loss causation. *Metzler* itself

23   acknowledges that "neither *Daou* nor *Dura* require an admission or finding of fraud before loss

24   causation can be properly pled." 540 F.3d at 1064.[15]

25

26   ---

     [15] Moreover, there is no requirement that the curative disclosure be issued by the defendant in question. *Lormand v.*
27   *U.S. Unwired, Inc.*, 565 F.3d 228, 264 and n. 32 (5th Cir. 2009); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266,
     297 (S.D.N.Y. 2006) ("Dura imposed no requirement that corrective disclosures emanate from the company itself,
     so long as the truth is disclosed in some fashion").

28

1    In *Dura*, the Supreme Court held that private plaintiffs need only plead a "short and plain

2    statement" under Fed. R. Civ. P. 8(a)(2) that provides "some indication of the loss and the causal

3    connection that the plaintiff has in mind."  544 U.S. at 347.  The Court explained that pleading

4    loss causation "[is] not meant to impose a great burden" and plaintiffs need only set forth the

5    relevant loss and "what the causal connection might be" between their loss and defendants'

6    misconduct.  *Id.*  *Dura* also disavowed any notion that plaintiffs are required to plead loss

7    causation in a formulaic or conclusive manner, stating that "neither the Rules nor the securities

8    statutes impose any special further requirement in respect to the pleading of proximate causation

9    or economic loss."  *Dura* at 346.

10    Under *Dura,* Lead Plaintiff is not required to "show that the loss was caused by a

11    corrective disclosure that mirrors, with precision, the alleged fraud."  *In re Bristol-Meyers*

12    *Squibb Sec. Litig.*, No. 00-1990, 2005 WL 2007004, at *18 (D.N.J. Aug. 17, 2005).  Nor need

13    the disclosure "explicitly correct the prior misrepresentation."  *In re Wash. Mut., Inc. Sec., Deriv.*

14    *& ERISA Litig.*, No. 08-MD-1919 MJP, 2009 WL 1393679, at *18 (D. Wash. May 15, 2009)

15    ("*WAMU*").  Rather, a plaintiff states a claim by pleading that the market price dropped after the

16    relevant truth began to leak out and otherwise make its way into the marketplace.  544 U.S. at

17    342.  As this Court has repeatedly recognized, loss causation may be pleaded on the theory that

18    defendants "did gradually walk the stock down by partially disclosing some of the previously

19    concealed problems and some of the impact those problems were having on UTSI's current

20    financial condition and would have on the Company's future results."  *In re UTStarcom, Inc.*

21    *Sec. Litig.*, 617 F. Supp. 2d 964, 977 (N.D. Cal. 2009) (emphasis in original); *Plumbers &*

22    *Pipefitters Local 572 Pension Fund v. Cisco Sys.*, Inc., 411 F. Supp. 2d 1172, 1177-78 (N.D. Cal.

23    2005) (stock declines following partial disclosures sufficient to plead loss causation under

24    *Dura*).[16]

---

[16]  *See also Daou*, 411 F.3d at 1025; *WAMU*, 2009 WL 1393679, at *18 ("No single disclosure laid bare the full
extent of WAMU's misstatements and omissions, and WAMU occasionally slowed the process by making new
misrepresentations"); *Lormand v. US Unwired*, 565 F.3d at 264 ("[A] reasonable person could draw the plausible
inferences that US Unwired's [disclosure of its] excessive churn rate was a partial emergence of the truth about
defendant's alleged fraud").

LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING      12
TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW

{1964 / BRF / 00097850.DOC v9}

1    In sum, the Supreme Court and the Ninth Circuit reject the contention that fraud must be

2    shown with certainty on the face of the complaint to allege loss causation.  On the contrary, so

3    long as a complaint "alleges facts that, if taken as true, plausibly establish loss causation, a Rule

4    12(b)(6) dismissal is inappropriate." *In re Gilead Sci. Sec. Litig.*, 536 F.3d at 1057 (citing *Bell*

5    *Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  This is true because loss causation is an

6    inherently fact-intensive inquiry that is best left until the record is more fully developed.  The

7    Ninth Circuit in *Gilead* cautioned that where, as here, "plaintiff alleges *facts* to support a theory

8    that is not facially implausible, the court's skepticism is best reserved for later stages of the

9    proceedings when the plaintiff's case can be rejected on evidentiary grounds."[17]  *In re Gilead*

10   *Sci. Sec. Litig.*, 536 F.3d at 1056 (emphasis added); *accord, Berson v. Applied Signal*

11   *Technology, Inc.*, 527 F.3d at 990 (reversing dismissal on loss causation grounds where

12   allegations gave "some assurance that the theory has a basis in fact"); *Lormand v. US Unwired,*

13   *Inc.*, 565 F.3d at 258 ("Rule 8(a)(2) requires plaintiff to allege, in respect to loss causation, a

14   facially 'plausible' causal relationship between the fraudulent statements or omissions and

15   plaintiff's economic loss").  Conversely, where plaintiff's causation theory has no factual

16   support, or is based upon implausible or unwarranted inferences, then the allegations fail to plead

17   loss causation.  *Metzler*, 540 F.3d at 1064-65.

18   In general, a disclosure is curative when it makes "the existence of the actionable fraud

19   more probable than it would be without the alleged fact (taken as true)." *Lormand v. US*

20   *Unwired, Inc.*, 565 F.3d at 256, n.20 (citing Fed. R. Evid. 401).  "At one end of the spectrum *it is*

21   *clear that plaintiff need not prove that the defendant admitted a fraud* . . . [while] at the other

22   extreme it is equally clear that a plaintiff must do more than show that the  market was merely

23

24

---

[17]  *Gilead*, 536 F.3d at 1056 (citing *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197
25   (2d Cir. 2003) (loss causation "is a matter for proof at trial and need not be decided on a Rule 12(b)(6) motion to
     dismiss")); *McCabe v. Ernst & Young*, LLP, 494 F.3d 418, 427 n.4 (3d Cir. 2007) ("'loss causation 'becomes most
26   critical at the proof stage'); *In re Juniper Networks, Inc. Sec. Litig.*, Case No. 5:06-cv-04327-JW, Order dated Feb.
     4, 2009 (N.D. Cal.) ("if Defendants seek to defeat Plaintiffs' claims on the basis of loss causation, Defendants will
27   have opportunities to advance such arguments after the completion of discovery").

28

{1964 / BRF / 00097850.DOC v9}

1   reacting to reports of defendant's poor financial health generally." *In re Shoretel, Inc. Sec.*

2   *Litig.*, No. C 08-0027, 2009 WL 2588881, at *2 (N.D. Cal. Aug. 19, 2009) (emphasis added).

3       **B.**    **Lead Plaintiff Alleges Strong Factual**
             **Support For Its Theory of Loss Causation**

4

5       As shown herein, the facts alleged supporting Lead Plaintiff's theory of loss causation

6   with respect to the May 2006 Disclosures easily satisfy the Ninth Circuit's plausibility standard.

7   Starting on May 16 and continuing through May 19, accurate partial disclosures about Juniper's

8   involvement in options backdating made their way into the market.  The market was advised

9   specifically of option grants issued to Juniper senior executives involving 4,500,000 shares,

10  which repeatedly followed a V-shaped pricing pattern.  Published reports indicated that the odds

11  against the grant dates having been selected innocently were astronomical.  As these factual

12  disclosures were widely disseminated by *The Wall Street Journal*, JP Morgan and the financial

13  media, the market perception of Juniper radically changed.  Complaint ¶¶ 273-279.  A

14  compensation charge for improper accounting for option grants was virtually a foregone

15  conclusion; what was uncertain was whether Juniper would restate its financial results, and if so,

16  in what amount.

17      That the analysts added *pro forma* disclaimers about whether option backdating actually

18  occurred at a particular company, is neither unusual nor of great import.  The analysts provided

19  the underlying facts and analysis to the market, and let investors draw their own conclusions

20  about each company.  Not surprisingly, the price of Juniper stock declined 4.5% and 6.5% on

21  May 18 and 19, respectively, or a total of 11%, on extraordinary trading volume of 18 million

22  and 34 million shares, respectively.  *Id.*  Contemporaneous market commentary attributed the

23  steep price decline to the May 2006 disclosures about options backdating.  *Id.; infra* p. 5-7.  An

24  event study conducted by Lead Plaintiff's expert also confirms that (1) the price declines on May

25  18 and May 19 were attributable to corrective partial disclosures about Juniper's option

26  backdating fraud and were statistically significant; and (2) no other information or events

27

28  LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING
TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW

14

{1964 / BRF / 00097850.DOC v9}

1   relating to Juniper could have precipitated its stock price declines on those two days.  Marek

2   Reb. at ¶¶ 19-34.

3         Here, the facts alleged not only support a plausible theory of loss causation, but the

4   theory has been sustained by this Court after competing evidentiary submissions on class

5   certification.  *See* September 25 Order at 11-13.

6         Recent cases in this District and other jurisdictions have also held that disclosures related

7   to alleged option backdating were sufficiently curative and plausible to plead loss causation.  In

8   *Rudolph v. UTStarcom*, 560 F. Supp. 2d 880 (N.D. Cal. 2008) ("*UTStar I*"), issued prior to the

9   Ninth Circuit's decision in *Gilead*, the Court initially held that a press release which announced

10   an internal investigation concerning options granting practices was insufficient to plead loss

11   causation.  However, in light of *Gilead*, the Court revisited the issue and reached the opposite

12   conclusion in *Rudolph v. UTStarcom*, No. 07-04578, 2008 WL 4002855 (N.D. Cal. Aug. 21,

13   2008) ("*UTStar II*").  The facts disclosed in *UTStar* were far less extensive and credible than in

14   this case.  At issue was whether a press release that announced an internal investigation into the

15   Company's stock option practices, but <u>did not</u> reveal anything more than the potential or risk that

16   UTStarcom's prior financial statements might need to be restated, was sufficient to plead loss

17   causation.  Rejecting the exact argument advanced by Defendants here, the Court held:

18           Pursuant to the Ninth Circuit's recent clarification regarding
19           allegations of loss causation, the Court now finds that the
        November 7, 2006 press release could plausibly establish loss
        causation.  **While it is true that the press release did not**
20   **definitively state that backdating had occurred or that**
        **UTStarcom would adjust its financial statements as they**
21   **related to equity grants, the press release did, for the first time,**
        **put the market on notice that such disclosures might be**
22   **forthcoming.**

23   2008 WL 4002855, at *4 (emphasis added).  Other cases are in agreement.  *See, e.g., Police and*

24   *Fire Retirement Sys. of City of Detroit v. Safenet, Inc.*, No. 06 Civ. 5797 (PAC), 2009 WL

25   2391849, at *14 (S.D.N.Y. Aug. 5, 2009) (disclosure of government investigation of options

26   backdating followed by significant price decline satisfies loss causation); *In re Take-Two*

27   *Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 287 (S.D.N.Y. 2008) (same).

28

1    In *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230 (N.D. Cal. 2008), the Court found

2    that partial disclosures from securities analysts which conveyed the possibility that defendant had

3    inflated its financial result satisfied loss causation.  Specifically, Piper Jaffray published a

4    research note on October 3, 2007 reporting that "the LDK financial controller recently left the

5    company," and that, although the Company denied the allegations, the controller asserted that

6    LDK had poor internal controls and inaccurate inventory accounting.  *Id.* at 1239.  The court

7    held that allegations relating to this disclosure were sufficient to plead loss causation because,

8    when this "information about the inventory entered the market on October 3, 2007, LDK's stock

9    price dropped dramatically."  *Id.* at 1251.

10   Most recently, the court in *In re Shoretel Sec. Litig.*, 2009 WL 2588881, at *4, relying on

11   *Daou*, sustained allegations regarding loss causation that were far less certain in identifying

12   defendants' alleged misstatements than the May 2006 Disclosures in this case.  The Court noted

13   that while the allegations were hardly "indisputable," it was "*not impossible* that the market

14   understood the press releases to have revealed previously undisclosed facts about misstatements

15   in the Registration Statement."  *Id.* (emphasis added).[18]

16   **C.     *Metzler* Is Not An Intervening Change in the Law**

17   Defendants' claim that *Metzler* set a new standard for loss causation is at best misguided.

18   In fact, *Metzler* does not even hint that it was making new law.  Rather, the Ninth Circuit applied

19   the same legal analysis that it utilized in *Daou, Applied Signal*, and *Gilead*.  The only difference

20   in the cases was a factual one:  *Gilead* and *Applied Signal* warranted reversal because plaintiffs

21   had made out a plausible theory of causation, whereas the plaintiffs' theory in *Metzler* was

22   founded on speculation and implausible inferences.

23   The first alleged disclosure at issue in *Metzler* was a *Financial Times* article which

24   revealed a financial aid investigation at one of Corinthian's 88 campuses, but specifically stated

25   that it did not "affect the status of [87] other Corinthian schools."  540 F.3d at 1059.  The second

26   ───────────────

27   [18]  *See also In re Connetics Sec. Litig.*, No. C 07-02940-SI, 2008 WL 3842938, at *2 (N.D. Cal. Aug. 14, 2008)
(announcement that company would "likely have to restate its financial statements" was adequate to plead loss
causation).

28   LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING      16
TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW

{1964 / BRF / 00097850.DOC v9}

was a press release disclosing (i) a voluntary meeting with the California Attorney General regarding Corinthian's admission practices, and (ii) reduced revenue guidance due to six different reasons, one of which was "higher than anticipated attrition." *Id.* at 1059-60.

Plaintiff claimed that the two articles were partial disclosures of a company-wide enrollment and financial aid fraud to procure federal funding and thereby inflate company revenues. However, the Court found that this broad-based fraud claim was factually insupportable and based upon implausible and unwarranted inferences, which the Court was required to reject. Specifically, the Ninth Circuit concluded that *Financial Times'* disclosure of a governmental investigation affecting only one college, and which specifically represented that "the investigation does not affect the status of other schools" did not provide any basis for inferring "systematic manipulation of student enrollment" on a firm-wide basis. *Metzler*, 540 F.3d at 1064-65 and n.8.

In that context, where plaintiff's "corrective disclosure" allegations were based upon speculation about a company-wide enrollment manipulation rather than facts, and plaintiffs sought to draw unwarranted and implausible inferences based on a single incident that was quickly resolved, the Ninth Circuit gave short shrift to plaintiff's allegation that there was a "potential risk" that all 88 colleges could be investigated. The Court explained that

> neither *Daou* nor *Dura* support the notion that **loss causation** is pled where a defendant's disclosure reveals a **"risk"** or "potential" for widespread fraudulent conduct. In *Daou* the defendant disclosed that the company actually had $10 million in unbilled receivables, not merely that there was some **risk** it might accrue such receivables.

*Metzler*, 540 F.3d at 1064 (emphasis in original).

Considered in context, the Ninth Circuit's discussion of *Daou* stands for the unremarkable proposition that in order for a plaintiff's alleged disclosed facts to be corrective, they must support an inference that some aspect of the fraud was revealed. The Court stated that in *Daou*, the $10 million in unbilled revenues disclosed in the company's earnings release supported an inference that the company had violated revenue recognition practices under GAAP. Similarly, the company's announcement two months earlier that operating expenses and

LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW

17

{1964 / BRF / 00097850.DOC v9}

1    margins were deteriorating was a partially curative disclosure which began to reveal that Daou's

2    true financial condition had been misrepresented.  411 F.3d at 1026.

3       However, the disclosure of unbilled revenues and lower margins in *Daou* does not come

4    anywhere close to satisfying the Juniper Defendants' imaginary new standard of conclusively

5    establishing that "defendants affirmatively engaged in fraud."  *See* Def. Br. at 4.  On the

6    contrary, defendants in *Daou* vigorously asserted that the increases in unbilled revenues were

7    properly recorded under GAAP, and that its financial statements were accurate.

8       Thus, *Metzler*, *Daou*, *Gilead* and the other cases cited herein by Lead Plaintiff reveal that

9    the Juniper Defendants' supposed "distinction between disclosure that the defendants

10   affirmatively engaged in fraud and disclosures that the defendants *may have* engaged in fraud" is

11   legally insupportable.  Rather, *Daou*, *Gilead* and *Metzler* draw a critical distinction between a

12   plausible theory of loss causation which is based on disclosed facts and reasonable inferences

13   therefrom, and causation theories that have no factual support but rather are based upon

14   speculative and unwarranted inferences.

15      Defendants' reliance on *In re Maxim Sec. Litig.*, 2009 WL 2136939 (N.D. Cal. 2009),

16   and *Teamsters Local 617 Pension and Welfare Funds, v. Apollo Group, Inc.*, 633 F. Supp. 2d

17   763, is also misplaced.  In *Maxim* (which Lead Plaintiff cited to this Court in its class

18   certification brief), the Court addressed a Merrill Lynch analyst report concerning all the

19   semiconductor equipment companies comprising the popular "SOXX" index.  *In re Maxim Sec.*

20   *Litig.*, 2009 WL 2136939, at *5.  Unlike in this case, the report did not purport to identify

21   backdating of reported grant dates.  Instead, it merely examined whether companies in the SOXX

22   had issued options prior to an increase in the company's stock price, and identified Maxim as

23   one of the many companies where that had occurred.  This lone disclosure is far different than

24   the underlying facts revealed in May 2006 that the Juniper Defendants are trying to challenge

25   here as purportedly not "corrective."  In fact, in *Maxim*, this Court correctly noted "[a]lthough

26   Plaintiffs characterize the Merrill Lynch Report as placing Maxim on a list of 'the worst

27   backdating offenders,' <u>a careful review of the Report reveals that it only assesses the extent to</u>

28
LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING     18
TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW

{1964 / BRF / 00097850.DOC v9}

1   which options pricing out-performs overall returns." *In re Maxim Sec. Litig.*, 2009 WL 2136939,

2   at *5 n.7 (emphasis added).  The May 2006 Disclosures in this case reveal far more facts and

3   involve a far more extensive analysis.  Indeed, the CFRA Report used a methodology that had a

4   proven track record in identifying companies that had admittedly engaged in options backdating.

5        In addition, in *Maxim* the stock closed down a modest 4.28% on May 22, 2006.  *See*

6   Maxim Consolidated Complaint, 08-cv-00832-JW (D.K. 129) at Harrison Decl. Ex. 3.  In

7   contrast, Juniper stock declined a statistically significant 11% on May 18 and 19.  Furthermore,

8   the alleged final corrective disclosure in *Maxim* occurred more than 18 months after the Merrill

9   Lynch report was issued, further eroding the credibility of plaintiff's theory of loss causation in

10  that case.  Here, however, Juniper restated its financial results in less than three months, akin to

11  *Gilead*.

12       Similarly, *Apollo* does not advance the Juniper Defendants' argument in this case.

13  Unlike here, the allegations did "not comport with the relatively minimal loss causation pleading

14  standards of *Dura*."  2009 WL 890479, at *54.  On the contrary, in *Apollo* "there [was] no

15  mention in the Lehman Report of Apollo's prior financial statements, let alone that they were

16  false and misleading because they failed to account for stock option expenses."  Thus, the

17  Lehman report did not, as the plaintiff contended, "explicitly alert[ ] [the market] that Apollo

18  had very likely engaged in backdating."  *Id.*  In sharp contrast, the CFRA report advised

19  investors not only of the potential for an accounting restatement at Juniper, but it also alerted

20  them to the risk of regulatory investigations and the impugning of management integrity.  Ostler

21  Ex. 1.

22       Furthermore, as with *Maxim*, the *Apollo* court concluded that "[t]he weakness in

23  plaintiff's reliance upon the Lehman Report to support loss causation becomes even more

24  evident considering the relatively insignificant drop (2.7%) in the price of Apollo stock which

25  followed that Report."  *Apollo*, 633 F. Supp. 2d at 820.  However, here, Lead Plaintiff has

26  alleged a double-digit drop in the price of Juniper stock following the May 2006 Disclosures; the

27  market itself independently and contemporaneously attributed this drop to the May 2006

28  LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING          19
TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW

{1964 / BRF / 00097850.DOC v9}

1 Disclosures; and Lead Plaintiff has submitted expert testimony that the May 2006 Disclosures

2 were corrective and that they caused a statistically significant drop in Juniper's stock price. *See*

3 Complaint ¶¶ 273-279; Marek Reb. ¶¶ 19-34.

4      The *Apollo* Court recognized the type of option-related disclosures that could satisfy loss

5 causation. The Court specifically distinguished a press release at issue in that case from the

6 press release in *UTStar II*, which was sufficiently corrective. *Apollo* explained that while the

7 press release in *UTStar II* "did not definitively state that backdating had occurred or that

8 UTStarcom would adjust its prior financial statements as they related to equity grants," the press

9 release did "for the first time, put the market on notice that such disclosures *might be*

10 *forthcoming*." *Apollo*, 633 F. Supp. 2d at 822 (emphasis added). As such, the UTStarcom press

11 release *foreshadowed the possibility* that the Company would be correcting its prior financial

12 statements, although the release specifically stated that no conclusions had been reached. *Id.*

13      The same is true here. The May 2006 Disclosures, while they themselves do not state

14 definitely that backdating occurred at Juniper or that Juniper would definitely need to restate its

15 financial results as a result, did "for the first time, put the market on notice that such disclosures

16 might be forthcoming." *Apollo*, 633 F. Supp. 2d at 822. Importantly, the market swiftly took

17 notice and responded accordingly.

18      Thus, based on the same standards as this Court has consistently applied over the past ten

19 years, the Class's allegations of loss causation as they relate to the May 2006 Disclosures fully

20 satisfy all pleading requirements.

21 **CONCLUSION**

22      For the foregoing reasons, the Juniper Defendants' motion for judgment on the pleadings

23 relating to the May 2006 Disclosures should be denied.

24 DATED: October 9, 2009

          LOWEY DANNENBERG COHEN & HART, P.C.

25

26 /S/
          BARBARA J. HART

27           DAVID C. HARRISON
          TODD GARBER

28 LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW     20

{1964 / BRF / 00097850.DOC v9}

1                                  One North Broadway, 5th Floor
White Plains, NY  10601-2310

2                                  914-997-0500 (telephone)
914-997-0035 (facsimile)

3                                  *Counsel for Lead Plaintiff*

4                                  WILLEM F. JONCKHEER
SCHUBERT JONCKHEER KOLBE

5                                     & KRALOWEC LLP
Three Embarcadero Center, Suite 1650

6                                  San Francisco, CA 94111
415-788-4220 (telephone)

7                                  415-788-0161 (facsimile)

8                                  *Local Counsel*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEAD PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS RELATING
TO THE MAY 2006 DISCLOSURES – CASE NO. 06-04327-JW         21

{1964 / BRF / 00097850.DOC v9}