1  PILLSBURY WINTHROP SHAW PITTMAN LLP
   KIRKE M. HASSON (CA Bar No. 61446)
2  kirke.hasson@pillsburylaw.com
   ROBERT J. NOLAN (CA Bar No. 235738)
3  robert.nolan@pillsburylaw.com
   ALEX SANTANA (CA Bar No. 252934)
4  alex.santana@pillsburylaw.com
   50 Fremont Street
5  San Francisco, CA  94105
   Telephone: (415) 983-1000
6  Facsimile: (415) 983-1200

7  Attorneys for the Audit Committee of
   the Board of Directors of Juniper Networks, Inc.

8

9              **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11                  **SAN JOSE DIVISION**

12

| 13 In re JUNIPER NETWORKS, INC. SECURITIES LITIGATION | CASE NO.: C06-04327-JW (PVT) |
|---|---|
| 14 This Document Relates To: | **NOTICE OF MOTION AND MOTION OF THE AUDIT COMMITTEE OF THE BOARD OF DIRECTORS OF JUNIPER NETWORKS, INC. FOR PROTECTIVE ORDER REGARDING THE DEPOSITION OF WILLIAM HEARST; MEMORANDUM IN SUPPORT THEREOF AND IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL** |
| 15 ALL ACTIONS. | |

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION..................................................................................1

STATEMENT OF ISSUES (CIVIL L.R. 7-4(A)(3)) ............................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................2

I.      INTRODUCTION. ......................................................................................................2

II.     BACKGROUND. ........................................................................................................3

        A.      The Genesis of the Audit Committee's Investigation and Pillsbury's
                Work. .............................................................................................................3

        B.      The Parties' Current Dispute. ........................................................................5

        C.      Plaintiff's Waiver Argument. .........................................................................5

III.    ARGUMENT. .............................................................................................................7

        A.      Pillsbury's Work for the Audit Committee's Investigation Is Entitled
                to Attorney Work Product Protection. ...........................................................7

        1.      Work Product Protection Attaches To Materials Prepared Because Of
                The Prospect Of Litigation, Even If Those Materials May Have A
                Dual Purpose. .................................................................................................8

        2.      Pillsbury's Work For Juniper's Audit Committee Was Performed
                Because of Threatened and Pending Litigation...........................................13

        B.      Disclosure to Outside Auditors Does Not Result in a Waiver of Work
                Product Protection. ......................................................................................15

        C.      The Limited Disclosure, in SEC filings and to the SEC, of a
                Summary of the Audit Committee's Conclusions Does Not Effect A
                Waiver of Work Product Protection or Attorney-Client Privilege as
                to the Information Underlying Those Conclusions. .....................................17

        1.      Disclosure of a Summary Does Not Waive as to Underlying Details..........18

        2.      Even Where a Report of Findings is Disclosed, Any Work Product
                Waiver Extends Only to the Disclosure Made. ...........................................20

        3.      A Person's Disclosure of Conclusions on an Issue Does Not Waive
                Attorney-Client Privilege as to Discussions Leading to the
                Conclusions. .................................................................................................21

        D.      The Current Dispute Concerns Only Questions to Audit Committee
                Members at Depositions. ..............................................................................23

IV.     CONCLUSION. ........................................................................................................25

701863913v10

i

NOTICE OF MOTION AND MOTION
FOR PROTECTIVE ORDER REGARDING
THE DEPOSITION OF WILLIAM HEARST
Case No. M:06-04327-JW (PVT)

1

# **TABLE OF AUTHORITIES**

2

3

<u>Cases</u>

4 *Amersham Pharmacia Biotech, Inc. v. The Perkin-Elmer Corp.,*
    No. C-97-04203 CRB/EAI,
5    2000 WL 34217818 (N.D. Cal. Jan. 18, 2000) .......................................................... 24

6 *Audi AG v. D'Amato,*
    469 F.3d 534 (6th Cir. 2006) ..................................................................................... 24
7

*Buttler v. Benson,*
8    193 F.R.D. 664 (D. Colo. 2000) ................................................................................. 24

9 *Chamberlain Manufacturing Corp. v. Maremont Corp.,*
    No. 90 C 7127, 1993 WL 11885 (N.D. Ill. Jan. 19, 1993) ................................... 20, 21
10

*Cornwell v. Electra Central Credit Union,*
11    439 F.3d 1018 (9th Cir. 2006) ................................................................................... 24

12 *Digital Envoy, Inc. v. Google, Inc.,*
    No. C 04 01497 RS, 2006 WL 824412 (N.D. Cal. Mar. 28, 2006) .......................... 24
13

*Everett v. Aldi, Inc.,*
14    Case No. 1:07-CV-275,
    2009 WL 940379 (N.D. Ind. Apr. 6, 2009) ............................................................... 24
15

*Griffith v. Davis,*
16    161 F.R.D. 687 (C.D. Cal. 1995) ................................................................................. 9

17 *Gutter v. E.I. DuPont de Nemours & Co.,*
    No. 95-CV-2152, 1998 U.S. Dist. LEXIS 23207 (S.D. Fla. 1998) .......................... 16
18

*Hickman v. Taylor,*
19    329 U.S. 495 (1947) ..................................................................................................... 7

20 *Hollinger Int'l Inc. v. Hollinger Inc.,*
    230 F.R.D. 508 (N.D. Ill. 2005) ......................................................................... 12, 21
21

*In re Air Crash,*
22    133 F.R.D. 515 (N.D.Ill. 1990) ................................................................................. 21

23 *In re Cardinal Health Inc. Sec. Litig.,*
    No. C2-04-575 (ALM), 2007 WL 495150 (S.D.N.Y. Jan. 26, 2007) ............... 10, 12
24

*In re Dayco Corp. Deriv. Sec. Litig.,*
25    99 F.R.D. 616 (S.D. Ohio 1983) ........................................................................ 18, 19, 20

26 *In re Feldberg,*
    862 F.2d 622 (7th Cir. 1988) ..................................................................................... 22
27

*In re Grand Jury Subpoena (Mark Torf / Torf Environmental Management)*, 357
28    F.3d 900 (9th Cir. 2004) ...................................................................................... passim

*In re JDS Uniphase Corp. Sec. Litig.*,
    2006 U.S. Dist. LEXIS 76169 (N.D. Cal. Oct. 5, 2006) .................................... 15, 16

*In re LTV Sec. Litig.*,
    89 F.R.D. 595 (N.D. Tex. 1981) .................................................................. 12

*In re Special September 1978 Grand Jury (II)*,
    640 F.2d 49 (7th Cir. 1980) ...................................................................... 11

*In re Sulfuric Acid Antitrust Litig.*,
    231 F.R.D. 331 (N.D. Ill. 2005) ................................................................ 24

*In re Veeco Instruments Inc. Sec. Litig.*,
    No. 05 MD 1695 (CM)(GAY),
    2007 WL 210110 (S.D.N.Y. Jan. 25, 2007) ................................... 11, 18, 19

*In re Vioxx Products Liability Litig.*,
    No. MDL 1657, 2007 WL 854251 (E.D. La. Mar. 6, 2007) ...................... 11, 20, 21

*In re Woolworth Corp. Sec. Class Action Litig.*,
    No. 94 Civ. 2217 (RO), 1996 WL 306576 (S.D.N.Y. June 7, 1996) ................ 11, 12

*Kelly v. City of San Jose*,
    114 F.R.D. 653 (N.D. Cal. 1987) ................................................................ 9

*Kintera v. Convio*,
    219 F.R.D. 503 (S.D. Cal. 2003) ................................................................ 9

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*,
    237 F.R.D. 176 (N.D. Ill. 2006) ................................................................ 16

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
    229 F.R.D. 441 (S.D.N.Y. 2004) ......................................................... 15, 16

*Middlesex Retirement System v. Quest Software, Inc.*,
    CV 06-6863-DOC (RNBx) (C.D. Cal. July 8, 2009) ................................ 16, 17

*Middlesex Retirement System v. Quest Software, Inc.*,
    CV 06-6863-DOC (RNBx) (C.D. Cal. September 18, 2009).......................... 17

*Rauh v. Coyne*,
    744 F. Supp. 1181 (D.D.C. 1990).............................................................. 22

*Roth v. Aon Corp.*,
    254 F.R.D. 538 (N.D. Ill. 2009) ................................................................ 22

*S.E.C. v. Roberts*,
    254 F.R.D. 371 (N.D. Cal. 2008) ......................................... 13, 15, 16, 17

*S.E.C. v. Schroeder*,
    No. C07-03798, 2009 WL 1125579 (N.D. Cal. June 10, 2009).............................. 17

*S.E.C. v. Schroeder*,
    No. C07-3798 (JW) (HRL),
    2009 WL 1125579 (N.D. Cal. Apr. 27, 2009)...................................... 12, 15, 16, 17

*Terra Novo, Inc. v. Golden Gate Products, Inc.*,
    No. C-03-2684 MMC EDL,
    2004 WL 2254559 (N.D.Cal. 2004) .......................................................................... 22

*U.S. v. Treacy*,
    No. S2 08 CR 366 (JSR),
    2009 WL 812033 (S.D.N.Y. Mar. 24, 2009) ............................................................ 13

*United States v. Adlman*,
    134 F.3d 1194 (2d Cir. 1998) ............................................................................. 7, 10

*United States v. ChevronTexaco Corp.*,
    241 F. Supp. 2d 1065 (N.D. Cal. 2002) ................................................................. 11

*United States v. Nobles*,
    422 U.S. 225 (1975) ............................................................................................... 7

*United States v. Schlegal*,
    313 F. Supp. 177 (D. Neb. 1970) ......................................................................... 22

*Upjohn Co. v. United States*,
    449 U.S. 383 (1981) ........................................................................................ 21, 22

<u>Rules and Regulations</u>

Federal Rules of Civil Procedure
    Rule 26(b)(3) ..................................................................................................... 7, 8

Federal Rules of Civil Procedure
    Rule 26(c) ............................................................................................................. 1

Northern District of California
    Local Rule 7-4(a)(3) .............................................................................................. 1

701863913v10

iv

NOTICE OF MOTION AND MOTION
FOR PROTECTIVE ORDER REGARDING
THE DEPOSITION OF WILLIAM HEARST
Case No. M:06-04327-JW (PVT)

1 <u>**NOTICE OF MOTION AND MOTION**</u>

2 TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3      PLEASE TAKE NOTICE THAT the Audit Committee of the Board of Directors of

4 Juniper Networks, Inc. ("Audit Committee") hereby brings this motion pursuant to Rule

5 26(c) of the Federal Rules of Civil Procedure for a protective order to prevent Lead Plaintiff

6 from deposing members of the Audit Committee regarding the information underlying the

7 conclusions reached by the Audit Committee in connection with its investigation of Juniper

8 Networks Inc.'s ("Juniper") stock option grant processes because such information is

9 protected by the attorney-client privilege and work product doctrine.

10     This Motion is based on this Notice of Motion and Motion, the accompanying

11 Memorandum of Points and Authorities, the Declarations of Mitchell Gaynor, Joni Ostler

12 and Kirke M. Hasson served and filed herewith, any other matter that may be submitted at

13 the hearing, and all the files and records in this action.

14 <u>**STATEMENT OF ISSUES (Civil L.R. 7-4(a)(3))**</u>

15     Where an investigation is conducted by an Audit Committee's counsel in direct

16 response to and because of threatened and pending litigation, in order to learn facts and

17 obtain legal advice to assess the company's exposure and position it to defend against the

18 threatened litigation, do certain disclosures constitute a "waiver" of the attendant attorney-

19 client and work product privileges that attach to the underlying work of the investigation

20 team?  Plaintiff contends that the disclosure of a summary of conclusions in a Securities

21 and Exchange Commission ("SEC") filing and letters to the SEC constitutes a waiver, or

22 alternatively that disclosures to Juniper's outside auditors constitute a waiver of those

23 privileges.  *See* D'Esposito's Letter to Court dated Dec. 7, 2009, Dkt. 449.  On the contrary,

24 as demonstrated below, the details underlying the investigation work are privileged and

25 retain their privileged character.

26

27

28

701863913v10                    - 1 -              NOTICE OF MOTION AND MOTION

1          **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION.**

3          This Motion addresses the limited issue of whether Plaintiff may question members

4    of Juniper's Audit Committee about information underlying the Audit Committee's

5    conclusions in connection with its internal investigation of Juniper's historical stock option

6    granting practices.  At the deposition of one Audit Committee member (William R. Hearst

7    III), Juniper's counsel instructed Mr. Hearst not to answer such questions on the basis of

8    attorney-client and work product privileges.  In challenging these instructions, Plaintiff

9    contends that Juniper waived any attorney-client and work product privileges that may have

10   attached to this information as a result of certain disclosures made to Ernst & Young

11   ("E&Y") and as a result of disclosures made in Juniper's 2006 Form 10-K and two letters to

12   the SEC.

13         As discussed below, Plaintiff has not identified any attorney-client communications

14   between the Audit Committee and its counsel that it contends were purportedly disclosed

15   either to E&Y or in Juniper's public filings or letters to the SEC.  It has therefore identified

16   no basis for any claimed waiver of the attorney-client privilege.

17         To the extent that Plaintiff contends that work product protection never attached in

18   the first instance, the Ninth Circuit's decision in *In re Grand Jury Subpoena (Mark Torf /*

19   *Torf Environmental Management)*, 357 F.3d 900 (9th Cir. 2004) ("*Torf*") is controlling.

20   *Torf* establishes that work product protection attaches to work performed by outside counsel

21   who has been retained to conduct an internal investigation in response to government

22   inquiries even where counsel's work also served a non-litigation purpose.  Under *Torf* and

23   the decisions following *Torf*, the work performed by counsel, retained by Juniper's Audit

24   Committee to conduct an internal investigation regarding Juniper's option granting

25   practices in response to a DOJ subpoena and SEC inquiry, is unquestionably protected work

26   product.

27         Plaintiff's claim that work product protection was waived, either by the disclosures

28   to E&Y or by summarizing the Audit Committee's conclusions in the Company's public

1   filings and correspondence, is equally unfounded.  Numerous cases, including a recent

2   decision upheld by Judge Ware, make it clear that work product protection is *not* waived

3   when work product is shared with a company's outside auditor. The law is equally settled

4   that publication of a summary of conclusions – even if detailed – does not waive work

5   product protection as to the analysis underlying those conclusions.

6        For these and the reasons set forth below, the Court should grant Juniper's Motion

7   for a Protective Order.

8   **II.    BACKGROUND.**

9        **A.    The Genesis of the Audit Committee's Investigation and Pillsbury's
             Work.**

10

11       In May 2006, several events made it clear to Juniper that it was facing civil and

12   potentially criminal litigation relating to its historical stock option granting practices and

13   that it would need to obtain legal counsel to investigate, assess the Company's potential

14   exposure to civil and criminal proceedings and act on behalf of the Company in connection

15   with the government agencies that were investigating the Company:

16   • On May 12, 2006, Juniper received questions from several stockholders regarding
       Juniper's stock option granting process generally and regarding several specific
17     grants.  Declaration of Kirke M. Hasson in Supp. of Mot. For Prot. Order ("Hasson
       Decl."), ¶ 4; Declaration of Mitchell Gaynor in Supp. of Mot. For Prot. Order
18     ("Gaynor Decl.") ¶ 2.

19   • On May 16, 2006, the Center for Financial Research and Analysis ("CFRA") issued
       a report entitled "Options Backdating, Which Companies Are At Risk?" in which
20     CFRA identified Juniper as a company "at risk" of having backdated option grants.
       Hasson Decl., ¶ 5.
21
22   • On May 19, 2006, the U.S. Attorney's Office for the Eastern District of New York
       issued a subpoena commanding Juniper to testify before the grand jury on June 2,
       2006 and produce documents concerning Juniper's stock options.  Gaynor Decl., ¶
23     4; Hasson Decl., ¶ 6 and Ex. A.

24   • On May 23, 2006, the U.S. Attorney's Office for the Northern District of California
       issued a second subpoena to Juniper.  Gaynor Decl., ¶ 6; Hasson Decl., ¶ 6 and
25     Ex. B.

26   • On May 24, 2006, Juniper received a letter from the SEC stating that the SEC was
       conducting an inquiry into Juniper's option granting practices to determine whether
27     the Company had violated the federal securities laws.  Gaynor Decl., ¶ 6; Hasson
       Decl., ¶ 8 and Ex. C.
28

1   - Also on May 24, 2006, two derivative lawsuits were filed against Juniper and several of its current and former officers.  These were the first of several derivative
2   lawsuits and class action lawsuits that were subsequently filed between May 24, 2006 and August 29, 2006.  Gaynor Decl., ¶ 6; Hasson Decl., ¶ 7.[1]

3   - On June 7, 2006, Juniper received a formal request for documents from the SEC.
4   Gaynor Decl., ¶ 8; Hasson Decl., ¶ 9 and Ex. D.[2]

5   As a direct response to the threats of litigation that were unfolding in May, Juniper's

6   Board of Directors convened a special meeting on May 20, 2006 to decide how to respond

7   to the Department of Justice's ("DOJ") subpoena.  Gaynor Decl., ¶ 4 and Ex. A.  At that

8   Board meeting, in light of the receipt of the DOJ subpoena, the Board directed the Audit

9   Committee to commence a formal investigation into the Company's historical option

10   pricing and specifically directed the Audit Committee to retain independent counsel to

11   conduct the investigation.  *Id.* ¶ 7.  On May 23, 2006, the Audit Committee interviewed and

12   selected Pillsbury as independent counsel to conduct the investigation.  *Id.*, ¶ 5.  The

13   retention of Pillsbury was formalized on June 8, 2006.  Hasson Decl., ¶ 10.

14   The Company anticipated that Pillsbury would investigate the facts, advise the

15   Audit Committee on the Company's potential exposure to criminal and civil litigation and

16   to act on behalf of the Company with respect to the DOJ subpoenas and the SEC's

17   investigation and document request.  Gaynor Decl., ¶ 7; Hasson Decl., ¶ 12.  Pillsbury

18   ───────────────

19   [1]  *See In re Juniper Networks Derivative Actions*, No. C-06-03396 JW (N.D. Cal.) (filed 5/24/06); *In Re Juniper Networks, Inc. Derivative Litigation*, No. 1-06-CV-064294 (Santa Clara Superior) (filed 5/24/06); *Shemtov v. Kriens, et al.*, No. C-06-03406 JW (N.D. Cal.)
20   (filed 5/26/06); *Rizzo v. Sindhu et al.*, No. C-06-03466 JW (N.D. Cal.) (filed 5/25/06); *Kaya v. Gani et al.*, No. C06-03452 JW (N.D. Cal.) (filed 5/26/06); *Employer-Teamsters Local*
21   *Nos. 175 & 505 Pension Trust Fund v. Kriens et al.*, No. C-06-03708 JW (N.D. Cal.) (filed 6/9/06); *Buckley v. Kriens, et al.*, No. C-06-04984 JW (N.D. Cal.) (filed 8/17/06); *Indiana*
22   *State District Council of Laborers and HOD Carriers Pension Fund v. Kriens et al.*, No. C-06-04717 JW (N.D. Cal.) (filed 8/03/06); *Pirelli Armstrong Tire Corporation Retiree*
23   *Medical Benefits Trust v. Kriens*, No. 1-06-CV-064853 (Santa Clara Superior) (filed 6/2/06); *Garber v. Juniper Networks, Inc. et al.*, Case No. C 06 4327 (N.D. Cal.) (filed
24   7/14/06); *Peters v. Juniper Networks, Inc., et al.*, Case No. C 06 5303 JW (N.D. Cal.) (filed 8/29/06).

25   [2]  These facts are largely set forth in prior filings with the Court.  See, e.g., Ostler Decl. in Supp. of Defendants Mot. to Dismiss, Ex. 3 (Dkt. 83); Supplemental Brief of Audit
26   Committee in Response to the Court's November 4, 2009, Further Interim Order at pp. 4-5; Harrison Decl. in Supp. of Lead Plaintiff's Mot. for Class Cert., Ex. 1 (Dkt. 221-2, at
27   p. 3); Compl., ¶ 278 (Dkt. 73); Compl. in *New York City Employee's Retirement System v. Berry*, No. 08-0246, ¶ 202 (Dkt. 65).

28

NOTICE OF MOTION AND MOTION
FOR PROTECTIVE ORDER REGARDING
THE DEPOSITION OF WILLIAM HEARST
Case No. M:06-04327-JW (PVT)

1   understood that it was retained for these purposes.  Gaynor Decl., ¶ 7; Hasson Decl., ¶ 11.

2   In other words, Juniper's Audit Committee retained Pillsbury directly because of the

3   Company's potential exposure to criminal and civil litigation.

4        The Audit Committee investigation was extensive.  It involved the review of

5   approximately 785,000 documents and interviews of 35 current and former directors,

6   officers and employees.  Hasson Decl., ¶ 13.  During the investigation, Pillsbury

7   communicated with the DOJ and the SEC on behalf of the Audit Committee and responded

8   to the DOJ and SEC's subpoenas and further requests for documents.  Gaynor Decl., ¶ 8;

9   Hasson Decl., ¶ 14.  The SEC ultimately filed a complaint against Juniper on August 28,

10  2007.  Gaynor Decl., ¶ 9 and Ex. B.

11       **B.     The Parties' Current Dispute.**

12       On December 4, 2009, Plaintiff deposed William R. Hearst III, a member of the

13  Board of Directors and the Audit Committee that conducted the investigation.  Ostler Decl.,

14  ¶ 2.  During the deposition, counsel for Plaintiff asked questions that sought information

15  regarding the investigation conducted by the Audit Committee, the answers to which would

16  have required Mr. Hearst to disclose information obtained from discussions with Pillsbury

17  and the work product of the investigation.  *Id.* ¶ 2, Ex. A (excerpts of Hearst Deposition).

18  Counsel for the Audit Committee and counsel for Juniper objected to the questioning on the

19  basis of attorney-client privilege and work product, and instructed Mr. Hearst not to answer.

20  *Id.* ¶ 2 and Ex. A (e.g., at pp. 172, 181-82).  Plaintiff has indicated it intends to seek such

21  details from the other members of the Audit Committee, and has asked the Court to rule on

22  whether any privileges have been waived for purposes of such questioning.

23       **C.     Plaintiff's Waiver Argument.**

24       Plaintiff argues that the Audit Committee waived the attorney-client and work

25  product privileges with respect to information underlying its conclusions through certain

26  disclosures, and that Plaintiff is therefore entitled to ask Mr. Hearst and the other Audit

27  Committee members (Messrs. Calderoni and Goldman) about that information, including

28

1   details of attorney work product and perhaps even attorney-client discussions with Pillsbury

2   leading to the Audit Committee's conclusions.

3        First, Plaintiff claims that the Audit Committee waived work product privilege by

4   sharing certain details of the investigation with  Juniper's outside auditors, E&Y.

5   Declaration of Todd Garber, Nov. 9, 2009, ¶ 4.[3]  For the reasons discussed below, as a

6   matter of law, the sharing of such details with an outside auditor does not waive work

7   product privileges.

8        Second, Plaintiff points to (a) Juniper's March 9, 2007, Form 10-K SEC filing for

9   the year 2006 (the "2006 10-K"), where Juniper provided a summary of the conclusions of

10  the investigation (Hasson Decl. ¶ 15, Ex. E (pp. 32-33)),[4] and (b) Juniper's January 12 and

11  17, 2007 letters to the SEC (the "Preclearance Letters") that also provided a summary of the

12  conclusions of the investigation, by way of preface to the Company's (not Pillsbury's)

13  proposed methodology for choosing  measurement dates for certain stock option grants for

14  purposes of calculating its restatement.  *Id.*, Exs. F and G.  Plaintiff does not identify any

15  statements in Juniper's 2006 10-K and Preclearance Letters that reflect or otherwise

16  disclose attorney-client communications between Juniper's Audit Committee and Pillsbury.

17  Accordingly, Plaintiff has not articulated a basis for waiver of the attorney-client privilege.

18  Nonetheless, Plaintiff appears to argue that, by disclosing a summary of its conclusions in

19  _____

20  [3]  Although Plaintiff suggests in its December 7, 2009 letter to the Court framing the issue
    to be briefed that the attorney-client privilege that attaches to communications between the
21  Audit Committee and Pillsbury was waived through disclosures to E&Y, it does not
    identify any privileged communication between the two that it contends was disclosed to
22  E&Y.  Therefore, the Audit Committee is only addressing the issue of whether work
    product protection was waived through disclosure of certain details of the investigation to
23  E&Y.  The Audit Committee reserves the right to respond to any argument by Plaintiff that
    a disclosure to E&Y contained attorney-client communications.

24  [4]  The 2006 10-K also provided thereafter a detailed description of the actions taken *by the
    Company* by way of its restatement, such as the details of certain grants and the consequent
25  changes to measurement dates for purposes of the restatement accounting (Hasson Decl., ¶
    15, Ex. A, pp. 33-35).  This restatement activity by the Company was not performed by
26  Pillsbury, and accordingly Plaintiff has been allowed access to the Company's documents
    and personnel to explore at length the restatement accounting.  *See* Decl. of Joni Ostler,
27  filed July 14, 2009 (Dkt. 288), at ¶¶ 6-16, and Ex. B thereto (deposition of Senior Director
    of Corporate Accounting Bill Carey).

28

1   Juniper's 2006 10-K and Preclearance Letters to the SEC, the Audit Committee waived

2   both attorney-client privilege and work product protection with respect to the information

3   underlying the Audit Committee's conclusions.  *See* D'Esposito's Letter to the Court dated

4   Dec. 7, 2009 (Dkt. 449).

5        However, for the reasons discussed below, as a matter of law, the identification of

6   the investigation and the disclosure of a summary of its conclusions does not constitute a

7   waiver of the work product protection or attorney-client privilege with respect to the

8   underlying investigation.

9   **III.    ARGUMENT.**

10       **A.    Pillsbury's Work for the Audit Committee's Investigation Is Entitled to
              Attorney Work Product Protection.**

11

12       The work product doctrine, first announced in *Hickman v. Taylor*, 329 U.S. 495

13   (1947), and codified in Federal Rules of Civil Procedure 26(b)(3), protects from discovery

14   materials prepared by a party's counsel "in anticipation of litigation."  Fed. R. Civ. P.

15   26(b)(3).  As the Supreme Court has explained, the doctrine "shelters the mental processes

16   of the [party's] attorney, providing a privileged area within which he can analyze and

17   prepare his client's case."  *United States v. Nobles*, 422 U.S. 225, 238 (1975); *Hickman*,

18   329 U.S. at 510 ("In performing his various duties, . . . it is essential that a lawyer work

19   with a certain degree of privacy, free from unnecessary intrusion by opposing parties and

20   their counsel."); *see also United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998) (the

21   work product doctrine "is intended to preserve a zone of privacy in which a lawyer can

22   prepare and develop legal theories and strategy 'with an eye toward litigation,' free from

23   unnecessary intrusion by his adversaries").

24       There is no dispute that the work performed by Pillsbury for the Audit Committee's

25   internal investigation regarding Juniper's option granting practices contains "written

26   statements, private memoranda and personal recollections prepared or formed by an adverse

27   party's counsel in the course of [its] legal duties."  *Hickman*, 329 U.S. at 510; *see* Hasson

28   Decl., ¶ 13.  The only remaining question, then, is whether Pillsbury's work is eligible for

1   work product protection because it was performed "in anticipation of litigation."  As

2   explained below, Pillsbury's work was indeed performed in anticipation of litigation, and

3   the work product doctrine clearly applies to Pillsbury's work on behalf of the Audit

4   Committee's investigation.

5               **1.      Work Product Protection Attaches To Materials Prepared
                          Because Of The Prospect Of Litigation, Even If Those Materials**
6                         **May Have A Dual Purpose.**

7               Under Ninth Circuit law, documents and materials are protected work product under

8   Rule 26(b)(3) if, "in light of the nature of the document and the factual situation in the

9   particular case, the document can be fairly said to have been prepared or obtained *because*

10  *of* the prospect of litigation."  *Torf*, 357 F.3d at 907 (internal quotation marks and citation

11  omitted and emphasis added).[5]  This "because of" test "does not consider whether litigation

12  was a primary or secondary motive behind the creation of a document."  *Id.* at 908.  Rather,

13  so long as the document was prepared "at least in part" to "advise and defend [a company]

14  in anticipated litigation," it qualifies for work product protection.  *Id.* at 909.

15              In *Torf*, the Ninth Circuit specifically rejected the notion that a document created for

16  "dual purposes" (*i.e.*, a litigation purpose and a non-litigation purpose) cannot qualify for

17  work product protection.  As the Court explained, "the question of entitlement to work

18  product protection cannot be decided simply by looking at one motive that contributed to a

19  document's preparation."  *Id.* at 908.  There, the Court considered whether work product

20  attached to documents created by an environment consultant (Torf), who had been retained

21  to assist the company's lawyer (McCreedy) in defending against an Environmental

22  Protection Agency ("EPA") investigation.  *Id.* at 908.  The government argued – and the

23  Court agreed – that certain of the consultant's documents were also prepared for non-

24  litigation purposes and therefore "would have been created in substantially similar form"

25  regardless of the EPA's threat of litigation.  *Id.* at 907-908.  That, however, did not

26  _____

27  [5]  As noted in *Torf*, this formulation has been adopted by the First Circuit, Second Circuit,
    Third Circuit, Seventh Circuit, Eighth Circuit and D.C. Circuit.  *See Torf*, 357 F.3d at 907
28  at n.2.

1  eviscerate work product protection because the documents were *also* produced "because of"

2  anticipated litigation:

> 3  [By] hiring McCreedy who in turn hired Torf, Ponderosa was not assigning
> an attorney a task that could just as well have been performed by a non-
> 4  lawyer. *The company hired McCreedy only after learning that the federal
> government was investigating it for criminal wrongdoing; a circumstance
> 5  virtually necessitating legal representation.* Torf assisted McCreedy in
> preparing Ponderosa's defense. He also acted as an environmental
> 6  consultant on the cleanup. Although in that capacity, he could have been
> retained by Ponderosa directly, this circumstance does not preclude the
> 7  application of the work-product privilege to documents produced in that
> capacity, if the documents were *also* produced "because of" litigation.

8

9  *Id.* at 909 (first emphasis added). Because the "withheld documents . . . were prepared by

10  Torf, *at least in part*, to help McCreedy advise and defend Ponderosa in anticipated

11  litigation with the government," work product protection attached. *Id.* at 909 (emphasis

12  added).

13      In Plaintiff's brief filed November 9, 2009 (filed under seal) at page seven, Plaintiff

14  urged the Court to apply the "primary motive / but for" test sometimes applied in this

15  circuit before *Torf*, citing *Kintera v. Convio*, 219 F.R.D. 503 (S.D. Cal. 2003). That

16  appears to have led this Court in its December 9, 2009 Order to rely erroneously on *Kintera*

17  and a case it cited, *Kelly v. City of San Jose*, 114 F.R.D. 653 (N.D. Cal. 1987), to rule that

18  work product protection did not apply to the Audit Committee's interview with Brienne

19  Fisher. 12/9/09 Order (Dkt. 458) at 4:26-28.[6] Both *Kelly* and *Kintera* used the "primary

20  motive / but for" test to determine whether certain documents were entitled to work product

21  protection. *Kelly*, 114 F.R.D. at 659 (the work product doctrine "applies only to material

22  generated *primarily* for use in litigation, material that would not have been generated *but*

23  *for* the pendency or imminence of litigation") (emphases added and citation omitted);

24  *Kintera*, 219 F.R.D. at 510 (relying on *Griffith v. Davis*, 161 F.R.D. 687, 699 (C.D. Cal.

25  1995), which in turn cited to *Kelly*, for the proposition that work product only applies to

26

_____

27  [6] Juniper and the Audit Committee are preparing to seek permission to file a motion for
reconsideration regarding that Order.

28

1    documents that would not have been generated but for the pendency or imminence of

2    litigation).  However, both cases predate *Torf*, which specifically rejected the "primary

3    motive / but for" test.  *Torf*, 357 F.3d at 906, 908, 910 (rejecting that test and instead

4    holding that the district court erred in concluding that the "withheld documents were not

5    covered by the work product doctrine because they would have been created even without

6    the prospect of litigation."); *see also Adlman*, 134 F.3d at 1198 ("We believe that the

7    requirement that documents be produced primarily or exclusively to assist in litigation in

8    order to be protected is at odds with the text and the policies of [Rule 26(b)(3)].").[7]

9            Consistent with *Torf*, cases have uniformly applied the work product doctrine to

10   work performed by outside counsel who have been retained to conduct an internal

11   investigation in response to government inquiries, even if the work may have also been

12   used for additional, non-litigation purposes.  *See e.g., In re Cardinal Health Inc. Sec. Litig.*,

13   No. C2-04-575 (ALM), 2007 WL 495150, at *1, 5 (S.D.N.Y. Jan. 26, 2007) (work product

14   attached to materials prepared by outside counsel retained by Audit Committee to conduct

15   internal investigation in response to SEC inquiry, even though the results of the

16   investigation were also used for business purposes such as restating financials and

17   improving policies and procedures); *In re Woolworth Corp. Sec. Class Action Litig.*, No. 94

_____

19   [7] *Torf* expressly relied on *Adlman* in adopting the "because of" test.  *Torf*, 357 F.3d at 908.
     In *Adlman*, the Second Circuit set forth various examples in which legal analysis performed
20   in connection with a routine business purpose (such as creating reserves for projected
     litigation) can qualify as work product:

21           A business entity prepares financial statements to assist its executives,
             stockholders, prospective investors, business partners, and others in
22           evaluating future courses of action.  Financial statements include reserves
             for projected litigation.  The company's independent auditor requests a
23           memorandum prepared by the company's attorneys estimating the
             likelihood of success in litigation and an accompanying analysis of the
24           company's legal strategies and options to assist it in estimating what
             should be reserved for litigation losses. . . .

25           In [this] scenario the company involved would require legal analysis that
             falls squarely within *Hickman*'s area of primary concern–analysis that
26           candidly discusses the attorney's litigation strategies, appraisal of
             likelihood of success, and perhaps the feasibility of reasonable settlement.

27   *Adlman*, 134 F.3d at 1200.

28

1   Civ. 2217 (RO), 1996 WL 306576, at *3 (S.D.N.Y. June 7, 1996) (work product attached to

2   work performed by outside counsel for internal investigation regarding company's

3   accounting practices in response to SEC inquiry, even though investigative materials

4   assisted in company's restatement); *see also In re Vioxx Products Liability Litig.*, No. MDL

5   1657, 2007 WL 854251, at *4 (E.D. La. Mar. 6, 2007) (work product attached to report

6   prepared by Special Committee and outside counsel during internal investigation of

7   company's development and marketing of Vioxx in response to existing and anticipated

8   shareholder litigation, as well as DOJ and SEC investigations, even if report "may have also

9   been motivated by business purposes").[8]

10      Indeed, we are unaware of any post-*Torf* decision holding that work product does

11  not attach to materials prepared by counsel retained to conduct an internal investigation in

12  response to an SEC inquiry, DOJ investigation and/or anticipated civil litigation. *Cf. In re

13  Veeco Instruments Inc. Sec. Litig.*, No. 05 MD 1695 (CM) (GAY), 2007 WL 210110, at *1

14  (S.D.N.Y. Jan. 25, 2007) (work product attached to materials prepared by outside counsel

15  and forensic accounting firm during the course of internal investigation regarding

16  company's accounting irregularities even where *no* government investigation was pending,

17  because counsel was retained to provide legal advice "regarding [the company's] financial

18  statements, past and future disclosures and possible litigation arising therefrom").

19      Fundamentally, every internal investigation can be said to be intended to contribute

20  to some business result – *e.g.*, to bring the company in compliance with SEC and Nasdaq

21  [8]  *See also United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1082 (N.D. Cal.
    2002) (work product attached to legal analyses performed by company's tax counsel
22  regarding transaction where counsel attested that there was "virtual certainty" of IRS
    challenge:  "The expectation of litigation is either real or it is not.  Whether the party
23  prepared for that litigation before conducting a transaction (to inform its business affairs) or
    implemented the transaction 'in the dark' and then prepared for the litigation that would
24  surely arise from it does not alter the imminence or 'realness' of the expectation of
    litigation."); *In re Special September 1978 Grand Jury (II)*, 640 F.2d 49, 61-62 (7th Cir.
25  1980) (work product attached to list of campaign contributions and names of recipients,
    even though these materials were also used in preparation for Illinois State Board of
26  Elections:  "[T]he law firm knew before it began to prepare the reports that the Grand Jury
    as well as the Illinois State Board of Elections wanted information concerning political
27  contributions by the Association.").

28

1    reporting requirements, OSHA regulations, Department of Labor rules, etc.  Yet where

2    there is a threat of litigation, courts have consistently found that work product protection

3    attaches to the investigative materials.  *Torf*, 357 F.3d at 909 (work product protection

4    attached to documents prepared by environmental consultant to assist in cleanup where

5    such documents were also prepared "at least in part" to help advise and defend in

6    anticipated litigation.); *see also In re LTV Sec. Litig.*, 89 F.R.D. 595, 616 (N.D. Tex. 1981)

7    (work product protection attached to work performed by special officer retained to conduct

8    investigation of company's accounting practices and to implement an SEC consent degree:

9    "It is difficult, if not impossible, to discern how LTV can bring its accounting and auditing

10   practices into compliance with SEC standards without expert legal advice, and how such

11   advice is to be rendered without the benefit of an investigation of the questionable

12   practices.").  As the court in *Woolworth* recognized, "[a]pplying a distinction between

13   anticipation of litigation and business purposes is . . . artificial, unrealistic, and the line

14   between is . . . essentially blurred to oblivion." *In re Woolworth Corp. Sec. Class Action*

15   *Litig.*, No. 94 Civ. 2217, 1996 WL 306576, at *3 (S.D.N.Y. June 7, 1996) (quoted and

16   followed by *In re Cardinal Health Inc. Sec. Litig.*, 2007 WL 495150, at *5) (internal

17   quotation marks omitted); *see also Hollinger Int'l Inc. v. Hollinger Inc.*, 230 F.R.D. 508,

18   515 n.9 (N.D. Ill. 2005) (observing that "[e]very action by a public corporation – even

19   litigation decisions – can be characterized as partly motivated by business considerations.

20   To hold that any such 'mixed motives' preclude work product protection would eviscerate

21   the doctrine.") (internal quotation marks and citation omitted).

22          In the context of options backdating, the notion that internal investigations

23   conducted by audit committees with the assistance of outside counsel qualify for work

24   product protection has become so recognized that plaintiffs have not contested it, basing

25   their arguments instead on claims of "waiver."  This is so even though the investigative

26   materials assist the company in connection with restating its financials and bringing the

27   company back into compliance with its reporting requirements.  *See e.g., S.E.C. v.*

28   *Schroeder*, No. C07-3798 (JW) (HRL), 2009 WL 1125579, at *6 (N.D. Cal. Apr. 27, 2009)

1   (work product attached to documents prepared by Special Committee and outside counsel

2   during internal investigation of company's options backdating practices in response to SEC

3   and DOJ inquiries); *U.S. v. Treacy*, No. S2 08 CR 366 (JSR), 2009 WL 812033 (S.D.N.Y.

4   Mar. 24, 2009) (interview memoranda created by company's outside counsel during

5   internal investigation regarding company's options granting practices assumed to be work

6   product; issue was whether waiver had occurred); *S.E.C. v. Roberts*, 254 F.R.D. 371, 375

7   (N.D. Cal. 2008) (attorney notes from witness interviews, meetings with the government,

8   and meetings with company's management, Special Committee and Board were

9   unquestionably work product; issue was whether waiver had occurred).

10              **2.      Pillsbury's Work For Juniper's Audit Committee Was
                         Performed Because of Threatened and Pending Litigation.**

11

12          Application of these principles to the case at bar compels the conclusion that the

13   work performed by Pillsbury during the investigation is protected work product.  As

14   demonstrated below, Juniper's Audit Committee retained Pillsbury "only after learning that

15   the federal government was investigating it for [civil] wrongdoing; a circumstance virtually

16   necessitating legal representation."[9]  *Torf*, 357 F.3d at 909.

17          Specifically, on May 19, 2006, Juniper received a subpoena from the U.S.

18   Attorney's Office requesting documents regarding Juniper's past option granting practices.

19   Gaynor Decl., ¶ 4; Hasson Decl., ¶ 6, Ex. A.  Juniper's Board of Directors convened a

20   meeting the next day to discuss the subpoena.  Gaynor Decl., ¶ 4.  At that Board meeting, in

21   light of the subpoena, the Board directed the Audit Committee to commence a formal

22   investigation into the Company's historical option pricing and specifically directed the

23   Audit Committee to retain independent counsel to conduct the investigation.  *Id.* ¶ 4 and

24   Ex. A.  On May 23, 2006, the Audit Committee interviewed Pillsbury and decided to hire

25   _____

26   [9]  To the extent that the Court's December 9, 2009 Order considered only the Declaration of
     Kirke M. Hasson (dated October 27, 2009), the record requires some clarification.  While it
     is true that the interviews conducted by Pillsbury served in part to aid the shareholder and
27   derivative suits, the interviews were also a necessary predicate to Pillsbury's defense efforts
     regarding the DOJ subpoenas and SEC inquiry.  Hasson Decl., ¶ 11.

28

1   them as independent counsel.  *Id.*, ¶ 5.  That same day, Juniper received yet another

2   subpoena from the U.S. Attorney's Office.  *Id.* ¶ 6.  The following day, the first two of

3   several derivative lawsuits were filed against Juniper and several of its current and former

4   officers and directors.  *Id.*  On May 24, 2006, Juniper also received a letter from the SEC

5   stating that the SEC had commenced an investigation of Juniper.  Hasson Decl., ¶ 8, Ex. C.

6   On June 7, 2006, the SEC sent Juniper a formal request for documents.  Hasson Decl., ¶ 9,

7   Ex. D.  Pillsbury was formally retained on June 8, 2006.  Hasson Decl., ¶ 10.

8       Pillsbury commenced and conducted its investigation against the backdrop of, and

9   in direct response to, these government investigations and civil lawsuits.  Hasson Decl.,

10  ¶ 11; Gaynor Decl., ¶ 7. Juniper expected and intended that Pillsbury, through its

11  investigation, would advise the Audit Committee regarding the Company's potential

12  exposure to criminal and civil litigation and act on the Company's behalf with respect to the

13  DOJ subpoenas and the SEC's investigation and document request.  Gaynor Decl., ¶ 7;

14  Hasson Decl., ¶ 12.  Juniper also expected that Pillsbury's investigation and analyses would

15  be used to assist the Company in its defense in any litigation filed by either the DOJ or the

16  SEC, as well as in the civil litigation.  Gaynor Decl., ¶ 7; Hasson Decl., ¶ 14.  Pillsbury's

17  role was not merely to investigate accounting errors; there would be no reason to conduct a

18  mere accounting inquiry in the form of an investigation by counsel.  Rather, Pillsbury

19  assessed the Company's legal exposure vis-a-vis the DOJ and SEC, assisted the Company

20  in responding to the DOJ and SEC investigations, and performed substantive legal analysis

21  and advice regarding the issues raised by the government inquiries regarding Juniper's

22  option granting practices.  Gaynor Decl., ¶¶ 5-7; Hasson Decl., ¶¶ 10-13.  In other words,

23  the Company chose to employ outside counsel to conduct the investigation specifically

24  because of the threat of civil and criminal litigation.

25      Under these circumstances, at a minimum, the work performed by Pillsbury was

26  done "at least in part . . . to advise and defend [Juniper]" in response to the DOJ subpoena,

27  SEC inquiry and anticipated shareholder litigation and is therefore entitled to work product

28  protection.  *Torf*, 357 F.3d at 909.  Accordingly, Pillsbury's work for the Audit

1    Committee's investigation is entitled to work product protection.  Also, as discussed below,

2    contrary to Plaintiff's contentions otherwise, the Audit Committee's work product

3    protection has not been waived.

4        **B.      Disclosure to Outside Auditors Does Not Result in a Waiver of Work
               Product Protection.**

5

6        Plaintiff contends that Juniper's Audit Committee waived its work product

7    protection as to information shared with Juniper's outside auditors E&Y and is therefore

8    entitled to question the Audit Committee members about that work product.  Plaintiff is

9    wrong.

10       The disclosure of information to outside auditors does not constitute a waiver of

11   work product.  *See Schroeder*, 2009 WL 1635202, at *3; *Roberts*, 254 F.R.D. at 381-82; *see*

12   *also In re JDS Uniphase Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 76169, at *11 (N.D. Cal.

13   Oct. 5, 2006) (Laporte, J.); *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 229 F.R.D. 441

14   (S.D.N.Y. 2004).

15       In *Schroeder*, 2009 WL 1635202, Judge Ware overruled the objections to

16   Magistrate Judge Lloyd, found at 2009 WL 1125579 (N.D. Cal. April 27, 2009).  There,

17   plaintiff sought evidence regarding the substance of interviews by counsel for a special

18   investigating committee, arguing that disclosures made to the company's outside auditors

19   constituted a waiver of work product protection.  As Judge Lloyd explained:

20           [U]nder the circumstances presented here, this court finds that the better
             view, recently followed by another court in this district in a different stock
21           option backdating case, is that espoused by *Merrill Lynch & Co. v.
             Allegheny Energy, Inc.*, 229 F.R.D. 441 (S.D.N.Y. 2004).  That court
22           concluded that disclosures to outside auditors do not have the "tangible
             adversarial relationship" requisite for waiver.  *Id.* at 447.  The court
23           reasoned:

24               [A]ny tension between an auditor and a corporation that arises from
                 an auditor's need to scrutinize and investigate a corporation's records
25               and book-keeping practices simply is not the equivalent of an
                 adversarial relationship contemplated by the work product doctrine.
26               Nor should it be. A business and its auditor can and should be
                 aligned insofar as they both seek to prevent, detect, and root out
27               corporate fraud.  Indeed, this is precisely the type of limited alliance
                 that courts should encourage.

28

1    *Id.* at 2009 WL 1125579, at *9.  Similarly, in *Roberts*, 254 F.R.D. at 382, Judge Patel held

2    that disclosure of information by counsel for an investigating committee to the company's

3    auditors did not constitute a waiver:

4         [T]his court finds that its holding furthers the strong public policy of
         encouraging critical self-policing by corporations.  Indeed, sanctioning a
5         broad waiver here would have a chilling effect on the corporation's efforts to
         root out and prevent corporate fraud and disclose the results as necessary to
6         its auditors.

7    *Accord, In re JDS Uniphase Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 76169, at *11

8    (disclosure to outside auditors does not waive work product because it does not increase the

9    danger that true adversaries will obtain the information); *Merrill Lynch & Co.*, 229 F.R.D.

10   at 449 (holding that no waiver occurs where information is shared with outside auditors).[10]

11        In *Roberts*, a former executive being prosecuted by the SEC sought to compel the

12   production of notes of his former employer's outside counsel relating to the outside

13   counsel's investigation into allegations of stock option backdating.  *Roberts*, 254 F.R.D. at

14   373.  The outside counsel disclosed to auditors information obtained during the

15   investigation and some of the outside counsel's conclusions regarding the investigation.  *Id.*

16   at 381.  Judge Patel held that there was no waiver of work product protection as a result of

17   the disclosures to outside auditors and noted that, aside from not having an adversarial

18   relationship with their clients, outside auditors have "aligned interests" with their clients as

19   a result of outside auditors' fiduciary duty to their clients.  *Id.* at 382.  Judge Patel also

20   stated that any disclosures made to auditors did not amount to a waiver because the

21   assistance of auditors "is necessary for [outside counsel] to properly conduct its

22   investigation and for [the client] to restate its financial statements."[11]  *Id.*

23   _____

24   [10]  See also *Gutter v. E.I. DuPont de Nemours & Co.*, No. 95-CV-2152, 1998 U.S. Dist.
     LEXIS 23207, at *13-14 (S.D. Fla. May 18, 1998) (disclosure to an outside auditor does not
25   waive work product protection because accountants are not considered a conduit to a
     potential adversary and there is an expectation of confidentiality); *Lawrence E. Jaffe*
26   *Pension Plan v. Household Int'l, Inc.*, 237 F.R.D. 176, 183 (N.D. Ill. 2006) (holding that
     independent auditors do not have an adversarial relationship with their clients).

27   [11]  In prior briefing Plaintiffs cited *Middlesex Retirement System v. Quest Software, Inc.*,
     CV 06-6863-DOC (RNBx) (C.D. Cal. July 8, 2009) (*Quest 1*) and *Middlesex Retirement*
28                                                                    (continued...)

1        Accordingly, in the case at bar, although Pillsbury shared certain information, as

2   selected by Pillsbury, with Juniper's outside auditors E&Y, those disclosures did not waive

3   the work product protection that applied to the shared information.  As in *Roberts* and

4   *Schroeder*, not only does E&Y not have an adversarial relationship with its client, Juniper,

5   but E&Y also owes a fiduciary duty to Juniper that causes the parties' interests to be

6   aligned.  Because of the fiduciary duty owed to its client, E&Y is not a conduit through

7   which the work product of the Audit Committee's counsel would end up in the possession

8   of a potential adversary.  *Roberts*, 254 F.R.D. at 382; *Schroeder*, 2009 WL 1125579, at *9.

9   The Court should reject Plaintiff's contention that disclosure to E&Y waived work product

10  protection.

11      **C.    The Limited Disclosure, in SEC filings and to the SEC, of a Summary of
                the Audit Committee's Conclusions Does Not Effect A Waiver of Work
12              Product Protection or Attorney-Client Privilege as to the Information
                Underlying Those Conclusions.**

13

14       As Plaintiff itself has noted, and complained, the information Juniper has disclosed

15  regarding the findings of the investigation has only been a limited "summary."[12]  In the

16  context of corporate investigations, court after court has held that the publication of a

17  summary of conclusions, without discussion of the underlying evidence and details, does

18  not constitute a waiver of work product protection for the information underlying those

19  ──────────────────

20  (…continued)
    *System v. Quest Software, Inc.*, CV 06-6863-DOC (RNBx) (C.D. Cal. September 18, 2009)
21  (*Quest 2*) (attached as exhibits 1-2 to the Decl. of Todd Garber filed on November 9, 2009),
    for the proposition that a disclosure to outside auditors constitutes a waiver.  However,
22  those decisions, from the Central District of California, acknowledged that there is a split of
    authority on this issue, and that authority in the Northern District of California has rejected
23  Plaintiffs' position and held that a disclosure to outside auditors does not constitute a
    waiver because auditors are not in an adversarial relationship to the company.  *See Quest 1*
24  at 10 (citing *S.E.C. v. Schroeder*, No. C07-03798, 2009 WL 1125579, at *9 (N.D. Cal. June
    10, 2009), objections overruled by 2009 WL 1635202 (June 10, 2009); *In re JDS Uniphase*
25  *Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 76169, at *1-2; *Roberts*, 254 F.R.D. at 375 (N.D.
    Cal. 2008)); *Quest 2* at 5.

26  [12] "The full details of defendants' misconduct with respect to stock option grants have yet
    to be disclosed, since Juniper has not publicly released its Audit Committee report, but
27  rather only presented a selected summary of its investigative efforts and findings in the
    2006 Form 10-K."  Complaint ¶ 22 [Dkt. 73].

28

- 17 -

1   conclusions.  Moreover, even where a detailed report is issued, courts hold that the waiver

2   of work product protection extends only to that which was disclosed, not to the underlying

3   materials.  Additionally, cases in this and other contexts confirm the well-known principle

4   that a corporate statement of its conclusions on a subject does not waive the attorney-client

5   privilege as to communications that may have helped it reach those conclusions.

6        **1.    Disclosure of a Summary Does Not Waive as to Underlying**
         **Details.**
7

8        In determining whether any waiver has occurred, courts examine whether, as here,

9   the disclosure was merely at a summary level regarding the conclusions, and if so, hold

10  there is no waiver.  *See In re Veeco Instruments, Inc. Sec. Litig.*, 2007 WL 210110, at *2

11  (holding that privilege was not waived where, as here, disclosures summarized the findings

12  and conclusions of the internal investigation); *In re Dayco Corp. Deriv. Sec. Litig.*, 99

13  F.R.D. 616, 619 (S.D. Ohio 1983) (holding that the disclosure of findings and conclusions

14  of a Special Review Committee of the Board of Directors in a press release did not waive

15  privilege as to the final report prepared by the Committee).

16       In *In re Veeco Instruments, Inc. Sec. Litig.*, 2007 WL 210110, at *1, the Kaye

17  Scholer firm conducted an internal investigation for Veeco Instruments, Inc. ("Veeco") in

18  connection with a restatement of Veeco's financials.  Kaye Scholer retained Jefferson

19  Wells, a forensic accounting firm, to assist in the investigation.  *Id.*  Plaintiffs sought to

20  compel details underlying the conclusions of the investigation, such as reports generated by

21  Kaye Scholer and Jefferson Wells, along with the documents prepared in support of the

22  reports.  *Id.*  Plaintiffs argued that the documents generated during the investigation were

23  not protected by the work product doctrine, and that any work product privilege was waived

24  by disclosure in a press release and a letter to the SEC that summarized the findings and

25  conclusions of the internal investigation.  *Id.*  The court disagreed, holding that the

26  underlying documents generated in the investigation were work product, and that there was

27  no waiver.  *Id.* at *1-2.  As the court explained, "Clearly, the disclosures cited by the

28

1   plaintiff merely summarized the findings and conclusions of the internal investigation and

2   did not quote, paraphrase or reference any of the specific documents at issue in support of

3   its conclusions.  Said limited disclosure does not constitute a waiver of the work product

4   doctrine." *Id.* at *2.

5          Likewise, in *In re Dayco Corp. Derivative Sec. Litig.*, 99 F.R.D. at 619, a Special

6   Review Committee of the Board of Directors retained the Dickstein, Shapiro & Morin firm

7   to conduct an investigation into Dayco's alleged securities law violations.  Following the

8   investigation, Dayco issued a press release that summarized, among other things, the

9   findings and conclusions set forth in the investigative report by the Committee and its

10  counsel.  *Id.*  As in this case, neither the facts supporting the findings and conclusions, nor

11  the report itself were released.  *Id.*  The Court held that the disclosure of the findings and

12  conclusions, but not the substance, of the report did not result in a waiver of attorney-client

13  privilege or work product protection.  *Id.*

14         In this case, the summary of the conclusions of the investigation that was disclosed

15  did not reveal the detailed findings or report of the Audit Committee or discuss the

16  evidence on which it was based.  As a prelude to a discussion of the *Company's* restatement

17  methodology, Juniper's 2006 Form 10-K contains four paragraphs identifying the

18  investigation and referring in very general terms to a summary of conclusions of the

19  investigation.  *See* Hasson Decl., Ex. E.  Juniper's Preclearance Letters are similar,

20  describing the investigation only in general terms and then focusing on the *Company's*

21  intended methodologies for a restatement.  *Id.*, Exs. F-G.

22         Neither the 2006 Form 10-K nor the Preclearance Letters quote, paraphrase or

23  reference any of the specific findings or documents at issue in support of the general

24  conclusions contained the 2006 Form 10-K or Preclearance Letters.  *See In re Veeco*, 2007

25  WL 210110, at *2 (finding no waiver of work product protection where disclosure of

26  findings and conclusions did not "quote, paraphrase or reference any of the specific

27  documents at issue in support of its conclusions.").  As in *Dayco*, Juniper's disclosure of

28  general conclusions does not constitute a disclosure of the "substance" of the investigation

1    so there is no waiver of work product protection.  *See In re Dayco*, 99 F.R.D. at 619

2    (finding no waiver of work product protection because disclosure of findings and

3    conclusions did not reveal the substance of an investigation report).

4                **2.        Even Where a Report of Findings is Disclosed, Any Work
                              Product Waiver Extends Only to the Disclosure Made.**
5

6            In fact, even the publication of a detailed report does not waive work product

7    protection for the preceding drafts and underlying information.  *In re Vioxx Products*

8    *Liability Litig.*, 2007 WL 854251, at *5 ("The publication of the final investigative report

9    does not waive the protection for underlying draft and materials . . ."); *Chamberlain Mfg.*

10   *Corp. v. Maremont Corp.*, No. 90 C 7127, 1993 WL 11885 (N.D. Ill. Jan. 19, 1993)

11   (holding that disclosure of the final report of an internal investigation to the Department of

12   Defense did not waive attorney-client privilege or work product protection as to the

13   information underlying the report).

14           In *Chamberlain*, 1993 WL 11885, at *1, the Air Force was conducting an

15   investigation into possible fraud by a subsidiary that Chamberlain had acquired.

16   Chamberlain instigated an internal investigation into the alleged fraud and hired outside

17   counsel, Seyfarth, Shaw, Fairweather & Geraldson ("Seyfarth"), to assist in the

18   investigation.  *Id.*  Seyfarth conducted interviews, took notes and prepared summaries of the

19   interviews.  *Id.*  Ultimately, Seyfarth voluntarily disclosed to the Department of Defense

20   ("DOD") the results of the internal investigation in a report, but it did not disclose the

21   underlying documents prepared in the course of the investigation.  *Id.*  The magistrate judge

22   held that no privilege attached to the documents and that even if the privilege did attach, it

23   was waived by Chamberlain's disclosure of the report to the DOD.  *Id.*  The district court

24   disagreed, holding the attorney-client privilege attached and that the privilege was not

25   waived by the limited disclosure.  *Id.* at *2-3.  In particular, the court noted that Seyfarth

26   was hired to assist in conducting the investigation, and that interviews conducted by

27   Seyfarth were protected by the attorney-client privilege.  *Id.* at *2.  The court held that it

28   was "equally clear to us that these documents are protected under the work product

1    doctrine" because they were prepared by attorneys.  *Id.*  The court went on to hold that no

2    privilege was waived by disclosure to the government because, as here, privilege was

3    asserted over the documents underlying the report "from the very beginning."  *Id.*

4    According to the court, "[n]either does the sharing of the reports with the DOD act as a

5    'subject matter waiver' of all related materials."  *Id.* at *3 (citations omitted).  As the court

6    explained, the interview notes prepared during the investigation "contained attorney mental

7    impressions and reflected the legal strategies used by Seyfarth in advising Chamberlain.

8    *See In re Air Crash*, 133 F.R.D. 515 (N.D.Ill. 1990) (drafts of final documents made public

9    retained work product protection)."  *Id.*

10        Similarly, in *In re Vioxx Products Liability Litig.*, 2007 WL 854251, at *1, counsel

11   for a Special Committee of the Board of Directors conducted an investigation concerning

12   conduct of senior management in the development of a pharmaceutical product.  Plaintiffs

13   in a subsequent products liability action sought the production of documents relating to the

14   "creation, preparation, and publication" of a report drafted by outside counsel that was

15   publicly disclosed at the conclusion of the internal investigation.  *Id.* at *2.  The court

16   rejected plaintiffs' argument that the attorney work product did not shield materials

17   involving the same subject matter as the publicized report and held that, "The publication of

18   a final investigative report does not waive the protection for the underlying drafts and

19   materials[.]"  *Id.* at *5 (citing *Hollinger*, 230 F.R.D. 508, 516 (N.D. Ill. 2005) (finding that

20   disclosure of a final report did not waive "work product protection over the Special

21   Committee counsel's legal analyses, mental impressions, and attorney-client

22   communications involved in the investigative and Report compilation process.")).

23            **3.    A Person's Disclosure of Conclusions on an Issue Does Not
24                    Waive Attorney-Client Privilege as to Discussions Leading to the
                      Conclusions.**

25        As noted above, the *Chamberlain* court held there was also no waiver of attorney-

26   client privilege by a disclosure of a final report of investigation.  As that court noted, this

27   result flows in part from the decision in *Upjohn Co. v. United States*, 449 U.S. 383, 387

28   (1981), where the defendant corporation voluntarily disclosed to the SEC a report of

1   violations following an investigation conducted by counsel. In holding that

2   communications between employees and company counsel conducting an investigation are

3   privileged, the Supreme Court left undisturbed the Sixth Circuit's rejection of the

4   Magistrate's finding of waiver of the attorney-client privilege. *Id*. at 388. As the

5   *Chamberlain* court noted (at *3), the Supreme Court would not have found the materials in

6   *Upjohn* privileged if disclosure of the final report to the SEC acted as a waiver of that

7   privilege. As the Seventh Circuit has explained: "A corporation prepares and publishes an

8   internal report about 'questionable payments' abroad; we know from *Upjohn Co.* that it

9   does not follow that the government has access to the interviews underlying the published

10  report." *In re Feldberg*, 862 F.2d 622, 629 (7th Cir. 1988). See also *Rauh v. Coyne*, 744 F.

11  Supp. 1181, 1185 (D.D.C. 1990) (where defendant conducted an internal investigation into

12  allegations of race discrimination and disclosed the results of the investigation, underlying

13  documents relating to the investigation were protected by attorney-client privilege and the

14  work product doctrine, court stating that "[t]he privilege was not waived merely because

15  defendants disclosed counsel's conclusion").

16          This is one specific application of the more general rule that, when a person publicly

17  announces a conclusion on an issue, that does not waive the person's attorney-client

18  privileges as to discussions that may have led the person to that conclusion. For example,

19  companies often discuss draft 10-Ks with counsel, but the publication of the 10-K does not

20  waive privilege as to the discussions leading up to it. *Roth v. Aon Corp.*, 254 F.R.D. 538,

21  541 (N.D. Ill. 2009) ("Indeed, most courts have found that even when a final product is

22  disclosed to the public, the underlying privilege attached . . ."). See also *Terra Novo, Inc. v.

23  Golden Gate Products, Inc.*, No. C-03-2684 MMC EDL, 2004 WL 2254559 (N.D. Cal.

24  2004) at *2 (a press release stating that a patent was invalid and company would continue to

25  sell the product based on advice from lawyers did not waive attorney-client privilege with

26  respect to the advice provided by counsel, court noting that "the statement does not disclose

27  a privileged communication and does not create a waiver."); *United States v. Schlegal*, 313

28  F. Supp. 177 (D. Neb. 1970) (disclosure of information in a tax return does not waive

1   attorney-client privilege as to conversations between the attorney and client in preparing the

2   tax return).

3          It is commonplace for litigants and potential litigants to announce conclusions

4   resulting from investigations by counsel – such as corporations announcing the conclusion

5   that litigation against them lacks merit or, as in this case, Plaintiff's allegation in its

6   complaint of the conclusions it reached through its counsel's investigation, such as the

7   allegations that Mr. Kriens and Mr. Gani "knew or recklessly disregarded that Juniper had

8   issued backdated option grants[.]" Complaint ¶¶ 38, 44 [Dkt. 73].  If the announcement of

9   such conclusions worked a waiver of the privileges attaching to the underlying investigation

10  and conversations, then Plaintiff would be obliged to provide the details from its

11  investigation prior to filing its complaint in this case – precisely what the work product

12  privilege was intended to prevent – and to describe the communications between plaintiff

13  and its counsel that led it to the conclusions alleged in the complaint, e.g., that Mr. Kriens

14  acted with scienter – an invasion of the attorney-client privilege.

15         **D.     The Current Dispute Concerns Only Questions to Audit Committee
               Members at Depositions.**

16

17         One final point deserves mention.  The dispute presently before the Court, and the

18  subject matter of this briefing, is whether Plaintiff may question the Audit Committee

19  members (Messrs. Hearst, Calderoni and Goldman) about the information underlying their

20  conclusions as reported in Juniper's 2006 10-K and the Preclearance Letters.  This dispute

21  arises from counsel's instruction to Mr. Hearst not to answer certain questions at his

22  deposition on December 4, 2009, and Plaintiff's challenge to the appropriateness of that

23  instruction.  The dispute does not involve the production of documents, the reopening of

24  any other depositions that have already been concluded, or any other completed discovery,

25  and any such issues are not properly before the Court.

26         To the extent Plaintiff may claim otherwise, Plaintiff is wrong.  Discovery closed on

27  December 1, 2009 and the deadline to file motions to compel was December 8, 2009.  *See*

28  Dkt. 433 (Judge Ware's 11/16/09 Order reaffirming December 1 discovery cut-off); Civ.

1   L.R. 26-2.  Plaintiff has known the basis for its waiver contention for well over a year.

2   Ostler Decl. ¶¶ 3-4.  Plaintiff conducted discovery for over one year while Juniper asserted

3   work product and attorney-client privilege objections in response to document requests and

4   other discovery relating to the Audit Committee's investigation.  *Id.* ¶¶ 5-7.  Yet Plaintiff

5   did nothing – it did not ask to meet and confer and did not file a motion to compel.  Instead,

6   Plaintiff waited until after the discovery cut-off and chose to raise its waiver contention

7   *only* in its challenge to Juniper's instruction not to answer certain questions at Mr. Hearst's

8   deposition.  *Id.* ¶ 2.  Plaintiff has therefore forfeited any claim that additional documents

9   must be produced based on its waiver argument.  *See, e.g., Amersham Pharmacia Biotech,*

10  *Inc. v. The Perkin-Elmer Corp.*, No. C-97-04203 CRB/EAI, 2000 WL 34217818, at *1-2

11  (N.D. Cal. Jan. 18, 2000) (denying plaintiff's motion to compel additional discovery based

12  on privilege waiver argument where plaintiff knew basis of the argument for many months

13  yet sat on its rights); *cf. Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1026-27

14  (9th Cir. 2006) (where plaintiff was not diligent in pursuing discovery prior to discovery

15  deadline, district court has broad discretion to refuse to reopen discovery, even where the

16  evidence sought could have changed the outcome of the case).[13]  This is true even though

17  the parties agreed between themselves that certain *depositions* could take place after the

18  discovery cutoff.  *Digital Envoy, Inc. v. Google, Inc.*, No. C 04 01497 RS, 2006 WL

19  824412, at *5-6 (N.D. Cal. Mar. 28, 2006) (denying plaintiff's untimely motion to compel

20

21  _____

[13] *See also In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 331, 341 (N.D. Ill. 2005)
22  (denying plaintiffs' motion to compel where plaintiffs knew the motion's bases for eight
    months yet waited until the day discovery closed to file the motion); *Everett v. Aldi, Inc.*,
23  Case No. 1:07-CV-275, 2009 WL 940379 (N.D. Ind. Apr. 6, 2009) (denying both parties'
    motions to compel because they were filed on the eve of the discovery cut-off without
24  adequate explanation for failing to pursue the requested discovery previously); *Buttler v.
    Benson*, 193 F.R.D. 664, 665-66 (D. Colo. 2000) (denying motion to compel where plaintiff
25  knew the grounds for the motion for over a year before moving to compel after the
    discovery deadline had passed); *Audi AG v. D'Amato*, 469 F.3d 534, 541-42 (6th Cir. 2006)
26  (district court properly denied defendant's motion for additional discovery where he learned
    of the pertinent issue three weeks before discovery closed and had no explanation for
27  failing to seek discovery until the day of the discovery deadline).

28

1   despite plaintiff's argument that parties jointly continued to schedule depositions after the

2   discovery cut-off).[14]

3   **IV.     CONCLUSION.**

4           For the foregoing reasons, the Audit Committee respectfully requests that the Court

5   grant the motion for a protective order and enter an order precluding counsel for plaintiff

6   from questioning Audit Committee members regarding the privileged work product and

7   attorney-client communications underlying the conclusions reached by Juniper's Audit

8   Committee in connection with its investigation of Juniper's stock option grant processes.

9           Dated:  December 14, 2009.

10                                          PILLSBURY WINTHROP SHAW PITTMAN LLP
                                            KIRKE M. HASSON
11                                          ROBERT J. NOLAN
                                            ALEX SANTANA
12                                          50 Fremont Street
                                            San Francisco, CA  94105
13
                                            By _____ */s/ Kirke M. Hasson*_____
14                                                         Kirke M. Hasson
                                            Attorneys for the Audit Committee of the Board of
15                                                   Directors of Juniper Networks, Inc.

16

17

18

19

20

21

22

23

24

25   _____
     [14] With respect to Plaintiff's argument that disclosures to Ernst & Young waived the Audit
26   Committee's privileges, Plaintiff filed a separate motion to compel the production of
     certain documents shared with Ernst & Young.  *See* Dkt. 456.  The parties will address
27   that specific dispute regarding production of documents in the context of that separate
     motion, which is currently noticed for hearing on February 2, 2010.
28