BARBARA HART (*pro hac vice*)
DAVID C. HARRISON (*pro hac vice*)
JEANNE D'ESPOSITO (*pro hac vice*)
LOWEY DANNENBERG COHEN & HART, P.C.
One North Broadway, Suite 509
White Plains, NY 10601-2310
Telephone: 914-997-0500
Facsimile: 914-997-0035

*Lead Counsel for the New York City Pension Funds and the Class*

WILLEM F. JONCKHEER S.B.N. 178748
SCHUBERT JONCKHEER KOLBE & KRALOWEC LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone: 415-788-4220
Facsimile: 415-778-0160

*Local Counsel*

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
Carolyn Wolpert
100 Church Street
New York, NY 10007
Telephone: 212-788-0748

*Attorneys for the New York City Pension Funds*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| IN RE JUNIPER NETWORKS, INC. SECURITIES LITIGATION | Case No. C06-04327-JW (PVT) <br><br> **LEAD PLAINTIFF'S OPPOSITION TO DEFENDANT ERNST & YOUNG'S MOTION FOR PROTECTIVE ORDER** <br><br> Before: Hon. Patricia Trumbull <br><br> Requested Date: March 9, 2010 <br> Requested Time: 10:00 a.m. |

## I. INTRODUCTION

Lead Plaintiff, the New York City Pension Funds ("Lead Plaintiff"), opposes defendant Ernst & Young's ("EY") motion for protective order re-litigating this Court's Order of December 18, 2009 (the "December 18 Order") which granted Lead Plaintiff 28 hours of additional deposition time.

By its terms, the December 18 Order was addressed to EY. Pursuant to that Order, Lead Plaintiff has noticed five EY depositions, three less than the Order provided.

There is no language included in the text of the Order to suggest that additional depositions granted by the Court should be used only for Juniper witnesses. EY vigorously opposed Lead Plaintiff's application for additional depositions and lost. In this motion, EY makes many of its same arguments it advanced in 2009 as if it were a mere bystander to the Court's Order, claiming that once Juniper settled with Lead Plaintiff and the Class, the December 18 Order has become moot. This is not so. The Court already heard and considered EY's concerns about deposition scheduling and, fully cognizant of EY's position on the matter, granted Lead Plaintiff the right to conduct limited additional depositions. The limitations in the Order were specific: 1) no more than eight deponents, and 2) no more than 28 hours total. Within these strict parameters, Lead Plaintiff had total discretion. However, EY is now attempting to re-litigate the same issue by couching its arguments in a Motion for Protective Order, simply because it finds itself as the sole defendant in this Action.

Lead Plaintiff alleges in this Action that EY violated Section 11 of the Securities Act of 1933 in certifying financial statements used in connection with the merger between Juniper Networks and NetScreen Technologies. If EY is found liable, potential damages approach $100 million. To date, Lead Plaintiff has conducted only six depositions of EY witnesses. EY requests that the Court issue a Protective Order preventing it from having to produce any more than two additional witnesses in this Action (EY has claimed since August 2009 that a third witness, EY Partner Robert Browne, has been unavailable due to illness). To restrict Lead Plaintiff's discovery from EY to, at most, eight witness depositions would be entirely unreasonable. This is precisely why the Court granted Lead Plaintiff additional depositions. As explained herein, Lead

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANT ERNST & YOUNG'S
MOTION FOR PROTECTIVE ORDER – CASE NO. C06-04327-JW (PVT)
{1964 / BRF / 00100575.DOC v1}

Plaintiff seeks testimony from percipient EY witnesses and two 30(b)(6) designees on topics relevant to the complex claim for potentially $100 million in damages against EY. Therefore, EY's Motion for Protective Order Regarding Depositions and to Quash Subpoenas should be denied.

## II. FACTUAL BACKGROUND

On November 20, 2008, this Court entered a stipulated discovery plan providing Lead Plaintiff thirty depositions in the action *In re Juniper Securities Litigation* (the "Juniper Action" or "this Action"), to which EY is a defendant party, and provided that fact discovery would close on December 1, 2009. Dkt. 179.

Due to the complex nature of the multiple allegations against both Juniper and EY stemming from conduct over a six several year period -- involving numerous quarterly and annual financial reports, press releases, and committees involved in the backdating itself, and at least two different audit teams and three different audit partners -- Lead Plaintiff moved to amend the initial discovery plan to take an additional 15 witnesses. Dkt. 337; *See* Declaration of Michael Goldklang dated March 5. 2010 ("Goldklang Decl."), Ex. 1. In its September 2009 briefing, Lead Plaintiff stated that, in addition to the thirty depositions provided for in the initial discovery plan, it intended to take at least "an additional 5 depositions of EY personnel." *Id.* at 9. Lead Plaintiff then proceeded to identify potential EY witnesses it then considered necessary to question, including Michael Clark, a partner and Director of Professional Practice and one individual subject to the immediate motion. *Id.*, Ex. 3. Both Juniper and EY opposed Lead Plaintiff's motion to amend the discovery plan to add depositions. Docs 377-78.

On November 2, 2009, the Court issued an interim Order stating that it was "inclined to amend the November 17, 2008 Stipulated Discovery Plan to cover the number of depositions and/or deposition hours allotted to the parties in both the Juniper Action and the Berry Action." Dkt. No. 409, Goldklang Decl. Ex. 2. The Court ordered the parties to meet and confer regarding

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANT ERNST & YOUNG'S
MOTION FOR PROTECTIVE ORDER – CASE NO. C06-04327-JW (PVT)
{1964 / BRF / 00100575.DOC v1}

2

a reasonable amount of additional deposition time. *Id.* Lead Plaintiff submitted a supplemental brief on November 10, 2009 proposing an additional 140 deposition hours, 42 of which (or six depositions) would be allocated to EY witnesses. Dkt. No. 424, Goldklang Decl. Ex. 3.. EY filed a joint proposal with Juniper proposing that Lead Plaintiff be granted an additional 4 depositions in the Juniper Action. Dkt. No. 426.

More than a month after the briefing on the motion to amend the discovery plan, on November 3, 2009, EY unexpectedly produced to Lead Plaintiff more than a 650,000 additional pages of relevant documents. As a result of this late production of documents, Lead Plaintiff was forced to postpone already scheduled depositions of EY witnesses. This unreasonably delayed production is the subject of Lead Plaintiff's pending motion for sanctions against EY. Dkt. 427, Goldklang Decl. Ex. 4. Notably, this belated production came right after EY's belated admission at the end of August 2009 that it had "lost" most of its workpapers from its audit of Juniper's 2000 year-end financials and several highly relevant portions of its workpapers from its audit of Juniper's 1999 year-end financials. Dkt. No. 325.

On December 18, 2009, the Court permitted Lead Plaintiff additional time beyond the December 1, 2009 discovery deadline to depose certain Juniper witnesses, "plus any Additional Deposition granted to Lead Plaintiff…" Dkt. 474. Despite the fact that Lead Plaintiff and EY did not submit a joint stipulation providing that Lead Plaintiff would be permitted to depose EY witnesses after the December 1 discovery deadline, EY consistently indicated that it was bound by the discovery extension when it proposed dates in December 2009 and January 2010 for four of its witnesses, and when it offered on January 27, 2010, without any prompt from Lead Plaintiff, to provide one of its own witnesses for a deposition scheduled on February 22, 2010. *See* Goldklang Decl. Ex. 13.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANT ERNST & YOUNG'S
MOTION FOR PROTECTIVE ORDER – CASE NO. C06-04327-JW (PVT)
{1964 / BRF / 00100575.DOC v1}

3

The Court issued a Further Order on December 18, 2009 granting in part Lead Plaintiff the right to "take up to an additional 28 hours of depositions in the Juniper Action, provided that the total number of such additional depositions does not exceed eight." Doc 476 at 1 *Id.*, Ex. 5. To date, Lead Plaintiff has conducted twenty-eight of the originally granted thirty depositions, including six EY witnesses,[1] and has noticed the remaining two to be allocated among EY witnesses Robert Browne[2] and Mike Flint, an EY Audit Manager during the Class Period. All parties agreed to adjourn the depositions of certain Juniper and EY witnesses whose questioning could be impacted by the Court's December 9, 2009 Order regarding Juniper and EY's invocations of attorney work product and attorney-client privileges with respect to Juniper's Audit Committee Investigation. Dkt. 458.[3] *See* Ex. 12 to Goldklang Decl. Subsequent to the December 9 privilege Order, Lead Plaintiff conducted the depositions of six other witnesses not implicated by the Court's ruling.

Meanwhile, settlement negotiations ensued. Following the mediation sessions conducted on February 4-5 2010, Lead Plaintiff and the Juniper Defendants agreed to a settlement. At a discovery hearing held on February 9, 2010, Lead Plaintiff indicated that it intended to proceed with its Section 11 claims against EY and conduct fact discovery through the deposition of several EY and Juniper witnesses. The Court ordered the parties to meet and confer.

During a meet and confer on these issues on February 11, 2010, Counsel for Lead Plaintiff

---

[1] These witnesses included one corporate 30(b)(6) designated witness regarding EY's missing audit work papers for the 1999 and 2000 audit work years, Andrew Cotton, Lisa Schwartz, Brad Feller (audit years 1999-2002), Amanda Powell, and Sam Lazarakis (audit years 2003-2006).

[2] Lead Plaintiff initially requested a date for Mr. Browne's deposition eight months ago in August 2009. EY has not yet offered any date on which to conduct Mr. Browne's deposition contending vaguely that he is in ill health. However, despite interim representations that he would be available and then that Brown is now not available, EY has offered no reasonable explanation for Br. Brown's alleged incapacity. Lead Plaintiff informed EY that it would make every effort to accommodate the witness' physical needs, location needs, and any endurance or frailty issues, but wishes to proceed with the deposition. EY has made no response and has not sought a protective order. *See* Goldklang Decl. Ex. 19.

[3] Defendants have moved the Court to reconsider the December 9, 2009 Order. Dkts. 477, 489. EY's contention in its Motion for Protective Order that Lead Plaintiff adjourned all its scheduled depositions in light of pending settlement discussions simply is not true. Absent those depositions that may have implicated the claimed privileges of the Audit Committee Investigation, such as Chris Richardson's, Lead Plaintiff intended to move forward with discovery. In fact, Lead Plaintiff was prepared to conduct a 30(b)(6) deposition of a Juniper designated witness just a few days after the mediations. See Goldklang Decl., Ex. 16.

informed EY that it intended to notice the depositions of Robert Browne, Mike Flint, Michael Clark, Jeff Fong, Emily Mau, and two 30(b)(6) witnesses (which were in lieu of Chris Richardson's deposition.)[4] *See* Goldklang Decl. Paragraph 12. Lead Plaintiff indicated that, depending on the time allotted for each of the aforementioned witnesses, it may wish to conduct a deposition of an individual who could be identified only by EY, as well as another 30(b)(6) witness. *See* Ex. 16 to Goldklang Decl. EY noted that it would not object to either Browne or Fong's depositions; however, due to Mr. Browne's health concerns, it was likely that he would be unavailable for the foreseeable future. *Id.* EY ended the meet and confer by informing Lead Plaintiff that it would identify the unknown witness, provide further detail regarding Mr. Browne's failing health, and respond to an offer by Lead Plaintiffs to the deposition of EY witness Ginnie Carlier instead of Mr. Browne. However, EY has yet to furnish Lead Plaintiff with any of the promised information, despite repeated requests made subsequent to the meet and confer. *See* Goldklang Decl. Ex. 19.

On February 17, 2010, and pursuant to the Court's December 18, 2009 Order granting additional depositions, Lead Plaintiff served on EY notices of deposition and subpoenas for five EY witnesses – Jeff Fong, Michael Clark, Emily Mau, and two 30(b)(6) designees – totaling 21 of the additional 28 hours to which Lead Plaintiff is entitled under the December 18 Order.

### III. ARGUMENT

#### A. Lead Plaintiff's Deposition Notices Are Fully Justified and Timely Under the Court's December 18, 2009 Order

##### 1. The December 18 Order Governs the Deposition Notices

EY argues that Lead Plaintiff's decision to direct deposition time granted by the Court's December 18, 2009 Order is unjustified because Lead Plaintiff's original application focused primarily on the need to depose Juniper witnesses rather than EY. This argument ignores the lengthy proceedings in which EY vigorously opposed Lead Plaintiff's application to take

---

[4] Mr. Richardson's deposition was delayed first by EY's late production of documents relating to Juniper's restatement and then by the pendency of the motions to reconsider the Court's Order of December 9, 2010 regarding the Audit Committee privilege and work product issues, which substantially impacts the scope and substance of Mr. Richardson's testimony. *See* Goldklang Decl. Ex. 12.

additional depositions of EY witnesses as well as Juniper witnesses, and lost. Dkt. Nos. 377-426. Indeed, in response to the Court's directive in its November 2, 2009 order, Lead Plaintiff specifically advised the Court that its need for additional depositions extended beyond Juniper and that "Lead Plaintiff must also depose Ernst & Young audit team members from June 1999 through the restatement in March 2007." Dkt. No. 424, p.2. Lead Plaintiff's application to the Court requested full-day depositions of six EY witnesses (*id.*) amounting to 42 deposition hours by EY witnesses. *Id.*, p. 3. EY opposed Lead Plaintiff's position. Contrary to EY's mischaracterization, Lead Plaintiff specifically spelled out its need for more EY depositions in its prior submissions and EY was fully aware of the scope of the deposition testimony sought. The Court recognized this fact in issuing the December 18 order without any limitations on which witnesses Lead Plaintiff may depose.

The fact that Lead Plaintiff, as part of a pre-settlement negotiation strategy, chose to focus more of the December 18 ordered total deposition time on Juniper witnesses does not mean, as Defendant suggests, that Lead Plaintiff was not entitled to apply the 28 hour limit to additional EY witnesses. On the contrary, by the Order's language, it is entirely appropriate for Lead Plaintiff to direct its allocated time to pursuing the claim against EY.

In short, Lead Plaintiff is not re-opening fact discovery, as claimed by EY; rather, EY is attempting to re-litigate the merits of the December 18 Order.

### 2. Lead Plaintiff's Deposition Notices Are Not Untimely

EY avers in its Motion that, "The Court permitted only certain depositions to occur in December 2009 and January 2010, notwithstanding the December 1 cut-off" and claims that this means no depositions can occur after January 2010. Motion at 5. However, there is nothing in the Court Order which extinguishes Lead Plaintiff's right to take the additional depositions after January 2010 if warranted by circumstances such as witness availability or pending motions etc. In fact, the Court's December 18, 2009 Order (Dkt. 474, Goldklang Decl. Ex. 4) specifically states: "Notwithstanding the December 1, 2009 discovery deadline, Lead Plaintiff may complete the above-referenced depositions of Bill Carey, Ken Goldman, Marcel Gani, William Hearst, Robert Calderoni, Luke Fewel, and Ken Levy, ***plus any Additional Depositions granted to Lead***

*Plaintiff by the Magistrate* or agreed to by the Juniper Defendants, in the months of December 2009 and January 2010." (emphasis added). Lead Plaintiff took the depositions of Messrs. Carey, Gani, Hearst, and Calderoni pursuant to this Order and then the parties agreed to adjourn other depositions in light of the pendency of a motion to reconsider the Court's ruling on privilege with respect to the Audit Committee Investigation, the determination of which would affect the questioning of, among other individuals, Messrs. Goldman and Levy, as well as EY witness Christopher Richardson.[5]

Indeed, EY implicitly acknowledged that there is nothing to preclude the taking of additional depositions after January 2010 when it offered to schedule on February 22, 2010 the deposition of Mr. Fong, one of the additional deponents requested by Lead Plaintiff. *See* Goldklang Decl Ex. 20. Lead Plaintiffs agreed to that request. Tellingly, EY neglects to mention that agreement in its papers because it completely contradicts their current position.

Moreover, there is no prejudice to EY in the taking of these depositions. As demonstrated above, EY has been on notice of Lead Plaintiff's need to take depositions of additional EY witnesses and any delay in the taking of such depositions is due in large part to continuing attempts to block the production of documents regarding Juniper's internal investigation on grounds of privilege. EY has, in fact, benefitted by this delay and cannot now claim prejudice by that delay. In any event, the December 18 Order is still in effect despite those delays and EY should produce the noticed witnesses.

### B. EY Must Produce Browne or Provide Evidence that He Is Too Ill To Be Deposed

EY refuses to produce EY partner Robert Browne for his deposition on medical grounds. *See* Decl. Exs. 19. However, since August 2009, EY has yet to provide any information to Lead Plaintiff identifying his condition and demonstrating that he is too ill to be deposed. *See Blankenship v. Hearst Corp.*, 519 F.2d 418 (9th Cir. 1975) (holding that a party challenging a deposition must overcome a heavy burden before the Court will deny such an opportunity); *see also Richardson v. Sugg*, 220 F.R.D. 343, 346 (E.D. Ark. 2004) (ordering a deposition to move

---

[5] The fact that certain Juniper depositions were postponed while the parties engaged in mediation also does not render the December 18 Order void.

forward even when the witness's personal physician advised against it because the challenging party did not present any facts that the witness would be unable to attend the scheduled deposition because of illness).[6]

Finally, EY subtly attempts to shift the burden on to Lead Plaintiff to establish why its noticed depositions are necessary: "The fact that Plaintiffs no longer wish to depose a number of Juniper witnesses does not amount to 'good cause' for reopening fact discovery against EY..." Motion at 6. EY conveniently disregards the fact that its arguments are made in support of its own motion for a protective order. Accordingly, it is EY's burden to demonstrate why the liberal standard for fact discovery should be vacated and why this Court should overrule its December 18, 2009 Order granting additional depositions. It has failed to make such a showing.

### C. Lead Plaintiff's 30(b)(6) Notices are Relevant to its Claims Against EY

As noted above, Lead Plaintiff noticed two one-half day Rule 30(b)(6) depositions in lieu of the deposition of Chris Richardson. Goldklang Decl. Ex. Paragraph 2. In addition to its "untimely notice" argument which is addressed in Point A, *supra*, EY advances the tepid argument that the 30(b)(6) depositions should be prohibited on relevancy grounds. Lead Plaintiff's request for a corporate witness capable of addressing EY's internal audit methodologies relating to stock options clearly is relevant to EY defense that it engaged in sufficient due diligence under section 11 of the Securities Act. Recent case law supports Lead Plaintiff's contention (*see* discussion below). Even if they were to make an argument as to the admissibility of the testimony, they could not win as it will be both admissible and relevant. In either case, it is well-settled under Fed. R. Civ. P. 26(b)(1)'s provision that: "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *See also Gonzales v. Google, Inc.*, 234 F.R.D. 674, 680, 679, 680 (N.D. Cal. 2006) (Rule 26(b) should be "liberally construed to permit the discovery of information which ultimately may not be admissible at trial").

---

[6] Even assuming *arguendo* that EY can make the requisite showing of unavailability due to illness, Lead Plaintiff nevertheless would be entitled to an appropriate substitute. Lead Plaintiff would be willing to accept Sam Lazarakis in Mr. Browne's stead as the most suitable replacement. Browne and Lazarakis shared responsibilities as engagement partners on the 2003-2006 audits of Juniper Networks.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANT ERNST & YOUNG'S
MOTION FOR PROTECTIVE ORDER – CASE NO. C06-04327-JW (PVT)
{1964 / BRF / 00100575.DOC v1}

8

This inquiry on 30(b)(6) is extremely important because we know EY changed its audit protocol after the backdating scandal. It will cut directly to EY's ability to make out their affirmative defense of due diligence. "The issue is not simply how the audit was actually conducted, but how it *should* have been conducted ... *[T]he significance of what the auditors did or did not do may turn on the content of the audit manuals.*" *Official Unsecured Creditors Committee of Media Vision Tech., Inc. v. Jain*, 215 F.R.D. 587, 589 (N.D. Cal. 2003) (ordering defendant Ernst & Young to produce information about its internal audit methodologies and controls because such information implicated its scienter) (emphasis added).[7] In fact, audit practice manuals and internal audit guidelines are an integral part of the audit. Indeed, testimony already adduced in this case has revealed that Juniper's stock options were audited by a team staffed with junior-level EY employees, thereby, making EY's internal audit methodologies even more significant as audit manuals provide guidelines and check lists especially helpful to more inexperienced auditors. See Goldklang Decl. Ex. 21 and 22

Moreover, information relating to EY's audit methodologies and controls is needed to provide a basis for the company's interpretation of GAAS and the manner in which EY "translated those required industry standards into its actual work..." *See Gohler v. Wood*, 162 F.R.D. 691, 695 (D. Utah 1995) (ordering auditor to produce its practice manuals and finding they were relevant and necessary in a case alleging fraud and reckless misconduct in connection with audits performed by the defendant).

Further, EY missed the options backdating conduct of dozens of its clients, many of whom restated historic financial results. Evidence pertaining to a party's other clients is relevant when it could lead to the discovery of admissible evidence. *See, e.g., Viacom Int'l, Inc. v.*

---

[7] EY's reliance on *In re Worlds of Wonder Securities Litigation*, 147 F.R.D. 214 (N.D. Cal. 1992) is misplaced. *Media Vision Technology* explicitly rejected the *World of Wonder* reasoning, stating: "The Court is firmly convinced that the better authority is represented by the line of cases which holds that audit manuals are discoverable in cases such as this." 215 F.R.D. at 588. Furthermore, the two Northern District of Illinois cases which EY cites – *In re Conticommodity Servs., Inc. Sec. Litig.*, MDL No. 644, 1988 WL 56172 (N.D. Ill. May 25, 1988), and *Davis v. Coopers & Lybrand*, No. 90C 7173, 1992 WL 159504 (N.D. Ill. June 25, 1992) – have been rejected by more recent cases in that district. *See, e.g., In re Mercury Finance Co. of Ill.*, No. 97 C 3035, 1999 WL 495903, at *5 (N.D. Ill. July 12, 1999).

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANT ERNST & YOUNG'S
MOTION FOR PROTECTIVE ORDER – CASE NO. C06-04327-JW (PVT)
{1964 / BRF / 00100575.DOC v1}

9

*YouTube, Inc.*, C-08-80211 JF (PVT), 2009 WL 102808, at *5 (N.D. Cal. Jan. 14, 2009) (ordering production of documents related to other clients' because such evidence would "underscore plaintiffs' claims…"). To the extent that Lead Plaintiff's 30(b)(6) notice seeks information related to EY's audit practices for stock option relating to companies other than Juniper, such information may be relevant to the issue of EY's due diligence during the course of its audits of Juniper granting practices. Lead Plaintiff is entitled to ascertain whether EY's audit methodologies in place to detect option backdating practices were generically deficient, or whether the particular audit team assigned to Juniper was derelict in its specific duties.

Securities actions against auditors inevitably raise questions of what the auditors knew, or should have known, and when they knew it. Accordingly, evidence of EY's changes to its audit methodologies on a firm-wide basis in order to better detect option backdating practices would be probative. Changes to the audit methodology after the Class Period also may address whether EY's actions to detect the backdating at Juniper were sufficient during the Class Period. Notably, Ex. N to David Friedman's Decl. to Motion for a Protective Order (Doc No. 565) – a July 2006 Industry Audit Practice Alert Regarding Stock Option Grants- identifies specific factors that would be helpful to the auditor to in determining the risk of a material misstatement of the financial statement or the deficiency of internal controls over financial reporting, including "situations in which option-based compensation is a large component of executive compensation, highly variable grant dates, patterns of significant increases in stock prices following option grants, or high levels of stock-price volatility."

Although a change to EY's audit practice in 2006 may not be dispositive of a failure to perform due diligence, the fact that the audit team failed to consider, or perhaps ignored, factors which were indicative of a heightened risk of options backdating is relevant to whether EY performed reasonable investigations during the Class Period. Several EY witnesses have claimed during their depositions that they exercised all reasonable care in their audits. *See* Goldklang Decl. Ex. 23. However, testimony relating to changes to stock option audit methodologies may provide evidence inconsistent with these claims and can be used to impeach the testimony of those witnesses.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANT ERNST & YOUNG'S
MOTION FOR PROTECTIVE ORDER – CASE NO. C06-04327-JW (PVT)
{1964 / BRF / 00100575.DOC v1}

10

Finally, EY's contention that it is entitled to a protective order because its audit procedures are protected trade secrets should be rejected. Courts consistently have found that audit trade secrets do not enjoy an "absolute privilege," and that testimony on the subject is proper if the plaintiff can show such discovery is both relevant and necessary to the action. *See Gohler*, 162 F.R.D. at 693-95 (rejecting defendant auditor's claim that its practice manuals constituted "trade secrets" because it was the defendant's burden to prove the manuals constituted trade secrets and that their disclosure would be harmful). EY has offered no evidence to suggest why this information is "highly sensitive," and if it were, why the provisions of the Stipulated Protective Order are insufficient protection.[8]

Here, the information is relevant and necessary; and any contrary holding would effectively immunize EY from all actions alleging corporate negligence by shielding most of the relevant evidence. *See also Media Vision Technology*, 215 F.R.D. at 588 (although audit manuals may constitute trade secrets, plaintiffs were entitled to the proprietary information because it was relevant and necessary to cross-check EY's internal standards with regulations imposed by GAAS and GAAP) (citing *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996)).

EY also mixes apples and oranges in claiming that the auditing procedures implemented to detect option backdating in 2006 are somehow irrelevant because the governing accounting principles changed after 2005 from APB 25 to FAS 123R. Under both accounting principles, the fact of backdating necessarily implicated the how options would be priced. This fact is confirmed in the Practice Alert submitted by EY, which states:

---

[8] EY's reliance on *Insulate America v. Masco Corp.*, 227 F.R.D. 427 (W.D.N.C. 2005), to suggest that even in cases governed by a protective order confidential "trade secrets" should be protected, is inapposite. In *Insulate America*, the court quashed a subpoena seeking disclosure of confidential and sensitive business information primarily because the plaintiffs and defendants were direct business competitors who could easily gain financial advantage over the other by use of the requested information. *Id.* at 433-34. Here, disclosure of EY's "trade secrets" would be governed by a protective order and such documents would be produced to a non-competitor that has neither a need nor any business interest in EY's proprietary documents other than how such information could contribute to the immediate Action.

> *Accounting for discounted options.* For periods in which an issuer used the provisions of APB 25 to determine compensation cost related to stock options, the issuer may have been required to record additional compensation cost equal to the difference in the exercise price and the market price at the measurement date (as defined in APB 25). In periods in which the issuer has recorded option compensation cost using the fair value method as allowed by SFAS No. 123, or as required by SFAS No. 123 R (revised 2004), the impact on the calculated fair value of options of using an incorrect date as the grant date would depend on the nature and magnitude of changes in conditions that affect option valuation between the incorrect date used and the actual grant date.

Declaration of David Friedman, Exhibit N.

Finally, The need for discovery regarding EY audit procedures is made all the more necessary and relevant here where EY has conveniently "lost" much of the audit workpapers for the period when majority of the fraudulent conduct occurred. Therefore, it is disingenuous for EY to argue that it has produced workpapers negating the need for discovery of audit procedures (see EY brief at p. 8) when, in fact, it has not produced a very substantial and principally significant portion of the relevant workpapers in this litigation.

## IV. CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests the Court to deny EY's Motion for Protective Order.

DATED: March 5, 2010

                LOWEY DANNENBERG COHEN & HART, P.C.

                /S/
                BARBARA J. HART
                DAVID C. HARRISON
                TODD S. GARBER
                One North Broadway, 5th Floor
                White Plains, NY 10601-2310
                914-997-0500 (telephone)
                914-997-0035 (facsimile)

                *Counsel for Lead Plaintiff*

                WILLEM F. JONCKHEER
                SCHUBERT JONCKHEER KOLBE
                  & KRALOWEC LLP
                Three Embarcadero Center, Suite 1650
                San Francisco, CA 94111
                415-788-4220 (telephone)

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANT ERNST & YOUNG'S
MOTION FOR PROTECTIVE ORDER – CASE NO. C06-04327-JW (PVT)
{1964 / BRF / 00100575.DOC v1}

12

| | |
|---|---|
| 1 | 415-788-0161 (facsimile) |
| 2 | *Local Counsel* |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANT ERNST & YOUNG'S
MOTION FOR PROTECTIVE ORDER – CASE NO. C06-04327-JW (PVT)

{1964 / BRF / 00100575.DOC v1}

13