BARBARA HART (*pro hac vice*)
DAVID C. HARRISON (*pro hac vice*)
LOWEY DANNENBERG COHEN & HART, P.C.
One North Broadway, Suite 509
White Plains, NY 10601-2310
Telephone: 914-997-0500
Facsimile: 914-997-0035

*Lead Counsel for the New York City Pension Funds and the Class*

WILLEM F. JONCKHEER S.B.N. 178748
SCHUBERT JONCKHEER KOLBE & KRALOWEC LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone: 415-788-4220
Facsimile: 415-778-0160

*Local Counsel*

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
Carolyn Wolpert
100 Church Street
New York, NY 10007
Telephone: 212-788-0748

*Attorneys for the New York City Pension Funds*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| IN RE JUNIPER NETWORKS, INC. SECURITIES LITIGATION | No. C06-04327-JW (PVT)<br><br>**DECLARATION OF BARBARA HART IN SUPPORT OF PRELIMINARY APPROVAL OF PROPOSED PARTIAL CLASS SETTLEMENT, PLAN OF ALLOCATION, FORM OF SETTLEMENT NOTICE, AND PROPOSED AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES** |
| THE NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>LISA C. BERRY,<br><br>Defendant. | No. C08-0246-JW (PVT)<br><br>Date: March 29, 2010<br>Time: 9:00 a.m.<br>Place: Courtroom 8, 4th Floor<br>Judge: James J. Ware |

I, BARBARA HART, declare as follows:

1. I am a senior member of the firm of Lowey Dannenberg Cohen & Hart, P.C. ("LDCH" or "Lead Counsel"), counsel for Lead Plaintiff the New York City Pension Funds (the "Funds") and the certified Class of investors in Juniper public securities, as defined in this Court's Opinion Granting Class Certification dated October 16, 2009 (the "Class Opinion"), and incorporated in the Stipulation of Settlement dated March 15, 2010 (the "Stipulation").

2. I have actively managed all aspects of this litigation, including settlement negotiations which I personally conducted through two formal mediation sessions almost a year apart and over many months with Nicki Locker of Wilson Sonsini Goodrich & Rosati, counsel for the Juniper Defendants. These negotiations culminated in the successful mediation with several client representatives in attendance on February 4 and 5, 2010 under the auspices of the Hon. Abraham D. Sofaer

3. I make this declaration in support of the preliminary approval of the proposed Class Action Settlement, the Plan of Allocation, the Form of Settlement Notice and the Proposed Award of Attorneys' Fees and Reimbursement of Expenses.

4. I have personal knowledge of the matters set forth in this declaration and the facts set forth in Lead Plaintiff's application for preliminary approval, and attest to their accuracy.

## I. PRELIMINARY STATEMENT

5. Pursuant to a Memorandum of Understanding executed on February 5, 2010 (the "MOU"), Juniper has deposited $169,000,000 in cash (the "Settlement Fund") in an interest-bearing escrow account established by Lead Counsel for the benefit of the Class.

6. Lead Counsel believes that the Settlement is an excellent result for the Lead Plaintiff and the Class, achieved as a result of the hard work and effective advocacy of my Firm, which undertook prosecution of the class action on a fully contingent basis.

7. LDCH has spent more than 20,000 hours prosecuting this class action, including investigating and developing the facts underlying this case; securing the appointment of the New York City Pension Funds as the Lead Plaintiff; crafting the consolidated and amended complaints (the "Complaints") in both the Juniper Action and the related Berry Action; briefing the

oppositions to the motions to dismiss filed by defendant Juniper Networks, Inc. ("Juniper") and its senior officers and directors, including Lisa C. Berry ("Berry"); consulting with industry, accounting, and financial experts; examining over 2.5 million pages of documents produced by the Juniper Defendants, non-settling defendant Ernst & Young, and third parties; conducting dozens of fact depositions and expert depositions; defending depositions of multiple representatives of the New York City Pension Funds; prosecuting Lead Plaintiff's Motion for Class Certification and numerous discovery motions; engaging in two separate mediations — the first in September 2008 which was unsuccessful, and the second in February 2010, both of which were preceded by months of painstaking arm's length negotiations in an attempt to establish procedural and substantive parameters from which the parties could resolve the class action; and negotiating the terms of the Stipulation of Settlement filed concurrently with the Court.

8. In Lead Counsel's judgment, the foregoing has provided a well-informed basis for the evaluation of the Settlement. Lead Counsel had a strong grasp of the strengths and weaknesses of Lead Plaintiff's case and the likelihood of recovery.

9. Lead Counsel submits that the Settlement represents an excellent recovery for the members of the Class. The Settlement was negotiated by experienced counsel on both sides with firm understandings of the strengths and weaknesses of their respective cases. The $169,000,000 Settlement confers an immediate and substantial benefit to the Class while eliminating the substantial risks of the litigation and obstacles to collection on any judgment. Moreover, the Settlement is the third largest settlement for all class action cases involving the backdating of stock options.

10. Even if Lead Plaintiff were successful at trial, a jury could award less to the Settlement Class than that which was obtained by settlement. Moreover, any judgment is subject to the risks on appeal that would inevitably follow a jury verdict in Lead Plaintiff's favor.

11. For the reasons set forth below and in the accompanying memorandum of law, Lead Counsel respectfully requests that the Court (1) preliminarily approve as fair and reasonable the proposed Settlement, the Plan of Allocation, and the request for an award of legal fees and reimbursement of expenses, (2) authorize notice to be sent to members of the Settlement Class,

and (3) schedule a hearing for final approval of the Settlement, Plan of Allocation and applications for attorneys' fees and expenses.

## II. HISTORY OF THE LITIGATION AND SETTLEMENT NEGOTIATIONS

12. In the interests of efficiency, I refer the Court to Lead Plaintiff's accompanying Application for Preliminary Approval of the Proposed Partial Settlement for a detailed description of the history of the litigation. Suffice it to say that this case was hotly but professionally litigated at every turn for more than 3-1/2 years. Several class actions were initially filed following revelations by the financial media beginning in May 2006 that targeted Juniper as "at high risk" for backdating stock option grants. On August 10, 2006, Juniper announced that it intended to restate its financial results for more than three years, beginning January 1, 2003 through the quarter ended March 31, 2006.

13. LDCH was retained by the New York City Pension Funds to seek appointment as the Lead Plaintiff. On November 20, 2006, this Court consolidated the class actions, appointed the New York City Pension Funds as the Lead Plaintiff, and approved LDCH as Lead Counsel for the class of investors in Juniper public securities.

14. My firm conducted an intensive investigation of the factual and legal issues necessary to plead and prove claims for securities fraud against Juniper and its current and former officers and directors (collectively, the "Juniper Defendants") arising from the alleged backdating of stock option grants over a several year period, and the material misstatement of Juniper's financial statements in failing to record $900 million in compensation expenses associated with the disguised grant of "in-the-money" options. This conduct allegedly violated generally accepted accounting principles and contradicted Juniper's public representations concerning the grant of employee options under the Company's stock option plans.

15. LDCH, with the assistance of its financial and damages expert, Financial Markets Analysis LLC ("FMA"), crafted complaints in both the consolidated Juniper action and subsequently in the related action against Lisa Berry, that have been sustained in large part by this Court. *See In re Juniper Securities Inc. Securities, Litig.*, 542 F. Supp. 2d 1037 (N.D. Cal. 2008); *New York City Employees' Retirement System v. Lisa C. Berry,* 616 F. Supp. 2d 987 (N.D. Cal.

2009); 667 F. Supp. 2d 1121 (N.D. Cal. 2009). Specifically, the Amended Complaint in the *Juniper Action* asserts violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 against Juniper and certain of its senior officers. In addition, these defendants and Juniper's directors are sued under sections 11 and 15 of the Securities Act of 1933 as signatories to registration statements relating to (i) Juniper's merger with NetScreen Technologies, Inc. in April 2004, and (ii) the registration of zero coupon convertible senior notes in November 2003, and as control persons of Juniper.

16. While the Juniper Defendants' motion to dismiss was *sub judice*, the parties began negotiations to explore a potential settlement of the class action. Notwithstanding the automatic stay of discovery under the Private Securities Law Reform Act ("PSLRA"), Lead Counsel requested and Juniper agreed to a production of all documents that Juniper had provided to the Securities and Exchange Commission in connection with its investigation of Juniper's options granting practices. In September 2008, Lead Plaintiff and the Juniper Defendants held an initial mediation session in New York in an attempt to settle the claims before embarking on what was certain to be an expensive and time-consuming discovery process.

17. At the initial mediation, it quickly became apparent that the parties held divergent positions on key untested issues of liability and damages. For example, defendants argued that plaintiff would have difficulty establishing scienter against Juniper's top officers, Chief Executive Officer and Chairman, Scott Kriens, and former Chief Financial Officer, Marcel Gani. They claimed that at best we might establish scienter against Lisa Berry, the former general counsel and secretary, but pointed out that Ms. Berry was not a signatory to many of the false SEC filings which served as the basis for Lead Plaintiff's securities fraud claims. Defendants claimed that the Ninth Circuit had rejected the concept of "collective scienter," whereby Berry's wrongful knowledge could be imputed to the corporation for statements made in the SEC reports by Defendants Kriens and Gani, who claimed to have relied completely on Berry to properly administer Juniper's stock option program. Defendants also pointed out that Berry had left her employ at Juniper at the end of 2003.

18. The Juniper Defendants also raised vigorous challenges to Lead Plaintiff's theory

of loss causation and damages. Defendants' primary argument related to whether the market's reaction to a report from the Center for Financial Research and Analysis ("CFRA") was swift enough to establish causation. The CFRA Report initially identified 17 companies, including Juniper, as being at high risk of options backdating. Lead Plaintiff claimed that when the information in the CFRA Report and additional relevant facts were made public on May 18 and May 19, 2006 by *The Wall Street Journal* ("WSJ"), JP Morgan and the financial media, Juniper's stock price promptly declined by 11% during those two days, causing hundreds of millions of dollars of damages. Defendants countered that under the efficient market theory, institutional investors should have immediately sold, causing Juniper's stock price to decline on May 16 and 17, rather than two days later. Defendants contended that this sequence defeated Lead Plaintiff's causation theory and eliminated the lion's share of the claimed damages.

19. The parties reached an impasse before the close of the first day of mediation. Intensive discovery ensued. During the past 17 months, Lead Counsel reviewed in excess of 2.5 million pages of documents, took dozens of depositions, and litigated numerous motions. In this regard, discovery taken from the Juniper Defendants went well beyond the production of documents provided to the SEC. Lead Plaintiff's document requests addressed, among other issues, questions of loss causation that were not at issue in the SEC inquiry. For example, Lead Plaintiff sought all communications relating to events in 2006 that resulted in Juniper's multi-year restatement filed in March 2007. Juniper resisted production and Lead Plaintiff successfully moved to compel before Judge Trumbull, obtaining an order requiring the production of restatement communications. Lead Plaintiff contends that the documents circumstantially supported the claim that news of Juniper's impending restatement was leaked to the market on August 10, 2006, prior to Juniper's official announcement after the market closed. The leakage was reflected in the aberrantly high trading in Juniper stock on August 10 and the statistically significant price decline that day, as determined by our expert FMA. Under a leakage theory, Lead Plaintiff is entitled to recover damages that resulted from Juniper's stock drop on August 10 prior to the restatement announcement. FMA estimated that these damages were in excess of $100 million.

20. Our discovery efforts yielded positive results. First, the facts supported a contention that Juniper's management and Board were involved in options backdating, although their scienter was hotly contested. Second, we obtained evidence showing Berry was involved in the preparation of the Company's false SEC filings. As such, Lead Plaintiff may be able to establish primary liability against Ms. Berry for the fraud, and her knowing misconduct might be imputed to Juniper under the doctrine of *respondeat superior*. *See Iqbal v. Ashcroft*, 129 S. Ct. 1937, 1952 (2009); *In re Brocade Sec. Litig.*, C05-02042 CRB, 2008 WL 2050847, at *2 (N.D. Cal. May 13, 2008).

21. Third, in certifying this class action, this Court accepted Lead Plaintiff's theory of loss causation "in light of the fact that on May 18 and May 19 Juniper's stock declined by a total of 11% when news articles publicly disclosed the CFRA Report and another report by JP Morgan that identified Juniper as . . . at risk for backdating." *In re Juniper Networks, Inc. Sec. Litig.*, ----- F.R.D. -----, 2009 WL 3353321, at *7 (N.D. Cal. Oct. 16, 2009).

22. Beginning in November 2009, settlement negotiations resumed. I spent many hours negotiating the parameters of a potential second mediation with Nicki Locker, counsel for the Juniper Defendants. In late January and early February 2010, Lead Plaintiff and the Juniper Defendants exchanged extensive analyses regarding liability and damages as part of the mediation process. Defendants raised several independent bases for reducing any potential liability, and contested Lead Plaintiff's ability to establish loss causation with respect to each of the four alleged corrective disclosure dates in May and August 2006. These submissions further informed the parties as to the strengths and weaknesses of Lead Plaintiff's claims and the defenses thereto.

23. The second mediation session ensued on February 4, 2010 under the aegis of a professional mediator, retired United States District Court Judge Abraham Sofaer. The negotiations were arduous and contentious, with loss causation front and center, including the impact of this Court's opinion in *In re Maxim Integrated Prods. Inc. Sec. Litig.*, 639 F. Supp. 2d 1038 (N.D. Cal. July 16, 2009). In the evening of the second full day of negotiations with principals and counsel present, an agreement in principle was reached to settle the class action

claims against Defendants for $169,000,000, the terms of which were contained in an MOU executed by the parties. Pursuant to the MOU, on February 19, 2010 Juniper deposited the $169 million Settlement Fund in an escrow account established by Lead Counsel with Amalgamated Bank in New York, N.Y.

24. Subsequent negotiations ensued over the next several weeks, including whether and to what extent bar order was appropriate with respect to the claims under Section 11 of the Securities Act asserted against non-settling defendant Ernst & Young LLC. The Stipulation of Settlement was executed on March 15, 2010.

**The Settlement**

25. The Settlement consists of $169,000,000. As a part of the proposed settlement, the parties have also agreed to consolidate the Berry Action with the Juniper Action under Rule 42(a), Fed. R. Civ. P., and to the certification in *Berry* of the same class of Juniper securities purchasers previously certified by this Court in the Juniper Action. *See* Preliminary Order ¶¶ 1-4. The Settlement and Proposed Final Judgment provide for a bar order with respect to claims for contribution or indemnification against the Juniper Defendants asserted by non-settling defendant Ernst & Young LLC.

## III. THE SETTLEMENT IS FAIR AND REASONABLE

26. As described above and in the accompanying memorandum of law, prior to engaging in settlement discussions, Lead Counsel engaged in intensive discovery over 17 months that left no stone unturned. The proposed Settlement is the product of vigorous arm's-length negotiations that included two separate mediations. These negotiations produced a result that the parties believe to be in their respective best interests.

27. Representatives of Lead Plaintiff attended the mediations and consulted with Lead Counsel with respect to all major litigation decisions, including the negotiations conducted by Lead Counsel that led to the proposed Settlement. After additional discussions with Lead Plaintiff at the February 2010 mediation, the parties agreed to the $169 million Settlement.

28. Lead Counsel has a great deal of experience in the prosecution and resolution of complex class actions. In our opinion, this Settlement is in the best interests of the Settlement

Class in light of numerous factors, including (a) the immediate substantial financial benefits as compared to the uncertainty of any potential recovery or the amount thereof at some point in the future; (b) the risk, expense, and uncertainty inherent in complex litigation; and (c) the defenses asserted by and available to the Defendants.

29. As explained in the accompanying memorandum, Lead Plaintiff's best-case damages estimate is $957 million. *See* Marek Decl. ¶ 13. The $169,000,000 Settlement would amount to 18% of the best-case most aggressive and optimistic potential recovery. If Lead Plaintiff only succeeded in proving liability and loss causation as to one of the disclosure dates, a real possibility, the recovery represents 94% of damages. At 18%, the percentage of recovery is far in excess of the average shareholder class action settlements of 2 to 3 percent recovered between 2002 and 2007. *See In re Heritage Bond Litig.*, 02ML1475, 2005 WL 159443 (C.D. Cal. June 10, 2005), at *8-9. It also compares favorably with recent shareholder settlements of 9% in *In re OmniVision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008), and a 12% recovery in *In re Immune Response Sec. Litig.*, 475 F. Supp. 2d 1166, 1175 (S.D. Cal. 2007), and is at the high end, in terms of percentage of recovery of comparable stock option backdating settlements.

**The Plan of Allocation**

30. The Settlement proceeds, after payment of taxes, costs (including costs of providing notice and claims administration), expenses and attorneys' fees, will be distributed to Settlement Class members who timely complete proofs of claim pursuant to a Plan of Allocation which was created based on our consultations with FMA. *See* Marek Decl. attached as Exhibit A hereto. The Plan of Allocation provides that the net proceeds will be distributed *pro rata* to members of the Settlement Class, based on formulae which take into account their investment losses and the varying strengths and weaknesses of claims based upon purchases of Juniper securities at different times during the Class Period, which is July 11, 2003 through August 10, 2006. The proposed Plan of Allocation is attached as Ex. A to the Marek Decl., and is described in detail in the Class Notice (Ex. A-1 to Stipulation).

31. As more fully described in Point II of Lead Plaintiff's Application for Preliminary

Approval and in the Marek Declaration, under the Plan of Allocation, "Recognized Losses" are calculated using a constant inflation amount of $3.02 per share for all stock purchasers prior to May 18, 2008, which is the date of the first alleged partial corrective disclosure about Juniper's options practices and related representations. This inflation amount is derived from FMA's damages analysis. *See* Marek Decl. ¶ 8. However, investors who bought after the May 2006 disclosure and resulting decline in stock price will have their claims substantially discounted as compared to purchasers before May 18, 2006, because much of the inflation accounted for and reflected in the lower stock price following the May 18, 2006 disclosure. A detailed rationale for this distinction is included in Lead Plaintiff's Application, *Id.*

**<u>The Class Notice</u>**

32. To the extent approved by the Court, the Class Notice, together with a Proof of Claim form and return envelope, will be mailed to (a) the names and addresses of potential Class members obtained from listings provided by Juniper's transfer agent; (b) banks, brokers, and nominees, beneficially holding securities in street name for their customers. The Class Notice will request that banks, brokers, and nominees forward copies of the notice and claim form to potential Class Members and to send Lead Counsel an invoice for reimbursement of those reasonable costs associated with providing such notice.

33. In addition to the Settlement Notice to be mailed to Class members, a Summary Notice will be published in *The Wall Street Journal* (national edition) and *San Jose Mercury News* on a date set in the Preliminary Approval Order.

34. The Application for Preliminary Approval provides the details of the Notice Plan established under the Settlement. As explained therein, in order to implement an extensive notice and claims administration program, Lead Plaintiff undertook a competitive bidding process involving submissions on experience, plan, staffing and cost and fees. After several rounds of submissions and review, Rust Consulting, Inc. ("Rust"), an experienced claims administrator, was selected and retained. As set forth in the declaration of Senior Project Administrator Charles E. Ferrara (the "Ferrara Decl.") (attached hereto as Exhibit B), Lead Plaintiff has established a schedule that gives Class members 90 days after the initial mailings of the Class Notice to decide

how to respond. In Mr. Ferrara's experience, the 90-day period "will provide sufficient time for a Class member to receive notice through a second round of mailing and to timely respond to the Notice in the event he or she wishes to opt out or object to the Settlement." *See* Ferrara Decl. ¶¶ 22-23.

**The Requested Fees and Expenses Should Be Preliminarily Approved**

35. Since its appointment as Lead Counsel, Lowey Dannenberg has necessarily expended more than 20,000 hours vigorously investigating and litigating this case without any payment or guaranty thereof. While Juniper restated its financial results, it denied any culpability and asserted that the misstatements about its stock option practices were not material to the market. All of the evidence relating to the scienter of Juniper's executives and in support of Lead Plaintiff's theories of loss causation were developed by Lead Counsel in discovery and through testimony. As a result of these efforts, Lead Counsel has obtained a significant recovery for Lead Plaintiff and the Settlement Class. As noted above, this is the third largest settlement in gross dollars for all cases involving the backdating of stock options.

36. The $169 million benefit achieved, representing 18% of Lead Counsel's estimate of recoverable damages. For their efforts in creating a common fund, Lead Counsel seeks preliminary approval of its request for an award of less than 6% of the Net Settlement Fund after payment of all reasonable expenses. This requested fee is well below the Ninth Circuit's 25% benchmark, and is well within the range of reasonableness given (1) the results achieved; (2) the risks of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee and the financial burden carried; and (5) the awards made in similar cases. *See and compare Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002); *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1175 (S.D. Cal. 2007) (recovery of 12% of damages supported a 25% fee award); *In re OmniVision Techs. Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2007) (recovery of 9% of damages, three times the usual recovery in securities settlements, supported a 28% fee award (citing *In re Heritage Bond Litig.*, 02 ML 1475, 2005 WL 1594403, at *11 (C.D. Cal. June 10, 2005) (median shareholder recovery is in the range of 2-3% of damages from 2002 through 2007).

37. It is axiomatic that there is no such thing as a risk-free PSLRA class action. At many junctures in the litigation, the case may be dismissed, leaving Lead Counsel's efforts uncompensated. Here, Lead Counsel faced substantial risks and uncertainties from the outset that made it far from certain that any recovery from Defendants for the Settlement Class would be obtained. For example, Defendants asserted several independent grounds in support of their motions to dismiss the Complaint, in opposing Class certification, and in their pending motion for judgment on the pleadings, including failure to establish scienter and the absence of loss causation. There is no guarantee that Lead Plaintiff would recover a substantial jury award at trial in excess of the amount of the Settlement or win on appeal after a lengthy and costly process.

38. LDCH has advanced or anticipates paying approximately $2.6 million of expenses in connection with the prosecution and settlement of this action, including claims administration. Among the largest cost incurred by Lead Counsel was for Lead Plaintiff's financial and accounting experts whose assistance was essential to the successful prosecution of these actions. In complex litigation such as this, courts do "not doubt the necessity for counsel to retain expert assistance." *In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1367 (N.D. Cal. 1996) (recognizing the necessity for counsel to retain securities and financial analysts, forensic accountants, and an investigator to locate and contact potential witnesses).

39. For example, Lead Counsel utilized FMA, an expert in determining damages under the federal securities laws, on several aspects of the case. First, FMA prepared Lead Plaintiff's damage calculations in connection with the application for lead plaintiff and prepared additional analyses in connection with the NYC Funds' opposition to a competing applicant. Next, counsel consulted with FMA in crafting the allegations of the complaints regarding loss causation and in defending those allegations in opposing Defendants' motion to dismiss. Third, in anticipation of the initial mediation, FMA prepared a classwide damage report and an event study to address the impact of Juniper's disclosures on its stock price. Lead Plaintiff annexed FMA's report to the Mediation Statement. As part of that mediation, FMA analyzed the report submitted by Defendants' expert and assisted Lead Counsel in formulating written questions which were propounded on Defendants' expert and responded to questions submitted by Defendants with the

40. Fourth, FMA prepared a report of market efficiency in support of Lead Plaintiff's Motion for Class Certification. FMA also provided deposition testimony and assisted Lead Counsel in preparing for the deposition of Defendants' expert on the class certification motion. FMA also submitted a rebuttal declaration which addressed, *inter alia*, the viability of Lead Plaintiff's theories of loss causation with respect to the May 2006 disclosures. It is gratifying that FMA's findings were repeatedly cited with approval by this Court in the Class Opinion. *See* 2009 WL 335321, at *7, 9, 11 and n.11. Fifth, FMA updated its damages analysis in advance of the February 2010 mediation. Finally, Lead Counsel worked with FMA in preparing the proposed Plan of Allocation. FMA also calculated the potential recovery per share for Class members, which is required under the PSLRA to be included in the Notice. 15 U.S.C. § 78u4(a)(7)(B). *See* Notice, Ex. A-1 to Stipulation, p. 1.

41. Lead Counsel also incurred significant travel costs relating to many depositions and Court hearings in San Jose, Palo Alto and San Francisco, as well as related expenses for document production and court reporters.

**CONCLUSION**

42. For the reasons set forth above, in the accompanying Memorandum of Law, and in the supporting declarations, I respectfully request preliminary approval of the proposed Settlement, Plan of Allocation, and request for an award of attorneys' fees and reimbursement of expenses, and request that the Class Notice be sent to members of the Class.

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct.

Executed at White Plains, New York, on March 15, 2010.

BARBARA HART