1  BARBARA HART (*pro hac vice*)
   DAVID C. HARRISON (*pro hac vice*)
2  LOWEY DANNENBERG COHEN & HART, P.C.
   One North Broadway, Suite 509
3  White Plains, NY 10601-2310
   Telephone: 914-997-0500
4  Facsimile: 914-997-0035

5  *Lead Counsel for the New York City Pension Funds and the Class*

6  WILLEM F. JONCKHEER S.B.N. 178748
   SCHUBERT JONCKHEER & KOLBE LLP
7  Three Embarcadero Center, Suite 1650
   San Francisco, CA 94111
8  Telephone: 415-788-4220
   Facsimile: 415-778-0160
9
   *Local Counsel*
10
   MICHAEL A. CARDOZO
11 Corporation Counsel of the City of New York
   Carolyn Wolpert
12 100 Church Street
   New York, NY 10007
13 Telephone: 212-788-0748

14 *Attorneys for the New York City Pension Funds*

15             UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
16                   SAN JOSE DIVISION

17

18 IN RE JUNIPER NETWORKS, INC.          No. C06-04327-JW (PVT)
   SECURITIES LITIGATION
19                                        **APPLICATION OF LEAD PLAINTIFF**
                                          **AND MEMORANDUM OF POINTS AND**
20                                        **AUTHORITIES IN SUPPORT OF FINAL**
                                          **APPROVAL OF SETTLEMENT, THE**
21                                        **NOTICE AND THE PLAN OF**
                                          **ALLOCATION**
22
23 THE NEW YORK CITY EMPLOYEES'          No. C08-0246-JW (PVT)
   RETIREMENT SYSTEM, et al.,
24                                        Date:    August 30, 2010
                          Plaintiffs,     Time:    9:00 a.m.
25                                        Place:   Courtroom 8, 4th Floor
                      v.                  Judge:   James J. Ware
26 LISA C. BERRY,
27
                          Defendant.
28

APPLICATION OF LEAD PLAINTIFF AND BRIEF IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT,
NOTICE, PLAN OF ALLOCATION, CASE NOS. C06-04327-JW (PVT) AND C08-024-JW (PVT)
{1964 / BRF / 00102771.DOC v1}

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... ii

APPLICATION .......................................................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ........................................................... 2

MEMORANDUM OF POINTS AND AUTHORITIES

I.     INTRODUCTION ........................................................................................... 2

II.    SUMMARY OF CLAIMS AND PROCEDURAL HISTORY ........................... 5

III.   THE SETTLEMENT SHOULD BE APPROVED

     A.    The Standards for Judicial
            Approval of Class Action Settlements ................................................ 12

     B.    The Parties Were Able to Assess the
            Strengths and Weaknesses of Their Cases ......................................... 14

     C.    The Settlement Appropriately Balances
            the Risks of Litigation and the Benefit
            to the Class of a Certain Recovery ..................................................... 15

     D.    The Risks, Expense and Likely Duration of
            Protracted Litigation and Trial Favors Settlement ............................. 18

     E.    The Recommendations of Experienced Counsel .................................. 21

     F.    Reaction of the Class Supports
            Approval of the Settlement ................................................................. 22

IV.   THE PLAN OF ALLOCATION SHOULD BE APPROVED ........................... 23

V.    CERTIFICATION OF THE SETTLEMENT CLASS
     UNDER FEDERAL RULE 23 IS APPROPRIATE ....................................... 24

VI.   CONCLUSION ............................................................................................. 25

APPLICATION OF LEAD PLAINTIFF AND BRIEF IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT,
NOTICE, PLAN OF ALLOCATION, CASE NOS. C06-04327-JW (PVT) AND C08-024-JW (PVT)
{1964 / BRF / 00102771.DOC v1}

i

# TABLE OF AUTHORITIES

## CASES

*AUSA Life Ins. Co. v. Ernst & Young,*
  00-9472, 2002 WL 1467546 (2d Cir. Jul. 8, 2002)...........................................................17

*Backman v. Polaroid Corp.,*
  910 F.2d 10 (1st Cir. 1990) .........................................................................................17

*Berson v. Applied Signal Technology, Inc.,*
  527 F.3d 982 (9th Cir. 2008) ......................................................................................15

*Boyd v. Bechtel Corp.,*
  485 F. Supp. 610 (N.D. Cal. 1979) .................................................................13, 14, 22

*CLRB Hanson Indus. LLC v. Google Inc.,*
  05-03649-JW, slip op. (N.D. Cal. May 12, 2009) .........................................................15

*Ellis v. Naval Air Rework Facility,*
  87 F.R.D. 15 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981) ...............................14

*Girsh v. Jepson,*
  521 F.2d 153 (3d Cir. 1975).................................................................................15, 18

*Hughes v. Microsoft,*
  No. C98-1646C, 2001 WL 34089697 (W.D. Wash. Mar. 26, 2001)................................13

*In re Apollo Group, Inc. Sec. Litig.,*
  CV 04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008) ...............................17

*In re Apollo Group, Inc. Sec. Litig.,*
  No. 08 16971, Slip Op. (9th Cir. June 23, 2010) ...................................................17

*In re Broadcom Corp. Class Action Litig.,*
  06-05036 (C.D. Cal.), *on appeal*, 09-55632 (9th Cir.) ...................................................20

*In re Brocade Communications Systems, Inc. Derivative Litig.,*
  05-02233-CRB (N.D. Cal.)..........................................................................................20

*In re Cendant Corp. Litig.,*
  109 F. Supp. 2d 235 (D.N.J. 2000) ..............................................................................17

*In re Cisco Systems, Inc. Sec. Litig.,*
  01-20418-JW, slip op. (Dec. 5, 2006).............................................................................18

*In re Comverse Technology, Inc. Sec. Litig.,*
  No. 06-1825 (E.D.N.Y.).................................................................................................20

*In re Indep. Energy Hldgs. PLC Sec. Litig.,*
  00 Civ. 6689 (SAS), 2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003)..............................13

*In re Mfrs. Life Ins. Co. Premium Litig.,*
  MDL 1109, 1998 WL 1993385 (S.D. Cal. Dec. 21, 1998).................................................17

*In re Maxim Integrated Prods. Sec Litig.*,
    No. C08-00832JW, 2009 WL 2136939 (N.D. Cal. July 16, 2009) ...................................16

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ...........................................................................14, 15, 20

*In re NASDAQ Market-Makers Antitrust Litig.*,
    94 Civ. 3996 (RWS), 2000 WL 37992 (S.D.N.Y. Jan. 18, 2000) ....................................23

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ......................................................................15, 23

*In re Oracle Sec. Litig.*,
    No. C-90-0931 VRW, 1994 WL 502054 (N.D. Cal. Jun. 18, 1994) ...............................23

*In re Pac. Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) .............................................................................................13

*Knight v. Red Door Salons, Inc.*,
    C08-01520 SC, 2009 WL 248367 (N.D. Cal. Feb. 2, 2009) ...........................15, 19, 20

*Lewis v. Newman*,
    59 F.R.D. 525 (S.D.N.Y. 1973) ......................................................................................15

*Lundell v. Dell, Inc.*,
    C05-3970 JW, 2006 WL 3507938 (N.D. Cal. Dec. 5, 2006)....................................*passim*

*Molski v. Gleich*, 318 F.3d 937
    (9th Cir. 2003).................................................................................................................12

*Nat'l Rural Telecom. Coop. v. DirectTv, Inc.*,
    221 F.R.D. 523 (C.D. Cal. 2004) ....................................................................................22

*Officers for Justice v. Civil Serv. Comm'n*,
    688 F.2d 625 (9th Cir. 1982) ....................................................................................*passim*

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) ......................................................................................17

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ...........................................................................................12

*Torrisi v. Tucson Elec. Power Co.*,
    8 F.3d 1370 (9th Cir. 1993) .............................................................................................12

*Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*,
    758 F.2d 86 (3d Cir. 1985)...............................................................................................22

## STATUTES, RULES, and OTHER AUTHORITIES

Laura Simmons & Ellen M Ryan, *Securities Class Action Settlements: 2009 Review and*
    *Analysis*, at 15 (Cornerstone 2010) ................................................................................21

## APPLICATION

Pursuant to this Court's Orders preliminarily approving the Settlements with Juniper Networks, Inc. ("Juniper" or the "Company"), entered April 12, 2010 (Dkt. No. 597), and with Ernst & Young LLP ("E&Y"), entered May 12, 2010 (Dkt. No. 610), on August 30, 2010, or as soon thereafter as counsel may be heard, Lead Plaintiff, the New York City Pension Funds (collectively, the "NYC Funds" or "Lead Plaintiff") will move at the United States Courthouse – 4th Floor, Courtroom 8, 280 South 1st Street, San Jose, California, for entry of a Final Judgment approving (1) the Settlement of this Action and dismissing it with prejudice; (2) the Plan of Allocation; and (3) the form and manner of the Class Notice provided to the certified Class.[1]

The Settlement, as set forth in the Amended Stipulation of Settlement dated April 27, 2010 (the "Stipulation"), provides for the payment of $169,500,000 in cash for the benefit of the Class. The grounds for the application for final approval are that the Settlement, Notice and Plan of Allocation are fair, reasonable and adequate under Federal Rule of Civil Procedure 23(e). Moreover, in accordance with this Court's April 12, 2010 and May 12, 2010 Orders, notice of the terms of the Settlement has been duly provided to the members of the Class; and no Class member has objected to the Settlement, Notice or Plan of Allocation. The time for filing objections expires on August 9, 2010. Further, the fairness of the Settlement is demonstrated by the Class' favorable response in having already submitted several thousand proofs of claim to the Administrator.

This application is based on the Declaration of Barbara Hart in Support of Application for Final Approval of Settlement, the Notice, and the Plan of Allocation ("Hart Decl."); the Declaration of Charlene Young in connection with Notice by Mailing and Publication ("Young Decl."); the Memorandum of Points and Authorities in Support of the Settlement; the Stipulation; and all other pleadings and matters of record and such additional evidence or argument as may be presented at the hearing.

---

[1] A separate memorandum addresses Lead Counsel's request for attorneys' fees and reimbursement of expenses.

1     A proposed form of order has been lodged herewith.

2     **STATEMENT OF ISSUES TO BE DECIDED**

3     1.     Whether the Settlement is fair, reasonable and adequate;

4     2.     Whether the Notice of the Settlement complied with Fed. R. Civ. P. 23 and due

5     process;

6     3.     Whether the Plan of Allocation should be approved as fair and reasonable; and

7     4.     Whether a Settlement Class in the Berry Action should be certified.

8     **MEMORANDUM OF POINTS AND AUTHORITIES**

9     **I.    INTRODUCTION**

10     Pursuant to the terms of the Stipulation, Juniper and E&Y have paid $169,000,000 and

11     $500,000, respectively, into a Settlement Fund which has been invested in interest-bearing U.S.

12     Treasury Notes. Lead Plaintiff and the parties reached separate settlements after years of hard-

13     fought, protracted litigation, two separate rounds of mediation with Juniper, and months of

14     extensive, separate negotiations with E&Y. The Settlement is an excellent result which was

15     achieved notwithstanding difficult and real litigation risks.

16     On March 15, 2010, Lead Plaintiff submitted its Unopposed Application for Preliminary

17     Approval of the Juniper Settlement, accompanied by numerous declarations and exhibits. Dkt.

18     Nos. 579-582. Following the preliminary approval hearing on April 2, 2010, this Court

19     preliminarily approved the $169 million Juniper Settlement on April 12, 2010, Dkt. No. 597, and

20     scheduled the hearing on final approval for August 30, 2010.

21     Lead Plaintiff and E&Y subsequently entered into a separate agreement resolving the

22     remaining claim in the action for $500,000, bringing the total Settlement Fund to $169.5 million.

23     *See* Declaration of Barbara Hart In Support of Preliminary Approval of Class Settlement With

24     Ernst & Young LLP dated April 27, 2010 (Dkt. No. 604) ("Hart E&Y Prelim. App. Decl."). On

25     April 27, 2010, Lead Plaintiff submitted its Unopposed Application for Preliminary Approval of

26     the E&Y Settlement, accompanied by an Amended Stipulation, together with updated forms and

27     schedules for providing notice to the Class, while still adhering to the August 30, 2010 final

28

hearing date approved on April 12, 2010. Dkt. Nos. 602-606. On May 12, 2010, the Court

preliminarily approved the E&Y Settlement and reconfirmed the August 30, 2010 hearing on

final approval. Dkt. No. 610.

In its April 12 Order, the Court authorized notice to be sent to the following Settlement

Class:

> All persons and entities who purchased or otherwise acquired the publicly traded securities of Juniper Networks, Inc. from July 11, 2003 through August 10, 2006, inclusive, and who did not sell such acquired securities before May 18, 2006, were damaged, including (a) those who received or acquired Juniper common stock issued pursuant to a registration statement on SEC Form S-4, dated March 10, 2004, for the Company's merger with NetScreen Technologies Inc.; and (b) purchasers of Zero Coupon Convertible Senior Notes due June 15, 2008 issued pursuant to a registration statement on SEC Form S-3, dated November 20, 2003. Excluded from the Class are the Defendants and the current and former officers and directors of the Company, their immediate families, their heirs, successors, or assigns and any entity controlled by any such person.

Dkt. No. 597.

Beginning on May 21, 2010, the Claims Administrator, Rust Consulting, Inc. ("Rust"),

mailed the Class Notice to over 430,000 potential Class members, broker-dealers and nominees.

Young Decl. ¶¶ 3-6, 8-9, and Exhibit A. In addition, a summary notice was published nationally

in the June 10, 2010 editions of *The Wall Street Journal*, the *San Jose Mercury News*, the *San

Mateo County Times*, and the *Contra Costa Times*. *Id.* ¶ 7, and Exhibit B.

The Class Notice provided detailed information concerning: (a) the rights of Class

Members, including the manner in which objections or exclusions could be lodged; (b) the

nature, history and progress of the litigation; (c) the proposed Settlement and reasons therefore;

(d) the process for filing Proofs of Claim; (e) a description of the Plan of Allocation and

Recognized Loss per share; (f) the fees and expenses to be sought by Lead Plaintiff's Counsel

and the estimated average cost per share if the amount requested by counsel in fees and costs is

approved by the Court; (g) the date, time and place of the Settlement Hearing to take place

before this Court; (h) the necessary information for the examination of the Court record should

1   any Class Member elect to do so; and (i) the identification of counsel to contact with questions

2   regarding the Settlement.  *See* Ex. A to Young Decl.

3       Rust also established a website and a toll-free number to further assist Class members in

4   obtaining additional Notices and understand their rights with respect to the Settlement, including

5   the right to object or opt out of the class action, or to file a proof of claim.  By giving Class

6   Members 80 days after the initial mailing to decide how to respond to the Class Notice, Lead

7   Plaintiff has assured that there was more than sufficient time for a Class Member to receive

8   notice through a second round of mailing and to timely respond in the event he or she decided to

9   object or opt out of the Settlement.  Young Decl. ¶ 13.

10      Both the Class Notice and the Summary Notice advised Class members of the August 9,

11  2010 deadline for filing objections and/or exclusions to the Settlement.  As that deadline

12  approaches, no objections have been filed, and only a single valid exclusion, representing 130

13  shares, was submitted.  *Id.* ¶¶ 16-17, and Exhibit D thereto.[2]  The Settlement therefore appears to

14  enjoy the overwhelming support of the Class Members.

15      Lead Plaintiff is also pleased to report that as of July 30, 2010, the Claims Administrator

16  has received 4,285 proof-of-claim forms.  *Id.* ¶ 15.  The fact that Rust already has collected a

17  substantial number of proofs of claim eight weeks before the filing deadline on September 21,

18  2010, demonstrates the effectiveness of the notice program designed by Lead Counsel, Lowey

19  Dannenberg Cohen & Hart, P.C. ("Lowey" or "Lead Counsel") and Rust in reaching the largest

20  number of Class members possible through multiple media sources.  The number of filings to

21  date likely represents only a very small fraction of the proofs of claim that the Claims

22  Administrator anticipates will be filed as the September 21, 2010 deadline approaches.  *Id.*

23

24

25  [2]  The Claims Administrator received a total of eight requests for exclusions from the Juniper
    Settlement representing 1,635 shares; however, seven of these requests, representing 1,505
    shares, were deficient for the following reasons: two potential members requesting exclusion

26  sold their shares prior to the end of the Class Period; one purchased shares after the end of the
    Class Period and otherwise profited on the shares that she held throughout the Class Period;

27  and five others failed to provide the requisite trade data requested by the Notice.  Accordingly,
    these seven potential Class members did not qualify as Recognized Claimants.

28

1    As discussed herein, in the Hart Decl., and in Lead Plaintiff's prior submissions in
2    connection with preliminary approval, Lead Plaintiff and Lead Counsel believe that the
3    $169,500,000 Settlement is an excellent result given the immediate financial benefit for the Class
4    and the significant litigation risks involved if the Actions against Defendants are not
5    compromised.

6    II.    **SUMMARY OF CLAIMS AND PROCEDURAL HISTORY**

7            On November 20, 2006, the Actions were consolidated, the NYC Funds were appointed
8    as the Lead Plaintiff, and Lowey was approved as Lead Counsel.  On January 12, 2007, Lead
9    Plaintiff filed a Consolidated Class Action Complaint expanding the claims and class period
10   asserted in the initial complaint, and adding several Juniper Directors and E&Y as defendants
11   under Section 11 of the Securities Act of 1933.  In March 2007, Juniper filed restated financial
12   statements, reducing the Company's earnings by $900 million over several years to account for
13   compensation expenses associated with historical stock option grants.  On April 9, 2007, Lead
14   Plaintiff filed the Amended Consolidated Class Action Complaint (the "Complaint").

15           The Complaint alleges that Defendants engaged in a long-running scheme whereby
16   Defendants failed to disclose that they had manipulated stock option grant dates in order to
17   provide Juniper executives and employees with more favorable option exercise prices with the
18   benefit of hindsight.  Like many companies, Juniper used stock options as a form of
19   compensation for its directors, officers and employees.  Juniper represented that its stock option
20   grants were made at the market price on the date of the option grant.  The Complaint alleges,
21   however, that Defendants failed to disclose that Juniper backdated the grant dates, *i.e.*, it
22   retroactively selected dates in the past, when the market price was lower, as the "grant date" so
23   that the options were "in the money" when issued.

24           The Complaint alleges that from the time Juniper went public in June 1999, the
25   Company's financial statements and proxy statements were materially false and misleading in
26   representing (1) that under the Company's stock option plans, no stock options "have been
27   granted for less than fair market value on the date of grant"; (2) that no compensation expense

28

1   was recognized for the option grants because "the exercise price of the Company's stock options
2   equals the market price of the underlying stock on the date of grant"; and (3) that stock options
3   "will provide value to executive officers only when the price of the Company's common stock
4   increases over the exercise price." By backdating the grant dates to a date when the market price
5   was lower, Defendants contradicted Juniper's public representations, and routinely issued in-the-
6   money options without recording compensation charges, as required by generally accepted
7   accounting principles ("GAAP").

8          The Complaint further asserts that when Juniper's stock options practices were disclosed
9   by the financial media on May 18 and May 19, 2006, Juniper's stock price declined by 11
10  percent. Juniper's stock lost another 9 percent in value on August 10 and August 11, 2006 in
11  connection with the Company's announcement that it intended to restate its financial results.
12  Following the revelations about backdating in May 2006, Juniper undertook an internal
13  investigation. The results of the investigation were summarized in December 2006 and in the
14  Company's 2006 Form 10-K, dated March 9, 2007. The Complaint alleges that the Form 10-K
15  included several admissions:

16      • Juniper backdated options granted to executives, and employees to ensure that the
          options were "in the money" when granted.
17
        • One or more Juniper senior executives deliberately orchestrated the backdating.
18
        • The backdating involved the falsification of documents, including documents filed
19        with the Securities and Exchange Commission ("SEC"), which misrepresented
          executive and director compensation, the Company's option granting practices, and
20        its financial results.

21      • Juniper violated GAAP and thereby materially understated expenses and overstated
          net income, necessitating a restatement of $900 million over several years.
22
    In the Complaint, Lead Plaintiff charged Juniper and certain of its current and former
23
    senior officers under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule
24
    10b-5 issued by the SEC, and Sections 11 and 15 of the Securities Act of 1933 and directors.[3]
25

26  _____

[3] The officer defendants include Scott Kriens ("Kriens") (Chairman and Chief Executive Officer
27  from 1996 to July 2008) and Marcel Gani (Chief Financial Officer from 1997 to 2004, and Chief
    of Staff from 2005 to 2006). The director defendants include Kriens, William R. Hearst III,
28

1    Lead Plaintiff also asserts a single claim against E&Y for violation of Section 11 in connection
2    with Juniper's merger with NetScreen.  The Complaint alleges that Juniper's 2003 financial
3    statements audited by E&Y, which were incorporated in the proxy statement/prospectus, were
4    materially false in overstating the Company's earnings, in violation of generally accepted
5    accounting principles, by failing to record nearly $900 million in compensation expenses relating
6    to disguised in-the-money stock option grants.  In its 2006 Form 10-K, Juniper restated its 2003
7    financial results to account for compensation expenses associated with stock option grants,
8    thereby implicitly conceding that the financial misstatements were material.

9    On March 31, 2008, this Court granted in part and denied in part the Juniper Defendants'
10   motion to dismiss, finding each element of securities fraud: scienter, loss causation, and
11   damages, was adequately pled.  The Court also held that Lead Plaintiff had standing to assert
12   claims on behalf of purchasers of the Notes and had adequately alleged control person liability
13   against the outside Directors.  *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037
14   (N.D. Cal. 2008).

15   On January 14, 2008, Lead Plaintiff filed a related action in this Court against Lisa C.
16   Berry, Juniper's former General Counsel, Vice-President and Secretary.  *New York City*
17   *Employees' Retirement System. v. Lisa C. Berry*, Case No. 08-0246-JW (the "Berry Action" and
18   together with the Juniper Action, the "Actions").  Lead Plaintiff asserts Section 10(b) and 20(a)
19   claims against Ms. Berry.

20   On September 29, 2008, Ms. Berry moved to dismiss, arguing, among other things, that
21   the complaint failed to plead primary liability under Rule 10(b) under the Supreme Court's
22   recent decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148
23   (2008), and that the complaint failed to adequately allege Berry's scienter.  On May 15, 2009, the
24   Court granted in part and denied in part Ms. Berry's motion to dismiss the initial complaint
25

26   ──────────────────────────────────────────────
27   Vinod Khosla, Kenneth Levy, Stratton Sclavos, Pradeep Sindhu, William R. Stensrud, Robert
     Calderoni, and Kenneth Goldman.  The directors are sued as "control persons" of Juniper and as
28   a signatory to one or more registration statements for the NetScreen Merger and/or the Notes.

1   against her. 616 F. Supp. 2d 987 (N.D. Cal. 2009).

2         On June 18, 2009, Lead Plaintiff filed an amended class action complaint against Ms.

3   Berry. On July 13, 2009, Ms. Berry moved to dismiss the amended complaint and strike certain

4   allegations in the amended complaint derived from evidence obtained during discovery in the

5   Juniper Action and from allegations included in the SEC complaint against Berry, which is

6   pending before Judge Whyte. On September 24, 2009, this Court granted in part and denied in

7   part Ms. Berry's motion to dismiss the Amended Complaint. 667 F. Supp. 2d 1121 (N.D. Cal.

8   2009). The Court held, *inter alia*, that Lead Plaintiff had adequately alleged that Berry "played a

9   significant role in drafting and editing" Juniper's false financial statements issued during the

10   Class Period, even though she was not a signatory to the SEC filings. *Id.* at 1124.

11         On March 2, 2009, Lead Plaintiff moved to certify the class in the Juniper Action;

12   Juniper filed its opposition to class certification on June 2, 2009. In connection with Lead

13   Plaintiff's motion, the parties engaged in substantial fact and expert discovery, briefing and oral

14   argument. On September 25, 2009, the Court granted Lead Plaintiff's motion for class

15   certification on behalf of Juniper investors during the period July 11, 2003 through August 10,

16   2006. Order and Opinion Granting Class Certification, Dkt. No. 342. In so ruling, the Court

17   held that Defendants' challenges to Lead Plaintiff's theories of loss causation were insufficient to

18   prevent class certification. Slip op. at 12-13.

19         On September 28, 2009, Juniper filed a motion for leave to file a motion for

20   reconsideration in order to, among other things, redefine the Class definition. On October 16,

21   2009, the Court denied Juniper's motion and certified the following Class:

22             All persons and entities who purchased or otherwise acquired the
               publicly traded securities of Juniper Networks, Inc. from July 11,

23             2003 through August 10, 2006, inclusive and who did not sell
               such acquired securities before May 18, 2006, were damaged,

24             including (a) those who received or acquired Juniper common
               stock issued pursuant to a registration statement on SEC Form S-4,

25             dated March 10, 2004, for the Company's merger with NetScreen
               Technologies Inc.; and (b) purchasers of Zero Coupon Convertible

26             Senior Notes due June 15, 2008 issued pursuant to a registration
               statement on SEC Form S-3, dated November 20, 2003. Excluded

27             from the Class are the Defendants and the current and former
               officers and directors of the Company, their immediate families,

28

their heirs, successors, or assigns and any entity controlled by any such person.

*Juniper*, 264 F.R.D. 584, 594-95 (N.D. Cal. 2009).

On October 12, 2009, the parties filed a Submission re: Dissemination of Class Notice, attaching a form of class notice. Dkt. No. 376.

Lead Plaintiff, Juniper, and E&Y conducted extensive discovery pursuant to the Court's Discovery Plan. Prior to engaging in a second round of settlement discussions (the details of both settlement negotiations are set forth below), Lead Plaintiff examined more than 2.5 million pages of documents produced by the Defendants and third parties, and deposed 28 witnesses. Defendants also have conducted numerous depositions of representatives of Lead Plaintiff and third-party witnesses.

In September 2009, the Juniper Defendants filed a motion for judgment on the pleadings seeking a ruling that the May 2006 disclosures did not constitute "corrective disclosures" for which Lead Plaintiff can plead loss causation. The motion was fully briefed; however, the parties agreed to adjourn the hearing on the motion until March 15, 2009, pending resolution of the mediation on February 4-5, 2010.[4] In light of the Settlement, Defendants' motion was withdrawn on February 19, 2010.

Lead Plaintiff has participated in all major litigation decisions and negotiations that resulted in the Settlements with Juniper and E&Y. The negotiations were at all times conducted at arm's length. In September 2008, the Lead Plaintiff and Juniper engaged in an initial mediation before the Honorable Nicholas Politan. The initial mediation was unsuccessful. Declaration of Barbara Hart in Support of Preliminary Approval of Proposed Partial Class Settlement, Dkt. No. 581 ("Hart Juniper Prelim. Appr. Decl.") ¶ 17-19. The parties then engaged in 17 months of intensive discovery, during which period several legal rulings were issued by the Court which have shaped the contours of the litigation.

---

[4] Similarly, the parties postponed certain depositions until after the February mediation due to (1) the pending mediation; (2) resolution of outstanding motions to compel; and (3) the Juniper Defendants' motion for reconsideration regarding Judge Trumbull's December 9, 2009 ruling that the Audit Committee's investigation is not entitled to work-product protection.

1    Lead Plaintiff and Juniper began a second round of negotiations in November 2009.

2    Even prior to the exchange of settlement offers, the parties addressed several other key issues

3    concerning the selection of the mediator, the parameters of the mediation and the range of the

4    proposed settlement offers. *Id.* ¶ 22.  In late January and early February 2010, Lead Plaintiff and

5    the Juniper Defendants exchanged extensive analyses regarding liability and damages as part of

6    the mediation process.  Juniper raised several independent bases for reducing any potential

7    liability, including its respective extent of liability and Lead Plaintiff's burden to conclusively

8    establish loss causation with respect to each of the corrective disclosure dates. *Id.* These

9    submissions gave additional clarity to the strengths and weaknesses of Lead Plaintiff's claims

10   and the defenses thereto.

11   The mediation sessions began on February 4, 2010 under the aegis of a professional

12   mediator, retired United States District Court Judge Abraham Sofaer.  As described in the

13   accompanying Hart Decl., the negotiations among Lead Plaintiff, through Lead Counsel, and

14   counsel for the Juniper Defendants, were arduous and contentious.  In the evening of the second

15   full day of negotiations with all principals and counsel present, an agreement in principle was

16   reached to settle the class action claims against Defendants for $169,000,000, the terms of which

17   were contained in a Memorandum of Understanding ("MOU") executed by the parties. *Id.* ¶ 23.

18   Subsequent negotiations ensued over the next several weeks, which resulted in the Stipulation of

19   Settlement executed on March 15, 2010. *Id.* ¶ 24.[5]  This Court preliminarily approved the

20   Juniper Settlement on April 12, 2010.  Dkt. No. 576.

21   With all claims against the Juniper Defendants resolved, Lead Plaintiff recognized that

22   there were cost savings that could be achieved if the claim against E&Y could be settled in the

23   context of the same notice program and final settlement hearing as the Juniper Settlement.  In

24   mid-February 2010, Lead Plaintiff and E&Y began settlement discussions.  While the parties

25   acknowledged their differing views on liability, they focused their attention primarily on issues

26

27   [5]  Pursuant to the MOU, the Settlement Fund has been invested in interest-bearing Treasury bills
     since February 22, 2010.
28

affecting potential recoverable damages under Section 11. *See* Hart E&Y Prelim. App. Decl. ¶¶ 6-7. At Lead Plaintiff's suggestion, on March 19, 2010, counsel for Lead Plaintiff and E&Y and their respective damages experts participated in a teleconference during which the experts made presentations relating to, among other issues, the amount of recoverable Section 11 damages following trial, and a proof-of-claim process with the Class. *Id.* ¶ 10.

Following additional rounds of negotiations, and further consultation with Lead Plaintiff's expert, Michael A. Marek of Financial Markets Analysis LLC ("FMA"), on April 6, 2010, the parties reached an agreement in principle to settle the Section 11 claim asserted against E&Y for $500,000. On April 7, 2010, the parties promptly advised the Court that they would seek to adopt a single notice program and final hearing date for both the Juniper and E&Y Settlements, in order to avoid needless duplication and expense to the class. Dkt. No. 596. Subsequent negotiations ensued over the next several weeks among counsel for Lead Plaintiff, E&Y, and Juniper to amend the Stipulation of Settlement and revise the Class Notice and Release, to include the details of the E&Y Settlement.

On May 12, 2010, the Court preliminarily approved the E&Y Settlement, Amended Stipulation, and revised forms and schedules for providing notice to the Class. Dkt. No. 610. Accordingly, the Court authorized sending notice of the combined $169.5 million settlement to the Class. *Id.* The Notice was initially mailed to the Class beginning on May 21, 2010, and was published on June 10, 2010 in *The Wall Street Journal*, the *San Jose Mercury News*, and other local papers. Young Decl. ¶ 7. Additional mailings followed as broker-dealers and other nominees responded to the Notice. *Id.* ¶ 8. In total, Notice was mailed to more than 434,000 Class members, broker-dealers, and nominees. *Id.* ¶ 3. The Notice advised Class members that the deadline for objections to the Settlement was August 9, 2010. The deadline expiration is rapidly approaching, with no objections to the Settlement, the Plan of Allocation, or the Notice being filed, and only a single exclusion. *Id.* ¶¶ 16-17.

1  **III.    THE SETTLEMENT SHOULD BE APPROVED**

2      **A.    The Standards for Judicial Approval of Class Action Settlements**

3          It is well established in the Ninth Circuit that "voluntary conciliation and settlement are

4  the preferred means of dispute resolution." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d

5  615, 625 (9th Cir. 1982).  This Court has stated that "there is an overriding public interest in

6  settling and quieting litigation," and this is "'particularly true in class action suits.'"  *Lundell v.*

7  *Dell, Inc.*, C05-3970 JW, 2006 WL 3507938, at *2 (N.D. Cal. Dec. 5, 2006) (quoting *Van*

8  *Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976)).  Class action suits readily lend

9  themselves to compromise because of the difficulties of proof, the uncertainties of the outcome

10  and the typical length of the litigation.

11          In approving a proposed class action settlement under Fed. R. Civ. P. 23(e), the Court

12  must find that the proposed settlement is "fair, reasonable, and adequate." *Lundell*, 2006 WL

13  3507938, at *2 (quoting *Hanlon v. Chrysler Court*, 150 F.3d 1011, 1026 (9th Cir. 1998)).  To

14  make this determination, the Ninth Circuit instructs the lower courts to consider several factors:

15              the strength of plaintiffs' case; the risk, expense,
                complexity, and likely duration of further litigation; the risk
16              of maintaining class action status throughout the trial; the
                amount offered in settlement; the extent of discovery
17              completed, and the stage of the proceedings; the experience
                and views of counsel; the presence of a governmental
18              participant; and the reaction of the class members to the
                proposed settlement.
19
    *Officers*, 688 F.2d at 625.  *Accord, Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003);
20
    *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d
21
    1370, 1375 (9th Cir. 1993).
22
            The determination of fairness falls within the "sound discretion" of the District Court.
23
    *Torrisi*, 8 F.3d at 1375-76.  As this Court has emphasized, the "inquiry to be made by the district
24
    court is limited [and] [t]he Court must give 'proper deference to the private consensual decisions
25
    of the parties.'"  *Lundell*, 2006 WL 3507938, at *2 (quoting *Hanlon*, 150 F.3d at 1027).  So long
26
    as the Court is satisfied that the agreement "is not the product of fraud or overreaching by, or
27
    collusion between, the negotiating parties, and the settlement, taken as a whole, is fair,
28

1  reasonable, and adequate," the Court will defer to the judgment of the competing parties. *Id.*

2  *See also Officers, supra*, 688 F.2d at 625 (a "fairness hearing is not to be turned into a trial or

3  rehearsal for trial on the merits. . . . for it is the very uncertainty of outcome in litigation and

4  avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed

5  settlement is not to be judged against a hypothetical or speculative measure of what **might** have

6  been achieved by the negotiators") (emphasis added).

7  For these reasons, the courts recognize that a strong initial presumption of fairness

8  applies where, as here, it is reached by experienced counsel after arm's-length negotiations. The

9  Courts give great weight to the recommendations of experienced counsel, who are most closely

10  acquainted with the facts of the underlying litigation. *See Lundell*, 2006 WL 3507938, at *3 ("In

11  negotiating the Settlement, Class Counsel had the collective benefit of significant experience

12  with the facts and law of this case, including consultation with experts and data produced by

13  [defendants]"); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979) ("The

14  recommendations of plaintiffs' counsel should be given a presumption of reasonableness").

15  Here, it is the considered judgment of Lead Counsel that this Settlement provides for a

16  fair, reasonable and adequate resolution of the litigation and thus, should be entitled to a

17  presumption of reasonableness. *See Hughes v. Microsoft*, No. C98-1646C, 2001 WL 34089697,

18  at *7 (W.D. Wash. Mar. 26, 2001). This presumption of reasonableness is further strengthened

19  because the arm's-length negotiating process involved a mediator experienced in these types of

20  cases. *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) (finding mediator's

21  involvement supports settlement approval); *Lundell*, 2006 WL 3507938, at *3 ("The parties

22  employed three experienced and accomplished independent mediators during this period"); *In re*

23  *Indep. Energy Hldgs. PLC Sec. Litig.*, 00 Civ. 6689 (SAS), 2003 WL 22244676, at *4 (S.D.N.Y.

24  Sept. 29, 2003) ("[T]he fact that the Settlement was reached after exhaustive arm's-length

25  negotiations, with the assistance of a private mediator experienced in complex litigation, is

26  further proof that it is fair and reasonable").

27  Here, the Settlement is the product of arm's-length negotiations between Lead Plaintiff,

28

through its counsel, and Defendants, through their counsel. Moreover, the parties' views on the factual and legal issues were well-informed by merits discovery, as well as candid discussions by experts from both sides on the difficulties involved in proving up damages. As a result, the parties were able to negotiate a fair settlement, taking into account the costs and risks of continued litigation. Hart Decl. ¶¶ 14-22, 31-32. These negotiations produced a result that all parties believe to be within their respective best interests, and which will resolve the final component of this litigation. *Id.* ¶¶ 23-24.

Lead Plaintiff and Lead Counsel consider their claims meritorious, but not without risk. They have concluded that it is in the best interests of the Class to settle with the Defendants after considering the following factors: (1) the immediate benefits provided for the Class; (2) the risks and uncertainties in predicting the outcome of complex litigation; (3) the expense and length of time necessary to prosecute two separate Class Actions through trial and appeals; and (4) the challenges asserted by and available to the Defendants that could substantially reduce the claimed damages. Hart Decl. ¶¶ 34-37.

### B. The Parties Were Able to Assess the Strengths and Weaknesses of Their Cases

Courts consider the stage of the proceedings and the amount of information available to the parties to assess the strength and weaknesses of their case in determining the fairness, reasonableness and adequacy of a settlement. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981); *Boyd*, 485 F. Supp. at 616-17.

The Hart Juniper Prelim. Appr. Decl. details the extensive and thorough investigation undertaken into the facts and law in deciding to settle the class claims. Dkt. No. 581. Lead Plaintiff's claims have been tested and have survived multiple motions to dismiss as well as challenges to Lead Plaintiff's theory of loss causation at the class certification stage. Fact discovery in the Juniper Action was substantially complete. Lead Plaintiff has examined more than 2.5 million pages of documents have been produced by the Defendants and third parties, and has deposed 28 witnesses. In addition, Lead Plaintiff and the Juniper Defendants also

presented comprehensive evidentiary submissions in late January and early February 2010

pursuant to the mediation process. The parties' respective positions on liability and damages

were explored in great detail before the mediator, former federal Judge Abraham Sofaer. As a

result, Lead Counsel is thoroughly familiar with the facts of the case and has had ample

opportunity to assess the strengths and weaknesses of the claims in which to appraise the

sufficiency of the Settlement. *See CLRB Hanson Indus. LLC v. Google Inc.*, 05-03649-JW, slip

op. (N.D. Cal. May 12, 2009) (granting motion for settlement at a parallel stage of the

proceedings); *see also Knight v. Red Door Salons, Inc.,* C08-01520 SC, 2009 WL 248367, at *4

(N.D. Cal. Feb. 2, 2009).

### C. The Settlement Appropriately Balances the Risks of Litigation and the Benefit to the Class of a Certain Recovery

To determine whether the proposed Settlement is fair, reasonable and adequate, the Court

must balance the continuing risks of litigation against the benefits afforded to Class Members

and the immediacy and certainty of a substantial recovery. *Mego Fin.*, 213 F.3d at 458; *Girsh v.*

*Jepson*, 521 F.2d 153, 157 (3d Cir. 1975); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036,

1046 (N.D. Cal. 2008). Courts attempting to balance these factors have recognized that

"stockholder litigation is notably difficult and notoriously uncertain." *Lewis v. Newman*, 59

F.R.D. 525, 528 (S.D.N.Y. 1973). This is even more so today, in this post-PSLRA environment.

*Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982, 983 (9th Cir. 2008).

There were numerous risks associated with continuing this litigation which, on balance,

weighed in favor of settlement. First, Lead Plaintiff's theory of damages is based upon

establishing that Juniper's stock prices declined in response to adverse revelations about the

Company's stock option practices on four disclosure dates: May 18, May 19, August 10 and

August 11, 2006. Lead Plaintiff's financial expert estimates total damages resulting from losses

in Juniper's stock value on these four dates at approximately $957 million. However,

Defendants vigorously challenge Lead Plaintiff's ability to establish the causal connection for

three out of four disclosure dates, which account for 80% of the claimed recoverable damages.

Indeed, in September 2009, the Juniper Defendants filed a motion for judgment on the

1   pleadings seeking a ruling that the May 2006 disclosures were not corrective disclosures for

2   which Lead Plaintiff can plead loss causation, based upon this Court's decision in *In re Maxim*

3   *Integrated Prods. Sec Litig.*, No. C08-00832JW, 2009 WL 2136939 (N.D. Cal. July 16, 2009).

4   If the Juniper Defendants' motion on the May date were successful, it would eliminate over 60%

5   of Lead Plaintiff's claimed damages against the Juniper Defendants.

6          The Juniper Defendants also challenge causation resulting from the decline in Juniper's

7   share price on August 10, 2006. Lead Plaintiff contends that news of Juniper's restatement was

8   "leaked" to the market prior to Juniper's public release of the restatement announcement after the

9   market closed on August 10, 2006. Although fact discovery revealed dozens of individuals were

10  aware of the impending restatement announcement prior to its public release, Defendants have

11  argued Lead Plaintiff's leakage theory falls short as speculative. If Defendants' position prevails

12  on summary judgment, or Lead Plaintiff failed to convince a jury of leakage, it would have

13  reduced recoverable damages by almost another 20 percent. Hart Juniper Prelim. App. Decl.

14  ¶ 29.

15         Furthermore, the Section 11 damages against the E&Y Defendants are far from certain.[6]

16  Under the best-case scenario, damages are estimated at approximately $29.9 million arising from

17  documents filed for the NetScreen Merger in 2004. Hart E&Y Prelim. App. Decl. ¶ 11. E&Y's

18  damages estimate is substantially lower. As discussed above, Lead Plaintiff's theory of damages

19  is based upon establishing that Juniper's stock prices declined in response to disclosures about

20  the company's stock option practices on four separate dates: May 18, May 19, August 10 and

21  August 11, 2006. However, Defendants vigorously challenge Lead Plaintiff's ability to establish

22  the causal connection for three out of four disclosure dates, which, if successful, would eliminate

23  more than 87% ($26.1 million) of the claimed recoverable damages that will be presented at trial,

24  reducing classwide damages to $3.8 million. *See id.* ¶ 16.

25  _____

26  [6] As indicated in Lead Plaintiff's Unopposed Application in Support of Preliminary Approval of
    Proposed Class Action Settlement (Dkt. No. 603), E&Y can escape liability by demonstrating
    reasonable due diligence in auditing Juniper's financial statements. It is uncertain how the Court
27  or a jury would decide this issue and unclear whether Lead Plaintiff would survive on summary
    judgment or prevail at trial.
28

1    Moreover, any damages estimate is potentially subject to a significant judgment reduction

2 based upon E&Y's proportionate liability vis-à-vis Juniper. If the Section 11 claims were

3 pursued to trial, it is likely that the jury would assess a low level of comparative fault to E&Y for

4 its negligence in exercising due diligence, since E&Y's failings would be measured against

5 Juniper's intentional misconduct and fabrication of its underlying records. *See In re Cendant*

6 *Corp. Litig.*, 109 F. Supp. 2d 235, 261 (D.N.J. 2000) (holding that the proportionate liability

7 restriction imposed by the PSLRA offsetting potential damages weighed strongly in favor of

8 settlement with Ernst & Young, particularly with respect to its alleged Section 11 violation),

9 *aff'd*, 404 F.3d 173 (3d Cir. 2005).

10    Although Lead Counsel believes that the case is meritorious, its experience has taught it

11 how the risks discussed above can render the outcome of a lengthy litigation and trial extremely

12 uncertain. *See In re Mfrs. Life Ins. Co. Premium Litig.*, MDL 1109, 1998 WL 1993385, at *5

13 (S.D. Cal. Dec. 21, 1998) ("[E]ven if it is assumed that a successful outcome for plaintiffs at

14 summary judgment or at trial would yield a greater recovery than the Settlement – which is not at

15 all apparent – there is easily enough uncertainty in the mix to support settling the dispute rather

16 than risking no recovery in future proceedings"). Moreover, even if Lead Plaintiff were to

17 prevail at trial, risks to the Class would remain. For example, one court vacated a securities

18 verdict of approximately $280 million in favor of the plaintiffs after a lengthy trial, on loss

19 causation grounds. *In re Apollo Group, Inc. Sec. Litig.*, CV 04-2147-PHX-JAT, 2008 WL

20 3072731 (D. Ariz. Aug. 4, 2008). It took Plaintiffs nearly two years to reverse the JNOV in the

21 Ninth Circuit, *In re Apollo Group, Inc. Sec. Litig.*, No. 08 16971, Slip Op. (9th Cir. June 23,

22 2010), but a petition for rehearing is pending. Moreover, many Plaintiffs who prevailed at trial

23 have not been successful on appeals. *See, e.g., Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir.

24 1990) ($32 million verdict reversed); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1449 (11th

25 Cir. 1997) ($81 million jury verdict reversed with prejudice); *AUSA Life Ins. Co. v. Ernst &*

26 *Young*, 00-9472, 2002 WL 1467546 (2d Cir. Jul. 8, 2002) (affirming dismissal after a full bench

27 trial following earlier appeal and remand).

28

1   In light of these uncertainties, the aggregated $169.5 million Settlement amount is an

2   excellent recovery for members of the Class because it confers an immediate and substantial

3   benefit while eliminating the significant risks of the litigation and obstacles to collection on any

4   judgment.  The sentiments of this Court in *Lundell* are equally compelling here:

> Although each side could be expected to champion the merits of its
> case if this matter were to proceed to trial, both must also
> recognize the inherent uncertainty of litigation.  Class Counsel
> possess ample knowledge – gained through experience and
> thorough investigation – of the factual and legal strengths and
> weaknesses of their case.  At the same time, Defendant has been
> able to evaluate the strengths and weaknesses of its defenses.  This
> Settlement is the product of uncertainty and careful risk/benefit
> analyses on both sides.

10  2006 WL 3507938, at *3.  *See also In re Cisco Systems, Inc. Sec. Litig.*, 01-20418-JW, slip op.

11  (Dec. 5, 2006) (Dkt. 633) (approving $99 million settlement where there were substantial risks

12  in proving damages).  Therefore, careful consideration of the litigation risks supports approval

13  of the Settlement as fair, adequate and reasonable.

14      **D.      The Risks, Expense and Likely Duration of**
            **Protracted Litigation and Trial Favors Settlement**

15      The certainty of an immediate substantial recovery for Class Members weighs in favor of

16  settlement given the costs, delays and risks of possibly achieving a larger recovery at some point

17  in the future.  *See, e.g., Girsh*, 521 F.2d at 157; *Officers*, 688 F.2d at 626.  Even if Lead Plaintiff

18  survives the Juniper Defendants' motion for judgment on the pleadings, summary judgment

19  would have followed, the outcome of which is far from certain.  Even assuming that the case

20  withstood summary judgment, a trial would have required substantial, costly and prolonged

21  expert testimony on both sides.  Moreover, Lead Counsel "understand[s] that the duration and

22  outcome of this litigation, and of any appeals that would inevitably follow a successful trial, are

23  inherently uncertain." *Lundell*, 2006 WL 3507938, at *3.  Class Members would have to wait

24  many more years for any recovery if, in fact, Lead Plaintiff prevailed at every stage of the

25  litigation.  Accordingly, settlement of this litigation will "guarantee against a result that would

26  leave the Settlement Class without any recovery." *Id.*  The Settlement is, therefore, in the best

27  interest of the Class.

28

1     The Settlement Agreement provides for $169,500,000. It is difficult to compare the

2 Settlement to the theoretical amount that the Class might have obtained had it been completely

3 successful in establishing liability at trial, because the parties fiercely debated issues of

4 causation and damages. During the course of negotiations, the parties discussed at length

5 Defendants' loss causation challenges with respect to the alleged correction disclosures in May

6 and August 2006. The $169.5 million proposed Settlement represents a generous percentage of

7 recovery – ranging from 18% to 94% of damages – depending on whether one or more of the

8 four disclosure dates are excluded from the damages calculus. In all events, the 18%

9 percentage of recovery is well above the median percentage of investor losses recovered

10 recovery level in securities class action settlements. *See OmniVision*, 559 F. Supp. 2d at 1042

11 (approving 6% recovery of maximum damages) (citing *In re Heritage Bond Litig.*, 02ML1475,

12 2005 WL 1594403, at *8-9 (C.D. Cal. June 10, 2005) (average recovery between 2% to 3% of

13 maximum damages)). The percentage of recovery also falls within the higher end range of

14 recoveries in terms of dollar value and percentage of recovery for comparable options

15 backdating settlements. *Cf. Officers*, 688 F.2d at 628 ("It is well-settled law that a cash

16 settlement amounting to only a fraction of the potential recovery will not *per se* render the

17 settlement inadequate or unfair"). *See also Knight v. Red Door Salons, Inc.*, 2009 WL 248367,

18 at *3 ("The immediacy and certainty of the settlement award justifies a recovery smaller than

19 the Class Members could seek in the case").

20     With respect to the settlement of the Section 11 claims against E&Y, the $500,000

21 settlement is a very good result. Lead Plaintiff and E&Y hold divergent views on the estimated

22 number of damaged shares under Section 11, on loss causation, and on proportionate liability.

23 Even if one adopts Lead Plaintiff's estimate of damaged shares, if E&Y prevails on its loss

24 causation challenges and receives a finding of 10 to 25 percent comparative fault, then recovery

25 at trial for the Class would range from $380,000 to $942,000. Under this far-from-implausible

26 outcome, the $500,000 proposed Settlement accounts for 53% to 131% of potential recoverable

27 damages. Even considering the unlikely possibility that all four disclosure dates are accepted

28

1    and E&Y is found 100% responsible vis-à-vis Juniper, "[i]t is well-settled law that a cash

2    settlement amounting to only a fraction of the potential recovery will not *per se* render the

3    settlement inadequate or unfair." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459 (quoting

4    *Officers*, 688 F.2d at 628). *See also Knight v. Red Door Salons, Inc.*, 2009 WL 248367, at *3

5    ("The immediacy and certainty of the settlement award justifies a recovery smaller than the Class

6    Members could seek in the case"). *See also OmniVision*, 559 F. Supp. 2d at 1042 (citing *In re*

7    *Heritage Bond Litig.*, 2005 WL 1594403, at *8-9 (average recovery between 2% to 3% of

8    maximum damages)).

9        Indeed, very few securities stock option backdating suits with separate claims against the

10    company's outside auditors have survived to the point where the accountants contributed to a

11    monetary settlement.[7] In those few cases where the auditor contributed to a backdating

12    settlement, the amounts have been nominal. In *In re Brocade Communications Systems, Inc.*

13    *Derivative Litig.*, KPMG paid only $98,500 to settle securities fraud claims against in

14    conjunction with Brocade's $160 million settlement. 05-02233-CRB (N.D. Cal.) Similarly, in

15    *In re Comverse Technology, Inc. Sec. Litig.*, Deloitte & Touche paid $275,000 as part of a

16    derivative action settlement on behalf of Comverse, whereas the company and its senior

17    executives contributed $225 million to the settlement fund. No. 06-1825 (E.D.N.Y.)

18        In total, the $169.5 million Settlement also exceeds median percentages for all settled

19    securities class actions in the Ninth Circuit in 2009, which was approximately 2.2%. *See* Laura

20    Simmons & Ellen M Ryan, *Securities Class Action Settlements: 2009 Review and Analysis*, at 15

21    (Cornerstone 2010). Additionally, the 18% of potential recoverable damages settlement in this

22    Action is far greater than the 3.3% median percentages of potential recovery for all securities

23    class action settlements between $125 million and $249 million in 2009. *Id* at 5. Therefore, the

24    Settlement easily falls within a "range of reasonableness" that is appropriate for final approval.

25

26    [7] On the contrary, claims against outside auditors in backdating cases often do not survive
      beyond the pleading stage. For example, in *In re Broadcom Corp. Class Action Litig.*, 06-05036
27    (C.D. Cal.), which recently settled for $160 million, the complaint against Ernst & Young was
      dismissed, and is currently on appeal in the Ninth Circuit. 09-55632 (9th Cir.).

28

E.    **The Recommendations of Experienced Counsel**

Lead Counsel has a great deal of experience in the prosecution and resolution of complex class actions. Lowey has served as lead counsel in numerous class actions in this District and other jurisdictions, including appointments in *In re Luminent Mortgage Capital Inc. Securities Litigation*, C07-04073-PJH, (N.D. Cal.), and *In re Bayer AG Securities Litigation*, 03 Civ. 1546 (WHP) (S.D.N.Y.); *In re Beacon Associates*, Civ. Action No. 09-0777 (S.D.N.Y.). *See* Hart Decl. ¶ 33 and Ex. A thereto.

In Lead Counsel's opinion, this Settlement is in the best interests of the Settlement Class in light of numerous factors, including (a) the immediate substantial financial benefits as compared with the uncertain amount of a potential recovery at some point in the future; (b) the risk, expense, and uncertainty inherent in complex litigation; and (c) the uncertainty inherent in establishing Defendants' liability and establishing causation. In determining whether to accept the terms of the negotiated Settlement, Lead Counsel had the benefit of comprehensive merits discovery, expert analyses and detailed mediation submissions that further fleshed out the parties' divergent positions on liability and damages. Counsel was therefore in an informed position to fairly assess the chances of ultimate success on the merits in light of the substantial benefits that the Settlement will provide to the Class Members. Hart Decl. ¶¶ 14-23, 31-32. Given the complexities of this litigation and the continued risk and expense if the parties were to proceed to trial and through likely appeals, Lead Counsel concluded that the Settlement presented an excellent resolution of the claims against Juniper, Ms. Berry, and E&Y, and eliminates the risk that the Class might receive a much smaller recovery years later, or no recovery at all. *See Officers*, 688 F.2d at 624.

F.    **Reaction of the Class Supports Approval of the Settlement**

Beginning on May 21, 2010, more than 434,226 Notice Packets were sent to Class Members. Summary Notices were published on June 10, 2010 in *The Wall Street Journal*, the

1 *San Jose Mercury News*, and in other local papers.[8] Young Decl. ¶ 7.  By providing Class

2 members approximately three moths after the initial mailings of the Class Notice to decide how

3 to respond, Lead Plaintiff allowed sufficient time for a Class member to receive notice through a

4 second round of mailing and to timely respond to the notice in the event he or she wished to opt

5 out or object to the Settlement. *Id.* ¶ 13.  The time for filing objections or exclusions to the

6 Settlement is set to expire on August 9, 2010.  As of July 30, 2010, no objections have been filed

7 and only one valid request for exclusion representing only 130 shares was received by Rust. *Id.*

8 ¶ 16-17 and Ex. D thereto.

9       Moreover, as of July 30, 2010, 4,285 proofs of claim have been received by the Claims

10 Administrator.  The fact that a substantial number of Class members already have submitted

11 proofs of claim some 8 weeks before the September 21, 2010 deadline evidences both the

12 effectiveness of the notice program and the Class' apparent support for a settlement.  This

13 represents only a fraction of the claims that the Class Administrator anticipates will be submitted

14 as the September 21 deadline approaches. *Id.* ¶ 15.

15       Courts routinely have approved settlements with far less than unanimous support. *See*

16 *Boyd*, 485 F. Supp. at 624 (adequacy of settlement "persuasive" when 16% of class objected);

17 *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (fact only 10% of class

18 objected "strongly favors settlement"). *A fortiori*, no objections and the small number of

19 requests for exclusion supports approval of the Settlement. *See Nat'l Rural Telecom. Coop. v.*

20 *DirectTv, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) (holding that, when there are few

21 exclusions and objections from class members, a "strong presumption" is raised that the terms of

22 a settlement are fair to the class).

23

24

25

---

[8] In the May 12, 2010 Notice Order at ¶ 3, the Court found that this manner of notice complied

26 with Rule 23 and due process. *See Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90 (3d Cir. 1985) ("First-class mail and publication have consistently been considered

27 sufficient to satisfy the notice requirements of Rule 23(d)(2) and Rule 23(e) for advising class members").

28

1 **IV.    THE PLAN OF ALLOCATION SHOULD BE APPROVED**

2    Lead Plaintiff also requests that the Court approve the Plan of Allocation as "fair,

3 reasonable, and adequate." *Officers*, 688 F.2d at 625 (citations omitted). A "plan of allocation

4 of settlement proceeds in a class action . . . is governed by the same standards of review

5 applicable to approval of the settlement as a whole: the plan must be fair, reasonable and

6 adequate." *In re Omnivision Tech, Inc.*, 559 F. Supp. 2d at 1045 (internal quotations omitted,

7 emphasis added). *See also In re Oracle Sec. Litig.*, No. C-90-0931 VRW, 1994 WL 502054, at

8 *1 (N.D. Cal. Jun. 18, 1994) (citing *Class Plaintiffs v City of Seattle*, 955 F.2d 1268, 1284-85

9 (9th Cir 1992)).

10    In making this determination, courts have given great weight in determining the fairness,

11 reasonableness and adequacy of a proposed plan of allocation to the opinion of class counsel.

12 *See In re NASDAQ Market-Makers Antitrust Litig.*, 94 Civ. 3996 (RWS), 2000 WL 37992, at *2

13 (S.D.N.Y. Jan. 18, 2000) ("An allocation formula need only have a reasonable, rational basis,

14 particularly if recommended by 'experienced and competent' Class Counsel") (quoting *White v.*

15 *NFL,* 822 F. Supp. 1389, 1420 (D. Minn. 1993)) (the court "affords considerable weight to the

16 opinion of experienced and competent counsel that is based on their informed understanding of

17 the legal and factual issues involved" in approving distribution of different categories of claims

18 reflecting differences in damages).[9]

19    Under the Plan, all purchasers of Juniper common stock during the Class Period were

20 treated equally and the settlement funds were allocated accordingly. Specifically, the proposed

21 Plan of Allocation was prepared by Lead Counsel in consultation with its expert, FMA, which

22 found it to be fair and equitable. *See* Hart Juniper Prelim App. Decl. ¶¶ 30-31. Class Members

23 received their pro rata share of the total claims submitted. Recognized Losses were based upon a

24 constant inflation amount of $3.02 per share for stock, and $25 per Note, for all Class Period

25 purchases before May 18, 2006, the date of the first corrective disclosure. *Id.* ¶ 31. The Plan of

26 Allocation also limited losses depending upon the date of sale. Consistent with this Court's class

27

28 [9] Defendants take no position regarding the Plan of Allocation. *See* Stipulation ¶ 11.

certification order, purchasers who sold Juniper securities prior to May 18, 2006 were excluded from the definition of the Class because his or her losses were unrelated to the partial corrective disclosures about Juniper's option practices made on May 18, 2006. The POA also took into account sales during the 90-day period following Juniper's August 10, 2006 announcement that the Company intended to restate its financial results. Under PSLRA Rule 10b-5, damages were reduced for Class members who sold during this period to the extent that the average stock price between August 11 and the date of sale was higher than the market price on August 11, 2006.[10] *See* POA, note 2.

Accordingly, the proposed Plan of Allocation should be approved.[11]

## V. CERTIFICATION OF THE SETTLEMENT CLASS UNDER FEDERAL RULE 23 IS APPROPRIATE

As part of the settlement approval process, the parties agreed to certification of the same Class in *New York City Employees' Retirement System, et al., v. Lisa C. Berry*, Case No. C 08-0426-JW (PVT), as this Court certified in *Juniper*, and to consolidate the Actions under Rule 42(a), F.R.C.V.P. *See* April 12, 2010 Order, ¶¶ 1-4.

For the reasons set forth in the Unopposed Application of Lead Plaintiff for Preliminary Approval of Partial Class Settlement (Dkt. No. 580), and for the reasons listed in this Court's April 12, 2010 Order all of the requirements of Rule 23 have been met, and certification of the Class is clearly appropriate here. Lead Plaintiff requests the Court reaffirm its April 12, 2010 Order and certify the proposed *Berry* Action Settlement Class since that Class continues to meet the requirements Rule 23 for certification for the purposes of final settlement.

---

[10] The PSLRA's 90-day lookback provision is not applicable to Lead Plaintiff's Section 11 claims with respect to the NetScreen merger and the Notes.

[11] Following the distribution(s) to Class Members, in the event the Settlement Fund becomes too small to justify further administration, Lead Plaintiff will request a *cy pres* distribution of the residual amount of the Settlement. Designation of *cy pres* recipients will be by Order of the Court to organizations suitable to serve the proximate interests of shareholders and investors generally, as is widely accepted under the *cy pres* mechanism in class action settlements.

# VI. CONCLUSION

Based upon the foregoing reasons, this Settlement is eminently fair. Further, the complexity of the facts at issue, the substantial expenses if this litigation were to continue to trial, and the risks attendant to prevailing on a motion for judgment on the pleadings, summary judgment, trial and subsequent appeals, weigh in favor of accepting a $169.5 million recovery now. The Settlement presents an immediate and sizeable benefit to all Class Members. Accordingly, Lead Plaintiff respectfully requests this Court to approve the Settlement, the Notice, and Plan of Allocation as fair, reasonable, and adequate.

Date: August 2, 2010

LOWEY DANNENBERG COHEN
& HART, P.C.

By:     /S/

Barbara J. Hart (admitted *pro hac vice*)
David C. Harrison (admitted *pro hac vice*)
One North Broadway, Suite 509
White Plains, NY 10601-2310
914-997-0500 (telephone)
914-997-0035 (facsimile)

*Counsel for Lead Plaintiff*


WILLEM F. JONCKHEER
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
415-788-4220 (telephone)
415-788-0161 (facsimile)

*Local Counsel*

APPLICATION OF LEAD PLAINTIFF AND BRIEF IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT, NOTICE, PLAN OF ALLOCATION, CASE NOS. C06-04327-JW (PVT) AND C08-024-JW (PVT)
{1964 / BRF / 00102771.DOC v1}

- 25 -